# EXHIBIT 2

**GREENBERG TRAURIG, LLP**
ATTORNEYS AT LAW
SUITE 700
2375 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016
(602) 445-8000

Jeffrey H. Wolf (Arizona Bar No. 011361)
Marcy E. Mills (Arizona Bar No. 017384)
*Attorneys for Claimant Dunhill Staffing Systems, Inc.*

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| DUNHILL STAFFING SYSTEMS, INC., | Case No. 13-181-Y-01674-04 |
| Claimant, | **DUNHILL STAFFING SYSTEMS, INC.'S POST-HEARING MEMORANDUM OF LAW REGARDING RESPONDENTS ELIAS ZINN AND MICHAEL WILCOXSON** |
| v. | |
| DUNHILL FRANCHISEES TRUST, et al., | |
| Respondents. | |

**DUNHILL STAFFING SYSTEMS, INC.'S**
**POST-HEARING MEMORANDUM OF LAW REGARDING**
**RESPONDENTS ELIAS ZINN AND MICHAEL WILCOXSON**

## TABLE OF CONTENTS

Summary of Hearing Evidence.................................................................2

Argument ...............................................................................................7

I.  Respondents' "Decline and Deterioration" Is Not a Legally
Cognizable Claim or Theory ...............................................................7

    A.  There Is No Legal Precedent for the Decline and
Deterioration Theory ..................................................................7

    B.  In Any Event, There Is No Factual Basis for Respondents'
Theory:  The Staffing Industry Suffered a Slowdown Due to an
Economic Recession Between 2000 and 2003 and There Is No
Evidence of Dunhill's Failure to Deliver Services.....................10

II. Zinn Has Failed to Prove Fraud or Fraudulent Inducement as a Matter
of Law ..................................................................................14

    A.  The Fraud Claims Relating to the Lack of Training and Support
Are, if Anything, Breaches of Contract Claims.........................15

    B.  Under New York Law, the Franchise Agreement's Integration
Clause Fully Precludes Zinn's Fraudulent Inducement Claim
Based on the Size and Growth of the System, Percentage of
Exchange Program Referrals and Earnings Projected................16

    C.  Beyond the Application of the Integration Clause, Zinn Failed
to Prove the Elements of Fraud by Clear and Convincing Evidence ........21

III. Dunhill's Item 20 Disclosures Fully Comply with FTC Regulations as
a Matter of Law; There Is No Evidence of False or Misleading Disclosures .......31

IV. Zinn's Claim Under the New York Franchise Sales Act Is Barred by the
Statute of Limitations ..........................................................34

V.  Zinn Failed to Provide Written Notice of Any Alleged Breach of the
Franchise Agreement; Thus, His Breach of Contract Claims Are Barred............35

    A.  Zinn Made No Effort to Comply with These Explicit Notice
Requirements.............................................................35

    B.  Zinn's Failure to Provide Any Written Notice Now
Permanently Bars His Claims...........................................41

C.    The Arbitrator Should Give the Franchise Agreement's Unambiguous Language Its Plain Meaning and Full Effect.. ...................42

VI.    Dunhill Met All of Its Contractual Obligations, In Any Event ......... ...................43

A.    Dunhill Met Its Contractual Obligations to Each Respondent .................43

B.    Respondents Are Not Entitled to Rescission Because There Is No Evidence of Willfulness and No Wholesale Failure of Consideration.......................................................... ...................51

C.    Respondents Are Not Entitled to Recover Lost Wages......... ...................52

D.    Respondents Are Not Entitled to "Equitable Setoff" ........... ...................54

VII.    Zinn Materially Breached His Franchise Agreement........................... ...................55

A.    Failure to Provide Notice and Opportunity to Cure and Unilateral Termination .............................................................. ...................55

B.    Failure to Submit Statement 3 Reports and Failure to Pay Royalties .......56

C.    Dunhill Is Entitled to Recover Any and All Damages Stemming From Zinn's Breaches, Including Lost Future Royalties ...... ...................56

VIII.    Conclusion.................................................................... ...................57

Claimant Dunhill Staffing Systems, Inc. ("Dunhill") hereby submits its post-hearing memorandum of law regarding Respondents Elias Zinn ("Zinn") and Michael Wilcoxson (sometimes collectively referred to as "Zinn"). Based on the evidence presented at the arbitration hearing, Dunhill requests that the Arbitrator find in its favor on the following claims and counterclaims:

(1)     Finding in Dunhill's favor on its claims for past due and future royalties in the amount of $170,458.09;

(2)     Finding in Dunhill's favor on Zinn's counterclaim for breach of contract;

(3)     Finding in Dunhill's favor on Zinn's counterclaims for fraud or fraudulent inducement;

(4)     Finding in Dunhill's favor on Zinn's counterclaim for rescission;

(5)     Finding in Dunhill's favor on Zinn's counterclaim for violation New York's Franchise Sales Act; and

(6)     Finding in Dunhill's favor on Zinn's counterclaim for equitable setoff.

## SUMMARY OF HEARING EVIDENCE

Zinn is the most sophisticated businessman out of the group of Respondents, having been the CEO of various private and public companies over the past 30 years. (TR 1/25/07, p. 1093, lines 14-20).

