meeting minutes introduced into evidence indicated that as of October 2001 the exchange rate had decreased to 4%, a figure based on an analysis of the previous twelve months performed by Mr. Cech. (TR 1/24/07, pp. 971-974). But Mr. Cech did not testify, and it is not clear from the evidence presented exactly what information he had analyzed, if any. If the figure was based solely on the MDS reports, it would be difficult to ascertain an accurate number because, as discussed previously, those reports are voluntarily submitted by the franchisees.

Moreover, there is no evidence showing that, when Zinn received this brochure in late 1999, Dunhill had yet realized Monster's impact on the Exchange Program, and how critical that would become to a Dunhill franchisee's business in replacing the traditional franchisee intra-office relationships that were not internet-dependent. (TR 1/24/07, p. 1880). In short, there is no evidence, let alone any clear and convincing evidence, proving that Dunhill made any material misrepresentations that were known by Dunhill to be false when made, concerning the Exchange Program, or concerning the size, growth, or revenues of the Dunhill franchise system.

2.    Zinn Presented No Evidence of Fraudulent Intent.

Zinn's fraud claims must be based, not on Dunhill's failure to fulfill promises, but instead on the *intent* of Dunhill's management not to perform at the time they made the statements. In this case, there is simply no evidence of fraudulent intent at the time any of the alleged statements were made. An alleged misrepresentation or promise is actionable only when coupled with a contemporaneous intent not to perform. *Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957); *see also Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made.").

Here, Dunhill had no preconceived or undisclosed intention of not performing any of the promises or statements it supposedly made. In fact, the contrary is true. For

instance, Daniel Abramson told Zinn that the system was growing, and that Dunhill had a goal to open 40 offices in 2000 and 2001. (TR 1/24/07, p. 923). Zinn offered no evidence to show, nor any reason to believe, that Dunhill or Abramson did not intend to meet this projection at the time it was given to Zinn. The fact that Dunhill did not meet its goal does not render the representation of the goal to be fraudulent when made.

In the UFOC, Dunhill expressed its belief that "the market for permanent placement services is established yet competitive and expanding rapidly, that it will continue to expand, and that the need for such services will continue." (Ex. 1 at p. 4). But, Dunhill made plain: "Dunhill can naturally give no guarantee or warranty of this." *Id.*

And so it comes down to this: Zinn believed that the Dunhill franchise system would grow and that he would prosper. Dunhill's management had the exact same hopes, but never offered a guarantee: Dunhill's management simply offered its own opinions as to how Dunhill and its franchisees would perform--and it was in everyone's best interest to look positively to the future. Respondents are unhappy about the degree of success they achieved, but they were not, as a matter of law, affirmatively misled by Dunhill's statements or brochures. There is no evidence, let alone clear and convincing evidence, to infer that Dunhill acted with intent to deceive Zinn or anyone else.

3.     <u>Zinn Failed to Prove Reasonable Reliance on any Alleged Fraudulent Statement.</u>

"One to whom an allegedly false representation is made may not rely thereon if the means of obtaining the truth are available by the exercise of ordinary intelligence." *Sauer, supra* at 205, *quoting Arbitration between Jack Kent Cooke, Inc and Saatchi & Saatchi North America*, 222 A.D.2d 334 (N.Y.A.D. 1st Dep't 1995). The record establishes that each of the Respondents had an adequate opportunity to assess the Dunhill system viability, size, and Exchange Program, and to investigate the staffing industry as a whole. Clearly, they were each made aware of the risks of starting up a

business, and decided to purchase a Dunhill franchise based on the exercise of individual business judgment.

In the marketing kit sent to Zinn (and all prospects), Dunhill included a pamphlet titled, *Investigate Before Investing*, a guide for prospective franchisees published by the IFA. (Ex 31). Further, Dunhill's brochure expressly warns that in buying a franchise, "[t]he risks are high and there are no guarantees." (*Id.*)

Zinn engaged in due diligence, which included investigating the staffing industry and considering franchise opportunities with MRI, TRC and Dunhill (TR 1/24/07, p. 913) and by speaking with a Dunhill franchisee of franchisees (*Id.* at 1000). Zinn was fully aware of the risks, knew there was no guarantee of success, and decided to purchase a Dunhill franchise based on exercising his own business judgment. It simply defies any rational thought to conclude that Zinn could have reasonably relied on any allegedly fraudulent statement made by Dunhill concerning the size, growth or future of the franchise system. Thus, his fraud claim fails due to the lack of any reasonable or justifiable reliance.

4.    Zinn Could Not Reasonably Rely upon Opinion or Puffery.

The first page of Dunhill's marketing brochure states that "Dunhill has built one of the industries premiere staffing firms." (Ex. 33). Zinn testified that relied on that statement, and that as of early May 2000, he found that statement to be inaccurate. (TR 1/24/07, p. 917).

Vague statements and predictions must be characterized as an expression of opinion, sales talk, or "puffing" and will not support a claim for fraud. *See O'Neal v. Burger Chef Systems,* 860 F.2d 1341, 1348-49 (6th Cir. 1988); *George Backer Mgt. Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978). For example, in *American Casual Dining LP v. Moe's Southwest Grill, supra,* a franchisee sued a franchisor over certain alleged misrepresentations made orally and in the UFOC. 426 F.Supp.2d at 1365. One such statement upon which franchisee believed

27

and relied was that Moe's had "perfected the system of opening and operating restaurants."

The district court noted that the franchisee was not justified in relying upon representations that are general commendations or mere expressions of opinion. *Id.* at 1364, *citations omitted.* Applying these principles, the court observed that:

> "any representations regarding Moe's experience, knowledge, skill, or expertise in estimating expenses or creating a system of opening and operating restaurants are merely opinions and statements of commendation, or "puffing." A party is expected to profess competency in its area of business. Thus, such expressions of experience and skill are considered puffery upon which a plaintiff cannot justifiably rely."

*Id.*

The Seventh Circuit similarly resolved this issue in *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir. 1986), in which it held that General Foods' statements about the viability of its system could only be characterized as non-actionable "puffing." The Court explained:

> "General Foods' statements regarding the potential of the company were designed to encourage investment by new franchisees and to stimulate the existing franchisees' enthusiasm. On the evidence presented here, the jury could not have found that, at any given moment during the period in question, General Foods or Burger Chef had a firm, present intention to make the System anything other than "viable." . . . That General Foods' idea of viability did not match the Vaughns' expectations is unfortunate — but it is not fraud."

*Id.* at 1411-12 (footnotes omitted).

In this case, Dunhill was a 50 year old staffing business. Several respondents testified that Dunhill's reputation and longevity had attracted them to the opportunity in the first instance. Dunhill's attestation concerning its status in the staffing industry was true and, in any event, amounts to non-actionable puffery.

        5.    Zinn Could Not Reasonably Rely on Future Predictions.

Fraud cannot consist of mere broken promises, unfulfilled predictions or erroneous conjecture as to future events. The general rule is that actionable fraud cannot

be predicated upon promises to perform some act in the future. *Schwartz v. Newsweek, Inc.*, 653 F.Supp 384, 389 (S.D.N.Y. 1986). Nor does actionable fraud result from a mere failure to perform promises. *Telecom Int'l America Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001). Neither Zinn nor the other Respondents established by clear and convincing evidence that any of them reasonably relied on any allegedly fraudulent statement.

### a. Any Statements About Future Earnings Is a Future Prediction.

As discussed above, Item 19 in both Dunhill's permanent and temporary UFOCs disclaim guarantees of success, and specifically alerted the prospect that Dunhill did not authorize its representatives to furnish oral or written information projecting income or profits, and that actual results would vary from unit to unit. (Ex. 1, p. 36; Ex. 2, p. 19-1). Even though Item 19 of the UFOCs states that Dunhill will not furnish earnings projections to prospective franchisees, Zinn contends that Joanne Naccarato and Tom Esposito told him that he could make millions. (TR 1/24/07, p. 997). Zinn and Wilcoxson used those figures in their five year business plan, which included sales projections of $1,000,000 in the first twelve months of opening. (TR 1/25/07, p. 1173). This makes no sense, or is at least curious, because the marketing brochure upon which Zinn so closely relied suggested having 6 months of capital available when starting the business. (Ex. 33, Bates 003438).

