# EXHIBIT 3

**GREENBERG TRAURIG, LLP**
ATTORNEYS AT LAW
SUITE 700
2375 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016
(602) 445-8000

Jeffrey H. Wolf (Arizona Bar No. 011361)
Attorneys for Claimant Dunhill Staffing Systems, Inc.

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **DUNHILL STAFFING SYSTEMS, INC.**<br><br>Claimant,<br><br>v.<br><br>**DUNHILL FRANCHISEES TRUST, et al.,**<br><br>Respondents. | Case No. 13-181-Y-01674-04<br><br>**DUNHILL STAFFING SYSTEMS, INC.'S POST-HEARING MEMORANDUM OF LAW REGARDING RESPONDENT HARVEY AUGER** |

4/27

**DUNHILL STAFFING SYSTEMS, INC.'S
POST-HEARING MEMORANDUM OF LAW
REGARDING RESPONDENT HARVEY AUGER**

## TABLE OF CONTENTS

Summary of Hearing Evidence.................................................................2

Argument.....................................................................................7

I.    Respondent's "Decline and Deterioration" Is Not a Legally
      Cognizable Claim or Theory ...........................................................7

      A.    There Is No Legal Precedent for the Decline and
            Deterioration Theory ...........................................................8

      B.    In Any Event, There Is No Factual Basis for Respondents'
            Theory:  The Staffing Industry Suffered a Slowdown Due
            to an Economic Recession Between 2000 and 2003, and
            There Is No Evidence of Dunhill's Failure to Deliver Services................11

II.   Auger Has Failed to Prove Fraud or Fraudulent Inducement as a
      Matter of Law ......................................................................15

      A.    The Fraud Claims Relating to the Lack of Training and
            Support, Advertising, and Software Are, if Anything, Breaches
            of Contract Claims..............................................................15

      B.    Under New York Law, the Franchise Agreement's Integration
            Clause Fully Precludes Auger's Fraudulent Inducement Claim
            Based on the Size of Growth of the System, Percentages of
            Exchange Program Referrals and Earnings Projections...........................17

      C.    Beyond the Application of the Integration Clause, Respondents
            Failed to Prove the Elements of Fraud by Clear and Convincing
            Evidence .......................................................................21

III.  Dunhill's Item 20 Disclosures Fully Comply with FTC Regulations as a
      Matter of Law; There Is No Evidence of False or Misleading Disclosures ..........32

IV.   Auger's Claim Under the New York Franchise Sales Act Is Barred by the
      Statute of Limitations .............................................................34

V.    Auger Failed to Provide Dunhill Written Notice of Any Alleged Breach
      of the Franchise Agreement; Thus, His Breach of Contract Claims Are
      Barred .............................................................................35

      A.     Auger Made No Effort to Comply with These Explicit Notice Requirements ................................................................................... 36

      B.     Auger's Failure to Provide Any Written Notice Now Permanently Bars His Claims ................................................................. 41

      C.     The Arbitrator Should Give the Franchise Agreement's Unambiguous Language Its Plain Meaning and Full Effect ..................... 42

VI.    Dunhill Met All of Its Contractual Obligations, in Any Event ............................. 43

      A.     Dunhill Met Its Contractual Obligations to Each Respondent .................. 44

      B.     Respondents Are Not Entitled to Rescission Because There Is No Evidence of Willfulness and No Wholesale Failure of Consideration ...... 52

      C.     Respondents Are Not Entitled to Recover Lost Wages ........................... 54

      D.     Respondents Are Not Entitled to "Equitable Setoff" ............................... 55

VII.   Auger Materially Breached the Franchise Agreement .......................................... 57

      A.     Failure to Provide Notice and Opportunity to Cure and Unilateral Termination ........................................................................... 57

      B.     Failure to Submit Statement 3 Reports and Failure to Pay Royalties ....... 57

      C.     Dunhill Is Entitled to Recover Any and All Damages Stemming From Auger's Breaches, Including Lost Future Royalties ....................... 58

VIII.  Conclusion ................................................................................................... 58

Claimant Dunhill Staffing Systems, Inc. ("Dunhill") hereby submits its post-hearing memorandum of law regarding the claims and counterclaims pertaining to Respondent Harvey Auger ("Auger"). Based on the evidence presented at the arbitration hearing, Dunhill requests that the Arbitrator enter an award as follows:

(1)     Finding in Dunhill's favor on its claims for past due and future royalties in the amount of $62,785.40;

(2)     Finding in Dunhill's favor on Auger's counterclaim for breach of contract and failure of consideration;

(3)     Finding in Dunhill's favor on Auger's counterclaims for fraud or fraudulent inducement;

(4)     Finding in Dunhill's favor on Auger's counterclaim for rescission;

(5)     Finding in Dunhill's favor on Auger's counterclaim for violation New York's Franchise Sales Act; and

(6)     Finding in Dunhill's favor on Auger's counterclaim for equitable setoff.

## SUMMARY OF THE EVIDENCE

During early summer of 2000, Respondent Harvey Auger ("Auger") learned about the Dunhill opportunity from his friend, Pat Cacho, who at that time owned a Dunhill franchise in North San Francisco, California. (TR 1/25/07, p. 1229). Mr. Cacho's desk specialty was relocation real estate and mortgage. (TR 1/26/07, pp. 1335-1336). Mr. Cacho received the Dunhill franchisee President of the Year award for 2000, earning $450,000 that year. (*Id.* at 1339, lines 11-22). Auger knew Mr. Cacho because he had been in the relocation and mortgage industry himself, starting with a company called Home Equity for nineteen years, of which he was the president from 1989 to 1995. (TR 1/25/07, p. 1226). Starting in 1995, he consulted for Maris Home Services, a real estate conglomerate, and later worked for an internet mortgage company called IOwn.com, in San Francisco for sixteen months. (*Id.*) Prior to purchasing his Dunhill franchise, Auger had moved back to his hometown of Stratford, Connecticut.

At Mr. Cacho's suggestion, Auger telephoned Joanne Naccarato at Dunhill, and she forwarded him marketing materials. (TR 1/25/07, p. 1231). Then on July 11, 2000, Auger and his wife went to Dunhill Headquarters in New York for a "Discovery Day." (Ex. 42; TR 1/26/07 at 1350). After that meeting, Ms. Naccarato sent a letter to Auger suggesting that he contact Dunhill franchise owners by using the Call List. (*Id.*) As part of his due diligence, Auger contacted three existing Dunhill franchisees, Mr. and Mrs. Babson, Don Kaiser, and Tom Barbow. (*Id.* at 1353, see also TR 1/25/07, p. 1253). The Babsons told Auger that they thought it was a positive thing to be part of Dunhill, that they were having their best year yet, and that it was a good idea to get a permanent placement business on the ground before starting a temporary business. (*Id.* at p. 1355-1359). Before deciding to join Dunhill, one of Auger's clients told him that a franchise could not bring him value because he already had 25 years of experience in the industry and knew "everybody." (TR 1/25/07, pp. 1244-45). Auger, however, believed he would get training and support, wanted the motivation of the annual meetings and monthly rewards, and the network of offices. (*Id.* ).

