# EXHIBIT 5

**GREENBERG TRAURIG, LLP**
ATTORNEYS AT LAW
SUITE 700
2375 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016
(602) 445-8000

Jeffrey H. Wolf (Arizona Bar No. 011361)
Marcy E. Mills (Arizona Bar No. 017384)
*Attorneys for Claimant Dunhill Staffing Systems, Inc.*

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| DUNHILL STAFFING SYSTEMS, INC. <br><br>           Claimant, <br><br>   v. <br><br> DUNHILL FRANCHISEES TRUST, et al., <br><br>          Respondents. | Case No. 13-181-Y-01674-04 <br><br> **DUNHILL STAFFING SYSTEMS, INC.'S POST-HEARING MEMORANDUM OF LAW REGARDING RESPONDENT BUD WESTOVER** |

4/27

**DUNHILL STAFFING SYSTEMS, INC.'S**
**POST-HEARING MEMORANDUM OF LAW**
**REGARDING RESPONDENT BUD WESTOVER**

## TABLE OF CONTENTS

Summary of Hearing Evidence.................................................................2

Argument ............................................................................................7

I.    Respondents' Decline and Deterioration Is Not a Legally Cognizable
      Claim or Theory...........................................................................7

      A.    There Is No Legal Precedent for the Decline and Deterioration
            Theory...............................................................................8

      B.    In Any Event, There Is No Factual Basis for Respondents' Theory:
            The Staffing Industry Suffered a Slowdown Due to an Economic
            Recession Between 2000 and 2003, and There Is No Evidence of
            Dunhill's Failure to Deliver Services .....................................11

II.   Westover Has Failed to Prove Fraud or Fraudulent Inducement as a
      Matter of Law ..........................................................................15

      A.    Westover's Fraud Claims Relating to the Lack of Training and
            Support, or Advertising Are, if Anything, Breaches of Contract
            Claims..............................................................................15

      B.    Under New York Law, the Franchise Agreement's Integration
            Clause Fully Precludes the Fraudulent Inducement Claim
            Based on the Size of Growth of the System, Percentages of
            Exchange Program Referrals and Earnings Projections...........17

      C.    Beyond the Application of the Integration Clause, Westover
            Cannot Prove the Elements of Fraud by Clear and Convincing
            Evidence ..........................................................................21

III.  Dunhill's Item 20 Disclosures Fully Comply with FTC Regulations as a
      Matter of Law; There Is No Evidence of False or Misleading Disclosures ..........34

IV.   Westover Failed to Provide Dunhill Written Notice of Any Alleged Breach
      of the Franchise Agreement; Thus, His Breach of Contract Claims Are
      Barred .....................................................................................36

      A.    Despite This Mandate of Timely Written Notice, Westover Made
            No Effort to Comply with These Explicit Notice Requirements..............37

B.     Westover's Failure to Provide Any Written Notice Now
Permanently Bars His Claims..................................................................43

C.     The Arbitrator Should Give the Franchise Agreement's
Unambiguous Language Its Plain Meaning and Full Effect......................44

VI.     Dunhill Met All of Its Contractual Obligations, in Any Event ............................45

A.     Dunhill Met Its Contractual Obligations to Each Respondent .................45

B.     Respondents Are Not Entitled to Rescission Because There Is No
Evidence of Willfulness and No Wholesale Failure of Consideration......54

C.     Respondents Are Not Entitled to Recover Lost Wages.............................55

D.     Respondents Are Not Entitled to "Equitable Setoff" ...............................57

VII.     Westover Materially Breached the Franchise Agreement ......................................58

A.     Failure to Provide Notice and Opportunity to Cure and
Unilateral Termination .............................................................................58

B.     Failure to Submit Statement 3 Reports and Failure to Pay Royalties .......59

C.     Dunhill Is Entitled to Recover Any and All Damages Stemming
From Westover's Breaches, Including Lost Future Royalties...................59

VIII.     Conclusion..............................................................................................................60

Claimant Dunhill Staffing Systems, Inc. hereby submits its post-hearing memorandum of law regarding Respondent Bud Westover. Based on the evidence presented at the arbitration hearing, Dunhill requests that the Arbitrator find in its favor on the following claims and counterclaims:

(1)     Finding in Dunhill's favor on its claims for past due and future royalties in the amount of $80,077.57;

(2)     Finding in Dunhill's favor on Westover's counterclaim for breach of contract;

(3)     Finding in Dunhill's favor on Westover's counterclaims for fraud or fraudulent inducement;

(4)     Finding in Dunhill's favor on Westover's counterclaim for rescission;

(5)     Finding in Dunhill's favor on Westover's counterclaim for violation New York's Franchise Sales Act; and

(6)     Finding in Dunhill's favor on Westover's counterclaim for equitable setoff.

## SUMMARY OF HEARING EVIDENCE

Respondent Bud Westover ("Westover") first learned about Dunhill through his friend of 27 years, Jim Gunnin, who was a Dunhill franchisee. (TR 1/22/07, pp. 491-492). He then met with Robert Stidham, Dunhill's Vice President of Franchise Development, on February 28, 2002. (TR 1/22/07, p. 492-495). During that meeting, Stidham gave Westover a pamphlet entitled, *Investigate Before Investing*, a guide for prospective franchisees published by the International Franchise Association ("IFA"), and Dunhill's marketing brochure. (Exs. 31, 33; TR 1/23/07, p. 794). Stidham also delivered to Westover Dunhill's permanent franchise UFOC. (TR 1/22/07, p. 509, line 15 through p. 410, line 21).

During the four and a half months between Westover's receipt of the UFOC and when he signed his franchise agreement, he conducted a tremendous amount of due diligence. (TR 1/23/07, p. 669). First, he hired an attorney to review the franchise

2

agreement, an exhibit within UFOC, and his attorney advised that he did not notice anything out of the ordinary. (TR 1/22/07, pp. 582-584). Second, he discussed the Dunhill franchise opportunity, and the "break even point," with his CPA, Mr. Robideau. (TR 1/23/07, p. 683, lines 19-22). Robideau told Westover that he thought this would be a good opportunity for him, but advised that the staffing industry had its ups and downs. (TR 1/23/07, p. 684, lines 7-12). On Mr. Gunnin's advice, Westover also investigated two other possible employment staffing franchises, including MRI and Sanford Rose. (TR 1/23/07, pp. 658-659). Westover received marketing information from MRI and a UFOC from Sanford Rose, and compared the information he received from Sanford Rose in the UFOC with Dunhill's UFOC. (TR 1/23/07, p. 659).