In 1975, Zinn started a company called Custom Hi-Fi and grew it into a 75-store chain in 10 states. (TR 1/25/07, p. 1093) In 1981, he started a new company called Entertainment Marketing and was its president and CEO. (TR 1/24/07, pp. 908-911) This company went public in 1985 and traded its stock on the NASDAQ. *Id.* In 1987, he became president and CEO of Crazy Eddy Inc. in New York City. *Id.* He ran Crazy Eddy for two years. *Id.* Between 1992 and 1998, Zinn formed and operated Morpheen Organization of America. *Id.* In 1998, he became the managing partner of Z Investments, a real estate partnership that acquires and develops shopping centers. *Id.* Z

2

Investments owns 21 shopping centers. *Id.* Zinn is currently the chairman of Employment Solutions and also the CEO of EPZ Trading, another company he formed in 2004 which distributes perfume to 1300 convenience stores. *Id.*

Zinn and Wilcoxson began investigating the staffing industry because they "wanted something we could make a lot of money in." (TR 1/24/07, p. 913). They looked at the franchising possibilities with three companies--MRI, TRC and Dunhill. *Id.* Zinn spoke to Joanne Naccarato, who told him that they were a growing 50-year old company, and she sent him Dunhill's marketing materials. (TR 1/24/07, p. 914). In the materials sent to Zinn (and all prospects), Dunhill included a pamphlet titled, *Investigate Before Investing*, a guide for prospective franchisees published by the International Franchise Association ("IFA"). (Ex 31). Further, Dunhill's marketing brochure expressly warns that in buying a franchise, "(t)he risks are high and there are no guarantees." (Ex. 33).

In late 1999, Zinn visited Dunhill's headquarters in New York for a sales presentation. (TR 1/24/07, p. 923). At this meeting, the president of Dunhill, Daniel Abramson, allegedly said that he expected Dunhill to reach $100 million in sales, and that Dunhill planned to grow by 40 offices within the next two years. *Id.* During the same meeting, Rick Kean allegedly told Zinn that there were 150 offices, with varying desk specialties, that were able to interchange job orders and candidates, and that 25-35% of additional revenue could be generated through the Dunhill Exchange Program (the "Exchange Program"). (TR 1/24/07, p. 942). Although Rick Kean denies ever making this statement, (TR 1/31/07, p. 1896), Zinn testified that the Exchange Program was (quite conveniently and self-servingly) one of the main reasons he and his partner decided to purchase a Dunhill franchise. (TR 1/24/07, p. 931). But Zinn acknowledged on cross-examination that Dunhill never guaranteed that he would generate any particular percentage of his revenues from the Exchange Program. (TR 1/25/07, pp. 1106-1107).

During Zinn's visit to Dunhill's headquarters in December 1999, Joanne Naccarato of Dunhill allegedly showed him reports indicating that a franchised office, owned by the Martineaus, was generating over a million dollars a year in revenue. (TR 1/24/07, p. 997). Naccarato also allegedly told Zinn and Wilcoxson that they could make millions as well. *Id.*

After the New York meeting, Zinn contacted franchisees Harvey and Lorna Morris, who had been with Dunhill for eight or nine years, and also spoke with franchisee Lelia Babson; all said that Dunhill was a good company.[1] *Id.* at 1000. Ironically, even though Zinn now claims that the Exchange Program was one of the main reasons he joined Dunhill, he apparently did not think it was important enough to ask about this program in his discussions with the Morrises or Ms. Babson. Zinn testified that he thought the marketing brochure's reference to "150 offices nationwide to assist him" meant that there would be 150 offices doing placement exchanges within the Exchange Program to help him achieve sales of 25 to 35%. (TR 1/24/07, pp. 918-919). He also failed to inquire during his due diligence whether all 150 offices participated in the program.

Zinn testified during direct examination that he read the UFOC, but not carefully. However, in his deposition he had testified that he had read and understood this document without any qualification. (TR 1/25/07, p. 1149, lines 15-19) Both Dunhill's permanent and temporary UFOCs also contained language specifically disclaiming guarantees of success, and further specifically alerting the prospective franchisee that Dunhill did not authorize its representatives to furnish oral or written information

---

[1] Ms. Babson purportedly told Zinn at a mid-2000 meeting in Dallas that, despite Dunhill's problems, Rick Kean had asked her to give Dunhill a good recommendation to Zinn. (TR 1/24/07, p. 1007). This testimony is blatant double hearsay and, regardless, the credibility of Babson, a former Dunhill Franchisees Trust member in this case, is in question. Dunhill obviously had no opportunity at the hearing to cross-examine Ms. Babson as to the veracity of the statement Zinn attributed to her. The hearsay rule exists for this very reason.

4

projecting income or profits, and that actual results would vary from unit to unit. (Ex. 1, p. 36; Ex. 2, p. 19). The FTC warnings appearing on the front page of both UFOCs instructed prospective franchisees to read the contract carefully, and stated "(i)f possible show your contract and this information to an advisor like a lawyer or an accountant." *Id.* Zinn acknowledged that he had the ability and the means to hire an attorney or accountant to help him evaluate the opportunity but chose not to do so. (TR 1/26/07, p. 1120-21).

On January 22, 2001, Zinn executed his permanent placement franchise agreement and, in doing so, understood that he had agreed to be bound by its terms. (TR 1/25/07, p. 1150, lines 15-23). Those terms included an integration clause at Section 13.O, which stated:

> This Agreement, and all ancillary agreements executed contemporaneously herewith, constitute the entire agreement between the parties with reference to their subject matter and supersede any and all prior negotiations, understandings, representations and agreements. You acknowledge that you are entering into this Agreement, and all ancillary agreements executed at the same time, as a result of your own independent investigation of the franchised business and not as a result of any representations about us made by our shareholders, officers, directors, employees, agents, representatives, independent contractors or other Dunhill franchisees which are contrary of this Agreement or of any offering circular, prospectus, disclosure document or other similar document we have given you under applicable law.

(Ex. 4, p. 35).

Zinn's temporary placement franchise agreement contains a similar integration clause. (Ex. 5, p. 51). Zinn admitted that he read, understood and agreed to be bound by other provisions in Section 15 of the permanent agreement, which were fully capitalized to draw the reader's attention, and are paraphrased as follows:

(C)    The success of Zinn's Dunhill business was speculative and depended upon his business ability and personal efforts.