Because an action for misrepresentation must be based upon statement of a past or existing fact, statements about *future* profitability cannot provide a basis for an action in fraud. *Schwartz v. Newsweek, Inc.*, 653 F.Supp 384, 389 (S.D.N.Y. 1986). In fact, profit projections provided to a prospective franchisee have been held by courts to be mere puffery. In *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 2006 WL 3825103 (W.D.Mo. 12-21-2006), the franchisor assured the plaintiff that she was going to be "driving a truckload of money away . . . every year" and that she was "not going to have to worry about paying . . . bills." The court held that "[p]redictions and projections

29

regarding the future profitability of a business or investment cannot form a basis for fraud *as a matter of law*." *Id.* at \*2 (emphasis added) (citations omitted).    Because the franchisor's statements were non-actionable predictions of the franchise's future profitability, the court granted summary judgment in the franchisor's favor on this claim. *Id.*

In the face of disclaimer language concerning earnings projections, the court in *Carlock v. Pillsbury Co.*, *supra*, applying New York law, held that a party cannot reasonably rely on allegedly fraudulent representations of sales revenues of other franchisees where such representations are directly contradicted by the terms of an applicable offering circular. *Id.* at 829, *citing Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 416 (1st Cir. 1989); *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 805 (1st Cir. 1987); *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1518 (10th Cir. 1983)).

Here, Zinn cannot establish the justifiable reliance on the alleged earnings figures because, if provided, they were merely a prediction of some future event.    Furthermore, Zinn, prior to signing his franchise agreement, reviewed and understood the disclaimer language in Dunhill's UFOC, and is bound by the written acknowledgements he signed.

**b.    Statements Regarding Percentages of Referrals or Revenue Through the Exchange Program Were Also Mere Predictions of Future Events.**

Even if Dunhill's  management told Zinn he could generate 25% of his revenue through the Exchange Program, it would be a non-actionable future prediction.

To cite but one example, in *Webb v. First Michigan Corp.*, 195 Mich. App. 470, 491 N.W.2d 851 (1992), a franchisee claimed that the franchisor guaranteed a certain rate of return, and promised that the business was "risk-free."    The court held that the statements concerning the guaranteed rate of return were *nothing more than promises of future conduct* that could not constitute fraud.    The "risk free" statement might have supported the fraud claim, but not where the prospectus and other documents highlighted the risky nature of the business.    The court observed that: "[E]ven a cursory review of

any of these documents would have enlightened plaintiffs that the investment was not risk free as represented by the broker." *Id.* at 474. Because no reasonable reliance could be shown, the plaintiff's fraud claims were dismissed.

Future predictions of revenue also were found to be non-actionable in *Carlock v. Pillsbury, supra.* In that case, Pillsbury represented that, once it purchased Haagen-Dazs, it would "turn things around" and "concentrate on building revenues for the shoppes." 719 F.Supp. at 837. On summary judgment, the district court dismissed claims that the franchisor had misrepresented its ability to successfully operate Haagen-Dazs. *Id* at 837. The court reasoned as follows:

> "Pillsbury's actual success in operating Haagen-Dazs depended in large part on factors outside of the defendants' control — the economy and competing producers for example — and was therefore beyond defendants' ability to know with certainty. A statement by any of the defendants as to what Pillsbury would be able to achieve with Haagen-Dazs is by its very nature a prediction as to the future which is not actionable as fraud."

*Id.*

In this case, Dunhill was possibly slow to realize that the Exchange Program was becoming less important and less utilized in the internet age of employment staffing. But any statements about the future revenue a prospective franchisee might generate through use of the Exchange Program were just that - future predictions that are not actionable. Moreover, Respondents presented no evidence whatsoever that anyone at Dunhill made this prediction with the intent to defraud them.

III.    **DUNHILL'S ITEM 20 DISCLOSURES FULLY COMPLY WITH FTC REGULATIONS AS A MATTER OF LAW; THERE IS NO EVIDENCE OF FALSE OR MISLEADING DISCLOSURES**

Respondent Lamanna in his testimony expressed Respondents' view that Dunhill should have provided them with information about how many franchisees were producing revenue and the amounts. However, as a matter of law, Dunhill had no duty to disclose this information. Further, Lamanna never attempted to inquire of anyone at Dunhill how many franchises included in the UFOC were reporting royalties or

generating revenue at any particular revenue. *Id.* at p. 1698. And he offered no evidence, from any source, to establish that Dunhill was aware of the number of franchisees reporting or underreporting royalties at any time. (TR 1/29/07, p. 1668).

As to any allegations that Dunhill violated FTC regulations, there is no private right of action to enforce the disclosure requirements of Section 436 or any other FTC regulations. *See Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d. Cir. 1974). And, to the extent Lamanna is relying on the FTC regulations to establish he was fraudulently induced due to some alleged incompleteness in Dunhill's UFOC, his claim still fails because, absent a duty to disclose, Dunhill's failure to provide information cannot constitute fraud. *See Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 156 (2d Cir. 1995).

The Franchise Rule or Business Opportunity Rule, set out in 16 C.F.R. § 436.1 and titled *Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Venture,* requires franchisors to provide prospective franchisees or purchasers with a complete and accurate disclosure document containing 20 categories of information, including identity and experience information about the directors and executive officers of the franchisor as well as the identity of previous franchisees. 16 C.F.R. §§ 436.1(a)(2) and (a)(16). The franchisor must also disclose the names addresses, and telephone numbers of the ten franchisees nearest to the prospective purchaser, or all franchisees in the state where the prospective purchaser is locating the business, or all of the franchisees. 16 C.F.R. § 436.1(a)(16).

The comments to the FTC's Franchise Rule explains the intent behind Item 20:

> The disclosures required by section 436.1(a)(16) of the rule will inform prospective franchisees of the number of franchise outlets in operation during the previous fiscal year and the number of such outlets which were terminated or failed to be renewed during that period. This information will materially assist prospective franchisees to assess their chances of success on the basis of the success and failure rate of active franchisees. Further, this provision of the rule also requires that prospective franchisees be provided with the names and addresses of

similarly situated franchisees who are presently in operation. This information will provide prospective franchisees with a means to (a) ascertain the problems confronting franchisees operating under conditions similar to those under which the prospective franchisees would be operating, and (b) verify the representations made by the franchisor concerning the franchise.

Significantly, 16 C.F.R. § 436.1 does *not* require franchisors to disclose the revenues of each of its franchisees, or any other franchisee performance data. The FTC comments further explain as follows:

> Section 436.1(a)(16) is the product of the Commission's decision to reorganize and clarify such disclosure requirements, since they were within several separate provisions of the rule as earlier proposed. See §§436.1(a)(9), 436.1(a)(15), and 436.1(a)(20) of the first proposed rule, see App. B and §§436.1(a)(9) and (a)(16)(*b*) and (*c*) of the revised proposed rule, see app. C. In this respect, the Commission has not required the disclosure of "the number of franchisees, if any, that operated at a loss during the previous year," or disclosure providing the prospective franchisee with a right to inspect the "profit and loss statements of all existing franchisees." These disclosures were required by §§436.1(a)(10) and (a)(11) of the first proposed rule, respectively, and have been deleted. To make such a requirement workable, all franchisors would have to obtain profit and loss statements from their franchisees. The public record clearly indicates, however, that franchisors cannot readily obtain such information from franchisees.