Another factor in Auger's decision to join Dunhill was the prospect of Dunhill 2000, a proposed program to allow Dunhill franchisees to combine permanent and temporary businesses. (TR 1/26/07, p. 1365). Joanne Naccarato told him that, at that time, there were no available temporary franchises in Connecticut, but that he might look to the southeast for possible locations in which to eventually start a temporary business. (TR 1/25/07, p. 1249). Because Charlotte, North Carolina was growing by 10,000 people per month, and new hospitals and schools were being built, Auger thought there would be lots of opportunities for temporary staffing business there. (*Id.* at 1263, lines 18-25). Auger thought he could operate his Dunhill business from Charlotte because the permanent business could be run anywhere, and he had relationships all over the country. (TR 1/25/07, p. 1262, lines 15 thru 25). Further, Auger had very good relationships in

Charlotte area, including with a man named Allan Tate who runs one of the largest real estate companies there. (*Id.*)

Despite the fact that his franchise agreement did not contain any promises regarding Dunhill 2000 (it is not even mentioned in the agreement), Auger "figured" it might be offered to him six months down the road. (TR 1/25/07, p. 1251, lines 12-16). In fact, even the UFOC had disclosed to Auger that "Dunhill *intends to launch* a new franchise product, known as 'Dunhill 2000,' sometime in the year 2000." (Ex. 36, Bates 006020, emphasis added). Auger allegedly chose to move to North Carolina based on the prospect of participating in Dunhill 2000, and testified that he would have stayed in Connecticut with his family had he known that Dunhill 2000 would not be available. (TR 1/25/07, p. 1263, 1267).

Auger later learned that the FAC rejected the Dunhill 2000 program. (TR 1/26/07, p. 1368). Through no fault of Dunhill's, this product was not made available to Auger or anyone else. (*Id.*). Regardless, in March 2001, Auger attended a strategy meeting during which other seasoned Dunhill franchisees recommended that he first stabilize his permanent franchise business and learn how to make placements nationwide before he attempted to start a temporary business, because it was very different and time-consuming. (TR 1/25/07, p. 1265). In fact, those franchisees warned that if he started a temporary business too soon, his permanent business would "go down the tubes." (*Id.* at 1265). After receiving this advice, Auger had decided to focus on growing his permanent business anyhow. (*Id.*). Furthermore, Auger never sent written notice that he deemed Dunhill to be in default of its contractual obligations by not offering Dunhill 2000 to him.

While Auger was reviewing the Dunhill opportunity, his son Chip lost his job in Connecticut, and inquired whether it was a good opportunity for them to work together. (TR 1/25/07, p. 1228). Auger agreed to go into business with his son, and hoped that Chip would eventually take over operations of the Dunhill franchise. (*Id.*). Auger chose

4

not to investigate any other employment or staffing companies. (TR 1/25/07, p. 1230). Prior to signing his franchise agreement, Auger chose not to review Dunhill's marketing brochure's schedule of start-up costs with a business advisor. (TR 1/26/07, pp. 1376-1378).

When he signed his franchise agreement on October 12, 2000, Auger acknowledged that he agreed to the following provision, listed in Section 15 in all capitals:

> **A. THIS AGREEMENT EXPRESSES FULLY THE UNDERSTANDING BETWEEN THE PARTIES AND ALL PRIOR OR CONTEMPORANEOUS UNDERSTANDINGS, AGREEMENTS, AND REPRESENTATIONS OF ANY KIND, WHETHER ORAL OR WRITTEN, AS TO THE FRANCHISE . . . ARE CANCELED AND ARE NULL AND VOID AND OF NO EFFECT. ANY PREVIOUS MATTER, PRESENTLY COVERED WITHIN THIS AGREEMENT, IS HEREBY SUPERSEDED AND CANCELED WITH NO FURTHER LIABILITIES OR OBLIGATIONS OF THE PARTIES WITH RESPECT TO SUCH MATTER, EXCEPT AS TO ANY MONIES DUE AND UNPAID BETWEEN THE PARTIES TO THIS AGREEMENT AT THE TIME OF SIGNING THIS AGREEMENT.**

(Ex. 38, Bates 00267).

By signing the agreement, Auger also acknowledged other provisions in the agreement, which were also fully capitalized to draw the reader's attention, and are paraphrased as follows:

(C)    The success of Auger's Dunhill business was speculative and depended upon his business ability and personal efforts.

(D)    Dunhill had not guaranteed Auger any results.

(E)    Auger did not receive or rely upon any oral or written information contrary to the information contained in the franchise offering circular or franchise agreement.

(H)    Auger had a full opportunity to review the Dunhill UFOC and understood the terms, conditions and obligations of the franchise agreement.

(I)    No representations or promises were made by Dunhill to induce him into the agreement; and finally,

(J)    Auger did not rely on any statements other than those contained in the UFOC in deciding to sign the agreement.

(*Id.*)

Dunhill's UFOC also contained language specifically disclaiming guarantees of success, and further specifically alerting the prospective franchisee that Dunhill did not authorize its representatives to furnish oral or written information projecting income or profits, and that actual results would vary from unit to unit.  (Ex. 36, Bates 006054).

FTC warnings in the UFOC instructed prospective franchisees to read the contract carefully, and stated "[I]f possible show your contract and this information to an advisor like a lawyer or an accountant."  (*Id.* at 006012).  Auger acknowledged in Section 15.G. of the franchise agreement that Dunhill also encouraged him to seek legal or other professional guidance prior to signing it.  (Ex. 38, Bates 00268).  Despite this advice, Auger chose not to seek guidance from an attorney, an accountant or a franchise consultant. (TR 1/26/07, p. 1388, lines 15-25).

Because his Charlotte office would not be available until January 1, 2001, Auger started running his permanent franchise business out of his home in Stratford, Connecticut, right after his initial Dunhill training in October 2000.   (TR 1/25/07, pp. 1261-1262).  Auger testified that good training was "critical" to him and particularly his son who had no field experience. (*Id.* at 1236).  Even though he felt that the training was a "big disappointment" for himself and his son, he never sent written notice to Dunhill that he deemed Dunhill to be in default of its contractual obligations.  (*Id.*) Dunhill also provide training or guidance to Auger's office for the first three of for months after start-up, but then allegedly started canceling appointments in the March 2001 timeframe. (*Id.* at 1240).  Auger did not send written notice to Dunhill indicating that he deemed Dunhill to be in breach of its contractual duties with respect to continuing support.

6

In January 2003, Auger sent Dunhill's then interim president John Mills a letter in which he expressed his desire to become President of Dunhill. (TR 1/25/07, p. 1270). The letter discussed some issues of concern and that morale had gone down terribly in the last two years and that something needed to be done. (*Id.*).