Westover also contacted many existing Dunhill franchise owners to learn about Dunhill. Of course, he discussed the prospect of joining Dunhill with his friend Mr. Gunnin, whose opinion Westover trusted. (TR 1/23/07, p. 659). Gunnin told Westover that Dunhill was a good, reliable company. (TR 1/23/07, p. 661). However, *Gunnin also warned Westover that Dunhill was in a transitional period in the last couple of years*, and that Daniel Abramson, its long time president, had left the company. (TR 1/23/07, pp 657-659, lines 23-25). Gunnin also told Westover that he was not sure how the transition would affect the company or impact Westover's decision to go forward with a Dunhill franchise. (TR 1/23/07, p. 660, lines 11-14, p. 663). Several other franchisees alerted Westover that Dunhill was going through a transitional period concerning its leadership, and that some franchisees had recently left the Dunhill system, but Westover was not concerned by these statements at that time. (TR 1/22/07, pp. 554-556).

In March 2002, Westover attended the Dunhill national conference in New Orleans, although he had not yet signed his franchise agreement, and therefore had the opportunity to speak with the 35 Dunhill franchisees who attended the conference. (TR 1/23/07, pp. 694-697) The franchisees in attendance included Harvey Auger, Elias Zinn and Michael Wilcoxson, Mike Green, and Jesse Montalvo. (*Id.*) Most of the franchisees

Westover talked to during the conference seemed satisfied with Dunhill. (TR 1/23/07, p. 699, line 14)  Westover heard nothing at the conference that made him concerned about going forward with Dunhill. (TR 1/23/07, p. 700).

After the March conference, Westover did additional due diligence by visiting Dennis Garton, a Dunhill franchisee in Oklahoma City. (TR 1/23/07, p. 700, lines 8-25). Mr. Garton had been a Dunhill franchisee for approximately 5 or 6 years at that time. (TR 1/23/07, p. 701)  During the meeting, Mr. Garton expressed his concern about the direction of Dunhill, the loss of some offices, and further related that the FAC had several discussions with Dunhill corporate about the direction of the company and changes that were needed. (TR 1/23/07, p. 702)  Finally, Mr. Garton told Westover he hoped there would be more franchisees coming on board with Dunhill in the future. (TR 1/23/07, p. 703).

After Westover's meeting with Mr. Garton, he also spoke with other franchisees located in Mansfield, Texas, Harry and Lorna Morris. (TR 1/23/07, p. 703/11 - 21).  Like Mr. Garton, the Morrises related their concerns about Dunhill's direction and the number of franchisees that had recently left the system. (TR 1/23/07, p. 704-705).  Following his meeting with the Morrises, Westover also met with the Boudreauxs, a newer franchisee in the Fort Worth area, who told Westover they had concerns about the number of Dunhill offices that had recently left the system, and also had some concerns about Dunhill's training. (TR 1/23/07, pp. 706-708).  Westover also contacted a franchise owner in New Orleans during the national convention, who told Westover that he was leaving the system because he was not making any money. (TR 1/23/07, p. 712, lines 3-5).  Finally, Westover spoke with the Corpus Christi franchisee, a Mr. Frye, who advised that the Corpus Christi franchise was available for sale. (TR 1/23/07, p. 713).

With the knowledge gained from his due diligence, Westover chose to execute his Dunhill franchise agreement and join the Dunhill system in July 2002. (Ex. 55, TR 1/22/07, p. 543).  He testified that he entered the franchise agreement voluntarily and

4

agreed to be bound by all of its terms. (TR 1/23/07, p. 763, lines 12-19) . Those terms included an integration clause at Section 25.01 of the franchise agreement which provided:

> This Agreement and all ancillary agreements executed contemporaneously with this Agreement constitute the entire agreement between the parties with reference to the subject matter of this Agreement and supersede any and all prior negotiations, understandings, representations and agreements; provided, however, that nothing in this sentence is intended to disclaim the representations we made in the Uniform Franchise Offering Circular that we provided to you.  You acknowledge that you are entering into this Agreement, and all ancillary agreements executed contemporaneously with this Agreement, as a result of your own independent investigation of the franchised Business and not as a result of any representations about us made by our shareholders, officers, directors, employees, agents, representatives, independent contractors or franchisees which are contrary to the terms set forth in this Agreement or of any offering circular, prospectus, disclosure document or other similar document required or permitted to be given to you pursuant to applicable law.

(Ex. 55, Bates 001376).

During the hearing, Westover testified that he understood other disclaimer provisions in Section 31.01 of the Agreement, which read:

> You acknowledge, warrant and represent to us that:
>
> 1.    No representation has been made by us (or any of our employees, agents, or salespersons) and relied on by you as to the future or past income, expenses, sales volume or potential profitability, earnings or income of the franchised Business, or any other Dunhill Business, other than any information that may be provided in Item 19 of our Uniform Franchise Offering Circular.
>
> 2.    No representation or statement has been made by us (or any of our employees, agents or salespersons) and relied on by you regarding our anticipated income, earnings and growth or that of the Dunhill System, or the viability of the business opportunity being offered under this Agreement.
>
> 3.    Before executing this Agreement, you have had the opportunity to contact all our existing franchisees.
>
> 4.    You have had the opportunity to independently investigate, analyze and construe both the business opportunity being offered under this Agreement, and the terms and provisions of this Agreement, using the services of legal counsel, accountants or other advisers (if you so elects [sic] of your own choosing.  you

5

[sic] have been advised to consult with your own advisers with respect to the legal, financial and other aspects of this Agreement, the franchised Business, and the prospectus for that Business. you [sic] have either consulted with these advisors or has [sic] deliberately declined to do so.

5.    You have received from us a copy of our Uniform Franchise Offering Circular, together with a copy of all proposed agreements relating to the sale of the franchise, at least ten business days before the execution of this Agreement or at least ten business days before the payment by you to us of any consideration in connection with the sale or proposed sale of the franchise granted by this Agreement.

6.    No representation or statement has been made by us (or any of our employees, agents or salespersons) and relied on by you regarding your ability to procure any required license or permit that may be necessary to the offering of one or more of the services contemplated to be offered by the franchised Business.

7.    The covenants not to compete set forth in this Agreement are fair and reasonable, and will not impose any undue hardship on you, since you have other considerable skills, experience and education which afford you the opportunity to derive income from other endeavors.

(Ex. 55, Bates 001380-001381).

Dunhill's UFOC also contained language disclaiming guarantees of success, and further expressly alerting the prospective franchisee that Dunhill did not authorize its representatives to furnish oral or written information projecting income or profits, and that actual results would vary from unit to unit. (Ex. 53, Bates 1688). FTC warnings in the UFOC instructed prospective franchisees to read the contract carefully, and stated "[i]f possible show your contract and this information to an advisor like a lawyer or an accountant." (*Id.* at Bates 1648). In fact, Westover sought advice from both his attorney and accountant prior to signing his agreement. (TR 1/22/07, pp. 582-584; TR 1/23/07, pp. 683-685).