(D)    Dunhill had not guaranteed Zinn any results.

(E)    Zinn did not receive or rely upon any oral or written information contrary to the information contained in the franchise offering circular or franchise agreement.

(H)    Zinn had a full opportunity to review the Dunhill UFOC and understood the terms, conditions and obligations of the franchise agreement.

(I)    No representations or promises were made by Dunhill to induce him into the agreement; and finally,

(J)    Zinn did not rely on any statements other than those contained in the UFOC in deciding to sign the agreement.

(Ex. 4; TR 1/25/07, p. 1170).

Zinn further acknowledged in Section 15.G. of the franchise agreement that Dunhill also encouraged him to seek legal or other professional guidance prior to signing it. (Ex. 4, p. 37). He testified at the hearing that there was nothing about the terms and conditions of the temporary franchise agreement that he did not understand. (TR 1/25/07, p. 1152). Moreover, Zinn and Wilcoxson negotiated the permanent and temporary franchise agreements themselves and were successful in asking Dunhill to agree to numerous modifications of the contract language. (TR 1/25/07, pp. 1156-1169). They did not ask Dunhill to modify or alter any of the disclaimer provisions in either agreement, or the provision relating to the Exchange Program

Zinn's franchise agreement expressly states, "[f]ranchisor makes no representation or warranty as to the likelihood of success of franchisee in the business venture contemplated hereby." Zinn acknowledged that he voluntarily agreed to that provision, (TR 1/25/07, p. 1153, lines 6-14), and also that he understood the risks and that there was no guarantee of success in starting up a new business. Id. at pp. 1089-1090.

As things turned out, Zinn's franchise did not generate the millions of dollars he expected. (TR 1/25/07, p. 1173). By late 2002, Zinn organized a group of Dunhill franchisees that had several conference calls with attorney Robert Purvin concerning their dissatisfaction with Dunhill. (TR 1/24/07, p. 1019, lines 18-25). Zinn authorized Purvin to write a letter dated June 8, 2004 in which he and other franchisees provided notice of termination from Dunhill effective as of December 31, 2003. Prior to the termination

6

letter, Zinn had never provided Dunhill with a written notice of default and opportunity to cure as to either the permanent or temporary franchise agreement. Zinn claims to have de-identified his office as a Dunhill franchise some time in the summer of 2004. (TR 1/24/07, p. 1037).

## ARGUMENT

### I.   RESPONDENTS' "DECLINE AND DETERIORATION" IS NOT A LEGALLY COGNIZABLE CLAIM OR THEORY

Although not articulated with much precision, Respondents apparently contend that they should be excused from paying royalties because the Dunhill franchise system was in an alleged state of decline during the time they operated their franchises.

Respondents' position simply is not sustainable as a matter of law. And, other than the fact that the number of Dunhill franchisees decreased over a several year period, there is no factual support for this so-called theory. In the few instances that a franchisee has refused to pay royalties based on "decline and deterioration" their position has been soundly rejected by both state and federal courts.

#### A.   There Is No Legal Precedent for the Decline and Deterioration Theory.

Very few courts have considered whether a franchisor may be liable to its franchisees for the general decline and deterioration of its system and none have found in the franchisees' favor.

Most recently, this issue was addressed in *Brenco Enterprises, Inc. v. Takeout Taxi Franchising Systems, Inc.*, No. 177164, 2003 WL 21659422 (Va. Cir. Ct. May 23, 2003). In *Brenco*, a group of franchisees sued the franchisor for, among other things, "the deterioration ... and overall steady decline of the franchise system." *Brenco Enterprises, Inc.*, at *3. The franchisees claimed that because the "overall growth, stability and viability of the ... franchise system" was in decline, they were justified in unilaterally ceasing to pay royalties and refusing to honor post-termination non-compete clauses. *Id.*

7

Because decline and deterioration is not a cognizable cause of action (or defense), the *Brenco* franchisees wrapped this "claim" in breach of contract claims. *Id.* That is, they attempted to create a general franchisor duty to provide "advisory assistance, updates and revisions to manuals and software, and inspections and evaluations of each of the franchisee locations," as well as a general duty to support the success of the franchisee, and contended that by failing in these duties, the franchisor breached the franchise agreements. *Id.* at *3, *14.

The *Brenco* court rejected the franchisees' argument and found that the franchisor's shortcomings did not amount to a material breach, and thus did not justify the franchisees' non-payment of royalties and post-termination non-compete violations. *Id.* at *15. The court specifically found that the franchisor had fulfilled the essential purpose of the franchise agreement by (1) allowing franchisees to operate a business under the franchise system, (2) licensing their proprietary marks, and (3) providing training and other assistance. *Id.* With these three fundamental components satisfied, there was no material breach by the franchisor in allowing the franchise to go into a decline. *Id.* The court reasoned that:

> "although [the franchisor] did not perform certain of its post-opening obligations to the satisfaction of some of the franchisees, or may have failed to perform some of [these] obligations altogether, [such failures] hardly go to the root of the franchise agreements, or defeat the essential purpose of those agreements." *Id.*

Other courts have likewise rejected franchisees' "decline and deterioration" claims. In *Shoney's, Inc. v. Morris*, 100 F.Supp.2d 769 (M.D. Tenn. 1999), the court dismissed the franchisee's claims on summary judgment, and awarded Shoney's its past due account receivables, as well as future royalties. Morris, the franchisee, alleged that Shoney's breached the agreement first "by causing or permitting the decline of the value and reputation of its trade name," and causing a reduction in sales, thus forcing him to prematurely close his own restaurants. *Id.* at 774-775. Further, Morris claimed that although Shoney's represented to him an intent to grow the franchise system by

8

implementing "Project 500," a plan to open a certain number of franchises over the next five years, Shoney's actually concealed that it was a mature market, with a forecast for slow future growth. *Id.* at 778-779. Like the franchisees in this case, Morris claimed these alleged "breaches" relieved him of his obligations under his franchise agreement.