Courts have issued rulings that are consistent with 16 C.F.R. § 4361. In *Carlock, supra,* the court held that the franchisor was under no duty to provide information on the franchise system's declining revenues, and that even the UFOC recommended that a potential franchisee make his own investigation. 719 F.Supp. at 839.

In this case, contrary to what the Respondents have suggested, Dunhill was under no obligation whatsoever to disclose those franchisees generating revenues above $60,000–an arbitrary amount chosen by Respondents–or anything about its franchisees other than the number of outlets and contact information. Dunhill's UFOC includes all the existing and past franchisee names and telephone numbers; Zinn was encouraged to contact any one of them, and he in fact did contact at least three franchisees, and had the ability to inquire about levels of revenues or financial losses.

33

IV.  **ZINN'S CLAIM UNDER THE NEW YORK FRANCHISE SALES ACT IS BARRED BY THE STATUTE OF LIMITATIONS**

It is not entirely clear whether Zinn voluntarily dismissed his fraud claims based on the New York Franchise Sales Act (General Business Law § 687). In the opening statement, Zinn's counsel appeared to have conceded that Zinn's statutory claim is time-barred. However, as discussed above, Dunhill did not engage in any fraudulent conduct.

In any event, it is undisputed that Zinn's franchise agreement was executed on January 21, 2000, and that he asserted his statutory claim for the first time in his counterclaims filed on September 10, 2004.

To eliminate any question regarding the viability of a statutory fraudulent business practice claim under the New York Franchise Sales Act, such claims are time-barred if brought more than three years after the franchise agreement is executed. *Leung v. Lotus Ride, Inc.*, 198 A.D.2D 155, 604 N.Y.S.2d 65, Bus. Franchise Guide (CCH) ¶ 10,443 (1st Dept. 1993); *see also Fantastic Enterprises, Inc. v. S.M.R. Enterprises, Inc.*, 143 Misc. 2d 124, 540 N.Y.S.2d 131 (1998), Bus. Franchise Guide (CCH) ¶ 9425 (Sup. Ct. Onondaga Co. 1988).

In *Fantastic Enterprises, Inc., supra,* franchisees asserted a claim under the New York Franchise Sales Act, and contended that the statute of limitations was tolled by the franchisor's continuing obligations. The court rejected this argument and held that franchisees' claim for fraudulent inducement *accrued at the time the franchise agreement was executed*, and thus was time barred. *Id.* at 129 (emphasis added). Likewise in this matter, Zinn's franchise agreements were executed more than three years prior to commencing this case, and therefore his New York Franchise Sales Act claim is time-barred.[10]

---

[10]  In fact, as discussed *infra*, Zinn's claims, by contract, were also time-barred within one year after learning of any alleged violation of the New York Franchise Sales Act. *Potter, supra,* (holding that contractually agreed upon one-year statute of limitations has been upheld with regard to fraud claims).

34

V.    **ZINN FAILED TO PROVIDE WRITTEN NOTICE OF ANY ALLEGED BREACH OF THE FRANCHISE AGREEMENT; THUS, HIS BREACH OF CONTRACT CLAIMS ARE BARRED.**

Zinn was contractually obligated to provide written notice of breach as a condition of asserting a claim for breach of contract against Dunhill. Section 13.P of the permanent franchise agreement set forth that condition precedent as follows:

> "You agree to give us immediate written notice of any alleged breach or violation of this agreement by us after you have knowledge of, determine or believe that there has been an alleged breach of this Agreement by us, including any acts of misfeasance or nonfeasance."

This provision further required Zinn to give notice of any alleged claims against Dunhill within one year of the date he had knowledge of the alleged breach:

> You agree that if you do not give us written notice of any alleged breach of this Agreement within one year from the date that you have knowledge of, determine or believe that there has been an alleged breach by us, then our alleged breach will be deemed to be condoned, approved, and waived by you; our alleged breach will not be deemed to be a breach of this Agreement by us; and, you will be permanently barred from commencing any action against us for the alleged breach or violation.

*See* Ex. 4 (Zinn Permanent Placement Franchise Agreement at §13.P, p.36).

Section 14 further directed that written notice be *delivered* to Dunhill by certified mail, return receipt requested, or overnight mail, *attention to the Compliance Department*, with an additional copy to Dunhill's corporate counsel. (*Id.*). The written notice requirement in the Temporary Agreement is found in Section 18.08. (Ex. 5; TR 1/25/07, p. 1165, line 14).

A.    **Zinn Made No Effort to Comply with These Explicit Notice Requirements.**

It is undisputed that Zinn failed to provide Dunhill with a written notice of breach regarding any of the breaches he now alleges. Zinn testified that he learned about some problems immediately upon joining Dunhill, and the others no later than 2002, when he organized a group of franchises for several conference calls with attorney Robert Purvin. (TR 1/24/07, p. 1019, lines 18-22). Accordingly, if Zinn believed that the training class he attended in January 2000 was "not acceptable," he was contractually obligated to give notice of breach immediately or no later than January 2001. (TR 1/24/07, p. 943). If

35

Zinn believed that Dunhill was required, but failed to provide, national advertising, Zinn was obligated to promptly provide written notice and an opportunity for Dunhill to remedy the omission. *(Id.* at p. 984, line 5).

Zinn testified that he received support after starting his franchise operation, but that it was "inadequate." (*Id.* at p. 944). Even though Zinn thought that the R.A.T.I.F.Y. program had not worked for him, (*Id.* at p. 951), and had software problems,[11] (*Id.* at p. 988, p. 993-995) (*Id.* at 988), he failed to advise Dunhill that he perceived these problems to be a breach of his franchise agreements. Further, before joining the FAC, Zinn had already polled some franchisees and learned that the 25% exchange program figure was not accurate. (TR 1/25/07, p. 1182). Nevertheless, Zinn never gave Dunhill written notice of any alleged breach of contract after he made these findings. This defect is fatal to Zinn's breach of contract claims under New York law.

In *Sauer v. Xerox Corp.*, 17 F.Supp.2d 193 (W.D.N.Y. 1998), the plaintiff was fully *precluded* from filing a breach of contract suit because he failed to provide written notice that was clearly required by the parties' contract. The district court explained:

> It is well established under New York law that "the terms of a written agreement define the rights and obligations of the parties to the agreement" and "where the parties have agreed to conduct themselves in a accordance with the rights and duties expressed in a contract, a court should strive to give a fair and reasonable meaning to the language used." *Abiele Contracting, Inc. v. New York City Sch. Constr. Auth.*, 91 N.Y.2d 1, 9-10, 666 N.Y.S.2d 970, 689 N.E.2d 864 (1997). Where, as here, the parties have agreed to provide notice and an opportunity to cure prior to suing for performance or asserting termination rights under a contract, those covenants must be adhered to. A party's failure to do so renders ineffective that party's rights to pursue those other remedies. (citations omitted).

*Id.* at 197.

---

[11]    Zinn testified that he kept the RESUMate software in a box from 2000 to 2002 because he had not received a user manual. In 2002, he called RESUMate directly and was able to get the software up and running with the help of one of its technical support staff, with the same hardware he had already been using. (TR 1/24/07, p. 988, lines 10-22).

In *RBFC One v. Zeeks, Inc.*, 367 F.Supp.2d 604 (S.D.N.Y. 2005), the plaintiff conceded that it did not follow the notice procedures, and instead argued that defendant had actual knowledge by virtue of oral statements and e-mails that alleged non-performance. *Id.* at 611. The court held that "oral notice" was clearly inadequate because the contract required "written notice." *Id.* As to whether the e-mails sufficed, the magistrate judge noted that none of them mentioned the word "breach," they were not addressed to the correct person listed in the contract, and they were not delivered by hand or sent "return receipt requested" as required by the contract. *Id.* at 613. Finding that no rational jury could find any of these writings to constitute notice of breach, summary judgment was granted. *Id.*

Likewise, in the recent matter *Matrix Group Ltd. v. Rawlings Sporting Goods*, 477 F.3d 583 (8th Cir. 2007), the Eight Circuit affirmed summary judgment where contractual notice was not provided. Matrix and Rawlings had agreed that if either party breached any of the contract's provisions, written notice must be provided, and the party could terminate if the breach was not cured within 30 days. *Id.* at 586. During a meeting with Matrix, Rawlings expressed concerns that the product line had grown stagnant. *Id.* Rawlings believed that Matrix was disinterested in growing the business, and was not using its "best efforts" to develop and sell its products. *Id.* at 587.