Auger's Dunhill franchise did not generate as much income as he had expected. In fact, he did not draw any salary while he ran his Dunhill business, although he was able to pay his son $31,000 a year. (TR 1/25/07, pp. 1258, 1283). On March 9, 2004, Auger authorized Attorney Robert Purvin to send a letter to Dunhill terminating his franchise agreement, effective as of December 31, 2003. (TR 1/25/07, pp. 1274-1276). Despite this unauthorized letter of termination, Auger did not de-identify his office as a Dunhill Staffing office until September 2004. (*Id.* at 1278).

On April 1, 2005, Auger began working for ReMax of Georgia. (*Id.* at 1284, lines 19-25). In May 2005, Auger suffered a heart attack and required quadruple bypass surgery. Because he had no medical insurance, Auger wants Dunhill to pay his medical costs of $130,000. (*Id.* at 1281-1282). Further, even though Auger acknowledged that Dunhill did not agree to pay his relocation expenses if he decided to pursue a Dunhill franchise, (TR 1/26/07, pp. 1348-1349), he also seeks reimbursement from Dunhill for relocation expenses for himself and for his son. (*Id.* at 1317).

## ARGUMENT

## I.  RESPONDENTS' "DECLINE AND DETERIORATION" IS NOT A LEGALLY COGNIZABLE CLAIM OR THEORY

Although not articulated with much precision, Respondents apparently contend that they should be excused from paying royalties because the Dunhill franchise system was in an alleged state of decline during the time they operated their franchises.

Respondents' position simply is not sustainable as a matter of law. And, other than the fact that the number of Dunhill franchisees decreased over a several year period, there is no factual support for this so-called theory. In the few instances that a franchisee

7

has refused to pay royalties based on "decline and deterioration" their position has been soundly rejected by both state and federal courts.

**A.    There Is No Legal Precedent for the Decline and Deterioration Theory.**

Very few courts have considered whether a franchisor may be liable to its franchisees for the general decline and deterioration of its system and none have found in the franchisees' favor.

Most recently, this issue was addressed in *Brenco Enterprises, Inc. v. Takeout Taxi Franchising Systems, Inc.*, No. 177164, 2003 WL 21659422 (Va. Cir. Ct. May 23, 2003). In *Brenco*, a group of franchisees sued the franchisor for, among other things, "the deterioration ... and overall steady decline of the franchise system." *Brenco Enterprises, Inc.*, at *3. The franchisees claimed that because the "overall growth, stability and viability of the ... franchise system" was in decline, they were justified in unilaterally ceasing to pay royalties and refusing to honor post-termination non-compete clauses. *Id.*

Because decline and deterioration is not a cognizable cause of action (or defense), the *Brenco* franchisees wrapped this "claim" in breach of contract claims. *Id.* That is, they attempted to create a general franchisor duty to provide "advisory assistance, updates and revisions to manuals and software, and inspections and evaluations of each of the franchisee locations," as well as a general duty to support the success of the franchisee, and contended that by failing in these duties, the franchisor breached the franchise agreements. *Id.* at *3, *14.

The *Brenco* court rejected the franchisees' argument and found that the franchisor's shortcomings did not amount to a material breach, and thus did not justify the franchisees' non-payment of royalties and post-termination non-compete violations. *Id.* at *15. The court specifically found that the franchisor had fulfilled the essential purpose of the franchise agreement by (1) allowing franchisees to operate a business

8

under the franchise system, (2) licensing their proprietary marks, and (3) providing training and other assistance. *Id.* With these three fundamental components satisfied, there was no material breach by the franchisor in allowing the franchise to go into a decline. *Id.* The court reasoned that:

> "although [the franchisor] did not perform certain of its post-opening obligations to the satisfaction of some of the franchisees, or may have failed to perform some of [these] obligations altogether, [such failures] hardly go to the root of the franchise agreements, or defeat the essential purpose of those agreements." *Id.*

Other courts have likewise rejected franchisees' "decline and deterioration" claims. In *Shoney's, Inc. v. Morris*, 100 F.Supp.2d 769 (M.D. Tenn. 1999), the court dismissed the franchisee's claims on summary judgment, and awarded Shoney's its past due account receivables, as well as future royalties. Morris, the franchisee, alleged that Shoney's breached the agreement first "by causing or permitting the decline of the value and reputation of its trade name," and causing a reduction in sales, thus forcing him to prematurely close his own restaurants. *Id.* at 774-775. Further, Morris claimed that although Shoney's represented to him an intent to grow the franchise system by implementing "Project 500," a plan to open a certain number of franchises over the next five years, Shoney's actually concealed that it was a mature market, with a forecast for slow future growth. *Id.* at 778-779. Like the franchisees in this case, Morris claimed these alleged "breaches" relieved him of his obligations under his franchise agreement.

As to the first issue, the court noted "[e]ven if a decline in reputation and reduction in sales occurred, the court is at a loss to discern how this resulted in a breach of contract on the part of Shoney's." *Id.* at 775. Although Morris argued that Shoney's was obligated to maintain the value and reputation of Shoney's trade name, the court held that he failed to point to a specific requirement on the part of Shoney's in the franchise agreement to do so. *Id.* The second issue concerning Shoney's growth goals was barred by the agreement's integration clause, which precluded the admission of alleged

representations made to Morris which were not embodied in the final agreement.[1] *Id.* at 779.

Courts have also found assurances to franchisees by the franchisor that they "would turn things around" and "build revenue for the shoppes" to be not actionable. *Carlock v. Pillsbury*, 719 F.Supp. 791 (D. Minn. 1989). In *Carlock*, a Minnesota federal court applying New York law, dismissed claims asserted by a group of Haagen-Dazs franchisees. They had alleged that the franchisor: (1) overstated projected revenues to induce them into entering the contract; (2) failed to provide operational support and "know-how," and (3) failed to deliver promised marketing and advertising assistance.

As to whether the franchisor had a duty to disclose that revenues were on the decline nationally, the *Carlock* court noted that the UFOC specifically disclaimed any representations concerning sales or profits, and that the UFOC recommended to potential franchisees to make their own investigation. *Id.* at 839. The court also dismissed claims that the franchisor failed to provide "know-how" or ongoing support, finding that the franchise agreement outlined which services the franchisor was obligated to provide, and that, under New York law, there is no general duty to provide knowledge on how to run a profitable shop. *Id.* at 821.