Westover used the Dunhill trademark during the time period from 2002 through 2004. (TR 1/23/07, p. 764). As things turned out, Westover did not succeed as a Dunhill franchisee, and at the hearing he described his Dunhill experience as a financial disaster. (TR 1/23/07, p. 656). Despite experiencing little success, Westover voluntarily funded his Dunhill business, on a continuing basis, with his own savings and his wife's savings,

6

his 401(K) account, an inheritance, and his wife's Federal Employment Retirement Program, rather than obtaining a small business loan. (TR 1/23/07, p. 622). On July 1, 2002, Westover made the first loan to his business, and the last loan noted on his schedule was dated January 5, 2007, nearly three years after Westover deemed himself terminated from the Dunhill system. (TR 1/23/07, p. 626). In total, Westover allegedly invested over $724,000 into his failed business. (*Id.* at p. 615).

Westover admits that he never the contractually-required written notice of default at any time during the time he operated his Dunhill franchise. (TR 1/23/07, p. 783). Instead, on March 5, 2004, Westover authorized attorney Robert Purvin to send Dunhill a letter unilaterally terminating his franchise agreement, effective December 31, 2003. (TR 1/23/07, p. 645, p. 786). Just shortly before he terminated his franchise, in February 2004, Westover had extended his office lease until April 2007. (TR 1/23/07, p. 644). Curiously, around the time he disassociated with Dunhill, Westover testified that his business started to "turn around." (TR 1/24/07, p. 899). Westover attributed this to hiring a couple of experienced consultants who made some placements for him, and also because he started to spend more time on the phone himself instead of just supervising other "deadbeats" he had hired through the Dunhill RATIFY system. (TR 1/24/07, pp. 904-906). Despite having no prior experience in the staffing industry, Westover continues to run a staffing business today under the name New Beginnings Staffing. (TR 1/22/07, p. 604, lines 11-21).

## ARGUMENT

I.     **RESPONDENTS' DECLINE AND DETERIORATION IS NOT A LEGALLY COGNIZABLE CLAIM OR THEORY**

Although not articulated with much precision, Respondents apparently contend that they should be excused from paying royalties because the Dunhill franchise system was in an alleged state of decline during the time they operated their franchises.

Respondents' position simply is not sustainable as a matter of law. And, other than the fact that the number of Dunhill franchisees decreased over a several year period, there is no factual support for this so-called theory. In the few instances that a franchisee has refused to pay royalties based on "decline and deterioration" their position has been soundly rejected by both state and federal courts.

A.     **There Is No Legal Precedent for the Decline and Deterioration Theory.**

Very few courts have considered whether a franchisor may be liable to its franchisees for the general decline and deterioration of its system and none have found in the franchisees' favor.

Most recently, this issue was addressed in *Brenco Enterprises, Inc. v. Takeout Taxi Franchising Systems, Inc.*, No. 177164, 2003 WL 21659422 (Va. Cir. Ct. May 23, 2003). In *Brenco*, a group of franchisees sued the franchisor for, among other things, "the deterioration ... and overall steady decline of the franchise system." *Brenco Enterprises, Inc.*, at *3. The franchisees claimed that because the "overall growth, stability and viability of the ... franchise system" was in decline, they were justified in unilaterally ceasing to pay royalties and refusing to honor post-termination non-compete clauses. *Id.*

Because decline and deterioration is not a cognizable cause of action (or defense), the *Brenco* franchisees wrapped this "claim" in breach of contract claims. *Id.* That is, they attempted to create a general franchisor duty to provide "advisory assistance, updates and revisions to manuals and software, and inspections and evaluations of each of the franchisee locations," as well as a general duty to support the success of the franchisee, and contended that by failing in these duties, the franchisor breached the franchise agreements. *Id.* at *3, *14.

The *Brenco* court rejected the franchisees' argument and found that the franchisor's shortcomings did not amount to a material breach, and thus did not justify

8

the franchisees' non-payment of royalties and post-termination non-compete violations. *Id.* at *15. The court specifically found that the franchisor had fulfilled the essential purpose of the franchise agreement by (1) allowing franchisees to operate a business under the franchise system, (2) licensing their proprietary marks, and (3) providing training and other assistance. *Id.* With these three fundamental components satisfied, there was no material breach by the franchisor in allowing the franchise to go into a decline. *Id.* The court reasoned that:

> "although [the franchisor] did not perform certain of its post-opening obligations to the satisfaction of some of the franchisees, or may have failed to perform some of [these] obligations altogether, [such failures] hardly go to the root of the franchise agreements, or defeat the essential purpose of those agreements." *Id.*

Other courts have likewise rejected franchisees' "decline and deterioration" claims. In *Shoney's, Inc. v. Morris*, 100 F.Supp.2d 769 (M.D. Tenn. 1999), the court dismissed the franchisee's claims on summary judgment, and awarded Shoney's its past due account receivables, as well as future royalties. Morris, the franchisee, alleged that Shoney's breached the agreement first "by causing or permitting the decline of the value and reputation of its trade name," and causing a reduction in sales, thus forcing him to prematurely close his own restaurants. *Id.* at 774-775. Further, Morris claimed that although Shoney's represented to him an intent to grow the franchise system by implementing "Project 500," a plan to open a certain number of franchises over the next five years, Shoney's actually concealed that it was a mature market, with a forecast for slow future growth. *Id.* at 778-779. Like the franchisees in this case, Morris claimed these alleged "breaches" relieved him of his obligations under his franchise agreement.

As to the first issue, the court noted "[e]ven if a decline in reputation and reduction in sales occurred, the court is at a loss to discern how this resulted in a breach of contract on the part of Shoney's." *Id.* at 775. Although Morris argued that Shoney's was obligated to maintain the value and reputation of Shoney's trade name, the court held that he failed to point to a specific requirement on the part of Shoney's in the franchise

agreement to do so. *Id.* The second issue concerning Shoney's growth goals was barred by the agreement's integration clause, which precluded the admission of alleged representations made to Morris which were not embodied in the final agreement.[1] *Id.* at 779.

Courts have also found assurances to franchisees by the franchisor that they "would turn things around" and "build revenue for the shoppes" to be not actionable. *Carlock v. Pillsbury*, 719 F.Supp. 791 (D. Minn. 1989). In *Carlock*, a Minnesota federal court applying New York law, dismissed claims asserted by a group of Haagen-Dazs franchisees. They had alleged that the franchisor: (1) overstated projected revenues to induce them into entering the contract; (2) failed to provide operational support and "know-how," and (3) failed to deliver promised marketing and advertising assistance.

As to whether the franchisor had a duty to disclose that revenues were on the decline nationally, the *Carlock* court noted that the UFOC specifically disclaimed any representations concerning sales or profits, and that the UFOC recommended to potential franchisees to make their own investigation. *Id.* at 839. The court also dismissed claims that the franchisor failed to provide "know-how" or ongoing support, finding that the franchise agreement outlined which services the franchisor was obligated to provide, and that, under New York law, there is no general duty to provide knowledge on how to run a profitable shop. *Id.* at 821.