As to the first issue, the court noted "[e]ven if a decline in reputation and reduction in sales occurred, the court is at a loss to discern how this resulted in a breach of contract on the part of Shoney's." *Id.* at 775. Although Morris argued that Shoney's was obligated to maintain the value and reputation of Shoney's trade name, the court held that he failed to point to a specific requirement on the part of Shoney's in the franchise agreement to do so. *Id.* The second issue concerning Shoney's growth goals was barred by the agreement's integration clause, which precluded the admission of alleged representations made to Morris which were not embodied in the final agreement.[2] *Id.* at 779.

Courts have also found assurances to franchisees by the franchisor that they "would turn things around" and "build revenue for the shoppes" to be not actionable. *Carlock v. Pillsbury*, 719 F.Supp. 791 (D. Minn. 1989). In *Carlock*, a Minnesota federal court applying New York law, dismissed claims asserted by a group of Haagen-Dazs franchisees. They had alleged that the franchisor: (1) overstated projected revenues to induce them into entering the contract; (2) failed to provide operational support and "know-how," and (3) failed to deliver promised marketing and advertising assistance.

As to whether the franchisor had a duty to disclose that revenues were on the decline nationally, the *Carlock* court noted that the UFOC specifically disclaimed any representations concerning sales or profits, and that the UFOC recommended to potential franchisees to make their own investigation. *Id.* at 839. The court also dismissed claims that the franchisor failed to provide "know-how" or ongoing support, finding that the

---

[2]   Case law upholding the enforceability of integration clauses is fully discussed in a subsequent section of this brief.

franchise agreement outlined which services the franchisor was obligated to provide, and that, under New York law, there is no general duty to provide knowledge on how to run a profitable shop. *Id.* at 821.

Here, as in the *Brenco, Shoney's, and Carlock* cases, Respondents unquestionably received contractually-required franchisor support and services from Dunhill before they unilaterally terminated their franchise agreements. They challenge the *quality* of that support, but do not dispute that it was, in fact, provided. A mere difference of opinion on that issue does not constitute "decline and deterioration," nor does it excuse Respondents from paying their royalties. Just as important, while there may have been management changes at Dunhill and an economic challenges in the industry generally, Dunhill was not the cause of the Respondents' lack of success. If Dunhill was truly "dysfunctional," as they contend, then no other Dunhill franchisees could have succeeded during the same timeframe either. But, in fact, many did succeed. More importantly, the evidence established that Respondents were given the right to operate in the Dunhill System, received trademark licenses and received training and support. The only reasonable conclusion is that Respondents' own shortcomings as businessmen played a substantial role in their lack of success.

Because there is no case law -- from any jurisdiction, much less New York -- that allows a franchisee to escape responsibility for paying royalties based on the alleged decline of the franchise system the Arbitrator cannot give this theory any credence.

**B.     In Any Event, There Is No Factual Basis for Respondents' Theory: The Staffing Industry Suffered a Slowdown Due to an Economic Recession Between 2000 and 2003 and There Is No Evidence of Dunhill's Failure to Deliver Services.**

Respondents have attempted to put Dunhill on trial for decreasing in size as a franchise system, which in and of itself clearly does not violate any state or federal law. To support their theory, Respondents made erroneous comparisons between Dunhill and MRI and other staffing industry competitors and attempted to characterize Dunhill as a

10

failing system that was unable or unwilling to provide contractually-required services and support and brand value. However, Respondents not only failed to acknowledge the substantial downturn that the staffing industry during the relevant time period, they attempted to mislead the Arbitrator into believing that other staffing companies were thriving while Dunhill alone decreased in size. This is patently untrue.

The 2006 Staffing Industry Sourcebook© (the "Sourcebook"), authored by Staffing Industry Analysts, Inc., a company that tracks industry-wide data and trends, documented a "significant drop of (permanent placement) firms in the 2000-2003 period, with as many as 50% of recruiter desks actually abandoned during this period." (Staffing Industry Analysts, Inc., *Staffing Industry Sourcebook*, p. 27, 2006; attached hereto as Exhibit A). With reference to the impact of 9/11, the Sourcebook noted:

> "[T]he already shaky economy stumbled even more after the attacks, leading to depressed revenue, shuttered offices, staff reductions and consolidations. ... By 2003, the much anticipated economic turnaround still evaded the industry. ... By the end of 2004, the U.S. staffing industry finally appeared to be healthy, following three long years of suffering."

(*Id.* at pp. 35-36).

In contrast to the authoritative, unbiased Sourcebook, Respondent Lamanna, *who is obviously not an expert on the staffing industry,* compiled purely self-serving and misleading charts, which Respondents offered into evidence to supposedly show that other staffing companies were unaffected by recessionary factors and grew dramatically during the same period. (TR 3/7/07, p. 19). Because Respondents did not produce these charts until January 8, 2007, Dunhill had no opportunity to discover the sources of Lamanna's self-serving analysis or depose him about the trustworthiness and consistency of his methodology. At first blush, however, several of the figures are not what they seem.[3]

---

[3] It is more than a little ironic that Lamanna would offer testimony based on false, or at least seriously skewed data, given that he and the other respondents are alleging that Dunhill engaged in fraudulent practices.