When Matrix did not satisfactorily respond to these concerns, Rawlings sent a termination letter stating that despite repeated requests, Matrix had refused to comply with its contractual obligations. *Id.* Rawlings argued that it was excused from the contract's written notice requirement because Matrix first breached by not using its best efforts to sell Rawlings products. *Id.* at 588. The appellate court rejected Rawlings' position, finding:

> "It is precisely when a party is not in substantial compliance with the contract that the notice and cure provision mandates the giving of thirty days' notice. In similar circumstances the Eleventh Circuit has come to the same conclusion while applying the law of Pennsylvania. *See Alliance Metals, Inc. v. Hinely Indus., Inc.*, 222 F.3d 895, 903 (11th Cir. 2000) (it

37

would otherwise "effectively render meaningless contractual 'notice and cure' requirements")."

*Id.* at 589.[12]

Indeed, the language in Section 13.P amounts to a condition precedent to Zinn being able to raising these claims. Under the law of contracts, parties may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event. Where notice is a condition precedent to default, failure to give notice of the alleged default precludes recovery on the contract. *See Filmline (Cross-Country Prods.), Inc. v. United Artists Corp.*, 865 F.2d 513, 518 (2d Cir. 1989) (holding that defendant film company's contract termination was ineffective due to its failure to give contractually-secured opportunity to cure); *see also Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) ("[U]nder New York Law, . . . where the agreement specifies conditions precedent to the right of cancellation, the conditions must be complied with.") (*quoting Consumer Power Co. v. Nuclear Fuel Servs., Inc.*, 509 F. Supp. 201, 211 (W.D.N.Y. 1981)).

Several other jurisdictions also have held that actual or constructive notice fail to meet the condition precedent to bringing suit on a contract that contains a written notice provision. *See e.g. Jasty v. Wright Medical Technology, Inc.*, 2006 WL 961456 at *14-16 (D.Mass Apr. 6, 2006) (plaintiff's letter, even in conjunction with discussions at a prior meeting, failed to meet the express written notice requirements of the contract because it did not invoke the provision or advise defendant that he was perceived to be in breach); *State ex. re. Nixon v. Prudential Health Care Plan*, 2000 WL 33952262 at *4 (E.D. Mo. June 28, 2000) (courts strictly enforce condition precedent of written notice prior to bringing suit and it cannot be avoided by showing that the breaching party had informal

---

[12]    Even though Delaware law governed the *Matrix* case, that unambiguous contract language must be given its plain meaning is a fundamental contracts principle that is also followed in New York. *See Abiele Contracting, Inc., supra; see also Slamow v. Delcol*, 174 A.D.2d 725, 571 N.Y.S.2d 335 (2d Dep't 1991) (under New York law, full effect must be given to the plain meaning of the language in the agreement and that language cannot be construed in such as way as to distort its clear meaning).

or constructive knowledge of the complaining party's allegations or a chance to improve).

By failing to provide Dunhill written notice of any alleged breach, Respondents failed to satisfy this condition precedent, and are now precluded from successfully asserting a breach of contract claim.

### 1. The FAC Meeting Minutes Do Not Satisfy the Written Notice Provision.

Respondents improperly rely upon certain minutes taken during FAC meetings, and now conveniently and self-servingly assert that these minutes were somehow intended to provide written notice of breach to Dunhill.[13] (TR 1/25/07, pp. 1129-1131).

At the hearing, Respondents failed to produce any FAC by-laws showing that the FAC considered its minutes to constitute formal written notice of breach for individual franchisees. And there is no evidence to establish that Dunhill viewed the FAC as having that type of authority. Certainly there is no mention in the franchise agreement that the FAC was a vehicle for *any* particular form of communication from a Dunhill franchisee to Dunhill, let alone a vehicle intended to somehow supplant the notice requirements of an individual franchise agreement.

On the contrary, the FAC was created and administered by franchisees; it was not formed or managed by Dunhill. (TR 3/6/07, p. 174, lines 10-25). Dunhill simply recognized the FAC as an organization and attempted to work with this group to discuss the franchise system and to receive advice and guidance. (*Id.* at p. 175, lines 2-6). In the franchise industry, many franchisors meet with advisory councils without any contractual obligation to do so. (*Id.* at 176, lines 15-16).

---

[13]  Zinn testified that the 12 key action items listed on a March 19, 2003 President's teleconference report constituted one such example of written notice of breach. (Ex. 84). Curiously, Exhibit 84 was *Dunhill's* exhibit, and it fails to mention "breach" or "notice of default," in any event; Zinn did not include this document in his own exhibits, and likely was not intending to rely upon it at all.

Zinn, although never the secretary of the FAC, testified that the meeting minutes were kept in the ordinary course of business, and were distributed to Dunhill management for comment. (TR 1/24/07, pp. 979-981). But, as Robert Stidham testified, Dunhill was not routinely given an opportunity to edit the minutes, and that when minutes were received there was a "disconnect" between what management and the franchisees thought was covered at the meeting. (*Id.* at p.170, lines 7-12; p.175, lines 7-15). Thus, the minutes should be considered generally untrustworthy as documentary evidence and replete with self-serving hearsay.

Further, none of the meeting minutes refers to any "breach" or "default" of anyone's franchise agreement and there is no evidence to suggest, to even the slightest degree, that the minutes were ever even purportedly delivered to Dunhill in lieu of the contractually-mandated written notice of breach. There is simply no evidence to substantiate Respondents' claims that FAC meeting minutes were considered by the FAC or, more importantly, understood by Dunhill, to constitute written notice of breach. As a result, none of the FAC meeting minutes introduced into evidence should be deemed to constitute notice under the franchise agreement's specific provisions.

> 2.    Zinn is not Excused from Providing Notice Even if he Believed it to be Futile.

Even if Zinn believed that complying with the written notice procedures would have been useless, he is not excused under New York law from complying with his contractual obligations. This argument has been considered and rejected. *See e.g. Honeywell Intern. v. Air Products & Chem.*, 858 A.2d 392, 418 (Del Ch. 2004), *rev'd in part on other grounds*, 872 A.2d 944 (Del. 2005),(under New York law, a party cannot terminate a contract based on a claim of breach, regardless of its merits, where that party failed to first provide the contractually required opportunity to cure).

In *Needham v. Candies, Inc.*, 2002 U.S. Dist. LEXIS 15144 (S.D.N.Y. 2002), the plaintiff asserted that he could recover on an employment contract, notwithstanding his failure to provide notice and an opportunity to cure, because such an act would have been

futile. The court listed the extremely limited circumstances under New York law when a party can justify terminating a contract without providing notice, including repudiation, or an unequivocal intent to abandon the contract, or where the misfeasance is incurable. *Id.* at *11. Because there was no repudiation, and because plaintiff failed to provide notice and opportunity to cure, the court granted summary judgment to the employer, finding that this condition precedent was unmet. *Id.* at *16.

Here, there is no claim that Dunhill intended to abandon this franchise agreement. None of the breaches of contract Zinn alleges-- the insufficiency of the technology, training and support he received--are alleged breaches that could be deemed "incurable." Simply put, it would contradict the language of the agreement and New York case law to find now, years after the fact, that it would have been an idle act for Zinn to have provided the requisite notice to Dunhill.