Here, as in the *Brenco, Shoney's, and Carlock* cases, Respondents unquestionably received contractually-required franchisor support and services from Dunhill before they unilaterally terminated their franchise agreements. They challenge the *quality* of that support, but do not dispute that it was, in fact, provided. A mere difference of opinion on that issue does not constitute "decline and deterioration," nor does it excuse Respondents from paying their royalties. Just as important, while there may have been management changes at Dunhill and an economic challenges in the industry generally, Dunhill was not the cause of the Respondents' lack of success. If Dunhill was truly "dysfunctional," as

---

[1] Case law upholding the enforceability of integration clauses is fully discussed in a subsequent section of this brief.

they contend, then no other Dunhill franchisees could have succeeded during the same timeframe either. But, in fact, many did succeed. More importantly, the evidence established that Respondents were given the right to operate in the Dunhill System, received trademark licenses and received training and support. The only reasonable conclusion is that Respondents' own shortcomings as businessmen played a substantial role in their lack of success.

Because there is no case law – from any jurisdiction, much less New York – that allows a franchisee to escape responsibility for paying royalties based on the alleged decline of the franchise system the Arbitrator cannot give this theory any credence.

B.     **In Any Event, There Is No Factual Basis for Respondents' Theory: The Staffing Industry Suffered a Slowdown Due to an Economic Recession Between 2000 and 2003 and There Is No Evidence of Dunhill's Failure to Deliver Services.**

Respondents have attempted to put Dunhill on trial for decreasing in size as a franchise system, which in and of itself clearly does not violate any state or federal law. To support their theory, Respondents made erroneous comparisons between Dunhill and MRI and other staffing industry competitors and attempted to characterize Dunhill as a failing system that was unable or unwilling to provide contractually-required services and support and brand value. However, Respondents not only failed to acknowledge the substantial downturn that the staffing industry during the relevant time period, they attempted to mislead the Arbitrator into believing that other staffing companies were thriving while Dunhill alone decreased in size. This is patently untrue.

The 2006 Staffing Industry Sourcebook© (the "Sourcebook"), authored by Staffing Industry Analysts, Inc., a company that tracks industry-wide data and trends, documented a "significant drop of (permanent placement) firms in the 2000-2003 period, with as many as 50% of recruiter desks actually abandoned during this period." (Staffing Industry Analysts, Inc., *Staffing Industry Sourcebook*, p. 27, 2006; attached hereto as Exhibit A). With reference to the impact of 9/11, the Sourcebook noted:

"[T]he already shaky economy stumbled even more after the attacks, leading to depressed revenue, shuttered offices, staff reductions and consolidations. ... By 2003, the much anticipated economic turnaround still evaded the industry. ... By the end of 2004, the U.S. staffing industry finally appeared to be healthy, following three long years of suffering."

(*Id.* at pp. 35-36).

In contrast to the authoritative, unbiased Sourcebook, Respondent Lamanna, *who is obviously not an expert on the staffing industry*, compiled purely self-serving and misleading charts, which Respondents offered into evidence to supposedly show that other staffing companies were unaffected by recessionary factors and grew dramatically during the same period. (TR 3/7/07, p. 19). Because Respondents did not produce these charts until January 8, 2007, Dunhill had no opportunity to discover the sources of Auger's self-serving analysis or depose him about the trustworthiness and consistency of his methodology. At first blush, however, several of the figures are not what they seem.[2]

For instance, Lamanna testified that MRI grew in size over the years 2000-2003. But MRI's reported revenues, as reflected on its Form 10-K, belies that the company was thriving during this time period. Just the opposite is true: MRI's reported revenues are as follows: 2000 ($136,752); 2001 ($103,167); 2002 ($85,901); and 2003 ($56,876). This demonstrates a decrease of 58% in revenues. It is difficult to substantiate the active office units[3] of another staffing company, and particularly hard to ascertain which units met Lamanna's arbitrary $60,000 threshold. But one cannot argue with the accounting reported on a Form 10-K: the numbers simply don't lie.

For purposes of this argument, it is important to understand that Lamanna's "$60,000 analysis," by which he self-servingly deemed which Dunhill offices were "real

---

[2] It is more than a little ironic that Lamanna would offer testimony based on false, or at least seriously skewed data, given that he and the other respondents are alleging that Dunhill engaged in fraudulent practices.

[3] Other staffing companies might have had inactive offices but were not proceeding with the expense of legally terminating them.

units," was *not* based on any company generated data.   In observing Respondents'
Exhibit 42, it appears that Lamanna analyzed data from Monthly Data Statements,
otherwise known as "MDS reports," reports that are *voluntarily* submitted by only some
franchisees.   In contrast, Statement 3 Royalty Reports are mandatory, and indicate total
sales, total cash collections and total accounts receivable.   (TR 1/31/07, pp. 1907-1908).
Royalties are paid at the time of cash collections and remitted to Dunhill monthly.   The
Statement 3 reports are submitted to Dunhill and *cannot be shared with any other
franchisee.*

The voluntary MDS reports Lamanna relied on to create Exhibit 42 unfairly and
inaccurately show that only certain offices achieved $60,000 of revenue in 2003.   The
undisputed evidence showed that Dunhill merely uses the MDS reports as a tracking tool
-- to track various items in order to present monthly, annual, and lifetime achievement
awards on such things as placement fees by consultants, total placement fees, rookie
consultant awards, etc. (TR 1/31/07 at pp. 1905-1906). Thus, if a franchisee chooses not
to submit a report, they are not eligible for the recognition awards.   Some franchisees
might not participate for a variety of reasons including not wanting to reveal their
performance of profits to their peers, or to avoid showing revenues greater than their
Statement 3 royalty reports so they can pay less royalties. (*Id.* at 1904-1905).

Lamanna *himself* did not submit MDS reports: *the Irvine office shows no MDS
entries for the entire year of 2003, but he shows his total amount at $60,500.* The bottom
line is that Exhibit 42, in which Lamanna attempts to portray the number of Dunhill
offices earning over $60,000 in gross revenues, is based on incomplete and possibly
inaccurate information.

Finally, there is no factual basis for Lamanna's "impeachment" testimony
concerning Robert Stidham's testimony that there were only two staffing companies who
surpassed one hundred franchise units. Respondents made a big deal out of this but it is
Respondents' own evidence that lacks credibility. As the Arbitrator will recall, during

Lamanna's testimony, Respondents offered into evidence Respondents' Exhibit 61,[4] a list entitled "Franchised/Licensed Offices of Staffing Companies 2004," a list also generated by Staffing Industry Analysts, Inc. (TR 3/7/07, p. 12). The Arbitrator noted the "alphabet soup" footnote on the document which demonstrates that the companies listed are of various types, and are not all permanent placement businesses (listed as "p" in the footnote). And Dunhill wishes to make clear that when comparing apples to apples, Stidham's testimony holds up consistent with Stidham's testimony, as of 2004, Express Personnel and MRI were the only two permanent placement companies above the one hundred unit mark.[5]

From 2001 to 2004, Dunhill lost millions of dollars due to the slowdown in the U.S. economy after 9/11, not to mention the losses resulting from the non-payment of royalties by Respondents and the former Trust members. Yet, as described during the hearing and summarized herein, Dunhill continued to provide services to *all* franchisees during this timeframe. Some franchisees have greatly benefited from Dunhill's training and support,[6] while others have been less successful. But during the same period that Respondents claim there was no support, many Dunhill franchisees thrived. Thus, Respondents have not, and cannot, provide evidence to support their "decline and deterioration" theory, even if it were legally viable.