Here, as in the *Brenco, Shoney's, and Carlock* cases, Respondents unquestionably received contractually-required franchisor support and services from Dunhill before they unilaterally terminated their franchise agreements. They challenge the *quality* of that support, but do not dispute that it was, in fact, provided. A mere difference of opinion on that issue does not constitute "decline and deterioration," nor does it excuse Respondents from paying their royalties. Just as important, while there may have been management

---

[1] Case law upholding the enforceability of integration clauses is fully discussed in a subsequent section of this brief.

changes at Dunhill and an economic challenges in the industry generally, Dunhill was not the cause of the Respondents' lack of success. If Dunhill was truly "dysfunctional," as they contend, then no other Dunhill franchisees could have succeeded during the same timeframe either. But, in fact, many did succeed. More importantly, the evidence established that Respondents were given the right to operate in the Dunhill System, received trademark licenses and received training and support. The only reasonable conclusion is that Respondents' own shortcomings as businessmen played a substantial role in their lack of success.

Because there is no case law – from any jurisdiction, much less New York – that allows a franchisee to escape responsibility for paying royalties based on the alleged decline of the franchise system the Arbitrator cannot give this theory any credence.

**B.    In Any Event, There Is No Factual Basis for Respondents' Theory: The Staffing Industry Suffered a Slowdown Due to an Economic Recession Between 2000 and 2003 and There Is No Evidence of Dunhill's Failure to Deliver Services.**

Respondents have attempted to put Dunhill on trial for decreasing in size as a franchise system, which in and of itself clearly does not violate any state or federal law. To support their theory, Respondents made erroneous comparisons between Dunhill and MRI and other staffing industry competitors and attempted to characterize Dunhill as a failing system that was unable or unwilling to provide contractually-required services and support and brand value. However, Respondents not only failed to acknowledge the substantial downturn that the staffing industry during the relevant time period, they attempted to mislead the Arbitrator into believing that other staffing companies were thriving while Dunhill alone decreased in size. This is patently untrue.

The 2006 Staffing Industry Sourcebook© (the "Sourcebook"), authored by Staffing Industry Analysts, Inc., a company that tracks industry-wide data and trends, documented a "significant drop of (permanent placement) firms in the 2000-2003 period, with as many as 50% of recruiter desks actually abandoned during this period." (Staffing

11

Industry Analysts, Inc., *Staffing Industry Sourcebook*, p. 27, 2006; attached hereto as Exhibit A). With reference to the impact of 9/11, the Sourcebook noted:

> "[T]he already shaky economy stumbled even more after the attacks, leading to depressed revenue, shuttered offices, staff reductions and consolidations. ... By 2003, the much anticipated economic turnaround still evaded the industry. ... By the end of 2004, the U.S. staffing industry finally appeared to be healthy, following three long years of suffering."

(*Id.* at pp. 35-36).

In contrast to the authoritative, unbiased Sourcebook, Lamanna, *who is obviously not an expert on the staffing industry,* compiled purely self-serving and misleading charts, which Respondents offered into evidence to supposedly show that other staffing companies were unaffected by recessionary factors and grew dramatically during the same period. (TR 3/7/07, p. 19). Because Respondents did not produce these charts until January 8, 2007, Dunhill had no opportunity to discover the sources of Lamanna's self-serving analysis or depose him about the trustworthiness and consistency of his methodology. At first blush, however, several of the figures are not what they seem.[2]

For instance, Lamanna testified that MRI grew in size over the years 2000-2003. But MRI's reported revenues, as reflected on its Form 10-K, belies that the company was thriving during this time period. Just the opposite is true: MRI's reported revenues are as follows: 2000 ($136,752); 2001 ($103,167); 2002 ($85,901); and 2003 ($56,876). This demonstrates a decrease of 58% in revenues. It is difficult to substantiate the active office units[3] of another staffing company, and particularly hard to ascertain which units met Lamanna's arbitrary $60,000 threshold. But one cannot argue with the accounting reported on a Form 10-K: the numbers simply don't lie.

---

[2] It is more than a little ironic that Lamanna would offer testimony based on false, or at least seriously skewed data, given that he and the other respondents are alleging that Dunhill engaged in fraudulent practices.

[3] Other staffing companies might have had inactive offices but were not proceeding with the expense of legally terminating them.

For purposes of this argument, it is important to understand that Lamanna's "$60,000 analysis," by which he self-servingly deemed which Dunhill offices were "real units," was *not* based on any company generated data. In observing Respondents' Exhibit 42, it appears that Lamanna analyzed data from Monthly Data Statements, otherwise known as "MDS reports," reports that are *voluntarily* submitted by only some franchisees. In contrast, Statement 3 Royalty Reports are mandatory, and indicate total sales, total cash collections and total accounts receivable. (TR 1/31/07, pp. 1907-1908). Royalties are paid at the time of cash collections and remitted to Dunhill monthly. The Statement 3 reports are submitted to Dunhill and *cannot be shared with any other franchisee.*

The voluntary MDS reports Lamanna relied on to create Exhibit 42 unfairly and inaccurately show that only certain offices achieved $60,000 of revenue in 2003. The undisputed evidence showed that Dunhill merely uses the MDS reports as a tracking tool -- to track various items in order to present monthly, annual, and lifetime achievement awards on such things as placement fees by consultants, total placement fees, rookie consultant awards, etc. (TR 1/31/07 at pp. 1905-1906). Thus, if a franchisee chooses not to submit a report, they are not eligible for the recognition awards. Some franchisees might not participate for a variety of reasons including not wanting to reveal their performance of profits to their peers, or to avoid showing revenues greater than their Statement 3 royalty reports so they can pay less royalties. (*Id.* at 1904-1905).

Lamanna *himself* did not submit MDS reports: *the Irvine office shows no MDS entries for the entire year of 2003, but he shows his total amount at $60,500.* The bottom line is that Exhibit 42, in which Lamanna attempts to portray the number of Dunhill offices earning over $60,000 in gross revenues, is based on incomplete and possibly inaccurate information.

Finally, there is no factual basis for Lamanna's "impeachment" testimony concerning Robert Stidham's testimony that there were only two staffing companies who

13

surpassed one hundred franchise units. Respondents made a big deal out of this but it is Respondents' own evidence that lacks credibility. As the Arbitrator will recall, during Lamanna's testimony, Respondents offered into evidence Respondents' Exhibit 61,[4] a list entitled "Franchised/Licensed Offices of Staffing Companies 2004," a list also generated by Staffing Industry Analysts, Inc. (TR 3/7/07, p. 12). The Arbitrator noted the "alphabet soup" footnote on the document which demonstrates that the companies listed are of various types, and are not all permanent placement businesses (listed as "p" in the footnote). And Dunhill wishes to make clear that when comparing apples to apples, Stidham's testimony holds up consistent with Stidham's testimony, as of 2004, Express Personnel and MRI were the only two permanent placement companies above the one hundred unit mark.[5]

From 2001 to 2004, Dunhill lost millions of dollars due to the slowdown in the U.S. economy after 9/11, not to mention the losses resulting from the non-payment of royalties by Respondents and the former Trust members. Yet, as described during the hearing and summarized herein, Dunhill continued to provide services to *all* franchisees during this timeframe. Some franchisees have greatly benefited from Dunhill's training and support,[6] while others have been less successful. But during the same period that Respondents claim there was no support, many Dunhill franchisees thrived. Thus, Respondents have not, and cannot, provide evidence to support their "decline and deterioration" theory, even if it were legally viable.