For instance, Lamanna testified that MRI grew in size over the years 2000-2003. But MRI's reported revenues, as reflected on its Form 10-K, belies that the company was thriving during this time period.  Just the opposite is true: MRI's reported revenues are as follows:  2000 ($136,752); 2001 ($103,167); 2002 ($85,901); and  2003 ($56,876).  This demonstrates a decrease of 58% in revenues.  It is difficult to substantiate the active office units[4] of another staffing company, and particularly hard to ascertain which units met Lamanna's arbitrary $60,000 threshold.  But one cannot argue with the accounting reported on a  Form 10-K: the numbers simply don't lie.

For purposes of this argument, it is important to understand that Lamanna's "$60,000 analysis," by which he self-servingly deemed which Dunhill offices were "real units," was *not* based on any company generated data.  In observing Respondents' Exhibit 42, it appears that Lamanna analyzed data from Monthly Data Statements, otherwise known as "MDS reports," reports that are *voluntarily* submitted by only some franchisees.  In contrast, Statement 3 Royalty Reports are mandatory, and indicate total sales, total cash collections and total accounts receivable.  (TR 1/31/07, pp. 1907-1908). Royalties are paid at the time of cash collections and remitted to Dunhill monthly.  The Statement 3 reports are submitted to Dunhill and *cannot be shared with any other franchisee*.

The voluntary MDS reports Lamanna relied on to create Exhibit 42 unfairly and inaccurately show that only certain offices achieved $60,000 of revenue in 2003.  The undisputed evidence showed that Dunhill merely uses the MDS reports as a tracking tool -- to track various items in order to present monthly, annual, and lifetime achievement awards on such things as placement fees by consultants, total placement fees, rookie consultant awards, etc.  (TR 1/31/07 at pp. 1905-1906).  Thus, if a franchisee chooses not to submit a report, they are not eligible for the recognition awards.  Some franchisees

---

[4]  Other staffing companies might have had inactive offices but were not proceeding with the expense of legally terminating them.

12

might not participate for a variety of reasons including not wanting to reveal their performance of profits to their peers, or to avoid showing revenues greater than their Statement 3 royalty reports so they can pay less royalties. (*Id.* at 1904-1905).

Lamanna *himself* did not submit MDS reports: *the Irvine office shows no MDS entries for the entire year of 2003, but he shows his total amount at $60,500.* The bottom line is that Exhibit 42, in which Lamanna attempts to portray the number of Dunhill offices earning over $60,000 in gross revenues, is based on incomplete and possibly inaccurate information.

Finally, there is no factual basis for Lamanna's "impeachment" testimony concerning Robert Stidham's testimony that there were only two staffing companies who surpassed one hundred franchise units. Respondents made a big deal out of this but it is Respondents' own evidence that lacks credibility. As the Arbitrator will recall, during Lamanna's testimony, Respondents offered into evidence Respondents' Exhibit 61,[5] a list entitled "Franchised/Licensed Offices of Staffing Companies 2004," a list also generated by Staffing Industry Analysts, Inc. (TR 3/7/07, p. 12). The Arbitrator noted the "alphabet soup" footnote on the document which demonstrates that the companies listed are of various types, and are not all permanent placement businesses (listed as "p" in the footnote). And Dunhill wishes to make clear that when comparing apples to apples, Stidham's testimony holds up consistent with Stidham's testimony, as of 2004, Express Personnel and MRI were the only two permanent placement companies above the one hundred unit mark.[6]

From 2001 to 2004, Dunhill lost millions of dollars due to the slowdown in the U.S. economy after 9/11, not to mention the losses resulting from the non-payment of

---

[5]   This was Exhibit 61 in the "One or All" notebook. Respondents never provided an updated index to Dunhill, so Dunhill made an effort to follow the exhibit numbers listed in the transcripts and not the index as much as possible. Otherwise, all exhibits cited to in this brief refer to Claimant's exhibits, for which there is no numerical repetition.
[6]   Manpower, listed at 769 units, is primarily a temporary staffing business, although it also does some permanent placement.

royalties by Respondents and the former Trust members. Yet, as described during the hearing and summarized herein, Dunhill continued to provide services to *all* franchisees during this timeframe. Some franchisees have greatly benefited from Dunhill's training and support,[7] while others have been less successful. But during the same period that Respondents claim there was no support, many Dunhill franchisees thrived. Thus, Respondents have not, and cannot, provide evidence to support their "decline and deterioration" theory, even if it were legally viable.

## II.    ZINN HAS FAILED TO PROVE FRAUD OR FRAUDULENT INDUCEMENT AS A MATTER OF LAW

Without so much as a single shred of evidence to establish fraudulent intent (let alone any other element of fraud), Zinn alleges that Dunhill fraudulently induced him to join the Dunhill franchise system with false promises and misrepresentations, both in the marketing brochure and statements made by Dunhill management, related to: (1) training and ongoing support; (2) technology and software; (3) Dunhill's advertising efforts, (4) the size and viability of the system; (5) assurances that the Exchange Program would generate 25% to 35% of his revenues, and (6) the purported earnings projection.

Zinn's fraudulent inducement claim should be rejected for three reasons. First, Zinn cannot bootstrap fraud claims onto his contract claims, and thus any claims related to contractual obligations cannot be subjected to a fraud analysis. Second, the integration clause in the two franchise agreements preclude Zinn from supporting his non-contract related fraud claims with evidence of any statements made outside the UFOCs or the agreements. Third, even absent the integration clause, Zinn cannot prove any of the elements of fraud by clear and convincing evidence, the requisite standard of proof.

---

[7]    For example, Neil Whitman and his entire training class have kept open their franchise offices. (See TR 1/30/07, p. 1755).