**B.    Zinn's Failure to Provide Any Written Notice Now Permanently Bars His Claims.**

Section 13.P of the permanent franchise agreement provides that if Zinn does not notify Dunhill of any purported breaches *within one year*, he would "be permanently barred from commencing any action against us for the alleged breach or violation." Under New York law, parties can contractually agree to shorten the limitations period that would otherwise apply. *Potter v. Nathan's Famous Sys., Inc.*, 667 N.Y.S.2d 301 (App. Div. 1998) (*citing H.P.S. Capitol v. Mobil Corp.*, 588 N.Y.S.2d 29 (App. Div. 1992)).[14]

---

[14] Even if Zinn did not waive these claims by virtue of Section 13.P, Zinn still would be barred from raising these claims because he elected to continue performing under his franchise agreement rather than providing timely written notice of the alleged breaches. Under New York's common-law doctrine of election of remedies:

"Where a party has actual knowledge of its contract partner's breach but continues to perform under the contract or accept the performance of the breaching party, the continuing performance constitutes an election of remedies that precludes it under New York law from later asserting that the contract is terminable because of the prior breaches." *Honeywell Intern. v. Air Products & Chem.*, 858 A.2d 392, 419 (Del Ch. 2004) (holding that "[a] party cannot elect to continue with the contract, continue

Because Zinn failed to adhere to the notice requirement, he is permanently barred from asserting his claims.

### C.     The Arbitrator Should Give the Franchise Agreement's Unambiguous Language Its Plain Meaning and Full Effect.

The notice of breach provision contained in Section 13.P of the permanent franchise agreement is an express, unambiguous, and mandatory requirement agreed upon by the parties so that an arbitrator or court would not have to guess what might have happened had the notice not been provided. *See Screen Cartoonists Guild v. Walt Disney Productions*, 74 Cal.App.2d 414, 418 (1946) (court vacated an award because "the arbiter's ruling was in direct conflict with the express terms of the bargaining contract, and thus exceeded the powers conferred upon him."); *see also Western Employers Ins. Co. v. Jefferies & Co.*, 958 F.2d 258, 261-62 (9th Cir. 1992) (court vacated an award where the arbitrators failed to arbitrate the dispute in accordance with the terms of the arbitration agreement, noting that the party should be held to the agreement "under simple principles of contract law.").

The parties' contract cannot now be remade during arbitration. One opinion gives plain meaning to the policy behind this concept:

> "When a businessman retains a lawyer to prepare a contract, he expects, and is entitled to expect, that the lawyer will incorporate such provisions therein as are necessary to protect his client's interests. Nothing is more frustrating to the conscientious lawyer than to painstakingly draft such provisions and then have a court brush them aside as 'hypertechnical.'
>
> The attorneys for appellant very carefully provided that no failure to perform should be termed a material breach unless appellee should first deliver to appellant "a written notice specifying the . . . alleged failure to act constituting such claimed material breach and [appellant] shall have failed to cure the material breach within thirty (30) days after receipt by [appellant] of such written notice." Where such a clause exists, it is settled law that there can be no recovery unless the notice provided for has been given. *Plumley v. United States*, 226 U.S. 545, 548, 33 S.Ct. 139, 57 L.Ed. 342 (1913); *National Telefilm Associates, Inc. v. Pamandia Productions, Inc.*, 42 A.D.2d 514, 344 N.Y.S.2d 418 (1st Dep't 1973); 10 N.Y.

to receive benefits from it, and thereafter bring an action for rescission or total breach."

Jurisprudence Contracts § 293 (1960); 17A C.J.S. Contracts § 515, at 852-53 (1963)."

*Contemporary Mission v. Famous Music Corp.*, 557 F.2d 918, 928-29 (2nd Cir. 1977) (concurring opinion).

The notice provision would be rendered meaningless if the Arbitrator were to now find that oral remarks or "concerns" discussed at FAC meetings somehow constituted notice of breach. Thus, the Arbitrator should find that Zinn's breach of contract claims are barred as a matter of law.

## VI.    DUNHILL MET ALL OF ITS CONTRACTUAL OBLIGATIONS, IN ANY EVENT

Even if the breach of contract claims are not waived or time-barred, none of the Respondents proved by a preponderance of the evidence[15] that Dunhill even breached a contractual obligation in the first place. To establish a claim for breach of contract under New York law, a party must prove: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000). In the franchise context, as long as the franchisor has met its basic duty to: (1) allow the franchisee to operate a business under the franchisor's name and within the system, (2) license to the franchisees' marks and proprietary information, and (3) provide training and support, the franchisor has generally fulfilled its contractual obligations to its franchisees. *Brenco Enterprises, Inc. v. Takeout Taxi, supra.*

### A.    Dunhill Met Its Contractual Obligations to Each Respondent.

Each of the franchise agreements granted Respondents a ten (10) year license to operate a Dunhill business using the Dunhill system and trademarks.[16] Pursuant to Section 6 of each agreement,[17] Dunhill agreed to provide certain services and support.

---

[15]    The party asserting a breach of contract claim "has the burden of proving the material allegations in the complaint by a fair preponderance of the evidence." *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F.Supp. 1188, 1195 (S.D.N.Y. 1994).

[16]    Auger, Ex. 38 at § 2, p. 2; Lamanna, Ex. 14 at § 2, p. 3; Westover, Ex. 55 at § 4.01, p. 7, and Zinn, Ex. 4 at § 2, p. 2.

[17]    Auger, Ex. 38 at p. 13; Lamanna, Ex. 14 at p. 13; Westover, Ex. 55 at p. 15; Zinn, Ex. 4 at p. 12.

1.    Dunhill Provided Pre-Training Assistance and Consultation.

The franchise agreement required Dunhill to provide pre-training assistance and consultations, *"as we determine,"* which generally covered recommendations and approval regarding office location, a floor plan for the office layout, or furniture recommendations. *Id.* Although this provision did not mandate pre-training assistance, there is evidence in the record showing that Dunhill offered these services.

For instance, Rick Kean was available to assist franchisees with office layout. (TR 1/19/07, p. 386, line 23 through p. 388, line 24). Robert Stidham spent time with Lamanna in Irvine, California searching for office locations. (TR 1/29/07, p. 1534; TR 3/6/07, pp. 109-110). Westover sent his office layout proposal to Stidham, who responded by signing an approval. (Ex. 102; TR 1/23/07, pp. 806-807). Auger testified that he did not receive help with locating or setting up the layout for his Charlotte, North Carolina office, although he does not contend that he ever *requested* Dunhill's input. (TR 1/25/07, pp. 1242, line 20 through p. 1243, line 5).

Hence, Dunhill was available to consult on these matters when a request was made by the franchisees, or in its own discretion if input was necessary. Respondents offered no evidence that their ability to operate their office was compromised due to location, layout or furniture. In fact, location was not of critical importance to the success of a permanent staffing office. (TR 3/6/07, p. 43, lines 11-18). Thus, no harm has been shown by any purported failure to offer this service, and Respondents did not otherwise prove breach.

2.    Dunhill Provided New Franchise Training and Start-Up Materials.

Each Respondent attended a mandatory ten-day training program. The franchise agreements explained that the training program would cover "matters pertaining to the operation of the Dunhill permanent placement business, including, but not limited to, the following:  procedures employed in interviewing applicants for permanent placement, marketing of applicants to employer/clients, recruiting of applicants for permanent

44

placement, soliciting job orders from employer/clients, the maintenance of books of financial records, use of business forms pertaining to the business, standards, operating procedures, policies and guidelines."

Although Respondents take issue with the *quality* of training that they received, they nonetheless do not dispute that Dunhill actually provided the initial training. Mr. Kean, who has been with Dunhill for approximately 25 years, created the training regimen. Robert Stidham, who had observed MRI training for the previous eight years, sat through training with Kean in January of 2001, and considered the Dunhill training to be "very good." (TR 3/6/07, p. 39). Indeed, just prior to joining Dunhill, Stidham recalled finding an article in *Franchise Times,* a trade magazine, that recognized Dunhill for its quality of training. (*Id.*) Further, Neil Whitman, who went through training in 2000, testified that he was satisfied with training and gained a "bunch of skills." (TR 1/30/07, pp. 1750-1754). Even Elias Zinn described the training as "very good," although outdated, in his view, by changes in technology. (TR 1/24/07, pp. 945-946).