---

[4]    This was Exhibit 61 in the "One or All" notebook. Respondents never provided an updated index to Dunhill, so Dunhill made an effort to follow the exhibit numbers listed in the transcripts and not the index as much as possible. Otherwise, all exhibits cited to in this brief refer to Claimant's exhibits, for which there is no numerical repetition.
[5]    Manpower, listed at 769 units, is primarily a temporary staffing business, although it also does some permanent placement.
[6]    For example, Neil Whitman and his entire training class have kept open their franchise offices. (See TR 1/30/07, p. 1755).

## II.  AUGER HAS FAILED TO PROVE FRAUD OR FRAUDULENT INDUCEMENT AS A MATTER OF LAW

Without so much as a single shred of evidence to establish fraudulent intent (let alone any other element of fraud), Auger alleges that Dunhill fraudulently induced him to join the Dunhill franchise system with false promises and misrepresentations, both in the marketing brochure and statements made by Dunhill management, related to: (1) training and ongoing support; (2) technology and software; (3) Dunhill's advertising efforts, (4) the size and viability of the system; (5) assurances that the Exchange Program would generate 25% of his revenues, (6) the purported earnings projection and (7) statements regarding Dunhill 2000.

Auger's fraudulent inducement claim should be rejected for three reasons. First, Auger cannot bootstrap fraud claims onto his contract claims, and thus any claims related to contractual obligations cannot be subjected to a fraud analysis.   Second, the Agreement's valid integration clause precludes Auger from supporting his non-contract related fraud claims with evidence of any statements made outside the UFOC or franchise agreement.   Third, even absent the integration clause, Auger cannot prove any of the elements of fraud by clear and convincing evidence, the requisite standard of proof.

### A.  The Fraud Claims Relating to Lack of Training or Support, Advertising, and Software Are, If Anything, Breach of Contract Claims.

Several of Auger's fraud-based claims stem from his obvious disenchantment with his success after joining the Dunhill system, but Auger cannot package these disappointments as fraud claims.  The crux of these matters is a contractual in nature, and it is well settled that a cause of action for fraud will not lie when the alleged fraud relates to a breach of contract.  New York law requires that a fraud claim be "sufficiently distinct from the breach of contract claim." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). (*quoting Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996)).  Even an allegation of an

intentionally false statement that meets all the elements of a proper fraud claim cannot support a cause of action "where a fraud claim is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement.'" *Bridgestone/Firestone, supra, quoting Metropolitan Transportation Authority v. Triumph Advertising Productions*, 497 N.Y.S.2d 673, 675 (App.Div., 1st Dep't 1986).

This principle is further explained in *Telecom Int'l America Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001), in which the Second Circuit observed:

> "[U]nder New York law, where a fraud claim arises out of the same facts as [a] breach of contract claim, with the addition only of an allegation that [the other party] never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract. . . . In other words, simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim."

(*Id.*, internal citations and quotation marks omitted.); *see also Gordon v. Dino De Laurentiis Corp.*, 141 A.D.2d 435 (1st Dep't 1988) ("a fraud claim is not sufficiently stated where it alleges that a defendant did not intend to perform a contract with a plaintiff when he made it."); *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331 (4th Cir. 1998)(district court erred by allowing franchisees to advance tort counts paralleling their breach of contract claims.).

Auger's allegations concerning either Joanne Naccarato's pre-contractual statements or representations in the Dunhill brochure that he would receive training, ongoing support, state of the art software, or promises of advertising, are not collateral or extraneous to the franchise agreement, and thus are actionable, if at all, under a breach of contract theory. Because Auger cannot distinguish these "fraud" claims from his parallel breach of contract claims, the fraud theory, as to these issues, is unsupportable.

**B.    Under New York Law, the Franchise Agreement's Integration Clause Fully Precludes Auger's Fraudulent Inducement Claim Based on the Size and Growth of the System, Percentages of Exchange Program Referrals and Earnings Projections.**

To remind the Arbitrator, the integration clause states as follows:

**A.    THIS AGREEMENT EXPRESSES FULLY THE UNDERSTANDING BETWEEN THE PARTIES AND ALL PRIOR OR CONTEMPORANEOUS UNDERSTANDINGS, AGREEMENTS, AND REPRESENTATIONS OF ANY KIND, WHETHER ORAL OR WRITTEN, AS TO THE FRANCHISE . . . ARE CANCELED AND ARE NULL AND VOID AND OF NO EFFECT. ANY PREVIOUS MATTER, PRESENTLY COVERED WITHIN THIS AGREEMENT, IS HEREBY SUPERSEDED AND CANCELED WITH NO FURTHER LIABILITIES OR OBLIGATIONS OF THE PARTIES WITH RESPECT TO SUCH MATTER, EXCEPT AS TO ANY MONIES DUE AND UNPAID BETWEEN THE PARTIES TO THIS AGREEMENT AT THE TIME OF SIGNING THIS AGREEMENT.**

(Ex. 38, Bates 00267).

**1.    Under New York Law, Respondents are Presumed to Have Understood the Franchise Agreement and to be Conclusively Bound Thereby**

As a threshold matter, it is necessary to quickly address and dispose of Auger's self-serving testimony that he did not fully understand the franchise agreement when he signed it because he was "not a lawyer." (TR 1/26/07, p. 1259).

Basic to the law of contracts is the principle that a party who signs an instrument manifests assent to it, and may not later complain about not reading or not understanding the instrument. 7-29 *Corbin on Contracts* § 29.8, *citing Richardson Greenshields Securities, Inc. v. Metz*, 566 F. Supp. 131 (S.D.N.Y. 1983)*; see also Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566 (4th Cir. 1998) (parties to a commercial contract who deal at arms length have a duty to read the contract carefully and are presumed to understand it.).

New York law presumes knowledge of the contents of an executed instrument, and conclusively binds the signor whether or not the contract was read or understood. *See e.g., Sofio v. Hughes*, 162 A.D.2d 518, 519 (2nd Dept. 1990); *Toulamis v. Chalem,*

17

156 A.D.2d 230,548 N.Y.S.2d 493 (1st Dept 1989) ("One who enters into a plain and unambiguous contract cannot avoid the obligation by merely stating that he erred in understanding its terms."); *see also* Metzger *v. Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920)("Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations.").