---

[4]  This was Exhibit 61 in the "One or All" notebook. Respondents never provided an updated index to Dunhill, so Dunhill made an effort to follow the exhibit numbers listed in the transcripts and not the index as much as possible. Otherwise, all exhibits cited to in this brief refer to Claimant's exhibits, for which there is no numerical repetition.

[5]  Manpower, listed at 769 units, is primarily a temporary staffing business, although it also does some permanent placement.

[6]  For example, Neil Whitman and his entire training class have kept open their franchise offices. (TR 1/30/07, p. 1755).

II.    **WESTOVER HAS FAILED TO PROVE FRAUD OR FRAUDULENT INDUCEMENT AS A MATTER OF LAW**

Without so much as a single shred of evidence to establish fraudulent intent (let alone any other element of fraud), Westover alleges that Dunhill fraudulently induced him to join the Dunhill franchise system with false promises and misrepresentations, both in the marketing brochure and statements made by Dunhill management, related to: (1) training and ongoing support; (2) technology and software; (3) Dunhill's advertising efforts, (4) the size and viability of the system; (5) assurances that the Exchange Program would generate 25% of his revenues, and (6) a purported earnings projection.

Westover's fraudulent inducement claim should be rejected for three reasons. First, Westover cannot bootstrap fraud claims onto his contract claims, and thus any claims related to contractual obligations cannot be subjected to a fraud analysis. Second, the franchise agreement's valid integration clause precludes Westover from supporting his non-contract related fraud claims with evidence of any statements made outside the UFOC or franchise agreement. Third, even absent the integration clause, Westover cannot prove any of the elements of fraud by clear and convincing evidence, the requisite standard of proof.

A.    **Westover's Fraud Claims Relating to Lack of Training or Support, Software, or Advertising Are, if Anything, Breaches of Contract Claims.**

Several of Westover's fraud-based claims stem from his obvious disenchantment with his success once operating in the Dunhill system, but Westover cannot package these disappointments as fraud claims. The crux of these matters is contractual in nature, and it is well settled law that a cause of action for fraud will not lie when the alleged fraud relates to a breach of contract. New York law requires that a fraud claim be "sufficiently distinct from the breach of contract claim." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). (*quoting Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996)). Even an allegation of an intentionally false statement that meets all the elements of a proper fraud claim cannot

15

support a cause of action "where a fraud claim is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement.'" *Bridgestone/Firestone, supra, quoting Metropolitan Transportation Authority v. Triumph Advertising Productions*, 497 N.Y.S.2d 673, 675 (App.Div., 1st Dep't 1986).

This principle is further explained in *Telecom Int'l America Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001), in which the Second Circuit observed:

> "[U]nder New York law, where a fraud claim arises out of the same facts as [a] breach of contract claim, with the addition only of an allegation that [the other party] never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract. . . . In other words, simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim."

(*Id.*, internal citations and quotation marks omitted.); *see also Gordon v. Dino De Laurentiis Corp.*, 141 A.D.2d 435 (1st Dep't 1988) ("a fraud claim is not sufficiently stated where it alleges that a defendant did not intend to perform a contract with a plaintiff when he made it."); *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331 (4th Cir. 1998)(district court erred by allowing franchisees to advance tort counts paralleling their breach of contract claims.).

Westover's allegations concerning either Robert Stidham's pre-contractual statements or representations in the Dunhill brochure that he would receive training, ongoing support, state of the art software, or promises of advertising, are not collateral or extraneous to the franchise agreement, and thus are actionable, if at all, under a breach of contract theory.    Because Westover cannot distinguish these fraud claims from his parallel breach of contract claims, the fraud theory, as to these issues, is unsupportable.

B.    **Under New York Law, The Franchise Agreement's Integration Clause Fully Precludes the Fraudulent Inducement Claim Based on the Size and Growth of the System, Percentages of Exchange Program Referrals ad Earning Projections**

To remind the Arbitrator, the integration clause in Westover's franchise agreement states as follows:

> This Agreement and all ancillary agreements executed contemporaneously with this Agreement constitute the entire agreement between the parties with reference to the subject matter of this Agreement and supersede any and all prior negotiations, understandings, representations and agreements; provided, however, that nothing in this sentence is intended to disclaim the representations we made in the Uniform Franchise Offering Circular that we provided to you. You acknowledge that you are entering into this Agreement, and all ancillary agreements executed contemporaneously with this Agreement, as a result of your own independent investigation of the franchised Business and not as a result of any representations about us made by our shareholders, officers, directors, employees, agents, representatives, independent contractors or franchisees which are contrary to the terms set forth in this Agreement or of any offering circular, prospectus, disclosure document or other similar document required or permitted to be given to you pursuant to applicable law.

(Ex. 55, Bates 001376).

1.   Under New York Law, Respondents are Presumed to Have Understood the Franchise Agreement and to be Conclusively Bound Thereby.

As a threshold matter, it is necessary to quickly address and dispose of Westover's self-serving testimony that he either did not read[7] or fully understand the franchise agreement when he signed it. (TR 1/24/07, p. 851, p. 875).

Basic to the law of contracts is the principle that a party who signs an instrument manifests assent to it, and may not later complain about not reading or not understanding the instrument. 7-29 *Corbin on Contracts* § 29.8, *citing Richardson Greenshields Securities, Inc. v. Metz*, 566 F. Supp. 131 (S.D.N.Y. 1983); *see also Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566 (4th Cir. 1998) (parties to a commercial contract

---

[7]    Westover now claims that he did not read his contract, however, his initials appear in the lower right hand corner of each of the 70 pages of his agreement. (TR 1/23/07, pp. 875-876).

17

who deal at arms length have a duty to read the contract carefully and are presumed to understand it.).

New York law presumes knowledge of the contents of an executed instrument, and conclusively binds the signor whether or not the contract was read or understood. *See e.g., Sofio v. Hughes*, 162 A.D.2d 518, 519 (2nd Dep't 1990); *Toulamis v. Chalem*, 156 A.D.2d 230,548 N.Y.S.2d 493 (1st Dept 1989) ("One who enters into a plain and unambiguous contract cannot avoid the obligation by merely stating that he erred in understanding its terms."); *see also* Metzger *v. Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920)("Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations.").