14

A.    **The Fraud Claims Relating to the Lack of Training and Support Are, if Anything, Breach of Contract Claims.**

Several of Zinn's fraud-based claims appear to stem from his disenchantment with Dunhill after joining the Dunhill system. But the crux of these assertions is contractual in nature, and it is well settled that a cause of action for fraud will not lie when the alleged fraud relates to a breach of contract. New York law requires that a fraud claim be "sufficiently distinct from the breach of contract claim." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). (*quoting Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996)). Even an allegation of an intentionally false statement that meets all the elements of a proper fraud claim cannot support a cause of action "where a fraud claim is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement.'" *Bridgestone/Firestone, supra, quoting Metropolitan Transportation Authority v. Triumph Advertising Productions*, 497 N.Y.S.2d 673, 675 (App.Div., 1st Dep't 1986).

This principle is further explained in *Telecom Int'l America Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001), in which the Second Circuit observed:

> "[U]nder New York law, where a fraud claim arises out of the same facts as [a] breach of contract claim, with the addition only of an allegation that [the other party] never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract. . . . In other words, simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim."

(*Id.*, internal citations and quotation marks omitted.); *see also Gordon v. Dino De Laurentis Corp.*, 141 A.D.2d 435 (1st Dep't 1988) ("a fraud claim is not sufficiently stated where it alleges that a defendant did not intend to perform a contract with a plaintiff when he made it."); *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331

(4th Cir. 1998) (district court erred by allowing franchisees to advance tort counts paralleling their breach of contract claims.).

Zinn's allegations concerning Dunhill management's pre-contractual statements or representations in the Dunhill brochure that he would receive training, ongoing support, state of the art software, or promises of advertising, are not collateral or extraneous to the franchise agreement, and thus are actionable, if at all, under a breach of contract theory. Because Zinn cannot distinguish these fraud claims from his parallel breach of contract claims, the fraud theory, as to those issues, is unsupportable.

**B.     Under New York Law, the Franchise Agreement's Integration Clause Fully Precludes Zinn's Fraudulent Inducement Claim Based on the Size and Growth of the System, Percentages of Exchange Program Referrals and Earnings Projections.**

To remind the Arbitrator, the integration clause states as follows:

> This Agreement, and all ancillary agreements executed contemporaneously herewith, constitute the entire agreement between the parties with reference to their subject matter and supersede any and all prior negotiations, understandings, representations and agreements. You acknowledge that you are entering into this Agreement, and all ancillary agreements executed at the same time, as a result of your own independent investigation of the franchised business and not as a result of any representations about us made by our shareholders, officers, directors, employees, agents, representatives, independent contractors or other Dunhill franchisees which are contrary of this Agreement or of any offering circular, prospectus, disclosure document or other similar document we have given you under applicable law.

(Ex. 4, p. 35).

Zinn's temporary placement franchise agreement contains a similar integration clause. (Ex. 5, §, p. 51).

1.     <u>Under New York Law, Respondents Are Presumed to Have Understood the Franchise Agreement and to be Conclusively Bound Thereby.</u>

As a threshold matter, it is necessary to quickly address and dispose of Zinn's testimony that he was somehow unaware of certain facts because he did not read the UFOC carefully. (TR 1/25/07, p. 1149). Zinn testified that he did not know that Dunhill

even had company owned stores, and was also unaware that the Exchange Program was voluntary until the start of the arbitration proceedings, even though both of these facts were expressly disclosed in Dunhill's UFOC. (TR 1/25/07, p. 1104). In light of all the negotiated changes Zinn made to his franchise agreements, and his level of sophistication as a businessman, any notion that he failed to fully understand the UFOC (or any related documents or anything about the transaction) simply lacks credibility. (TR 1/25/07, pp. 1156-1169).

Basic to the law of contracts is the principle that a party who signs an instrument manifests assent to it, and may not later complain about not reading or not understanding the instrument. 7-29 *Corbin on Contracts* § 29.8, *citing Richardson Greenshields Securities, Inc. v. Metz*, 566 F. Supp. 131 (S.D.N.Y. 1983); *see also Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566 (4th Cir. 1998) (parties to a commercial contract who deal at arms length have a duty to read the contract carefully and are presumed to understand it.).

New York law presumes knowledge of the contents of an executed instrument, and conclusively binds the signor whether or not the contract was read or understood. *See e.g., Sofio v. Hughes*, 162 A.D.2d 518, 519 (2nd Dep't 1990); *Toulamis v. Chalem*, 156 A.D.2d 230,548 N.Y.S.2d 493 (1st Dep't 1989) ("One who enters into a plain and unambiguous contract cannot avoid the obligation by merely stating that he erred in understanding its terms."); *see also Metzger v. Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920) ("Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations.").

2.    The Integration Clause is Valid as a Matter of Law.

Because Zinn expressly acknowledged that he did *not* rely upon representations that were not set forth in the UFOC or franchise agreement, he cannot now claim to have done so. In any event, any alleged misrepresentations made outside the UFOC or the franchise agreements are barred by the integration clause. Under New York law, an

integration clause that *specifically* contemplates claimed oral representations is enforceable to preclude an action for fraud in the inducement and parol evidence concerning fraudulent representations. *See Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146, 1152 (S.D.N.Y. 1989) (holding that franchisee's reliance on alleged misstatements by defendants was unreasonable as a matter of law where "[t]he franchise agreement, as well as the offering circular which preceded it, both contained detailed, explicit integration and disclaimer clauses"); *see also Bibeault v. Advanced Health Corp.*, No. 97 Civ. 6026, 2002 WL 24305, *3-4 (S.D.N.Y. Jan. 8, 2002) (*citing Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-321 (1959)); *Lee v. Goldstrom*, 522 N.Y.S.2d 917, 918 (2d Dep't 1987).