Section 6 also required Dunhill to furnish an initial supply of start-up materials estimated to be sufficient for approximately 90 days. Mr. Kean testified that new franchisees were given brochures, forms, and daily planners for office use. (TR 1/19/07, p. 392, lines 22-25). In addition, Dunhill promised to provide a confidential Operating Manual that consists "collectively of the written guidance, directions, operational systems, procedures, policies, methods, prohibitions, requirements and specifications." Respondents do not dispute that they received a President's Manual and start-up materials.

Based on the foregoing, Respondents cannot succeed on a breach of contract claim premised on any alleged failure by Dunhill to provide initial training or start-up materials irrespective of the defective notice issue.

45

3.     Dunhill Provided Additional Training.

Within six months after a franchisee's opening, Dunhill provided a field representative to consult at the office location for five days, which could be met by conducting a hiring seminar in the area. Dunhill provided the five additional training days at Westover's office within the requisite month period.[18]  (TR 1/23/07, p. 613).  In addition to that, Jamie Owen visited three to four times to present Dunhill Consulting Training, although Westover did not feel that those classes were beneficial.  (TR 1/22/07, pp. 548-549).  Zinn testified that he received the five additional days at his office from various Dunhill representatives, but that his partner Wilcoxson did not receive the additional training on the temporary placement side.  (TR 1/24/07, p. 943).

Lamanna did not allege that he did not receive the initial training; he testified that although Jamie Owen visited approximately five times, this number of visits was not enough to support his business.  (TR 1/29/07, p. 1527).  Auger did not allege that Dunhill failed to provide the five additional training days, and testified that Dunhill was there when he called for training or guidance during the first three to four months after opening, though representatives often cancelled field visits thereafter.  (TR 1/25/07, p. 1240, lines 15-21).

Nobody denies that Dunhill went through a difficult period: there were administrative changes, a recessionary squeeze, and 9/11 certainly may have impacted Dunhill's ability to be as quick to respond to all the franchisees' needs at all times. Without exception, however, Dunhill maintained sufficient staff to fulfill its contractual obligations at all times.  (TR 1/22/07, pp. 436-438; TR 3/6/07, p. 103, lines 8-14).  Neil Whitman, who has had success following the Dunhill business model, views the Dunhill's support as "excellent."  (TR 1/30/07, pp. 1762-1764).  And Robert Stidham observed that the support staff at Dunhill was more personalized than its largest

---

[18]   Westover telephoned Dunhill to remind them that he had not yet received the additional days, but they sent Dunhill field representative, Jamie Owen, out "immediately" in response to his call and prior to the 180th day. (*Id.* at 613).

competitor, MRI, because Dunhill had six field representatives to service just the franchised units, whereas MRI had only 23 field support people for 1400 world-wide offices. (TR 3/6/07, p. 115).

Putting aside their failure to provide notice of breach, Respondents failed to prove by a preponderance of the evidence any failure to provide "additional training" or any damages caused by such a breach.

> 4.    Dunhill Provided Continuing Resources and Ongoing Support.

As part of the franchise agreement, Dunhill also agreed to provide ongoing support which would include occasional national seminars, regional meetings and/or field training sessions. Although attendance at such seminars and meetings was not mandatory, Dunhill recommended that franchisees attend. There was ample evidence offered at the hearing to demonstrate that Dunhill met its contractual requirements regarding ongoing support.

The training materials available to any Dunhill franchisee, listed in Exhibit 67, included informative manuals on Consultant Training, Sales and Service Training, Making Placements, Management Training, as well as interactive CD training, books, and videos available for checkout as needed from the "Lending Library" (resources listed at Ex. 69). All Dunhill franchisees would have received this catalog. (TR 1/19/07, pp. 409-410). Dunhill also prepared a yearly training calendar indicating what classes were available.[19] As an example, Exhibit 70 shows the ongoing training Dunhill provided in the years 2001 through 2004, and specific dates that field representatives would be in certain locales. (TR 1/19/07, p. 410, line 24 through p. 413, line 13). "Dunhill University" was an online facility available to all Dunhill franchisees at all times. (TR 1/19/07, p. 436, line 25 through p. 437, line 22). All Dunhill offices also received a template business plan to be used for yearly planning. (Ex. 73; TR 1/19/07,

---

[19] As one component in maintaining the success of his business, Whitman testified that he reviews Kean's training calendar, so that his permanent placement staff could select courses to reinforce their basic training over the year. (TR 1/30/07, p. 1764, lines 4-10).

pp. 416-417).    Dunhill consultant and management training seminars were held frequently (*See* Exs. 75-81), as were teleconferences, which were used frequently in place of field visits when travel became more difficult after 9/11.  (Ex. 74; TR 1/19/07, p. 417-421).

Despite Auger's, Lamanna's and Westover's opinions that Dunhill's training and support was 'worthless,' a close examination of the attendance lists for the teleconference calls belies those views, because each of their offices was still utilizing Dunhill's ongoing support throughout 2003.  For instance, Exhibit 74 shows that Westover (or staff from his office) participated in teleconference calls in the year 2003[20]: on June 4th (Bates 3098-99), July 15th (Bates 3096-97), September 8th (Bates 3137-38),  November 18th (Bates 3132-34), and December 9th (Bates 3144).  Likewise, Auger (or staff from his office) participated in the telecalls in 2003 on August 5th (Bates 3141), August 21st (Bates 3093), October 7th (Bates 3118), and October 22nd (Bates 3118).  Lamanna participated at least once on June 6, 2003 (Bates 3098), and testified that he attended these calls "on occasion." (TR 1/31/07, p. 1886-1889).  While Zinn's name never appears as an attendee, all telecalls were offered to any interested franchisee.

Finally, Dunhill held periodic conferences as discussed in Section 6 of the franchise agreement.  As one example, a national conference was held on March 20-23, 2002 in New Orleans and the conference roster reflected attendance by both Auger and Zinn. (Ex. 72).  Westover attended this conference as a prospective franchisee as part of his due diligence process; and it is curious to note that most of the franchisees to whom he spoke at the conference were satisfied with Dunhill, and he heard nothing that gave him pause about going forward with the opportunity. (TR 1/23/07, pp. 699-700).

Notwithstanding the recessionary factors and 9/11's impact, Stidham testified that Dunhill  always  provided  at  or  above  the  services  required  by  the  agreements.

---

[20]   Participation lists were only available for 2003, but the telecalls were provided during each year of the time period at issue.  (TR 1/19/07, p. 421, line 4 through p. 422, line 20).

(TR 3/6/07, p. 102, lines 8-18).  These four Respondents were obviously disappointed with their success level, and may now believe that the quality of Dunhill's resources were not what they had hoped, but they did not prove by a preponderance of the evidence that the level of service Dunhill provided ever fell below what was contractually required.

     5.    <u>Dunhill Met Its Obligations to Provide Advertising.</u>

Any claims of breach related to Dunhill's alleged failure to advertise also should be rejected.  In Section 5[21] referencing "Franchisee's Obligations," each Respondent agreed to contribute 1% of the prior month's receipts into a national advertising fund.  The franchise agreements are clear that Dunhill has the right, at its "sole discretion," to spend the monies in the advertising funds in any geographic area.  (*Id.*)  Further, the franchise agreement does not obligate Dunhill to disburse the funds within any single accounting period.  (*Id.*)  Furthermore, Dunhill disclosed in its UFOC that it has no obligation to maintain an advertising program, and also that its advertising expenditures may vary widely from year to year.  (TR 1/23/07, pp. 723-724).