2.    The Integration Clause is Valid as a Matter of Law.

Because Auger expressly acknowledged that he did *not* rely upon representations that were not set forth in the UFOC or franchise agreement, he cannot now claim to have done so.   In any event, any alleged misrepresentations made outside the UFOC or agreement are barred by the integration clause.   Under New York law, an integration clause that *specifically* contemplates claimed oral representations is enforceable to preclude an action for fraud in the inducement and parol evidence concerning fraudulent representations. *See Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146, 1152 (S.D.N.Y. 1989) (holding that franchisee's reliance on alleged misstatements by defendants was unreasonable as a matter of law where "[t]he franchise agreement, as well as the offering circular which preceded it, both contained detailed, explicit integration and disclaimer clauses"); *see also Bibeault v. Advanced Health Corp.*, No. 97 Civ. 6026, 2002 WL 24305, *3-4 (S.D.N.Y. Jan. 8, 2002) (*citing Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-321 (1959)); *Lee v. Goldstrom*, 522 N.Y.S.2d 917, 918 (2d Dep't 1987).

Courts in other jurisdictions have similarly enforced franchise agreement integration clauses finding that franchisees cannot prove fraud based upon extraneous statements in light of an integration clause. *See e.g. Cook v. Little Ceasar Enters., Inc.*, 210 F.3d 653, 658 (6th Cir. 2000) (existence of an integration clause in the franchise agreements made the buyer's alleged reliance on prior representations unreasonable); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (integration clause precluded "the imposition of extra-contractual obligations based upon the welter of conflicting oral statements and representations that plaintiffs introduced at

18

trial."); *Cajun Enterprises, Inc. v. Copeland*, 130 F.3d 180, 186 (5th Cir. 1997) (no reasonable reliance in face of integration/disclaimer clause contained in both franchise agreement and UFOC); *American Casual Dining LP v. Moe's Southwest Grill*, 426 F.Supp.2d 1356 (N.D.Ga. 2006) (integration and acknowledgement clauses precluded the franchisee's fraud claim based on pre-contractual representations); *Wootton Enters., Inc. v. Subaru of Am.*, 134 F. Supp. 2d 698, 715 (D. Md. 2001) (any actionable statements made during negotiations were superseded by fully integrated franchise agreement and could not reasonably be relied upon by the franchisee).

*Motor City Bagels, LLC v. American Bagel Co.*, 50 F.Supp.2d 460 (Md. 1990), in which franchisees claimed that the franchisor provided false earnings projections through average annual store sales statements, is highly instructive. *Id.* at 471. In that case, the franchisee relied on earnings information provided by the franchisor, which the franchisee incorporated it into its business plan. *Id.* The court granted summary judgment for the franchisor, concluding that these statements were not actionable as a matter of law for two reasons: first, the franchise agreement contained an integration clause which stated that the written agreement superseded all prior oral or written agreements, and it was unreasonable for the franchisee to subsequently claim that he had relied on the projections. *Id.* at 471-472. Second, the UFOC contained language disclaiming any ability to project sales, profits or earnings because each franchisee's results would vary, further explaining that no representative was authorized to make such a representation. *Id.*

Dunhill's franchise agreement, like the documents at issue in *Motor City Bagels, supra,* contained a specific integration clause, and the Dunhill UFOC included disclaimer language concerning earnings projections akin to the Motor City Bagels UFOC. Thus, even if Joanne Naccarato made some sort of comment that making $250,000 was within the "realm of possibilities," there is no evidence that the information Auger received was false, dishonestly presented or in any way designed to deceive or trick Auger into

entering the transaction. And by signing the franchise agreement, Auger specifically acknowledged that he entered into the agreement based on his own independent investigation, and not based on any representations or warranties made by Dunhill's management.

In attempting to support their fraudulent inducement claims, Respondents have also hung their proverbial hats on Dunhill's purported assurances that they would generate 25% revenues - in addition to whatever other revenues they earned - through participation in Dunhill's Exchange Program.

There is no contractual guarantee of a 25% revenue generation. The franchise agreement only speaks to rules governing the Exchange Program *should* a franchisee choose to participate in this voluntary program. Auger apparently believed (mistakenly) that the Exchange Program was mandatory, and that 150 offices would be "assisting" him with placements.[7] Despite this misconception, Auger is presumed to have read and understood Section 7.S of their Franchise Agreements which read, *"If you wish to participate* in the Dunhill Exchange Program, ..." a clear indication of the program's voluntary nature.

More importantly, the franchise agreement mentions nothing about percentage of revenues, projected or guaranteed, and no indication that other Dunhill offices would "assist" Respondents in gaining clients or revenue. Thus, Respondents' claim that Dunhill somehow committed fraud or breached its contractual obligations to them because they did not generate a certain level of income from the Exchange Program has no support, and is barred by the integration clause.

In view of the foregoing, any alleged oral or written misrepresentations regarding the size of the Dunhill system, Dunhill's intention to expand or grow the system, the percentage of revenue generated from the Exchange Program, and earnings projections,

---

[7]  The marketing brochure itself does not correlate "150 offices to assist you" with the Exchange Program.

are barred by the integration clause. Consequently, the Arbitrator should rule in favor of Dunhill on Auger's fraudulent inducement claim.

**C.    Beyond the Application of the Integration Clause, Respondents Failed to Prove the Elements of Fraud by Clear and Convincing Evidence.**

To prove a claim for fraud under New York law, the plaintiff must demonstrate, *with clear and convincing evidence*[8], (1) that defendant made a material false misrepresentation which was false at the time made and was known to be false by defendant; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the misrepresentation; and (4) the plaintiff suffered damages as a result of the reliance. *Sauer v. Xerox Corp.*, 17 F.Supp.2d 193 (W.D.N.Y. 1998), *citing Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 153 (2d Cir. 1995).

At the hearing, Respondents offered no evidence whatsoever to prove the Dunhill made any material misrepresentations that were false when made and known by Dunhill to be false. Respondents' subjective beliefs or retrospective accusations do not constitute proof of fraud. The evidence showed that Dunhill's UFOC and franchise agreement contained true and historically accurate information concerning the company and its operations. Further, any projections or predictions Dunhill's executives made as to the growth and viability of the company were pure opinion, and made with the hope that the company would succeed in the future. Respondents presented no evidence of any fraudulent intent on Dunhill's part, and the also evidence failed to establish that any of the franchisees justifiably relied upon any of the alleged misrepresentations because: (1) the materials advised them to conduct due diligence and investigate, which they did; (2) the pre-contractual statements regarding the attributes of the franchise system,

---

[8]    Claims for fraud mandate this higher standard of proof because 'the interests at stake are deemed to be more substantial than mere loss of money.' *In the Matter of Father Philip K. Eichner v. Dillon*, 426 NYS2d 517, 523 (2d Dep't 1980).

including statements contained in the sales brochure, amount to non-actionable puffery; and (3) predictions or comments relating to future events are not considered fraudulent if they later prove to be untrue.

1.    Auger Failed to Present Evidence of Material Misrepresentations.

The hearing evidence did not prove, let alone by clear and convincing evidence, that Dunhill made any material misrepresentation, or any statements known to be false at the time the statement was made.