> 2.    The Integration Clause is Valid as a Matter of Law, and Acts to Bars Oral or Written Statements That Precede or Were Made Outside the Franchise Agreement.

Because Westover expressly acknowledged that he did *not* rely upon representations that were not set forth in the UFOC or Franchise Agreement, he cannot now claim to have done so.  In any event, any alleged misrepresentations made outside the UFOC or agreement are barred by the integration clause.  Under New York law, an integration clause that *specifically* contemplates claimed oral representations is enforceable to preclude an action for fraud in the inducement and parol evidence concerning fraudulent representations. *See Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146, 1152 (S.D.N.Y. 1989) (holding that franchisee's reliance on alleged misstatements by defendants was unreasonable as a matter of law where "[t]he Franchise Agreement, as well as the offering circular which preceded it, both contained detailed, explicit integration and disclaimer clauses"); *see also Bibeault v. Advanced Health Corp.*, No. 97 Civ. 6026, 2002 WL 24305, *3-4 (S.D.N.Y. Jan. 8, 2002) (*citing Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-321 (1959)); *Lee v. Goldstrom*, 522 N.Y.S.2d 917, 918 (2d Dep't 1987).

Courts in other jurisdictions have similarly enforced franchise agreement integration clauses finding that franchisees cannot prove fraud based upon extraneous statements in light of an integration clause. *See e.g. Cook v. Little Ceasar Enters., Inc.*, 210 F.3d 653, 658 (6th Cir. 2000) (existence of an integration clause in the Franchise Agreements made the buyer's alleged reliance on prior representations unreasonable); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (integration clause precluded "the imposition of extra-contractual obligations based upon the welter of conflicting oral statements and representations that plaintiffs introduced at trial."); *Cajun Enterprises, Inc. v. Copeland*, 130 F.3d 180, 186 (5th Cir. 1997) (no reasonable reliance in face of integration/disclaimer clause contained in both Franchise Agreement and UFOC); *American Casual Dining LP v. Moe's Southwest Grill*, 426 F.Supp.2d 1356 (N.D.Ga. 2006) (integration and acknowledgement clauses precluded the franchisee's fraud claim based on pre-contractual representations); *Wootton Enters., Inc. v. Subaru of Am.*, 134 F. Supp. 2d 698, 715 (D. Md. 2001) (any actionable statements made during negotiations were superseded by fully integrated Franchise Agreement and could not reasonably be relied upon by the franchisee).

*Motor City Bagels, LLC v. American Bagel Co.*, 50 F.Supp.2d 460 (Md. 1990), in which a franchisee claimed that the franchisor provided false earnings projections through average annual store sales statements, is highly instructive. *Id.* at 471. The franchisee relied on this information and incorporated it into its business plan. *Id.* The court granted summary judgment for the franchisor, concluding that these statements were not actionable as a matter of law for two reasons: first, the Franchise Agreement contained an integration clause which stated that the written agreement superseded all prior oral or written agreements, and it was unreasonable for the franchisee to subsequently claim that he had relied on the projections. *Id.* at 471-472. Second, the UFOC contained language disclaiming any ability to project sales, profits or earnings

because each franchisee's results would vary, and further explaining that no corporate representative was authorized to make such a representation. *Id.*

Dunhill's franchise agreement and UFOC, like the documents at issue in *Motor City Bagels, supra,* contain a specific integration clause and the Motor City Bagels UFOC included disclaimer language.   There is no evidence that any information Westover received was false, dishonestly presented or in any way designed to deceive or trick him into entering the transaction.   And by signing the franchise agreement, *Westover specifically acknowledged that he entered into the agreement based on his own independent investigation, and not based on any representations or warranties made by Dunhill's management.*

Moreover, any extraneous "promises," such as an assurance or representation regarding the Exchange Program, are barred by the integration clause.  In attempting to support their fraudulent inducement claims, Westover and the other Respondents have hung their proverbial hats on Dunhill's purported assurances that they would generate 25% revenues - in addition to whatever other revenues they earned - through participation in Dunhill's Exchange Program.

There is no contractual guarantee of a 25% revenue generation.  The franchise agreement only speaks to rules governing the Exchange Program *should* a franchisee choose to participate. Each Respondent apparently believed (mistakenly) that 150 offices would be "assisting" with placements.[8]   More importantly, the franchise agreement mentions nothing about the percentage of revenues, projected or guaranteed, and no indication that other Dunhill offices would "assist" Respondents in gaining clients or revenue. Thus Respondents' claim that Dunhill somehow committed fraud or breached its contractual obligations to them because they did not generate a certain level of income from the Exchange Program has no support, and is barred by the integration clause.

---

[8]   The marketing brochure itself does not correlate "150 offices to assist you" with the Exchange Program. (Ex. 33).

In view of the foregoing, any alleged oral or written misrepresentations regarding the size of the Dunhill system, Dunhill's intention to expand or grow the system, the percentage of revenue generated from the Exchange Program, and earnings projections, are barred by the integration clause. Consequently, the Arbitrator should find in Dunhill's favor on Westover's fraudulent inducement claim.

### C.    Beyond the Application of the Integration Clause, Westover Cannot Prove the Elements of Fraud by Clear and Convincing Evidence.

To prove a claim for fraud under New York law, the plaintiff must demonstrate, *with clear and convincing evidence*[9] (1) that defendant made a material false misrepresentation which was false at the time made and was known to be false by defendant; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the misrepresentation; and (4) the plaintiff suffered damages as a result of the reliance. *Sauer v. Xerox Corp.*, 17 F.Supp.2d 193 (W.D.N.Y. 1998), *citing Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 153 (2d Cir. 1995).

At the hearing, Respondents offered no evidence whatsoever to prove that Dunhill made any material misrepresentations that were false when made and known by Dunhill to be false. Respondents' subjective beliefs or retrospective accusations do not constitute proof of fraud. The evidence showed that Dunhill's UFOC and franchise agreements contained true and historically accurate information concerning the company and its operations. Further, any projections or predictions expressed by Dunhill's executives made as to the growth and viability of the company were pure opinion, and made with the hope that the company would succeed in the future. Respondents presented no evidence of any fraudulent intent on Dunhill's part, and the evidence failed to establish that any of the franchisees justifiably relied upon any of the alleged misrepresentations because: (1)

---

[9]    Claims for fraud mandate this higher standard of proof because "the interests at stake are deemed to be more substantial than mere loss of money." *In the Matter of Father Philip K. Eichner v. Dillon*, 426 NYS2d 517, 523 (2d Dep't 1980).

the materials advised each of them to conduct due diligence and investigate, which they did; (2) the pre-contractual statements regarding the attributes of the franchise system, including statements contained in the sales brochure, amount to non-actionable puffery; and (3) predictions or comments relating to future events are not considered fraudulent if they later prove to be untrue.