Courts in other jurisdictions have similarly enforced franchise agreement integration clauses finding that franchisees cannot prove fraud based upon extraneous statements in light of an integration clause. *See e.g. Cook v. Little Ceasar Enters., Inc.*, 210 F.3d 653, 658 (6th Cir. 2000) (existence of an integration clause in the franchise agreements made the buyer's alleged reliance on prior representations unreasonable); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (integration clause precluded "the imposition of extra-contractual obligations based upon the welter of conflicting oral statements and representations that plaintiffs introduced at trial."); *Cajun Enterprises, Inc. v. Copeland*, 130 F.3d 180, 186 (5th Cir. 1997) (no reasonable reliance in face of integration/disclaimer clause contained in both franchise agreement and UFOC); *American Casual Dining LP v. Moe's Southwest Grill*, 426 F.Supp.2d 1356 (N.D.Ga. 2006) (integration and acknowledgement clauses precluded the franchisee's fraud claim based on pre-contractual representations); *Wootton Enters., Inc. v. Subaru of Am.*, 134 F. Supp. 2d 698, 715 (D. Md. 2001) (any actionable statements made during negotiations were superseded by fully integrated franchise agreement and could not reasonably be relied upon by the franchisee).

18

*Motor City Bagels, LLC v. American Bagel Co.,* 50 F.Supp.2d 460 (Md. 1990), in which a franchisee claimed that the franchisor provided false earnings projections through average annual store sales statements, is highly instructive. *Id.* at 471. The franchisee relied on this information and which the franchisee incorporated it into its business plan. *Id.* The court granted summary judgment for the franchisor, concluding that these statements were not actionable as a matter of law for two reasons: first, the franchise agreement contained an integration clause which stated that the written agreement superseded all prior oral or written agreements, and it was unreasonable for the franchisee to subsequently claim that he had relied on the projections. *Id.* at 471-472. Second, the UFOC contained language disclaiming any ability to project sales, profits or earnings because each franchisee's results would vary, and further explaining that no corporate representative was authorized to make such a representation. *Id.*

Dunhill's franchise agreement, like the documents at issue in *Motor City Bagels, supra,* contain a specific integration clause, and the Dunhill UFOC included disclaimer language concerning earnings projections. Even if Zinn did receive some sort of an earnings claim or projection from Joanne Naccarato, which Dunhill does not concede, there is no evidence that the information Zinn received was false, dishonestly presented or in any way designed to deceive or trick Zinn into entering the transaction. And by signing the franchise agreement, Zinn *specifically acknowledged that he entered into the agreement based on his own independent investigation, and not based on any representations or warranties made by Dunhill's management.*

Furthermore, any extraneous "promises," such as an assurance or representation regarding the Exchange Program, are barred by the integration clause. In attempting to support their fraudulent inducement claims, Respondents have also hung their proverbial hats on Dunhill's purported assurances that they would generate 25% revenues -- in addition to whatever other revenues they earned -- through participation in the Exchange

Program.  However, the franchise agreement itself is silent as to any particular level of success a franchisee might achieve by participating in the Exchange Program.

Moreover, there is no contractual guarantee that a franchisee would actually generate 25% of its revenue through the Exchange Program.  The franchise agreement only speaks to rules governing the Exchange Program *should* a franchisee choose to participate in this voluntary program.  Each Respondent apparently believed (mistakenly) that the Exchange Program was mandatory, and that 150 offices would be "assisting" with placements.[8]  Despite this misconception, all four Respondents are presumed to have read and understood  Section 7.S of their Franchise Agreements which read, "*If you wish to participate* in the Dunhill Exchange Program, ..." a clear indication of the program's voluntary nature.

More importantly, the franchise agreement mentions nothing about percentage of revenues, projected or guaranteed, and no indication that other Dunhill offices would "assist" Respondents in gaining clients or revenue.  Thus, Respondents' claim that Dunhill somehow committed fraud or breached a contractual obligation to them because they did not generate a certain level of income from the Exchange Program has no support, and is barred by the integration clause.

In view of the foregoing, any alleged oral or written misrepresentations regarding the size of the Dunhill system, Dunhill's intention to expand or grow the system, the percentage of revenue generated from the Exchange Program, and earnings projections, are barred by the integration clause.  Consequently, the Arbitrator should find in Dunhill's favor on Zinn's fraudulent inducement claim.

---

[8] The marketing brochure itself does not correlate "150 offices to assist you" with the Exchange Program.

**C.    Beyond the Application of the Integration Clause, Zinn Failed to Prove the Elements of Fraud by Clear and Convincing Evidence.**

To prove a claim for fraud under New York law, the plaintiff must demonstrate, *with clear and convincing evidence*[9], (1) that defendant made a material false misrepresentation which was false at the time made and was known to be false by defendant; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the misrepresentation; and (4) the plaintiff suffered damages as a result of the reliance. *Sauer v. Xerox Corp.*, 17 F.Supp.2d 193 (W.D.N.Y. 1998), *citing Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 153 (2d Cir. 1995).

At the hearing, Respondents offered no evidence whatsoever to prove that Dunhill made any material misrepresentations that were false when made and known by Dunhill to be false. Respondents' subjective beliefs or retrospective accusations do not constitute proof of fraud. The evidence showed that Dunhill's UFOC and franchise agreements contained true and historically accurate information concerning the company and its operations. Further, any projections or predictions expressed by Dunhill's executives made as to the growth and viability of the company were pure opinion, and made with the hope that the company would succeed in the future. Respondents presented no evidence of any fraudulent intent on Dunhill's part, and the evidence failed to establish that any of the franchisees justifiably relied upon any of the alleged misrepresentations because: (1) the materials advised each of them to conduct due diligence and investigate, which they did; (2) the pre-contractual statements regarding the attributes of the franchise system, including statements contained in the sales brochure, amount to non-actionable puffery; and (3) predictions or comments relating to future events are not considered fraudulent if they later prove to be untrue.