Robert Freeman, Dunhill's CFO, testified that Dunhill had, in its discretion, used advertising fund money to help pay for the franchisees' Monster.com contracts.  Around 2003, there was no ability to spend the advertising dollars without carrying forward a negative balance, so Dunhill scaled back advertising for that period.  (TR 1/18/07, pp. 131-139).  Although each Respondent now claims that Dunhill somehow breached its advertising obligations, not one of them had any personal knowledge, or offered any evidence, that Dunhill used advertising funds during the time he contributed to the advertising fund for anything other than the costs that are listed in that section.  (TR 1/23/07, p. 775, line 25).

Moreover, Dunhill was never contractually obligated to provide Monster.com to its franchisees in the first place.  Although Dunhill subsidized the cost of Monster.com

---

[21]  (Auger, Ex. 38, § 5.C, p. 11; Lamanna, Ex. 14, § 5.C, p. 11; Westover, Ex. 55, § 5.03, p. 11; Zinn, Ex. 4 § 5.C, p. 11).

until the end of 2002, it was not contractually obligated to do so, and certainly had no duty to continue providing this benefit. *Monster.com is not even mentioned anywhere in any franchise agreement.* When the contract with Monster.com came to an end, the FAC demanded that Dunhill incur the cost of a $6 million dollar renewal contract on behalf of the franchisees, even though that amount was more than the entire gross royalty income of the system! (TR 3/6/07, p. 65). It was obviously impractical for Dunhill to continue, and as Robert Freeman testified, would have turned Dunhill's advertising account "upside down." Even though it had no duty to do so, Dunhill did negotiate a substantial discount from published pricing for the benefit of its franchisees. (*See* Ex. 86). However, no good deed goes unpunished. Any breach claim related to Monster.com is specious and should be rejected.

6.    Dunhill Provided Software or Technology.

Pursuant to Section 7's Operating Requirements provision, Respondents agreed to use the software specified by Dunhill and to execute software license agreements required by the vendor. Dunhill agreed that it would provide substitute software at no charge if Dunhill decided to use a different program.

Dunhill provided Respondents with RESUMate software. Rick Kean testified that RESUMate is the best software he has found for the permanent search industry. (TR 1/19/07, pp. 395-396). Stidham also thought the RESUMate technology was quite good and, in fact, purchased the commercially available version for his own staffing company. (TR 3/8/07, p. 114). Auger testified that RESUMate was a "decent" program, but not state-of-the-art. (TR 1/26/07, p. 1401, line 19 through p. 1402, line 5). Zinn let the software sit in its box for two years,[22] but found it workable using the same system hardware after speaking with RESUMate's technical staff and purchasing upgrades.

---

[22]    The RESUMate vendor, Chuck Schaldenbrand, attended the March 2002 Dunhill national conference in New Orleans, and presumably could have addressed any questions or concerns. (Ex. 72, Bates 009227).

(TR 1/24/07, p. 989-991). Westover received the RESUMate software, but testified that it was not installed and did not work properly for his office. (TR 1/23/07, p. 772).

Lamanna, who was supposed to receive DunStar[23] software per the supplement to his agreement, considered RESUMate to be extremely technical and not an easy program to learn. (TR 1/29/07, p. 1530). Dunhill suggested to Lamanna that he call the manufacturer for a one- to two-hour training session on how to use the software, but apparently Lamanna chose not to make that call. (*Id.*) In contrast, Neil Whitman took Dunhill's recommendation, and called RESUMate for technical assistance, and describes RESUMate as "user friendly." (TR 1/30/07, p. 1755, line 12 through p. 1757, line 9).

Respondents also argued that Dunhill failed to timely create a user's manual for RESUMate after Mr. Kean, who was working on that project, left the company to care for his father. Admittedly, there may have been some necessary action on the franchisee's part to contact the vendor about software use. But there is no evidence that Dunhill failed to provide adequate software to Respondents or otherwise breached this provision.

**B.     Respondents Are Not Entitled to Rescission Because There Is No Evidence of Willfulness and No Wholesale Failure of Consideration.**

To warrant rescission, the alleged breach must be "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Septembertide Publ'g, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1998); *see also Mina Invest. Holdings, Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 362 (S.D.N.Y. 1998) ("As an extraordinary remedy, rescission is appropriate only when a breach may be said to go to the root of the agreement between the parties"); *Pate v. Nat'l Fund Raising Consult., Inc.*, 20 F.3d 341, 346 (8th Cir. 1994) (affirming directed verdict on franchisee's rescission claim because franchisee failed to demonstrate a "total failure of consideration").

---

[23]   Lamanna offered no evidence as to the materiality or his reliance on DunStar software over RESUMate, which Dunhill had decided was a superior substitute, and he offered no evidence of harm caused thereby.

New York contract law provides that "a party wishing to rescind a contract must make this intention known promptly after the discovery of the wrong or defect." *K.M.L. Labs. Ltd. v. Hopper*, 830 F. Supp. 159, 166 (E.D.N.Y. 1993). A party cannot "elect to continue with the contract, continue to receive benefits from it, and thereafter bring an action for rescission or total breach." *ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp.2d 383 (S.D.N.Y. 1999), *quoting Macfarlane & Assocs., Inc. v. Noxell Corp.*, 93 Civ. 5192, 1994 WL 369324, *4 (S.D.N.Y. July 13, 1994); *see also Bigda v. Fischbach Corp.*, 849 F. Supp. 895, 901 (S.D.N.Y. 1994) (nonbreaching party may not continue to perform after learning of breach, and then later choose to terminate the contract on account of the past breach).

Respondents failed to present any evidence whatsoever demonstrating any willful conduct on Dunhill's part.

To the contrary, the evidence demonstrated that Dunhill did not breach its franchise agreements at all, let alone in a manner that would "defeat the entire object of the contract." In the face of the purported breaches by Dunhill, each Respondent chose not to notify Dunhill of breach or terminate their franchise agreement at that time, but instead continued to use the Dunhill name, trademarks, methods of operation, and continued, at least until December 2003, to submit Statement 3 royalty reports. This conduct indicates Respondents' willingness to continue performing under the contract despite their knowledge or the belief that Dunhill had not fulfilled its obligations. It is now unfair, years after the purported breaches, for Respondents to request to be put in the position as if no contract was ever entered. Their allegations regarding Dunhill's supposed failures do not warrant the extraordinary remedy of rescinding Respondents' franchise agreements.

### C.    Respondents Are Not Entitled to Recover Lost Wages.

Respondents' claims for moving expenses, lost wages and future lost wages are, in effect, "personal injury" damages that can only be recovered, if at all, in tort. Tort

claims are precluded in this case under the economic loss doctrine and Respondents should be limited to presenting breach of contract damages, if any. Under New York law, the recovery of lost profits as damages is subject to the following stringent requirements: (1) it must be demonstrated with certainty that the damages were caused by the breach; (2) the alleged loss must be capable of proof with reasonable certainty, and (3) there must be a showing that the damages were fairly within the contemplation of the parties to the contract at the time it was made. *Travellers Int't; AG. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (*citation omitted*). Respondents bear the burden to come forward with specific evidence in order to establish the existence of damages flowing from an alleged breach of contract. *See Stanford Square, LLC v. Nomura Asset Capital Corp.*, 229 F.Supp.2d 199, 206 (D. N.Y. 2002); *Wenger v. Alidad*, 265 A.D.2d 322, 323, 696 N.Y.S.2d 227, 228 (N.Y. App. Div. 1999) (contract "damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not the result of other intervening causes.")