### a.    Dunhill's UFOC Contained Accurate Information About the Number of Outlets

The Dunhill marketing brochure indicated that there were 150 other franchises in the system.    Auger also testified that Joanne Naccarato commented on this topic. (TR 1/26/07, p. 1434).    Robert Stidham testified that that would have been a fairly accurate number at that time. (TR 3/6/07, p. 117, lines 18-25).    More importantly, Respondents offered no evidence to show that the number of outlets listed in the UFOC Auger received was in any way inaccurate when reported.

Auger received Dunhill's UFOC on July 11, 2000, prior to signing his franchise agreement. (Ex. 37).    In the UFOC issued as of May 22, 2000, Dunhill disclosed the specific number of permanent placement franchisees in the system.    (Ex. 36, Bates 006055).    Reflecting the preceding three years as required by the Federal Trade Commission, the list shows 84 outlets operating at the end of 1999, 91 outlets for 1998, and 107 outlets for 1997.    The UFOC also projected 15 new franchised offices opening in 2000. (*Id.* at Bates 006056).

The evidence established that, as of December 31, 1998, there was a total of 151 offices in the Dunhill system. (TR 1/18/07, p. 118, lines 19-25).    This number is calculated by adding the franchised and company owned permanent staffing outlets listed in the permanent UFOC with the franchised and company owned temporary staffing outlets listed in the temporary UFOC. (*Id.* at pp. 116-118). As of the end of 1999, the

permanent UFOC shows a decrease of seven franchised outlets, and an increase of one company owned outlet, reflecting a possible 145 outlets in the system.[9]  Hence, there is no evidence that "150 offices nationwide" as stated in the perhaps slightly outdated marketing brochure was a material misrepresentation.  If the actual number of units in February 2001 was really 140, or 130, or 125, or even 100, why should that have made any material difference whatsoever to a prospective franchisee?

After the fact, and quite self-servingly, Auger claims that having 150 offices was somehow important to him.  (TR 1/25/07, p. 1238).  A party cannot reasonably rely upon allegedly false promises which are directly contradicted by the terms of a contract.  *See Carlock, supra,*  719 F.Supp. at 829.  Further, the number of franchise offices in the system was not a guarantee of any particular degree of success in the Exchange Program. And above all else, it is simply not credible to believe that Auger would not have purchased a Dunhill franchise had he known there were less than 150 offices when he signed his franchise agreement.

### b.    The Marketing Brochure Contained an Accurate Revenue Growth Number

Auger also testified that he relied on the reference in Dunhill's marketing brochure to "system-wide revenue growth" of 20%, but he now believes that that figure is inaccurate. (TR 1/25/07, p. 1235, lines 12-15).  The brochure expressly refers to "system-wide growth," not permanent placement office growth or temporary placement growth or *franchisee* growth.  (*Id.* at p. 1663, Ex. 33).  Further, Auger like any other prospect had the opportunity to review Dunhill's audited financial statements to independently assess all information concerning company revenues.

Rick Kean, who has been a trainer at Dunhill for approximately 25 years and has 'institutional memory,' testified that the 20% figure was accurate.  And the UFOCs introduced into evidence included audited financial statements that reflected a 20%

---

[9]  There is no evidence that the number of temporary franchises decreased in 1999.

system-wide annual growth in gross revenues over a trailing five year period. (Ex. 104). Critically, Respondents presented no evidence to dispute that Dunhill experienced 20% system-wide growth over the preceding 5-year period.

c.    **The Rate of Return on the Exchange Program was Historically Accurate**

Auger testified that he relied upon the statement in Dunhill's marketing brochure that "almost 25 percent of placements are the direct results of the exchange network." (TR 1/25/07, p. 1238). Further, Auger read and relied upon Dunhill's President's Manual that states: "The Dunhill Exchange Program is a set of procedures ... which have allowed Dunhill franchisees to generate 25% in additional revenues through shared resources over the past 15 years." (*Id.* at p. 1280; Ex. 68, Bates 009452). Because Auger generated no revenue through the Exchange Program, he contends that these representations are fraudulent.

The 25% rate was at least historically accurate and thus not a material misrepresentation. As the author of the Exchange Program section in the President's Manual, Kean testified that he based the 25% figure upon his own analysis of detailed MDS reports, and his own understanding from working at Dunhill during that time frame. (TR 1/31/07, pp. 1880-1883).

Granted, it appears that this figure changed, particularly during the time period at issue, when internet job boards such as Monster.com became available to the staffing industry. (TR 1/31/07, p. 1970, lines 5-20). Even so, Auger did not offer into evidence any independent analysis to determine whether the statement in the President's Manual about a 25% rate of success with the Exchange Program over the past 15 years was an accurate number. And no other evidence, from any source, was introduced by Respondents to controvert Mr. Kean's testimony on this point. FAC meeting minutes introduced into evidence indicated that as of October 2001 the exchange rate had decreased to 4%, a figure based on an analysis of the previous twelve months performed

24

by Mr. Cech. (TR 1/24/07, p. 971-974). But Mr. Cech did not testify, and it is not clear from the evidence presented exactly what information he had analyzed, if any. If the figure was based solely on the MDS reports, it would be difficult to ascertain an accurate number because, as discussed previously, those reports are voluntarily submitted by the franchisees.

Moreover, there is no evidence showing that, at the time Auger received this brochure in the summer of 2000, Dunhill had yet realized Monster's impact on the Exchange Program, and how critical that would become to a Dunhill franchisee's business in replacing the traditional franchisee intra-office relationships that were not internet-dependent. (*Id.* at p. 1880). In short, there is no evidence, let alone clear and convincing evidence, proving that Dunhill made any material misrepresentations that were known by Dunhill to be false when made concerning the Exchange Program, or concerning the size, growth, or revenues of the Dunhill franchise system.

2.     Auger Presented No Evidence of Fraudulent Intent.

Auger's fraud claims must be based, not on Dunhill's failure to fulfill promises, but instead on the intent of Dunhill's management not to perform at the time the alleged statements were made. An alleged misrepresentation or promise is actionable only when coupled with a contemporaneous intent not to perform. *Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957); *see also Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made.").

Here, Dunhill had no preconceived or undisclosed intention of not performing any of the promises or statements it supposedly made. In fact, the contrary is true. For instance, Naccarato told Auger that the system was growing, and that Dunhill had a goal to open 15 offices in 2000. (TR 1/26/07, p. 1434). Auger offered no evidence to show, nor any reason to believe, that Dunhill or Naccarato did not intend to meet, or actually did meet, this projection at the time it was given to Auger. The fact that Dunhill may

25

have also lost some offices in 2000, so that there was not a *net* growth of 15 offices, does not render Naccarato's projection fraudulent when made.