1. <u>Westover Failed to Present Evidence of Any Material Misrepresentations.</u>

The hearing evidence did not prove, let alone by clear and convincing evidence, that Dunhill made any material misrepresentation, or any statements known to be false at the time the statement was made.

a. **UFOC Contained Accurate Information About the Number of Outlets**

The Dunhill marketing brochure provided to Westover indicated that there were 150 other franchises in the system. Westover also testified that Mr. Stidham told him there were 150 offices, and Stidham testified that that would have been a fairly accurate number at that time. (TR 3/6/07, p. 117, lines 18-25). More importantly, Respondents offered no evidence to show that the number of outlets listed in the UFOCs was inaccurate when reported. (Ex. 53, Bates 001689-001690).

Westover admitted that he received, read, and fully understood the UFOC prior to signing his franchise agreement. (TR 1/23/07, p. 671). In the UFOC issued as of May 22, 2001, Dunhill disclosed the specific number of permanent placement franchisees in the system. (Ex. 53, p. 38, Bates 001689). Reflecting the preceding three years as required by the Federal Trade Commission, the list shows 90 outlets operating at the end of 2000, 84 outlets operating at the end of 1999, 91 outlets for 1998. The UFOC also projected 20 new franchised offices opening in 2000. (*Id.* at p. 39, Bates 001690). Further, Westover testified he reviewed the May 22, 2001 UFOC to determine how many franchise units existed at the end of 2001, and from his review *expected there to 110 units*: 90 existing franchise units plus the 20 projected openings. (TR 1/24/07, pp. 861-862). Yet Westover

22

also testified that he believed there would be 150 units in the Dunhill system based on statements outside of the UFOC or agreement.

Regardless, the evidence established that, as of December 31, 1998, there was a total of 151 offices in the Dunhill system. (TR 1/18/07, p. 118, lines 19-25). This number is calculated by adding the franchised and company owned permanent staffing outlets listed in the permanent UFOC with the franchised and company owned temporary staffing outlets listed in the temporary UFOC. (*Id.* at pp. 116-118). As of the end of 1999, the permanent UFOC shows a decrease of seven franchised outlets, and an increase of one company owned outlet, reflecting a possible 145 outlets in the system.[10] Hence, there is no evidence that "150 offices nationwide" as stated in the perhaps slightly outdated marketing brochure was a material misrepresentation. If the actual number of units in February 2002 was really 140, or 130, or 125, or even 100, why should that have made a material difference to a prospective franchisee?

After the fact, and quite self-servingly, Westover claims that having 150 offices was somehow important to him. The number of franchise offices in the system was not a guarantee of a particular degree of success in the Exchange Program. And above all else, it is simply not credible to believe that Westover would not have purchased a Dunhill franchise had he known there were less than 150 offices when he signed his Franchise Agreement.

### b.    The Marketing Brochure Contained an Accurate Revenue Growth Number

Westover also testified that he relied on the reference in Dunhill's marketing brochure to "system-wide revenue growth" of 20%, but he now believes that that figure is inaccurate. (TR 1/22/07, pp. 495-496). The brochure expressly refers to "system-wide growth," not permanent placement office growth or temporary placement growth or *franchisee* growth. (Ex. 33). Further, Westover, like any other prospect, had the

---

[10]  There is no evidence that the number of temporary franchises decreased in 1999.

opportunity to review Dunhill's audited financial statements to independently assess all information concerning company revenues.  In fact, Westover stated that he read through the entire UFOC.  (Ex. 53 at Bates 001822-001843; TR 1/23/07, p. 671; p. 692; p. 738, lines 15-19).

Rick Kean, who has been a trainer at Dunhill for approximately 25 years and has 'institutional memory,' testified that the 20% figure was accurate.  And the UFOCs introduced into evidence included audited financial statements that reflected a 20% system-wide annual growth in gross revenues over a trailing five year period.  Critically, Respondents offered no evidence to dispute that Dunhill had experienced 20% system-wide growth over the preceding 5-year period.

### c.    The Exchange Program's Placement Percentage Was Historically Accurate

Westover testified that he relied upon the statement in Dunhill's marketing brochure that "25 to 35 percent of his revenue would be generated from the exchange program." (TR 1/24/07, pp. 841-842).  Further, Westover read and relied upon Dunhill's President's Manual that states:  "The Dunhill Exchange Program is a set of procedures … which have allowed Dunhill franchisees to generate 25% in additional revenues through shared resources over the past 15 years."  (Ex. 68, Bates 009452).  Because Westover generated no revenue through the Exchange Program, he contends that these representations are fraudulent.  (TR 1/22/07, p. 553-554).

According to Mr. Kean's testimony, the 25% rate was at least historically accurate and thus is not a material misrepresentation.  As the author of the Exchange Program section in the President's Manual, Kean testified that he based the 25% figure upon his own analysis of detailed MDS reports, and his own understanding from working at Dunhill during that time period. (TR 1/31/07, pp. 1880-1883).  Granted, it appears that this figure changed, particularly during the time period at issue, when internet job boards such Monster.com became available to the staffing industry. (TR 1/31/07, p. 1970, lines 5-20).

24

Even so, Westover did not undertake any independent analysis to determine whether the statement in the President's Manual about a 25% rate of success with the Exchange Program over the past 15 years was an accurate number. And no other evidence, from any source, was introduced by Respondents to controvert Mr. Kean's testimony on this point. FAC meeting minutes introduced into evidence indicated that as of October 2001 the exchange rate had decreased to 4%, a figure based on an analysis of the previous twelve months performed by Mr. Cech. (TR 1/24/07, p. 971-974). Mr. Cech did not testify, and it is not clear from the evidence presented exactly what information he had analyzed, if any. If the figure was based solely on the MDS reports, it would be difficult to ascertain an accurate number because those reports are voluntarily submitted by the franchisees.

Moreover, there is no evidence showing that at the time Westover received this brochure in February 2002, Dunhill had yet realized Monster's impact on the Exchange Program, and how critical that would become to a Dunhill franchisee's business in replacing the traditional franchisee intra-office relationships that were not internet-dependent. (TR 1/31/07, p. 1880). In short, there is no evidence, let alone clear and convincing evidence, proving that Dunhill made any material misrepresentations that were known by Dunhill to be false when made, concerning the Exchange Program, or concerning the size, growth, or revenues of the Dunhill franchise system.

        2.      <u>Westover Presented No Evidence of Fraudulent Intent</u>.

Westover's fraud claims must be based, not on Dunhill's failure to fulfill promises, but instead on the *intent* of Dunhill's management not to perform at the time they made the statements. In this case, there is simply no evidence of fraudulent intent at the time any of the alleged statements were made. An alleged misrepresentation or promise is actionable only when coupled with a contemporaneous intent not to perform. *Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957); *see also Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("The failure to fulfill a promise to perform future acts is not ground

for a fraud action unless there existed an intent not to perform at the time the promise was made.").