---

[9]    Claims for fraud mandate this higher standard of proof because 'the interests at stake are deemed to be more substantial than mere loss of money.' *In the Matter of Father Philip K. Eichner v. Dillon*, 426 N.Y.S.2d 517, 523 (2d Dept. 1980).

1.    <u>Zinn Failed to Present Evidence of any Material Misrepresentations</u>.

The hearing evidence did not prove, let alone by *clear and convincing evidence*, that Dunhill made any material misrepresentation, or any statements known to be false at the time the statement was made.

a.    **The UFOC Contained Accurate Information About the Number of Outlets.**

The marketing brochure indicated that there were 150 other franchises in the system.  Zinn testified that several members of Dunhill management, including Rick Kean and Daniel Abramson, also commented that the system had 150 units. (TR 1/25/07, pp. 923, 928).  *Respondents offered no evidence to show that the number of outlets listed in the UFOC was in any way inaccurate when reported.*

Zinn received Dunhill's permanent and temporary franchise UFOCs on November 9, 1999. (Ex. 3).  In the UFOCs, which were both dated as of April 30, 1999, Dunhill disclosed the specific number of franchisees in the system.  For example, the permanent placement UFOC listed in Item 20 the number of permanent placement outlets.  (Ex. 1, p. 37).  Reflecting the preceding three years, as required by FTC regulations, the list shows 91 outlets operating at the end of 1998, 107 outlets for 1997, and 108 outlets for 1996.  The UFOC also projected 11 new franchised offices opening in 1999, as well as 3 company-owned office. (*Id.* at p. 39.).

The evidence further established that as of December 31, 1998, there was a total of 151 offices in the Dunhill system.  (TR 1/18/07, p. 118, lines 19-25).  This number is calculated by adding the franchised and company owned permanent staffing outlets listed in the permanent UFOC with the franchised and company owned temporary staffing outlets listed in the temporary UFOC. (*Id.* at pp. 116-118).  Hence, there is no evidence that "150 offices nationwide" as stated in the marketing brochure was a misrepresentation at all.  But even if the actual number of units in November 1999 was really less, which it

22

was not, why should that have made any material difference whatsoever to a prospective franchisee?

After the fact, and quite self-servingly, Zinn claims that having 150 offices was somehow important to him. Zinn testified that he was not obligated to make any independent investigation as the truth of any of the representations made to him. (TR 1/25/07, p. 1197, line 25). However, "[O]ne to whom an allegedly false representation is made may not rely thereon if the means of obtaining the truth are available by the exercise of ordinary intelligence." *Sauer, supra* at 205, *quoting Arbitration between Jack Kent Cooke, Inc and Saatchi & Saatchi North America*, 222 A.D.2d 334 (N.Y.A.D. 1st Dept. 1995). The record establishes that Zinn is a seasoned businessman participating in variety of business transactions, including the IPO process. Zinn had an full opportunity to assess whatever he wanted to know about the Dunhill system's viability and size, and Exchange Program, and to investigate the staffing industry as a whole.

Further, the actual number of franchised offices in the Dunhill system was not a guarantee of any particular degree of success in the Exchange Program. And, above all else, it is simply not credible to believe that Zinn would not have purchased a Dunhill franchise had he known there were less than 150 offices when he signed his franchise agreements.

### b.    The Marketing Brochure Contained an Accurate Revenue Growth Number.

Zinn also testified that he relied on both Daniel Abramson's statement regarding future revenue growth and the reference in Dunhill's marketing brochure to "system-wide revenue growth" of 20%. (TR 1/24/07, p. 923). As for the brochure, it expressly refers to "system-wide growth," not permanent placement office growth or temporary placement growth or *franchisee* growth. (Ex. 33). Further, Zinn like any other prospect had the opportunity to review Dunhill's audited financial statements that were included in the UFOC to independently assess all information concerning company revenues.

23

Rick Kean, who has been a trainer at Dunhill for approximately 25 years and has 'institutional memory,' testified that the 20% figure was accurate. And the UFOCs introduced into evidence included audited financial statements that reflected a 20% system-wide annual growth in gross revenues over a trailing five year period. (Ex. 104). Critically, Respondents offered no evidence to dispute that Dunhill had experienced 20% system-wide growth over the preceding 5-year period.

### c.    The Exchange Program's Placement Percentage was Historically Accurate

Zinn testified that he relied upon the statement in Dunhill's marketing brochure that "almost 25 percent of placements are the direct results of the exchange network." (TR 1/24/07, p. 936). Further, Zinn read and relied upon Dunhill's President's Manual, which states: "The Dunhill Exchange Program is a set of procedures ... which have allowed Dunhill franchisees to generate 25% in additional revenues through shared resources over the past 15 years." (*Id.* at p. 1101-1102; Ex. 68, Bates 009452). Because Zinn generated no revenue through the Exchange Program, he contends that these representations are fraudulent. (TR 1/24/07, p. 961).

The 25% placement rate, according to Mr. Kean's testimony, was at least historically accurate and thus not a material misrepresentation. As the author of the Exchange Program section in the President's Manual, Kean testified that he based the 25% figure upon his own analysis of detailed MDS reports, and his own understanding from working at Dunhill during that time frame. (TR 1/31/07, pp. 1880-1883).

Granted, it appears that this figure changed, particularly during the time period at issue, when internet job boards such as Monster.com became available to the staffing industry. (TR 1/31/07, p. 1970, lines 5-20). Other than saying that he spoke with some unknown franchisees who allegedly told him that the Exchange Program was long defunct, Zinn offered no independent reliable analysis showing that 25% over the past 15 years was an inaccurate number. And no other evidence, from any source, was introduced by Respondents to controvert Mr. Kean's testimony on this point. The FAC