In this case, the natural and probable consequence of Dunhill's alleged breach would be the loss of whatever benefit Respondents would have otherwise received in the absence of Dunhill's alleged breach. That, however, is *not* what the Respondents seek to recover. Respondents are asking the Arbitrator to award them lost *earnings* (as well as moving and medical expenses in the case of Auger) that they contend would have been received during this time period ***had they been employed doing something else.***

These damages, which can only be asserted under a tort theory, obviously bear no causal relationship to Respondents' breach of contract claims. Further, the evidence of damages set forth by Respondents is not only speculative, but was provided in the latent January 2007 production and thus Dunhill had no opportunity to investigate its accuracy. Thus, the Arbitrator should give little weight, if any, to Respondents' lost earnings "evidence." Finally, even if the Arbitrator is willing to assume that lost future earnings are somehow an appropriate measure of damages for breach of a franchise agreement,

Respondents failed to articulate any specific harm incurred or a causal connection between the alleged breach and any purported harm. Lost wages are simply not recoverable, as a matter of law, even if Respondents proved any of their liability claims (which they did not).

**D.    Respondents Are Not Entitled to "Equitable Setoff."**

      1.    The Franchise Agreement Expressly Prohibits Respondents from Withholding Royalties or "Setting Off" Amounts Due.

Each Respondent signed an agreement prohibiting him from attempting to "set off" his liability for unpaid royalties based on counterclaims seeking unliquidated damages. Respondents conveniently ignore the language of each of their franchise agreements,[24] which state that the franchisee agreed not to withhold payments based on grounds of alleged non-performance, and that they agreed to make payments without claiming a right of setoff.

Even without that contractual provision, Respondents' position contravenes well-established New York law regarding setoffs. The setoff doctrine allows parties who owe each other money to apply their mutual debts against each other, but there must be an express or implied agreement between the parties to do so. *See Simpson v. Mut. of Omaha Ins. Co.*, No 97 Civ. 1339, 2000 WL 322780 at *6 (S.D.N.Y. Mar. 28, 2000) (citations omitted). In the absence of a statutory provision, unliquidated damages ordinarily cannot be set off at law. 20 Am. Jur.2d, *Counterclaim, Recoupment and Setoff*, § 61; 80 C.J.S. *Set-Off and Counterclaim* § 42. Because Respondents contractually agreed to make payments without a right of set off, and their alleged damages pursuant to their counterclaims are unliquidated, Respondents are prohibited from asserting this claim.

---

[24] *See* §13(N) in Exs. 4, 14, and 38 at pp. 35-36; Ex. 55 §5.08 at p. 11.

2.     <u>Respondents Cannot Continue Using Dunhill's Trademarks and System and, At the Same Time, Refuse to Pay Royalties.</u>

Respondents' setoff argument also contravenes well-established franchise law. Even if Dunhill had breached the contract, Respondents were not entitled to continue deriving the benefits of their contract with Dunhill, while at the same time failing to remit monthly fees to Dunhill. Numerous courts have rejected the notion that a "royalty strike" is a proper remedy for franchisees based on the franchisor's alleged breach. *See, e.g., S&R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 376 (3rd Cir. 1992) ("[u]nder no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits") (emphasis in original); *see also Lewis & Maswep Enters., Inc. v. McDonald's Corp.,* No. 94-1351, 1995 WL 699707, at*3 (6th Cir. Nov. 27, 1995); *Travelodge Hotels, Inc. v. Elkins Motel Assocs., Inc.,* No. Civ. 03-799(WHW), 2005 WL 2656676, at *7 (D.N.J. Oct. 18, 2005).

Here, it is undisputed that Respondents, after ceasing to pay royalties and submit Statement 3 reports, continued to use Dunhill's trademarks and system for some period of time. Respondents have all admitted that, even though *they* considered their franchise agreements terminated as of December 31, 2003, they continued to use Dunhill's marks, operate under the Dunhill name, or otherwise capitalize on Dunhill's name and goodwill, well into 2004. Because Respondents cannot be permitted to avoid or defer payment while simultaneously receiving and retaining the benefits of the Dunhill franchise system, Dunhill is entitled to the recovery of its unpaid royalties.

## VII.   ZINN MATERIALLY BREACHED HIS FRANCHISE AGREEMENT

### A.   Failure to Provide Notice and Opportunity to Cure and Unilateral Termination.

As discussed above, Zinn was obligated to provide written notice of any alleged breach or violation within one year of discovering such breaches. By failing to provide written notice and an opportunity to cure, Zinn materially breached the franchise agreements. Zinn further breached the agreements by unilaterally and prematurely

terminating his agreements pursuant to the notice of termination dated June 8, 2004, under which he deemed the termination to have been effective as of December 31, 2003.

**B.     Failure to Submit Statement 3 reports and Failure to Pay Royalties.**

Zinn's franchise agreement required him to pay a (7%) royalty on gross sales, to be reported monthly on Statement 3 reports. Here, Zinn unquestionably breached this duty. As discussed above, Zinn's obligation to pay royalties, in connection with his use of Dunhill's trademark and systems, was unconditional. Under well-established principles of franchise law, a franchisee who engages in the ongoing use of a franchisor's trademarks and franchise system must pay royalties despite whatever claims the franchisee may have against the franchisor. *See McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F. Supp. 401, 403 (W.D.N.Y. 1986) ("the alleged wrongs of plaintiff do not constitute affirmative defenses to defendants' non-payment of franchise fees"); *see also Cle-Ware Rayco, Inc. v. Perlstein*, 401 F. Supp. 1231, 1234 (S.D.N.Y. 1975) ("It would be a gross inequity [for] the franchisees to reap the benefits of doing business under the [mark] without paying their proportionate share of the costs of those benefits pending the final outcome of this case").

Respondents' attorney, Robert Purvin, apparently advised Zinn to cease paying his royalties. But even if the counterclaims asserted by Zinn were legally viable, they would not excuse or provide a legal defense to Zinn's breaches of his franchise agreements.

**C.     Dunhill is Entitled to Recover Damages Stemming From Zinn's Breaches, Including Lost Future Royalties.**

In addition to its past-due royalties, prejudgment interest, and attorneys' fees and costs, Dunhill is also entitled to recover future royalty payments for the unexpired term of the wrongfully terminated franchise agreement. The *Restatement (Second) of Contracts* § 347 (1981) measures an injured party's expectation interest by (1) the loss in value of the performance of the contract caused by the breaching party's failure to perform, plus (2)

56

any other incidental or consequential loss caused by the breach, less (3) expenses saved by not having to perform. Thus, Dunhill may recover an amount equal to the monies it would have received from Zinn over the full, ten-year term of the franchise agreements, had Zinn not unilaterally terminated, less any cost savings. *Cf. Postal Instant Press, Inc. v. Sealy*, 43 Cal. App.4th 1704, 51 Cal. Rptr. 2d 365 (1996). As a result of Zinn's breach, Dunhill was deprived of future royalty payments by each Respondent, and is therefore entitled to recover $170,458.09 from him.

## VIII.  CONCLUSION

To remedy the harm it has suffered, Dunhill seeks damages in the amount of $170,458.09 for past-due and future royalties (*See* Ex. 105). The Arbitrator should deny Zinn's counterclaims. Dunhill also requests an award of prejudgment interest and its reasonable attorneys' fees and costs.

RESPECTFULLY SUBMITTED this 27th day of April, 2007.

GREENBERG TRAURIG, LLP

By

Jeffrey H. Wolf
2375 E. Camelback Road, Suite 700
Phoenix, Arizona 85016
*Attorneys for Dunhill Staffing
Systems, Inc.*

57

ORIGINAL of the foregoing sent
via e-mail this 27th day of April, 2007, to:

Michael D. Friedman, Esq.
Shiboleth, Yisraeli, Roberts & Zisman, L.L.P.
350 Fifth Avenue, Suite 6001
New York, New York  10118
*Arbitrator*

COPY of the foregoing sent via
e-mail this 30th day of April, 2007, to:

Richard L. Rosen, Esq.
THE RICHARD L. ROSEN LAW FIRM, PLLC
110 East 59th Street
New York, NY  10022
*Attorneys for Respondent Dunhill Franchisees Trust*