In the UFOC, Dunhill disclosed that "the market for permanent placement services is established yet competitive and expanding rapidly, that it will continue to expand, and that the need for such services will continue." (Ex. 36 at p. 4, Bates 006020). But, Dunhill made plain: "Dunhill can naturally give no guarantee or warranty of this." *Id.*

And so it comes down to this: Auger believed that the Dunhill system would work and that he would prosper. Dunhill's management had the exact same hopes, but never offered a guarantee: Dunhill's management simply offered its own opinions as to how the Dunhill system would perform--and it was in everyone's best interest to look positively to the future. Respondents are unhappy about the degree of success they achieved, but they were not, as a matter of law, affirmatively misled by Dunhill's statements or brochures. There is no evidence, let alone clear and convincing evidence, to infer that Dunhill acted with intent to deceive Auger or anyone else.

3.    Auger Failed to Prove Reasonable Reliance on any Alleged Fraudulent Statement.

"One to whom an allegedly false representation is made may not rely thereon if the means of obtaining the truth are available by the exercise of ordinary intelligence." *Sauer, supra* at 205, *quoting Arbitration between Jack Kent Cooke, Inc and Saatchi & Saatchi North America*, 222 A.D.2d 334 (N.Y.A.D. 1st Dept. 1995). The record establishes that each of the Respondents had an adequate opportunity to assess the Dunhill system viability, size, and Exchange Program, and to investigate the staffing industry as a whole. Clearly, they were each made aware of the risks of starting up a business, and decided to purchase a Dunhill franchise based on the exercise of individual business judgment.

In the marketing kit sent to Auger (and all prospects), Dunhill included a pamphlet titled, *Investigate Before Investing*, a guide for prospective franchisees published by the IFA. (Ex. 31). Further, Dunhill's brochure expressly warns that in buying a franchise, "[t]he risks are high and there are no guarantees." (Ex. 33). Auger testified that he engaged in due diligence of participating in Dunhill's Discovery Day, and then speaking with several Dunhill franchisees. (TR 1/26/07, pp. 1349-1355).

4.    <u>Auger Could Not Reasonably Rely upon Opinion or Puffery.</u>

The first page of Dunhill's marketing brochure states that "Dunhill has built one of the industries premiere staffing firms." (Ex. 33). Auger testified that relied on that statement, and that he now believes it is inaccurate. (TR 1/26/07, p. 1235, lines 8-11).

Vague statements and predictions must be characterized as an expression of opinion, sales talk, or "puffing" and will not support a claim for fraud. *See O'Neal v. Burger Chef Systems*, 860 F.2d 1341, 1348-49 (6th Cir. 1988); *George Backer Mgt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978). For example, in *American Casual Dining LP v. Moe's Southwest Grill, supra*, a franchisee sued a franchisor over certain alleged misrepresentations made orally and in the UFOC. 426 F.Supp.2d at 1365. One such statement upon which franchisee believed and relied was that Moe's had "perfected the system of opening and operating restaurants."

The district court noted that the franchisee was not justified in relying upon representations that are general commendations or mere expressions of opinion. *Id.* at 1364, *citations omitted.* Applying these principles, the court observed that:

> "any representations regarding Moe's experience, knowledge, skill, or expertise in estimating expenses or creating a system of opening and operating restaurants are merely opinions and statements of commendation, or "puffing." A party is expected to profess competency in its area of business. Thus, such expressions of experience and skill are considered puffery upon which a plaintiff cannot justifiably rely."

*Id.*

The Seventh Circuit similarly resolved this issue in *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir. 1986), in which it held that General Foods' statements about the viability of its system could only be characterized as non-actionable "puffing." The Court explained:

> "General Foods' statements regarding the potential of the company were designed to encourage investment by new franchisees and to stimulate the existing franchisees' enthusiasm. On the evidence presented here, the jury could not have found that, at any given moment during the period in question, General Foods or Burger Chef had a firm, present intention to make the System anything other than "viable." . . . That General Foods' idea of viability did not match the Vaughns' expectations is unfortunate — but it is not fraud."

*Id.* at 1411-12 (footnotes omitted).

In this case, Dunhill was a 50 year old staffing business. Several respondents testified that Dunhill's reputation and longevity had attracted them to the opportunity in the first instance. Dunhill's attestation concerning its status in the staffing industry was true and, in any event, amounts to non-actionable puffery.

     5.     Auger Could Not Reasonably Rely on Future Predictions.

Fraud cannot consist of mere broken promises, unfulfilled predictions or erroneous conjecture as to future events. The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. *Schwartz v. Newsweek, Inc.*, 653 F.Supp 384, 389 (S.D.N.Y. 1986). Nor does actionable fraud result from a mere failure to perform promises. *Telecom Int'l America Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001). Auger and the other Respondents failed to establish by clear and convincing evidence that any of them reasonably relied on any allegedly fraudulent statements concerning the growth or future success of the Dunhill system.

     a.     **Any Statements About Future Earnings Is a Future Prediction**

As discussed above, Dunhill's UFOC Item 19 disclaimed guarantees of success, and specifically alerted the prospect that Dunhill did not authorize its representatives to

furnish oral or written information projecting income or profits, and that actual results would vary from unit to unit. (Ex. 36, p. 37). Even though Item 19 of the UFOC states that Dunhill will not furnish earnings projections to prospective franchisees, Auger contends that Joanne Naccarato told him that making $250,000 was "within the realm of possibilities." (TR 1/26/07, p. 1402).

Because an action for misrepresentation must be based upon statement of a past or existing fact, statements about *future* profitability cannot provide a basis for an action in fraud. *Schwartz v. Newsweek, Inc.*, 653 F.Supp 384, 389 (S.D.N.Y. 1986). In fact, profit projections provided to a prospective franchisee have been held by courts to be mere puffery. In *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 2006 WL 3825103 (W.D.Mo. 12-21-2006), the franchisor assured the plaintiff that she was going to be "driving a truckload of money away . . . every year" and that she was "not going to have to worry about paying . . . bills." The court held that "[p]redictions and projections regarding the future profitability of a business or investment cannot form a basis for fraud *as a matter of law.*" *Id.* at *2 (emphasis added) (citations omitted). Because franchisor's statements were non-actionable predictions of the franchise's future profitability, the court granted summary judgment in the franchisor's favor on this claim. *Id.*

In the face of disclaimer language concerning earnings projections, the court in *Carlock v. Pillsbury Co., supra,* applying New York law, held that a party cannot reasonably rely on allegedly fraudulent representations of sales revenues of other franchisees where such representations are directly contradicted by the terms of an applicable offering circular. *Id.* at 829, *citing Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 416 (1st Cir. 1989); *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 805 (1st Cir. 1987); *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1518 (10th Cir. 1983)).

Here, Auger cannot establish the requisite justifiable reliance on the alleged earnings figures because if provided, they were merely a prediction of some future event. Furthermore, Auger, prior to signing his franchise agreement, reviewed and understood

29