Here, Dunhill had no preconceived or undisclosed intention of not performing any of the promises or statements it supposedly made. In fact, the contrary is true. For instance, Stidham told Westover that the system was growing, and that Dunhill had a goal to open 20 offices. (TR 1/22/07, p. 495, line 7 through p. 496, line 6). Westover conceded that he had no evidence to show, nor any reason to believe, that Dunhill or Stidham did not intend to meet this projection at the time it was given to Westover. (TR 1/23/07, p. 794). Indeed, Stidham testified that it was the company's goal to add 20 offices in 2001, and that they met this goal. (TR 3/06/07, p. 74). The fact that Dunhill may have also lost some offices in 2001, so that there was not a *net* growth of 20 offices, does not render Stidham's projection fraudulent when made.

In the UFOC, Dunhill disclosed that "the market for permanent placement services is established yet competitive and expanding rapidly, that it will continue to expand, and that the need for such services will continue." (See Ex. 53, Bates 01653). But, Dunhill made plain: "Dunhill can naturally give no guarantee or warranty of this." *Id.*

And so it comes down to this: Westover believed that the Dunhill system would work and that he would prosper. Dunhill's management had the exact same hopes, but never offered a guarantee: Dunhill's management simply offered its own opinions as to how the Dunhill system would perform--and it was in everyone's best interest to look positively to the future. Respondents are unhappy about the degree of success that they achieved, but they were, as a matter of law, not misled by Dunhill's statements or brochures. There is no evidence, let alone clear and convincing evidence, to infer that Dunhill acted with intent to deceive Westover or anyone else.

3.     <u>Westover Failed to Prove Reasonable Reliance on any Alleged Fraudulent Statement.</u>

"One to whom an allegedly false representation is made may not rely thereon if the means of obtaining the truth are available by the exercise of ordinary intelligence." *Sauer, supra* at 205, *quoting Arbitration between Jack Kent Cooke, Inc and Saatchi & Saatchi North America,* 222 A.D.2d 334 (N.Y.A.D. 1st Dept. 1995).   The record establishes that each of the Respondents had an adequate opportunity to assess the Dunhill system viability, size, and Exchange Program, and to investigate the staffing industry as a whole.  Clearly, they were each made aware of the risks of starting up a business, and decided to purchase a Dunhill franchise based on the exercise of individual business judgment.

In the marketing kit sent to Westover (and all prospects), Dunhill included a pamphlet titled, *Investigate Before Investing,* a guide for prospective franchisees published by the IFA.  (Ex 31).  Further, Dunhill's brochure expressly warns that in buying a franchise, "[t]he risks are high and there are no guarantees." (*Id.*)

Westover testified that he engaged in substantial due diligence, including speaking with numerous Dunhill franchisees, several of whom expressed concern about the direction of Dunhill and the declining number of franchisees (TR 1/23/07, pp. 657-663), obtaining financial and legal advice, (TR 1/22/07, pp. 582-584), and speaking with two other staffing franchisors. (TR 1/23/07, pp. 658-659).  It simply defies any rational thought to conclude that Westover could have reasonably relied on any allegedly fraudulent statement made by Dunhill concerning the size, growth or future of the franchise system.  Mr. Westover's eyes were about as wide open as they possibly could have been.  Thus, his fraud claim fails due to the lack of any reasonable or justifiable reliance.

4.    Westover Could Not Reasonably Rely upon Opinion or Puffery.

The first page of Dunhill's marketing brochure states that "Dunhill has built one of the industries premiere staffing firms." (Ex. 33). Westover testified that relied on that statement, and that he now believes it is inaccurate. (TR 1/24/07, p. 830).

Vague statements and predictions must be characterized as an expression of opinion, sales talk, or "puffing" and will not support a claim for fraud. *See O'Neal v. Burger Chef Systems,* 860 F.2d 1341, 1348-49 (6th Cir. 1988); *George Backer Mgt. Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978). For example, in *American Casual Dining LP v. Moe's Southwest Grill, supra,* a franchisee sued a franchisor over certain alleged misrepresentations made orally and in the UFOC. 426 F.Supp.2d at 1365. One such statement upon which franchisee believed and relied was that Moe's had "perfected the system of opening and operating restaurants."

The district court noted that the franchisee was not justified in relying upon representations that are general commendations or mere expressions of opinion. *Id.* at 1364, *citations omitted.* Applying these principles, the court observed that:

"any representations regarding Moe's experience, knowledge, skill, or expertise in estimating expenses or creating a system of opening and operating restaurants are merely opinions and statements of commendation, or "puffing." A party is expected to profess competency in its area of business. Thus, such expressions of experience and skill are considered puffery upon which a plaintiff cannot justifiably rely."

*Id.*

The Seventh Circuit similarly resolved this issue in *Vaughn v. General Foods Corp.,* 797 F.2d 1403, 1411 (7th Cir. 1986), in which it held that General Foods' statements about the viability of its system could only be characterized as non-actionable "puffing." The Court explained:

"General Foods' statements regarding the potential of the company were designed to encourage investment by new franchisees and to stimulate the existing franchisees' enthusiasm. On the evidence presented here, the jury could not have found that, at any given moment during the period in question, General Foods or Burger Chef had a firm, present intention to make the System anything other than "viable." . . . That

28

General Foods' idea of viability did not match the Vaughns' expectations is unfortunate — but it is not fraud."

*Id.* at 1411-12  (footnotes omitted).

In this case, Dunhill was a 50 year old staffing business. Several of the respondents testified that Dunhill's reputation and longevity had attracted them to the opportunity in the first instance. Dunhill's attestation concerning its status in the staffing industry was true and, in any event, amounts to non-actionable puffery.

### 5.    Westover Could Not Reasonably Rely on Future Predictions.

Fraud cannot consist of mere broken promises, unfulfilled predictions or erroneous conjecture as to future events. The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. *Schwartz v. Newsweek, Inc.*, 653 F.Supp 384, 389 (S.D.N.Y. 1986). Nor does actionable fraud result from a mere failure to perform promises. *Telecom Int'l America Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001). Respondents failed to establish by clear and convincing evidence that any of them reasonably relied on any allegedly fraudulent statement concerning the growth or future success of the Dunhill system

#### a.    Any Statements About Future Earnings Is a Future Prediction

As discussed above, Dunhill's UFOC Item 19 disclaimed guarantees of success, and specifically alerted the prospect that Dunhill did not authorize its representatives to furnish oral or written information projecting income or profits, and that actual results would vary from unit to unit. (See Ex. 53, Bates 001688). Even so, Westover contends that Dunhill's representations about 25% of additional revenues in the Exchange Program amounted to an earnings claim. (TR 1/23/07, p. 743). This contention is odd to say the least, especially when Westover admitted that Dunhill never projected a particular level of revenue that he could expect to receive. Dunhill highly doubts that a percentage of an unknown number constitutes an earnings projection under the law.

29