Because an action for misrepresentation must be based upon a statement of a past or existing fact, statements about *future* profitability cannot provide a basis for an action in fraud. *Schwartz v. Newsweek, Inc.*, 653 F.Supp 384, 389 (S.D.N.Y. 1986). In fact, profit projections provided to a prospective franchisee have been held by courts to be mere puffery. In *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 2006 WL 3825103 (W.D.Mo. 12-21-2006), the franchisor assured the plaintiff that she was going to be "driving a truckload of money away . . . every year" and that she was "not going to have to worry about paying . . . bills." The court held that "[p]redictions and projections regarding the future profitability of a business or investment cannot form a basis for fraud *as a matter of law*." *Id.* at *2 (emphasis added) (citations omitted). Because franchisor's statements were non-actionable predictions of the franchise's future profitability, the court granted summary judgment in the franchisor's favor on this claim. *Id.*

In the face of disclaimer language concerning earnings projections, the court in *Carlock v. Pillsbury Co., supra*, applying New York law, held that a party cannot reasonably rely on allegedly fraudulent representations of sales revenues of other franchisees where such representations are directly contradicted by the terms of an applicable offering circular. *Id.* at 829, *citing Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 416 (1st Cir. 1989); *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 805 (1st Cir. 1987); *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1518 (10th Cir. 1983)).

Here, Westover cannot establish the requisite justifiable reliance on the alleged earnings figures because if provided, they were merely a prediction of some future event. Furthermore, Westover testified that, prior to signing his Franchise Agreement, he read the UFOC, which contained the disclaimer language, and thus he is bound by the written acknowledgements he signed. (TR 1/23/07, p. 671).

b.    **Statements about Rates of Return on Exchange Program Were Also Mere Predictions of Future Events**

Even if Stidham told Westover that he could generate 25% to 40% of his revenue through the Exchange Program, it was a future prediction that is non-actionable.

To cite but one example, in *Webb v. First Michigan Corp.*, 195 Mich. App. 470, 491 N.W.2d 851 (1992), a franchisee claimed that the franchisor guaranteed a certain rate of return, and promised that the business was "risk-free." The court held that the statements concerning the guaranteed rate of return were *nothing more than promises of future conduct* that could not constitute fraud. The "risk free" statement might have supported the fraud claim, but not where the prospectus and other documents highlighted the risky nature of the business. The court observed that: "[E]ven a cursory review of any of these documents would have enlightened plaintiffs that the investment was not risk free as represented by the broker." *Id.* at 474. Because no reasonable reliance could be shown, the plaintiff's fraud claims were dismissed.

Future predictions of revenue also were found to be non-actionable in *Carlock v. Pillsbury, supra.* In that case, Pillsbury represented that, once it purchased Haagen-Dazs, it would "turn things around" and "concentrate on building revenues for the shoppes." 719 F.Supp. at 837. On summary judgment, the district court dismissed claims that the franchisor had misrepresented its ability to successfully operate Haagen-Dazs. *Id* at 837. The court reasoned as follows:

> Pillsbury's actual success in operating Haagen-Dazs depended in large part on factors outside of the defendants' control — the economy and competing producers for example — and was therefore beyond defendants' ability to know with certainty. A statement by any of the defendants as to what Pillsbury would be able to achieve with Haagen-Dazs is by its very nature a prediction as to the future which is not actionable as fraud.
> *Id.*

In this case, Dunhill was possibly slow to realize that the Exchange Program was becoming less important and less utilized in the internet age of employment staffing. But any statements about the future revenue a prospective franchisee might generate through

31

use of the Exchange Program were just that - future predictions that are not actionable. Moreover, Respondents presented no evidence whatsoever that Stidham or anyone else at Dunhill made this prediction with the *intent* to defraud them.

> 6.    Westover Is Not Entitled to Damages or Rescission under the New York Franchise Sales Act.

To the extent that Westover contends that Dunhill engaged in fraudulent and unlawful practices under the New York Franchise Sales Act ("the Act")(General Business Law § 680 et seq., hereinafter G.B.L.)[11], he failed to prove that damages are warranted, or that any violation by Dunhill was willful or material.

In order to ensure that franchise agreements are entered into by sufficiently informed parties, the Act declared it to be "unlawful and prohibited" for any person to offer or sell any franchise without first registering an "offering prospectus," containing certain prescribed information, including details about the franchisor's background and financial condition. (G.B.L. §683.)  The prospective franchisee is supposed to receive a copy of the prospectus at the earlier of: (a) the first personal meeting between the franchisor or its agent and the prospective franchisee; (b) at least ten business days prior to the execution of the binding franchise or other agreement, or (c) at least ten days prior to the receipt of any consideration in connection with the sale or proposed sale of the franchise. (G.B.L. §683, subd. 8).  Under  G.B.L. § 691, a franchisor can be held liable for damages and, if the violation is found to be "willful and material," the franchisee can seek rescission.  The purpose of the Act is to prohibit the sale of franchises where such sale would lead to fraud. (G.B.L. § 680(2)).

This is not a case in which Westover never received an UFOC from Dunhill.  In fact, Westover received Dunhill's May 22, 2001 UFOC on February 28, 2002, a timely disclosure, during his initial meeting with Robert Stidham in Dallas, Texas. (Exs. 53, 54;

---

[11]  This is not included as a counterclaim in Respondents' Answer and Counterclaim filed on September 10, 2004.

TR 1/22/07, p. 492). During the following four months of due diligence, Westover visited corporate headquarters in April 2002, and testified that he signed for an updated 2002 UFOC. (Id. at 560). Westover contends that Stidham told him to leave the UFOC and it would be sent to him in the mail; although Stidham denies ever saying that, he did testify that it was possible Westover was provided with an interim UFOC. (TR 3/8/07, pp. 140, 234-235). Neither party possesses the signed UFOC receipt, or the UFOC itself that Westover claims to have received. Dunhill's next UFOC offered into evidence was filed in October 2002.

As discussed above, by the time Westover purchased his franchise on July 18, 2002, he had done a tremendous amount of due diligence by speaking with many franchisees in the system, and he also had an attorney review the contract that was attached as an exhibit to the May 22, 2001 UFOC. (TR 1/23/07, p. 683-711). Westover testified that he read the entire UFOC. (*Id.* at p. 671). Because the purpose of the Act is to prevent fraud, it would not be served in this case where Westover was not an unknowledgeable purchaser, and where there is no evidence that Dunhill acted in a fraudulent matter, or committed any "willful and material" violation of the Act.

Indeed, Westover did not prove at the hearing that the information he could have gleaned from the phantom interim UFOC was materially different than the information disclosed to him in the May 22, 2001 UFOC. *See e.g., Baker Boy of Glendale v. 35-63 82nd St. Corp.*, 166 A.D.2d 397, 399, 573 N.Y.S.2d 1 (2d Dep't 1990) (defendants failed to submit evidence to support conclusory allegation that franchisor's failure to provide a UFOC was willful or material). As such, Westover has not demonstrated any actual damages flowing from the alleged failure to disclose, and undoubtedly has not shown any willful or material act that would warrant rescission.

III.   **DUNHILL'S ITEM 20 DISCLOSURES FULLY COMPLY WITH FTC REGULATIONS AS A MATTER OF LAW; THERE IS NO EVIDENCE OF FALSE OR MISLEADING DISCLOSURES**

Respondent Michael Lamanna expressed his view, on behalf of the other Respondents, that Dunhill should have provided him with information about how many franchisees were producing revenue and the amounts.   However, as a matter of law, Dunhill had no duty to disclose this information.   Further, none of the Respondents ever attempted to inquire with anyone at Dunhill how many franchises included in the UFOC were reporting royalties or generating revenue at any particular revenue.   And not one offered evidence, from any source, to establish that Dunhill was aware of the number of franchisees reporting or underreporting royalties at any time.   (TR 1/29/07, p. 1668).

As to any allegations that Dunhill violated FTC regulations, there is no private right of action to enforce the Disclosure Requirements of Section 436 or any other FTC regulations.   *See Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d. Cir. 1974).   And, to the extent Lamanna is relying on the FTC regulations to establish he was fraudulently induced due to some alleged incompleteness in Dunhill's UFOC, his claim still fails because, absent a duty to disclose, Dunhill's failure to provide information cannot constitute fraud.   *See Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 156 (2d Cir. 1995).

The Franchise Rule or Business Opportunity Rule, set out in 16 C.F.R. § 436.1 and titled *Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Venture*, requires franchisors to provide prospective franchisees or purchasers with a complete and accurate disclosure document containing 20 categories of information, including identity and experience information about the directors and executive officers of the franchisor as well as the identity of previous franchisees. 16 C.F.R. §§ 436.1(a)(2) and (a)(16).   The franchisor must also disclose the names addresses, and telephone numbers of the ten franchisees nearest to the prospective

purchaser, or all franchisees in the state where the prospective purchaser is locating the business, or all of the franchisees. 16 C.F.R. § 436.1(a)(16).

The comments to the FTC's Franchise Rule explains the intent behind Item 20:

> The disclosures required by section 436.1(a)(16) of the rule will inform prospective franchisees of the number of franchise outlets in operation during the previous fiscal year and the number of such outlets which were terminated or failed to be renewed during that period. This information will materially assist prospective franchisees to assess their chances of success on the basis of the success and failure rate of active franchisees. Further, this provision of the rule also requires that prospective franchisees be provided with the names and addresses of similarly situated franchisees who are presently in operation. This information will provide prospective franchisees with a means to (a) ascertain the problems confronting franchisees operating under conditions similar to those under which the prospective franchisees would be operating, and (b) verify the representations made by the franchisor concerning the franchise.

Significantly, 16 C.F.R. § 436.1 does *not* require franchisors to disclose the revenues of each of its franchisees, or any other franchisee performance data. The FTC comments further explain as follows:

> Section 436.1(a)(16) is the product of the Commission's decision to reorganize and clarify such disclosure requirements, since they were within several separate provisions of the rule as earlier proposed. See §§436.1(a)(9), 436.1(a)(15), and 436.1(a)(20) of the first proposed rule, see App. B and §§436.1(a)(9) and (a)(16)(*b*) and (*c*) of the revised proposed rule, see app. C. In this respect, the Commission has not required the disclosure of "the number of franchises, if any, that operated at a loss during the previous year," or disclosure providing the prospective franchisee with a right to inspect the "profit and loss statements of all existing franchisees." These disclosures were required by §§436.1(a)(10) and (a)(11) of the first proposed rule, respectively, and have been deleted. To make such a requirement workable, all franchisors would have to obtain profit and loss statements from their franchisees. The public record clearly indicates, however, that franchisors cannot readily obtain such information from franchisees.

Courts have issued rulings that are consistent with 16 C.F.R. § 4361. In *Carlock, supra,* the court held that the franchisor was under no duty to provide information on the

franchise system's declining revenues, and that even the UFOC recommended that a potential franchisee make his own investigation. 719 F.Supp. at 839.

In this case, contrary to what the Respondents have suggested, Dunhill was under no obligation whatsoever to disclose those franchisees generating revenues above $60,000–an arbitrary amount chosen by Lamanna–or anything about its franchisees other than the number of outlets and contact information.  Dunhill's UFOC includes all the existing and past franchisee names and telephone numbers; Westover was encouraged to contact any one of them, and he in fact did contact many franchisees, and had the ability to inquire about levels of revenues or financial losses.

## IV. WESTOVER FAILED TO PROVIDE WRITTEN NOTICE OF ANY ALLEGED BREACH OF THE FRANCHISE AGREEMENT; THUS, HIS BREACH OF CONTRACT CLAIMS ARE BARRED

Westover's franchise agreement set forth specific provisions to follow prior to making any claim that Dunhill was in breach.  Section 20.01 set forth that condition precedent as follows:

> "You agree to give us immediate written notice of any alleged breach or violation of this agreement by us after you have knowledge of, determine or believe that there has been an alleged breach of this Agreement by us, including any acts of misfeasance or nonfeasance."

This provision further required Westover to give notice of any alleged claims against Dunhill within one year of the date he had knowledge of the alleged breach:

> You agree that if you do not give us written notice of any alleged breach of this Agreement within one year from the date that you have knowledge of, determine or believe that there has been an alleged breach by us, then our alleged breach will be deemed to be condoned, approved, and waived by you; our alleged breach will not be deemed to be a breach of this Agreement by us; and, you will be permanently barred from commencing any action against us for the alleged breach or violation.

*See* Ex. 55 (Westover Franchise Agreement at §20.01, p.62, Bates 001374)

Section 26.01 further directed that written notice be *delivered* to Dunhill by certified mail, return receipt requested, or overnight mail, *attention to the Compliance*

*Department*, with an additional copy to Dunhill's corporate counsel.  (*See id.* at Bates 001377).

###### A.    Despite this Mandate of Timely Written Notice, Westover Made No Effort to Comply with These Explicit Notice Requirements.

Westover testified that he learned about each of the problems he alleges were contract breaches within a few months of joining the Dunhill system in 2002. Accordingly, if he believed that the training class he attended in July 2002 was somehow inadequate[12], he was contractually obligated to give notice of breach immediately or no later than July 2003.  (TR 1/22/07, pp. 530-534).  If Westover believed that Dunhill was required, but failed to provide, national advertising, Westover was also obligated to promptly provide written notice and an opportunity for Dunhill to remedy the omission. (TR 1/23/07, p. 720).

Westover now contends that he did not receive continuing on-going services (although a review of Exhibit 74[13] belies this contention) but he never sent Dunhill a notice of default on this issue   (TR 1/23/07, pp. 622, 734).   Even though Westover realized towards the end of 2002 that Dunhill had not opened very many offices and he was concerned that Dunhill would not meet its projections, he failed to advise Dunhill that he perceived there to somehow be a breach of the franchise agreement.  (TR 1/22/07, p.504, line 10 to p.505, line 8).  Similarly, when Westover hired an outside consultant to add content to the website Dunhill had provided, he did not inform Dunhill of any nonfeasance.  (TR 1/23/07, p. 616).

Westover also claims that Dunhill breached the exclusive territory provision of his franchise agreement. He testified that sometime in the fall of 2002, he became aware

---

[12] Westover did not feel that the training was effective, but did receive all of the training contractually guaranteed days before the 180 day period expired. (TR 1/23/07, p. 613).
[13] The 2003 telephonic conference participation lists in Exhibit 74 demonstrates that Westover's office did utilize those on-going services through at least December 2003. *See* Bates DSS 03096-03100, DSS 03132-03134, DSS 03136-03137, and DSS 03144-03145.

that another Dunhill franchisee, Jay Barham, was operating an office within his same
geographic territory. (TR 1/23/07, p. 732, lines 9-21). Westover testified that he called
Jamie Owen, a Dunhill field representative, about the problem. (*Id.* ). When Ms. Owen
did not respond to his concern, he did not mention the issue to anyone else at Dunhill.
(TR 1/23/07, p. 734). Indeed, Stidham testified that if Westover had notified Dunhill
that his territorial rights were being infringed, Dunhill would have gone back to the law
firm who generated the first right of refusal documents, and had advised Dunhill that the
geography in question was in the inventory. That is, if there were a complaint about
territory encroachment, Dunhill would have referred that to counsel to sort out, and to
Stidham's knowledge, that was not done in this case (TR 3/6/07, pp. 224-232). Westover
never provided Dunhill with written notice of the alleged breach, in accordance with the
terms of the franchise agreement, and admitted that the first time he raised the territory
issue, since having spoken with Jamie Owen in the fall of 2002, was *several years later*
*after the commencement of this litigation.*[14] (TR 1/23/07, p. 734, lines 17-23).

Westover acknowledged that he voluntarily agreed to the written notice provision
and to the one-year statute of limitations language. (TR 1/23/07, pp. 777 to 779). Even
so, Westover admitted that he never sent a written notice of breach to Dunhill regarding
any purported breach or violation of the agreement. (TR 1/23/07, pp. 776 to 783). This
defect is fatal to his breach of contract claims under New York law.

In *Sauer v. Xerox Corp.*, 17 F.Supp.2d 193 (W.D.N.Y. 1998), the plaintiff was
*precluded* from filing a breach of contract suit because he failed to provide written notice
that was clearly required by the parties' contract. The district court explained:

> It is well established under New York law that "the terms of a written
> agreement define the rights and obligations of the parties to the

---

[14] In fact, this issue was not raised in Westover's counterclaims or during his June 20,
2006 deposition, and was instead related for the first time in his supplemental affidavit,
which was not executed until over six months later on January 5, 2007, and provided to
Dunhill's counsel in the latent January 8, 2007 production.

agreement" and "where the parties have agreed to conduct themselves in a accordance with the rights and duties expressed in a contract, a court should strive to give a fair and reasonable meaning to the language used." *Abiele Contracting, Inc. v. New York City Sch. Constr. Auth.*, 91 N.Y.2d 1, 9-10, 666 N.Y.S.2d 970, 689 N.E.2d 864 (1997). Where, as here, the parties have agreed to provide notice and an opportunity to cure prior to suing for performance or asserting termination rights under a contract, those covenants must be adhered to. A party's failure to do so renders ineffective that party's rights to pursue those other remedies. (citations omitted).

*Id.* at 197.

In *RBFC One v. Zeeks, Inc.*, 367 F.Supp.2d 604 (S.D.N.Y. 2005), the plaintiff conceded that it did not follow the notice procedures, and instead argued that defendant had actual knowledge by virtue of oral statements and e-mails that alleged non-performance. *Id.* at 611. The court held that "oral notice" was clearly inadequate because the contract required "written notice." *Id.* As to whether the e-mails sufficed, the magistrate judge noted that none of them mentioned the word "breach," they were not addressed to the correct person listed in the contract, and they were not delivered by hand or sent "return receipt requested" as required by the contract. *Id.* at 613. Finding that no rational jury could find any of these writings to constitute notice of breach, summary judgment was granted. *Id.*

Likewise in the recent matter *Matrix Group Ltd. v. Rawlings Sporting Goods*, 477 F.3d 583 (8th Cir. 2007), the Eight Circuit affirmed summary judgment where contractual notice was not provided. Matrix and Rawlings had agreed that if either party breached any of the contract's provisions, written notice must be provided, and the party could terminate if the breach was not cured within 30 days. *Id.* at 586. During a meeting with Matrix, Rawlings expressed concerns that the product line had grown stagnant. *Id.* Rawlings believed that Matrix was disinterested in growing the business, and was not using its "best efforts" to develop and sell its products. *Id.* at 587.

When Matrix did not satisfactorily respond to these concerns, Rawlings sent a termination letter stating that despite repeated requests, Matrix had refused to comply

with its contractual obligations. *Id.* Rawlings argued that it was excused from the contract's written notice requirement because Matrix first breached by not using its best efforts to sell Rawlings products. *Id.* at 588. The appellate court rejected Rawlings' position, finding:

> "It is precisely when a party is not in substantial compliance with the contract that the notice and cure provision mandates the giving of thirty days' notice. In similar circumstances the Eleventh Circuit has come to the same conclusion while applying the law of Pennsylvania. *See Alliance Metals, Inc. v. Hinely Indus., Inc.*, 222 F.3d 895, 903 (11th Cir. 2000) (it would otherwise "effectively render meaningless contractual 'notice and cure' requirements")."

*Id.* at 589.[15]

Indeed, the language in Section 20.01 amounts to a condition precedent to Westover being able to raising these claims. Under the law of contracts, parties may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event. Where notice is a condition precedent to default, failure to give notice of the alleged default precludes recovery on the contract. *See Filmline (Cross-Country Prods.), Inc. v. United Artists Corp.*, 865 F.2d 513, 518 (2d Cir. 1989) (holding that defendant film company's contract termination was ineffective due to its failure to give contractually-secured opportunity to cure); *see also Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) ("[U]nder New York Law, . . . where the agreement specifies conditions precedent to the right of cancellation, the conditions must be complied with.") (*quoting Consumer Power Co. v. Nuclear Fuel Servs., Inc.*, 509 F. Supp. 201, 211 (W.D.N.Y. 1981)).

Several other jurisdictions also have held that actual or constructive notice fail to meet the condition precedent to bringing suit on a contract that contains a written notice

---

[15]  Even though Delaware law governed the *Matrix* case, that unambiguous contract language must be given its plain meaning is a fundamental contracts principle that is also followed in New York. *See Abiele Contracting, Inc., supra; see also Slamow v. Delcol*, 174 A.D.2d 725, 571 N.Y.S.2d 335 (2d Dept. 1991) (under New York law, full effect must be given to the plain meaning of the language in the agreement and that language cannot be construed in such as way as to distort its clear meaning).

provision. *See e.g. Jasty v. Wright Medical Technology, Inc.*, 2006 WL 961456 at *14-16 (D.Mass Apr. 6, 2006) (plaintiff's letter, even in conjunction with discussions at a prior meeting, failed to meet the express written notice requirements of the contract because it did not invoke the provision or advise defendant that he was perceived to be in breach); *State ex. re. Nixon v. Prudential Health Care Plan*, 2000 WL 33952262 at *4 (E.D. Mo. June 28, 2000) (courts strictly enforce condition precedent of written notice prior to bringing suit and it cannot be avoided by showing that the breaching party had informal or constructive knowledge of the complaining party's allegations or a chance to improve).

By failing to provide Dunhill written notice of any alleged breach, Westover and the other Respondents failed to satisfy this condition precedent, and are now precluded from successfully asserting a breach of contract claim.

1.    <u>The FAC Meeting Minutes Do Not Satisfy the Written Notice Provision.</u>

Respondents improperly rely upon certain minutes taken during Franchise Advisory Council (FAC) meetings, and now conveniently and self-servingly assert that these minutes were somehow intended to provide written notice of breach to Dunhill.

At the hearing, Respondents failed to produce any FAC by-laws showing that the FAC considered its minutes to constitute formal written notice of breach for individual franchisees. And there is no evidence to establish that Dunhill viewed the FAC as having that type of authority. Certainly there is no mention in the franchise agreement that the FAC was a vehicle for *any* particular form of communication from a Dunhill franchisee to Dunhill, let alone a vehicle intended to somehow supplant the notice requirements of an individual franchise agreement.

On the contrary, the FAC was created and administered by franchisees; it was not formed or managed by Dunhill. (TR 3/6/07, p.174, lines 10-25). Dunhill simply recognized the FAC as an organization attempted to work with this group to discuss the franchise and to receive advice and guidance. (*Id.* at p. 175, lines 2-6). In the franchise

industry, many franchisors meet with advisory councils without any contractual obligation to do so. (*Id.* at 176, lines 15-16).

Moreover, Westover himself never attended a single FAC meeting. (TR 1/22/07, p. 538, line 21). Respondent Elias Zinn, although never the secretary of the FAC, testified that the meeting minutes were kept in the ordinary course of business, and were distributed to Dunhill management for comment. (TR 1/24/07, pp. 979-981). But, as Robert Stidham testified, Dunhill was not routinely given an opportunity to edit the minutes, and that when minutes were received there was a "disconnect" between what management and the franchisees thought was covered at the meeting. (*Id.* at p.170, lines 7-12; p.175, lines 7-15). Thus, the minutes should be considered as generally untrustworthy as documentary evidence and replete with self-serving hearsay.

Further, none of the meeting minutes refers to any "breach" or "default" of anyone's franchise agreement and there is no evidence to suggest, to even the slightest degree, that the minutes were ever even purportedly delivered to Dunhill in lieu of the contractually-mandated written notice of breach. There is simply no evidence to substantiate Respondents' claims that FAC meeting minutes were considered by the FAC or, more importantly, understood by Dunhill, to constitute written notice of breach. As a result, none of the FAC meeting minutes introduced into evidence should be deemed to constitute notice under the franchise agreement's specific provisions.

      2.    <u>Westover Is Not Excused From Providing Notice Even if He Believed It Futile.</u>

Even if Westover believed that complying with the written notice procedures would have been useless, he is not excused under New York law from complying with his contractual obligations  This argument has been considered and rejected. *See e.g. Honeywell Intern. v. Air Products & Chem.*, 858 A.2d 392, 418 (Del Ch. 2004), *rev'd in part on other grounds*, 872 A.2d 944 (Del. 2005), (under New York law, a party cannot terminate a contract based on a claim of breach, regardless of its merits, where that party failed to first provide the contractually required opportunity to cure).

In *Needham v. Candies, Inc.*, 2002 U.S. Dist. LEXIS 15144 (S.D.N.Y. 2002), the plaintiff asserted that he could recover on an employment contract, notwithstanding his failure to provide notice and an opportunity to cure, because such an act would have been futile. The court listed the extremely limited circumstances under New York law when a party can justify terminating a contract without providing notice, including repudiation, or an unequivocal intent to abandon the contract, or where the misfeasance is incurable. *Id.* at *11. Because there was no repudiation, and because plaintiff failed to provide notice and opportunity to cure, the court granted summary judgment to the employer, finding that this condition precedent was unmet. *Id.* at *16.

Here, there is no claim that Dunhill intended to abandon this franchise agreement. None of the breaches of contract Westover alleges--territory encroachment and the insufficiency of the technology, training and support he received--are alleged breaches that could be deemed "incurable." Simply put, it would contradict the language of the agreement and New York case law to find now, years after the fact, that it would have been an idle act for Westover to have provided the requisite notice to Dunhill.

**B.      Westover's Failure to Provide Any Written Notice Now Permanently Bars His Claims.**

Section 20.01 of the franchise agreement provides that if Westover did not notify Dunhill of any purported breaches <u>within one year</u>, he would "be permanently barred from commencing any action against us for the alleged breach or violation." Under New York law, parties can contractually agree to shorten the limitations period that would otherwise apply. *Potter v. Nathan's Famous Sys., Inc.*, 667 N.Y.S.2d 301 (App. Div. 1998) (*citing H.P.S. Capitol v. Mobil Corp.*, 588 N.Y.S.2d 29 (App. Div. 1992)).[16]

---

[16]    Even if Westover did not waive these claims by virtue of Section 20.01, Westover would still be barred from raising these claims because he elected to continue performing under his franchise agreement rather than providing timely written notice of the alleged breaches. Under New York's common-law doctrine of election of remedies:

> "Where a party has actual knowledge of its contract partner's breach but continues to perform under the contract or accept the performance of the breaching party, the continuing performance constitutes an election of

Because Westover failed to adhere to the notice requirement, he is barred from asserting his claims.

### C.     The Arbitrator Should Give the Franchise Agreement's Unambiguous Language Its Plain Meaning and Full Effect.

Section 20.01 of the franchise agreement is an express, unambiguous, and mandatory requirement included in the agreement so that an arbitrator or court would not have to guess what might have happened had the notice not been provided. *See Screen Cartoonists Guild v. Walt Disney Productions*, 74 Cal.App.2d 414, 418 (1946) (court vacated an award because "the arbiter's ruling was in direct conflict with the express terms of the bargaining contract, and thus exceeded the powers conferred upon him."); *see also Western Employers Ins. Co. v. Jefferies & Co.*, 958 F.2d 258, 261-62 (9th Cir. 1992) (court vacated an award where the arbitrators failed to arbitrate the dispute in accordance with the terms of the arbitration agreement, noting that the party should be held to the agreement "under simple principles of contract law.").

The parties' contract cannot now be remade during arbitration. One opinion gives plain meaning to the policy behind this concept:

> "When a businessman retains a lawyer to prepare a contract, he expects, and is entitled to expect, that the lawyer will incorporate such provisions therein as are necessary to protect his client's interests. Nothing is more frustrating to the conscientious lawyer than to painstakingly draft such provisions and then have a court brush them aside as 'hypertechnical.'
>
> The attorneys for appellant very carefully provided that no failure to perform should be termed a material breach unless appellee should first deliver to appellant "a written notice specifying the . . . alleged failure to act constituting such claimed material breach and [appellant] shall have failed to cure the material breach within thirty (30) days after receipt by [appellant] of such written notice." Where such a clause exists, it is settled law that there can be no recovery unless the notice provided for has been given. *Plumley v. United States*, 226 U.S. 545, 548, 33 S.Ct. 139, 57 L.Ed. 342 (1913); *National Telefilm Associates, Inc. v. Pamandia Productions,*

> remedies that precludes it under New York law from later asserting that the contract is terminable because of the prior breaches." *Honeywell Intern. v. Air Products & Chem.*, 858 A.2d 392, 419 (Del Ch. 2004) (holding that "[a] party cannot elect to continue with the contract, continue to receive benefits from it, and thereafter bring an action for rescission or total breach."

*Inc.*, 42 A.D.2d 514, 344 N.Y.S.2d 418 (1st Dep't 1973); 10 N.Y. Jurisprudence Contracts § 293 (1960); 17A C.J.S. Contracts § 515, at 852-53 (1963)."

*Contemporary Mission v. Famous Music Corp.*, 557 F.2d 918, 928-29 (2nd Cir. 1977) (concurring opinion).

The notice provision would be rendered meaningless if the Arbitrator were to now find that oral remarks or "concerns" discussed at FAC meetings somehow constituted notice of breach. Thus, the Arbitrator should find that Westover's breach of contract claims are barred as a matter of law.

## V.   DUNHILL MET ALL OF ITS CONTRACTUAL OBLIGATIONS, IN ANY EVENT

Even if the breach of contract claims are not waived or time-barred, none of the respondents proved by a preponderance of the evidence[17] that Dunhill even breached a contractual obligation in the first place. To establish a claim for breach of contract under New York law, a party must prove: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000). In the franchise context, as long as the franchisor has met its basic duty to: (1) allow the franchisee to operate a business under the franchisor's name and within the system, (2) license to the franchisees its marks and proprietary information, and (3) provide training and support, the franchisor has generally fulfilled its contractual obligations to its franchisees. *Brenco Enterprises, Inc. v. Takeout Taxi, supra.*

### A.   Dunhill Met Its Contractual Obligations to Each Respondent.

Each of the franchise agreements granted Respondents a ten (10) year license to operate a Dunhill business using the Dunhill system and trademarks.[18] Pursuant to Section 6 of each agreement,[19] Dunhill agreed to provide certain services and support:

---

[17]   The party asserting a breach of contract claim "has the burden of proving the material allegations in the complaint by a fair preponderance of the evidence." *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F.Supp. 1188, 1195 (S.D.N.Y. 1994).

[18]   Auger, Ex. 38 at § 2, p.2; Lamanna, Ex. 14 at § 2, p.3; Westover, Ex. 55 at § 4.01, p.7, and Zinn, Ex. 4 at § 2, p.2.

[19]   Auger, Ex. 38 at p.13; Lamanna, Ex. 14 at p.13; Westover, Ex. 55 at p 15; Zinn, Ex. 4 at p. 12.

1.    Dunhill Provided Pre-Training Assistance and Consultation.

The franchise agreement required Dunhill to provide pre-training assistance and consultations, *"as we determine,"* which generally covered recommendations and approval regarding office location, a floor plan for the office layout, or furniture recommendations. *Id.* Although this provision did not mandate pre-training assistance, there is evidence in the record showing that Dunhill offered these services.

For instance, Rick Kean was available to assist franchisees with office layout. (TR 1/19/07, p. 386, line 23 through p. 388, line 24). Robert Stidham spent time with Lamanna in Irvine, California searching for office locations. (TR 1/29/07, p. 1534; TR 3/6/07, pp. 109-110). Westover sent his office layout proposal to Stidham, who responded by signing an approval. (Ex. 102; TR 1/23/07, pp. 806-807). Auger testified that he did not receive help with locating or setting up the layout for his Charlotte, North Carolina office, although he does not contend that he ever *requested* Dunhill's input. (TR 1/25/07, pp. 1242 line 20 through p. 1243, line 5).

Hence, Dunhill was available to consult on these matters when a request was made by the franchisees, or in its own discretion if input was necessary. Respondents offered no evidence that their ability to operate their office was compromised due to location, layout or furniture. In fact, location was not of critical importance to the success of a permanent staffing office. (3/6/07, p. 43, lines 11-18). Thus, no harm has been shown by any purported failure to offer this service; and Respondents did not otherwise prove breach.

2.    Dunhill Provided New Franchise Training and Start-Up Materials.

Each Respondent attended a mandatory ten-day training program. The franchise agreements explained that the training program would cover "matters pertaining to the operation of the Dunhill permanent placement business, including, but not limited to, the following: procedures employed in interviewing applicants for permanent placement, marketing of applicants to employer/clients, recruiting of applicants for permanent

46

placement, soliciting job orders from employer/clients, the maintenance of books of financial records, use of business forms pertaining to the business, standards, operating procedures, policies and guidelines."

Although Respondents take issue with the *quality* of training that they received, they nonetheless do not dispute that Dunhill actually provided the initial training. Mr. Kean, who has been with Dunhill for approximately 25 years, created the training regimen. Robert Stidham, who had observed MRI training for the previous eight years, sat through training with Kean in January of 2001, and considered the Dunhill training to be "very good." (TR 3/6/07, p. 39). Indeed, just prior to joining Dunhill, Stidham recalled finding an article in *Franchise Times,* a trade magazine, that recognized Dunhill for its quality of training. (*Id.*) Further, Neil Whitman, who went through training in 2000, testified that he was satisfied with training and gained a "bunch of skills." (TR 1/30/07, pp. 1750-1754). Even Elias Zinn described the training as "very good," although outdated, in his view, by changes in technology. (TR 1/24/07, pp. 945-946).

Section 6 also required Dunhill to furnish an initial supply of start-up materials estimated to be sufficient for approximately ninety (90) days. Mr. Kean testified that new franchisees were given brochures, forms, and daily planners for office use. (TR 1/19/07, p. 392, lines 22-25). In addition, Dunhill promised to provide a confidential Operating Manual that consists "collectively of the written guidance, directions, operational systems, procedures, policies, methods, prohibitions, requirements and specifications." Respondents do not dispute that they received a President's Manual and start-up materials.

Based on the foregoing, Respondents cannot succeed on a breach of contract claim premised on any alleged failure by Dunhill to provide initial training or start-up materials irrespective of the defective notice issue.

### 3.    Dunhill Provided Additional Training.

Within six months after a franchisee's opening, Dunhill provided a field representative to consult at the office location for five days, which could be met by conducting a hiring seminar in the area.  Dunhill provided the five additional training days at Westover's office within the requisite month period.[20]  (TR 1/23/07, p. 613).  In addition to that, Jamie Owen visited three to four times to present Dunhill Consulting Training, although Westover did not feel that those classes were beneficial.  (TR 1/22/07, pp. 548-549).  Zinn testified that he received the five additional days at his office from various Dunhill representatives, but that his partner Wilcoxson did not receive the additional training on the temporary placement side.  (TR 1/24/07, p. 943).

Lamanna did not allege that he did not receive the initial training; he testified that although Jamie Owen visited approximately five times, this number of visits was not enough to support his business.  (TR 1/29/07, p. 1527).  Auger did not allege that Dunhill failed to provide the five additional training days, and testified that Dunhill was there when he called for training or guidance during the first three to four months after opening, though  representatives often cancelled field visits thereafter.  (TR 1/25/07, p. 1240, lines 15-21).

Nobody denies that Dunhill went through a difficult period: there were administrative changes, a recessionary squeeze, and 9/11 certainly may have impacted Dunhill's ability to be as quick to respond to all the franchisees' needs at all times.  Without exception, however, Dunhill maintained sufficient staff to fulfill its contractual obligations at all times.  (TR 1/22/07, pp. 436-438; TR 3/6/07, p. 103, lines 8-14).  Neil Whitman, who has had success following the Dunhill business model, views the Dunhill's support as "excellent."  (TR 1/30/07, pp. 1762-1764).  And Robert Stidham observed that the support staff at Dunhill was more personalized than its largest

---

[20]    Westover telephoned Dunhill to remind them that he had not yet received the additional days, but they sent Dunhill field representative, Jamie Owen, out "immediately" in response to his call and prior to the 180th day.  (Id. at 613).

competitor, MRI, because Dunhill had six field representatives to service just the franchised units, whereas MRI had only 23 field support people for 1400 world-wide offices. (TR 3/6/07, p. 115).

Putting aside their failure to provide notice of breach, Respondents failed to prove by a preponderance of the evidence any failure to provide "additional training" or any damages caused by such a breach.

### 4. Dunhill Provided Continuing Resources and Ongoing Support.

As part of the franchise agreement, Dunhill also agreed to provide ongoing support which would include occasional national seminars, regional meetings and/or field training sessions. Although attendance at such seminars and meetings was not mandatory, Dunhill recommended that franchisees attend. There was ample evidence offered at the hearing to demonstrate that Dunhill met its contractual requirements regarding ongoing support.

The training materials available to any Dunhill franchisee, listed in Exhibit 67, included informative manuals on Consultant Training, Sales and Service Training, Making Placements, Management Training, as well as interactive CD training, books, and videos available for checkout as needed from the "Lending Library" (resources listed at Ex. 69). All Dunhill franchisees would have received this catalog. (TR 1/19/07, pp. 409-410). Dunhill also prepared a yearly training calendar indicating what classes were available.[21] As an example, Exhibit 70 shows the ongoing training Dunhill provided in the years 2001 through 2004, and specific dates that field representatives would be in certain locales. (TR 1/19/07, p. 410, line 24 through p. 413, line 13). "Dunhill University" was an online facility available to all Dunhill franchisees at all times. (TR 1/19/07, p. 436, line 25 through p. 437, line 22). All Dunhill offices also received a template business plan to be used for yearly planning. (Ex. 73, TR 1/19/07,

---

[21] As one component in maintaining the success of his business, Whitman testified that he reviews Kean's training calendar, so that his permanent placement staff could select courses to reinforce their basic training over the year. (TR 1/30/07, p. 1764, lines 4-10).

pp. 416-417). Dunhill consultant and management training seminars were held frequently (*See* Exs. 75-81), as were teleconferences, which were used frequently in place of field visits when travel became more difficult after 9/11. (Ex. 74, TR 1/19/07, p. 417-421).

Despite Auger's, Lamanna's and Westover's opinions that Dunhill's training and support was 'worthless,' a close examination of the attendance lists for the teleconference calls belies those views, because each of their offices was still utilizing Dunhill's ongoing support throughout 2003. For instance, Exhibit 74 shows that Westover (or staff from his office) participated in teleconference calls in the year 2003[22]: on June 4th (Bates 3098-99), July 15th (Bates 3096-97), September 8th (Bates 3137-38), November 18th (Bates 3132-34), and December 9th (Bates 3144). Likewise, Auger (or staff from his office) participated in the telecalls in 2003 on August 5th (Bates 3141), August 21st (Bates 3093), October 7th (Bates 3118), and October 22nd (Bates 3118). Lamanna participated at least once on June 6, 2003 (Bates 3098), and testified that he attended these calls "on occasion." (TR 1/31/07, p.1886-1889). While Zinn's name never appears as an attendee, all telecalls were offered to any interested franchisee.

Finally, Dunhill held periodic conferences as discussed in Section 6 of the franchise agreement. As one example, a national conference was held on March 20-23, 2002 in New Orleans and the conference roster reflected attendance by both Auger and Zinn. (Ex. 72). Westover attended this conference as a prospective franchisee as part of his due diligence process; and it is curious to note that most of the franchisees to whom he spoke at the conference were satisfied with Dunhill, and he heard nothing that gave him pause about going forward with the opportunity. (TR 1/23/07, pp. 699-700).

Notwithstanding the recessionary factors and 9/11's impact, Stidham testified that Dunhill always provided at or above the services required by the agreements (TR 3/6/07,

---

[22] Participation lists were only available for 2003, but the telecalls were provided during each year of the time period at issue. (TR 1/19/07, p. 421, line 4 through p. 422, line 20).

p. 102, lines 8-18). These four Respondents were obviously disappointed with their success level, and may now believe that the quality of Dunhill's resources were not what they had hoped, but they did not prove by a preponderance of the evidence that the level of service Dunhill provided ever fell below what was contractually required.

        5.     <u>Dunhill Met Its Obligations to Provide Advertising.</u>

Any claims of breach related to Dunhill's alleged failure to advertise also should be rejected. In Section 5[23] referencing "Franchisee's Obligations," each Respondent agreed to contribute 1% of the prior month's receipts into a national advertising fund. The franchise agreements are clear that Dunhill has the right, at its "sole discretion," to spend the monies in the advertising funds in any geographic area. (*Id.*) Further, the franchise agreement does not obligate Dunhill to disburse the funds within any single accounting period. (*Id.*) Furthermore, Dunhill disclosed in its UFOC that it has no obligation to maintain an advertising program, and also that its advertising expenditures may vary widely from year to year. (TR 1/23/07, pp.723-724).

Robert Freeman, Dunhill's CFO, testified that Dunhill had, in its discretion, used advertising fund money to help pay for the franchisees' Monster.com contracts. Around 2003, there was no ability to spend the advertising dollars without carrying forward a negative balance, so Dunhill scaled back advertising for that period. (TR 1/18/07, pp. 131-139). Although each Respondent now claims that Dunhill somehow breached its advertising obligations, not one of them had any personal knowledge, or offered any evidence, that Dunhill used advertising funds during the time he contributed to the advertising fund for anything other than the costs that are listed in that section. (TR 1/23/07, p. 775, line 25).

Moreover, Dunhill was never contractually obligated to provide Monster.com to its franchisees in the first place. Although Dunhill subsidized the cost of Monster.com

---

[23] (Auger, Ex. 38, § 5.C, p. 11; Lamanna, Ex. 14, § 5.C, p. 11; Westover, Ex. 55, § 5.03, p. 11; Zinn, Ex. 4 § 5.C, p. 11).

until the end of 2002, it was not contractually obligated to do so, and certainly had no duty to continue providing this benefit. *Monster.com is not even mentioned anywhere in any franchise agreement.* When the contract with Monster.com came to an end, the FAC demanded that Dunhill incur the cost of a $6 million dollar renewal contract on behalf of the franchisees, even though that amount was more than the entire gross royalty income of the system! (TR 3/6/07, p. 65). It was obviously impractical for Dunhill to continue, and as Robert Freeman testified, would have turned Dunhill's advertising account "upside down." Even though it had no duty to do so, Dunhill did negotiate a substantial discount from published pricing for the benefit of its franchisees. (*See* Ex. 86). However, no good deed goes unpunished. Any breach claim related to Monster.com is specious and should be rejected.

      6.   <u>Dunhill Provided Software or Technology.</u>

Pursuant to Section 7's Operating Requirements provision, Respondents agreed to use the software specified by Dunhill and to execute software license agreements required by the vendor. Dunhill agreed that it would provide substitute software at no charge if Dunhill decided to use a different program.

Dunhill provided Respondents with RESUMate software. Rick Kean testified that RESUMate is the best software he has found for the permanent search industry. (TR 1/19/07. pp. 395-396). Stidham also thought the RESUMate technology was quite good and, in fact, purchased the commercially available version for his own staffing company. (TR 3/8/07, p. 114 ). Auger testified that RESUMate was a "decent" program, but not state-of-the-art. (TR 1/26/07, p. 1401, line 19 through p. 1402, line 5). Zinn let the software sit in its box for two years,[24] but found it workable using the same system hardware after speaking with RESUMate's technical staff and purchasing upgrades.

---

[24]  The RESUMate vendor, Chuck Schaldenbrand, attended the March 2002 Dunhill national conference in New Orleans, and presumably could have addressed any questions or concerns. (Ex. 72, Bates 009227).

(TR 1/24/07, p. 989-991). Westover received the RESUMate software, but testified that it was not installed and did not work properly for his office. (TR 1/23/07, p. 772).

Lamanna, who was supposed to receive DunStar[25] software per the supplement to his agreement, considered RESUMate to be extremely technical and not an easy program to learn. (TR 1/29/07, p. 1530). Dunhill suggested to Lamanna that he call the manufacturer for a one- to two-hour training session on how to use the software, but apparently Lamanna chose not to make that call. (*Id.*) In contrast, Neil Whitman took Dunhill's recommendation, and called RESUMate for technical assistance, and describes RESUMate as "user friendly." (TR 1/30/07, p. 1755, line 12 through p. 1757, line 9).

Respondents also argued that Dunhill failed to timely create a user's manual for RESUMate after Mr. Kean, who was working on that project, left the company to care for his father. Admittedly, there may have been some necessary action on the franchisee's part to contact the vendor about software use. But there is no evidence that Dunhill failed to provide adequate software to Respondents or otherwise breached this provision.

7.    Dunhill Did Not Breach Westover's Territory Rights

As previously discussed, Westover paid $5,000 for a first right of refusal[26] for a temporary Dunhill franchise territory. (TR 1/22/07, p. 586-593) In the fall of 2002, he became aware of the fact that Mr. Barham was also operating within his same geographic territory. (TR 1/23/07, p. 732). Barham's presence allegedly impeded him from opening a temporary business, and Westover never attempted to exercise his rights. (TR 1/22/07, p. 598, lines 6-21). Despite being aware of the problem, Westover continued to make loans in the amount of $724,000 to fund his business. (TR 1/23/07, p. 815).

---

[25]   Lamanna offered no evidence as to the materiality or his reliance on DunStar software over RESUMate, which Dunhill had decided was a superior substitute, and he offered no evidence of harm caused thereby.

[26]   The "right of first refusal" allowed Westover, should he choose to exercise the right, to purchase a temporary staffing business at the then prevailing rate in the same territory. (TR 1/22/07, p. 597).

It appears that Westover mistakenly believed that Barham was operating a permanent and temporary franchise within his territory.    (TR 1/24/07, p. 892). Correspondence demonstrates that Barham's temporary business was terminated before Westover purchased his territory.  (Ex. 105; TR 1/31/07, pp. 1928-1929).    Although Barham was allowed to continue his permanent business, Westover acknowledged that the UFOC discloses that *all* Dunhill businesses can make job placements, solicit business, and advertise within his territory.  (TR 1/23/07, pp. 727-729).

Furthermore, Dunhill's outside counsel would have vetted the available territory in the process of approving Westover's right of first refusal documents.  (TR 3/6/07, p. 136).  Because they had also dealt with Barham's termination documents, they would have been familiar with which territories were in inventory.  (*Id.* at 224).  While Barham may have retained his office's telephone number for a period of time, this did not materially encroach upon Westover's ability to exercise his right of first refusal had he chosen to exercise that right.   Based on the foregoing, Dunhill did not breach any contractual obligation to Westover based on his first right of refusal.

### B.    Respondents Are Not Entitled to Rescission Because There Is No Evidence of Willfulness and No Wholesale Failure of Consideration.

To warrant rescission, the alleged breach must be "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Septembertide Publ'g, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1998); *see also Mina Invest. Holdings, Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 362 (S.D.N.Y. 1998) ("As an extraordinary remedy, rescission is appropriate only when a breach may be said to go to the root of the agreement between the parties"); *Pate v. Nat'l Fund Raising Consult., Inc.*, 20 F.3d 341, 346 (8th Cir. 1994) (affirming directed verdict on franchisee's rescission claim because franchisee failed to demonstrate a "total failure of consideration").

54

New York contract law provides that "a party wishing to rescind a contract must make this intention known promptly after the discovery of the wrong or defect." *K.M.L. Labs. Ltd. v. Hopper*, 830 F. Supp. 159, 166 (E.D.N.Y. 1993). A party cannot "elect to continue with the contract, continue to receive benefits from it, and thereafter bring an action for rescission or total breach." *ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp.2d 383 (S.D.N.Y. 1999), *quoting Macfarlane & Assocs., Inc. v. Noxell Corp.*, 93 Civ. 5192, 1994 WL 369324, *4 (S.D.N.Y. July 13, 1994); *see also Bigda v. Fischbach Corp.*, 849 F. Supp. 895, 901 (S.D.N.Y. 1994) (nonbreaching party may not continue to perform after learning of breach, and then later choose to terminate the contract on account of the past breach).

Respondents failed to present any evidence whatsoever demonstrating any willful conduct on Dunhill's part.

To the contrary, the evidence demonstrated that Dunhill did not breach its franchise agreements at all, let alone in a manner that would "defeat the entire object of the contract." In the face of the purported breaches by Dunhill, each Respondent chose not to notify of breach or terminate their franchise agreement at that time, but instead continued to use the Dunhill name, trademarks, methods of operation, and continued, at least until December 2003, to submit Statement 3 royalty reports. This conduct indicates Respondents' willingness to continue performing under the contract despite their knowledge or the belief that Dunhill had not fulfilled its obligations. It is now unfair, years after the purported breaches, for Respondents to request to be put in the position as if no contract was ever entered. Their allegations regarding Dunhill's supposed failures do not warrant the extraordinary remedy of rescinding Respondents' franchise agreements.

### C.    Respondents are not Entitled to Recover Lost Wages.

Respondents' claims for moving expenses, lost wages and future lost wages are, in effect, "personal injury" damages that can only be recovered, if at all, in tort. Tort

claims are precluded in this case under the economic loss doctrine and Respondents should be limited to presenting breach of contract damages, if any. Under New York law, the recovery of lost profits as damages is subject to the following stringent requirements: (1) it must be demonstrated with certainty that the damages were caused by the breach; (2) the alleged loss must be capable of proof with reasonable certainty, and (3) there must be a showing that the damages were fairly within the contemplation of the parties to the contract at the time it was made. *Travellers Int't; AG. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (*citation omitted*). Respondents bear the burden to come forward with specific evidence in order to establish the existence of damages flowing from an alleged breach of contract. *See Stanford Square, LLC v. Nomura Asset Capital Corp.*, 229 F.Supp.2d 199, 206 (D. N.Y. 2002); *Wenger v. Alidad*, 265 A.D.2d 322, 323, 696 N.Y.S.2d 227, 228 (N.Y. App. Div. 1999) (contract "damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not the result of other intervening causes.")

In this case, the natural and probable consequence of Dunhill's alleged breach would be the loss of whatever benefit Respondents would have otherwise received in the absence of Dunhill's alleged breach. That, however, is *not* what the Respondents seek to recover. Respondents are asking the Arbitrator to award them lost *earnings* (as well as moving and medical expenses in the case of Auger) that they contend would have been received during this time period ***had they been employed doing something else***.

These damages, which can only be asserted under a tort theory, obviously bear no causal relationship to Respondents' breach of contract claims. Further, the evidence of damages set forth by Respondents is not only speculative, but was provided in the latent January 2007 production and thus Dunhill had no opportunity to investigate its accuracy. Thus, the Arbitrator should give little weight, if any, to Respondents' lost earnings "evidence." Finally, even if the arbitrator is willing to assume that lost future earnings are somehow an appropriate measure of damages for breach of a franchise agreement,

Respondents failed to articulate any specific harm incurred or a causal connection between the alleged breach and any purported harm. Lost wages are simply not recoverable, as a matter of law, even if Respondents proved any of their liability claims (which they did not).

**D.    Respondents Are Not Entitled to "Equitable Setoff."**

    1.    <u>The Franchise Agreement Expressly Prohibits Respondents from Withholding Royalties or "Setting Off" Amounts Due.</u>

Each Respondent signed an agreement prohibiting him from attempting to "set off" his liability for unpaid royalties based on counterclaims seeking unliquidated damages. Respondents conveniently ignore the language of each of their franchise agreements, [27] which state that the franchisee agreed not to withhold payments based on grounds of alleged non-performance, and that they agreed to make payments without claiming a right of setoff.

Even without that contractual provision, Respondents' position contravenes well-established New York law regarding setoffs. The setoff doctrine allows parties who owe each other money to apply their mutual debts against each other, but there must be an express or implied agreement between the parties to do so. *See Simpson v. Mut. of Omaha Ins. Co.*, No 97 Civ. 1339, 2000 WL 322780 at *6 (S.D.N.Y. Mar. 28, 2000) (citations omitted). In the absence of a statutory provision, unliquidated damages ordinarily cannot be set off at law. 20 Am. Jur.2d, *Counterclaim, Recoupment and Setoff*, § 61; 80 C.J.S. *Set-Off and Counterclaim* § 42. Because Respondents contractually agreed to make payments without a right of set off, and their alleged damages pursuant to their counterclaims are unliquidated, Respondents are prohibited from asserting this claim.

---

[27] *See* §13(N) in Exs. 4, 14, and 38 at pp. 35-36; Ex. 55 §5.08 at p. 11.

2. Respondents Cannot Continue Using Dunhill's Trademarks and System and, At the Same Time, Refuse to Pay Royalties.

Respondents' setoff argument also contravenes well-established franchise law. Even if Dunhill had breached the contract, Respondents were not entitled to continue deriving the benefits of their contract with Dunhill, while at the same time failing to remit monthly fees to Dunhill. Numerous courts have rejected the notion that a "royalty strike" is a proper remedy for franchisees based on the franchisor's alleged breach. *See, e.g., S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3rd Cir. 1992) ("[u]nder no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits") (emphasis in original)); *see also Lewis & Maswep Enters., Inc. v. McDonald's Corp.*, No. 94-1351, 1995 WL 699707, at*3 (6th Cir. Nov. 27, 1995); *Travelodge Hotels, Inc. v. Elkins Motel Assocs., Inc.*, No. Civ. 03-799(WHW), 2005 WL 2656676, at *7 (D.N.J. Oct. 18. 2005).

Here, it is undisputed that Respondents, after ceasing to pay royalties and submit Statement 3 reports, continued to use Dunhill's trademarks and system for some period of time. Respondents have all admitted that, even though *they* considered their franchise agreements terminated as of December 31, 2003, they continued to use Dunhill's marks, operate under the Dunhill name, or otherwise capitalize on Dunhill's name and goodwill, well into 2004. Because Respondents cannot be permitted to avoid or defer payment while simultaneously receiving and retaining the benefits of the Dunhill franchise system, Dunhill is entitled to the recovery of its unpaid royalties.

## VI. WESTOVER MATERIALLY BREACHED THE FRANCHISE AGREEMENT

### A. Failure to Provide Notice and Opportunity to Cure and Unilateral Termination.

As discussed above, Westover was obligated to provide written notice of any alleged breach or violation within one year of discovering the breach. By failing to provide written notice and an opportunity to cure, Westover materially breached the franchise agreement. Westover further breached the agreement by unilaterally and

prematurely terminating his franchise agreement pursuant to the notice of termination dated March 5, 2004, under which he deemed the termination to have been effective as of December 31, 2003.

### B.     Failure to Submit Statement 3 Reports and Failure to Pay Royalties

Westover's franchise agreement required him to pay a (7%) royalty on gross sales, to be reported monthly on Statement 3 reports. Westover unquestionably breached this duty. As discussed above, Westover's obligation to pay royalty fees, in connection with its use of Dunhill's trademark and systems, is unconditional. Under well-established principles of franchise law, a franchisee who engages in the ongoing use of a franchisor's trademarks and franchise system must pay royalties despite whatever claims the franchisee may have against the franchisor. *See McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F. Supp. 401, 403 (W.D.N.Y. 1986) ("the alleged wrongs of plaintiff do not constitute affirmative defenses to defendants' non-payment of franchise fees"); *see also Cle-Ware Rayco, Inc. v. Perlstein*, 401 F. Supp. 1231, 1234 (S.D.N.Y. 1975) ("It would be a gross inequity [for] the franchisees to reap the benefits of doing business under the [mark] without paying their proportionate share of the costs of those benefits pending the final outcome of this case").

Respondents' attorney, Robert Purvin, apparently advised Westover to cease paying his royalties. But even if the counterclaims asserted by Westover were legally viable, they would not excuse or provide a legal defense to Westover's breach of his Agreements.

### C.     Dunhill Is Entitled to Recover Any and All Damages Stemming From Westover's Breaches, Including Lost Future Royalties.

In addition to its past-due royalties, prejudgment interest, and its attorneys' fees and costs, Dunhill is also entitled to recover future royalty payments for the unexpired term of the wrongfully terminated franchise agreement. The *Restatement (Second) of Contracts* § 347 (1981) measures an injured party's expectation interest by (1) the loss in

value of the performance of the contract caused by the breaching party's failure to perform, plus (2) any other incidental or consequential loss caused by the breach, less (3) expenses saved by not having to perform.  Thus, Dunhill may recover an amount equal to the monies it would have received from Westover over the full, ten-year term of the franchise agreement, had Westover not unilaterally terminated, less any cost savings.  *Cf. Postal Instant Press, Inc. v. Sealy*, 43 Cal. App.4[th] 1704, 51 Cal. Rptr. 2d 365 (1996).  As a result of Westover's breach, Dunhill was deprived of future royalty payments by Westover, and is therefore entitled to recover $80,077.57 from him.

## VIII.    CONCLUSION

To remedy the harm it has suffered, Dunhill seeks damages in the amount of $80,077.57 for past-due and future royalties    (Ex. 105).    Dunhill also requests prejudgment interest, and its attorneys' fees and costs.

RESPECTFULLY SUBMITTED this _27th_ of April, 2007.

GREENBERG TRAURIG, LLP

By _Mary Mills for_

Jeffrey H. Wolf
2375 E. Camelback Road, Suite 700
Phoenix, Arizona 85016
*Attorneys for Dunhill Staffing
Systems, Inc.*

60

ORIGINAL of the foregoing sent
via e-mail this 27th day of April, 2007, to:

Michael D. Friedman, Esq.
Shiboleth, Yisraeli, Roberts & Zisman, L.L.P.
350 Fifth Avenue, Suite 6001
New York, New York  10118
*Arbitrator*

COPY of the foregoing sent via
e-mail this 30th day of April, 2007, to:

Richard L. Rosen, Esq.
THE RICHARD L. ROSEN LAW FIRM, PLLC
110 East 59th Street
New York, NY  10022
*Attorneys for Respondent Dunhill Franchisees Trust*

_____P. Berger_____

# EXHIBIT A

# WESTOVER BRIEF

# EXHIBIT A

# STAFFING INDUSTRY SOURCEBOOK

Facts and Figures for Market Research



2006 Edition

**Staffing**Industry
ANALYSTS, INC.™

# Staffing Industry Sourcebook 2006 Edition
Facts and Figures for Market Research

Copyright ©2006 by Staffing Industry Analysts Inc.

For comments and inquiries, please write to
research@staffingindustry.com.

Editorial Offices:
Staffing Industry Analysts, Inc.
881 Fremont Avenue Suite A3, Los Altos, CA 94024
email: info@staffingindustry.com • http://www.staffingindustry.com

Sourcebook updates will be published periodically at our Web site.

## Notice of Rights

Reproduction prohibited. No part of the Sourcebook may be reproduced, stored in a retrieval system or transmitted in any form or by any means, including photocopying, facsimile, or electronic distribution, without written permission of the publisher. Unauthorized reproduction violates U.S. copyright protection laws.

For permissions, advertising, or other information, please contact the Staffing Industry Analysts editorial offices at 650-232-2350, fax your inquiry to 650-232-2360, email us at info@staffingindustry.com, or write to the address above.

## Notice of Liability

The content of the Sourcebook represents our interpretation and analysis of information generally available to the public or obtained from industry and financial research sources believed to be reliable but is not guaranteed as to accuracy or completeness.

ISBN # 1-883814-16-2

SAN: 253-8490

Single copy price: $750

STAFFING INDUSTRY SOURCEBOOK 2006

© 2006 Staffing Industry Analysts, Inc. • All rights reserved • Unauthorized photocopying and distribution is strictly prohibited by law.

# From the Publisher

The *Staffing Industry Sourcebook: Facts and Figures for Market Research, 2006 edition*, provides a comprehensive guide to the tools and resources industry players, analysts, investors and other interested parties need to understand a marketplace that is growing and evolving faster than ever before.

This third edition was challenging for the staff at Staffing Industry Analysts. The industry has expanded to more than 9,500 temporary staffing firms as well as thousands of other players in place and search, PEO and other sectors. It has also formed and re-formed around specialties that focus on skills, individual industries, and even people with specific educations. Technology increasingly drives how the staffing industry works as well as how it works with customers. And more and more companies are emerging to serve the staffing industry itself.

Our challenge was to capture the full breadth and depth of the staffing industry and create a single resource that would deliver value to the industry itself as well as the growing number of people who work with, regulate and even write about staffing and hiring issues.

The numerous lists and data in the *Sourcebook* are accompanied with articles and analysis published in Staffing Industry Analysts' publications and research reports, providing context to the numbers in the various charts and tables. This reflects our desire to offer comprehensive information solutions that readers and subscribers can use every day to set strategy and make tactical decisions.

New in this edition is an analysis of the opinions of the buyers of contingent workers, best practices in putting together an effective salesforce, trends in offshore outsourcing and an analysis of the distribution of temporary workers in different professions and penetration rates in different states.

I would also like to take this opportunity to thank the staff of Staffing Industry Analysts, Inc. You will find the contributions of many of our editors and researchers in this volume. And in particular, I would like to thank Research Analyst Sona Sharma, who edited the Sourcebook this year. Thanks as well to our entire top notch production team of Kay Peterson, Anna Wan and Jessie Leary who labored mightily to bring all the loose ends together. For Sona and the entire team here this edition has been a true labor of love.

We have taken extra care to ensure the accuracy of the information in the *Sourcebook*. But we cannot guarantee every detail simply because the details change every day and some of it is based on our best estimates. What we can guarantee is a fair and complete look at the staffing industry and the best possible information and analysis. We're eager to hear your conclusions on how well we succeeded as well as your advice, comments and suggestions for the next edition.

*Barry Asin*

Barry Asin
EVP & Chief Analyst
basin@staffingindustry.com

© 2006 Staffing Industry Analysts, Inc. • All rights reserved • Unauthorized photocopying and distribution is strictly prohibited by law.

association has remained solvent, proactive and staffed up to operate its many programs and services.

Not so for the National Technical Services Association, which disbanded during the recession and never returned. This group had been made up primarily of older and small to midsize firms that were not positioned well to survive reduced margins due to vendor management systems, leadership voids as original owners retired and a shift by customers toward emphasis on IT programming rather than design and engineering.

At The National Association of Computer Consultant Businesses, a group of young, entrepreneurial members saw spectacular success as growing IT requirements, dot-com businesses and one-time Y2K needs propelled these businesses to spectacular highs from 1995 to 2000 – and then dropped them to spectacular lows in the early years of the new millennium. Today the organization is stable, but not heady. Annual meeting attendance is off by more than 60% from its high.

For the National Association of Personnel Services, representing the smaller "mom-and-pop" blended temp/perm services and many solo recruiter practitioners, the ups and downs were also severe. Just five years ago, the placement and search business was booming; two years later it was a bust. Annual events of more than 1,000 slumped to just a couple hundred, though the last two years have seen a modest resurgence (300-plus in 2004 and 600-plus in 2005). And the next 1,000-plus event might be only a year or two away!

Finally, let's look at the National Association of Professional Employer Organizations, representing the nation's "professional employers." There we have seen a grinding reduction in the total number of PEOs over the last 10 years, as costs and risks in this business rise. But because of an ever-larger number of employees under subscriber contract and a sizeable group of larger vendors (insurers,

benefit providers, transaction processors, etc.), the association continues to operate with a good revenue stream and substantial member support.

## KEY PLAYERS GO, NEW PLAYERS COME.
In 1995 we were following 46 public staffing companies on the back pages of the *SI Report* newsletter. That year we saw new public offerings by many smaller firms – SOS, Romac, PGA and Corestaff. We counted 183 merger deals in the industry that year. Private and public rollups were the rage. Those trends continued for several years.

But by 2005, half of the previous decade's public firms had disappeared, though some new ones or new names had come to take their place. Consolidation replaced expansion at the stock exchange, just as it has among our Fortune 500 customers' vendor lists. Of the 38 public companies we follow today, many are new stock listings – Monster, Administaff, Gevity, Westaff, RemedyTemp, Korn/Ferry and Hudson Highland, for example. But just as many have disappeared – SOS, PGA, AccuStaff, Brandon Systems, Career Horizons, Norrell and Olsten, among them. Manpower, which entered the last decade a clear No. 1 with $6.8 billion in worldwide sales in 1995, today finds itself playing second fiddle to a strong Adecco, which posted more than $21 billion in 2005 sales.

Rounding out the "Big Four" multinational players in 2005 were Manpower at $16 billion, Vedior at $8.1 billion and Randstad at $7.9 billion. Where only two public firms (or 4%) were predominantly in medical staffing 10 years ago, that number tripled to 6 (17%) today. Two are PEOs, versus none in 1995.

Interestingly, though, we found the 13 top U.S. staffing firms with a relatively small portion of the total U.S. staffing market in 1995 (29%), but 10 years later, 12 firms accounted for just a 23% share. One big difference – the cutoff point for listings in 1995 was $500 million, while

STAFFING INDUSTRY SOURCEBOOK 2006

© 2006 Staffing Industry Analysts, Inc. • All rights reserved • Unauthorized photocopying and distribution is strictly prohibited by law.

10 years later it had risen to close to $1 billion in sales. Overall, the U.S. staffing market has been growing – and we see aggressive inroads into the U.S. market from several foreign staffing entities (Randstad, Vedior and Japan's Crystal, to name just the largest).

We found 63 companies with U.S. sales of $100 million in 1995, but by the end of 2005 that number had grown to 100. Yet despite consolidation trends among midsize to large players, the rather low barriers to entry and ever-greater demand trend for staffing have not led to a significant falloff in the number of temporary firms doing business in the United States. On the permanent placement side, however, we saw a significant drop of firms in the 2002-2003 period, with as many as 50% of recruiter desks actually abandoned during this period. Today, both the number of desks and the number of firms are increasing again as the unemployment rate falls.

In late 1995 and early 1996 the country and the staffing industry were pulling rapidly out of the 1990-1992 recession, and the staffing industry was heating up fast. That is again true today, though we may be a year or more behind the heavy pace of 1995-1996. In those days, the Staffing Industry Stock Index was handily out-performing the S&P 500 Index, and what do you know – in just the last few months, we've seen it do the same again.

## STATISTICS TELL THE STORY, SOMETIMES.
There are many other aspects of staffing life that have changed from 10 years ago, but the reasons can be deceptive. The total number of temporaries working on a given day was something more than 2 million in late 1995, while today it is substantially higher, at more than 2.5 million. Yet in between these two high points of contingent work lie a severe economic downturn which saw temporary work first rise to 2.6 million and then plummet almost 20%. Today it has regained all of that loss,

though so far more on the industrial than clerical/professional side. Unemployment rates also are similar from what they were a decade ago, though the rate of jobs growth is not. At the end of 2005, we were hovering around the 5% unemployment mark, while in most of late 1995 the figure was somewhere around 5.6%. Perhaps the difference in these two numbers is the ability for today's out-of-work professionals to do meaningful and compensable work from home.

The Web certainly would seem to be a factor in the comparative readings of the Conference Board's Help Wanted Advertising Index over the last 10 years. This marker, which was hovering in the 80 to 90 range during much of 1995, continued in that range through most of 2000 before beginning a plunge to 35 to 40, where it has languished since 2003. The current reading is less than half its 2000 high and only about one third of the 1987 benchmarked index of 100. The advent of job boards and Web job-sourcing has greatly depressed classified advertising despite the turnout in hiring since mid-2004. Meanwhile, Monster's online employment index climbed from 100 in early 2004 to 130 in March 2005 to 145 in December 2005.

## STAFFING BECOMES STRATEGIC, GLOBAL – AND AUTOMATED.
Though none are as profound as the Internet, there are many other ways in which our environment has changed from a decade ago. Staffing companies now play a more strategic role in the workforce, there's a greater squeeze on margins and more competition from global resources such as Indian call centers, offshore programmers and foreign professionals with H-1B and other visas working in this country. Information technology has also made it much easier to know others' pricing, fees, pay rates and even value propositions.

Because of advancements in IT and communications, especially those facilitated

© 2006 Staffing Industry Analysts, Inc. • All rights reserved • Unauthorized photocopying and distribution is strictly prohibited by law.

STAFFING INDEX

SECTION 1 Trends & Outlook

CA, probably one of the first employee leasing firms. The next year, Gordon Brown started a PEO called California Staffing Management (later to become Your Staff Inc.) in suburban Los Angeles.

**THE EIGHTIES.** In 1981, T. Joe Willey launched another PEO, Staffing Network. That same year, IBM introduced the desktop PC with a DOS operating system developed by a small, unknown company called Microsoft Corp., headed by Bill Gates. Three years later, in 1984, Apple Computer introduced the Macintosh computer, with a more user-friendly graphical interface.

The Association of Outplacement Consulting Firms was founded in 1982, changing its name to Association of Career Management Consulting Firms International in 1997.

Olsten Corp. became listed on the American Stock Exchange in 1982.

In 1983, David Dunkel bought Romac's Tampa-based franchise. And Robert Funk, William Stoller and James Gray bought a portion of Acme Personnel and renamed it Express Personnel; the following year, Express bought 30 more Acme offices.

In November 1984, 22 people, driven by concerns about the 1982 tax code's safe harbor pension provisions, met in Scottsdale AZ and formed the National Staff Leasing Association (NSLA), which ten years later changed its name to the National Association of Professional Employer Organizations (NAPEO).

The temporary help services payroll in 1984 topped $5 billion for the first time, as average daily temporary employment reached 622,400. In 1986, Frank Liguori was named president of Olsten Corp.

Also in 1986, Robert Half International's current management team, headed by Max Messmer, purchased the company, which, four years later, went public on the New York Stock Exchange.

In 1987, two events occurred that shook the very foundations of the temporary help industry. A British employment services firm, Blue Arrow, bought Manpower for $2.4 billion, promising Manpower's Mitchell Fromstein continued total control. However, the company wasn't able to keep that promise, and Fromstein balked after being told to move Manpower into the permanent placement business. One day while Fromstein was out of town, the locks at Manpower headquarters in Milwaukee were changed. But after a classic corporate power struggle, Fromstein managed to become head of Blue Arrow, with the aid of the company's U.S. franchises, and regained control of Manpower. On Oct. 16, 1987, Wall Street crashed.

Robert Miller (see 1947) retired from Employers Overload in 1988 and assigned rights for the states of Washington and Oregon to Szambelan (see 1969); all other locations were sold to Uniforce Inc. Also in 1988, Jerry and (son) Clete Brewer purchased a local Fayetteville AR temporary help service and renamed it Brewer Personnel Services.

Temporary help employment topped 1 million in 1988, and payroll exceeded $10 billion ($11.9) for the first time.

In April 1989, Adia formed Personnel Group of America Inc. (PGA). In the next two years PGA acquired eight commercial staffing companies, and in 1992 Nursefinders came under PGA's umbrella as well. Adia spun off PGA as an IPO in September 1995. In December 1997, PGA sold Nursefinders to Atlantic Medical Management, a venture capital group that included Dr. Michael Sinclair, founder of what became Lifetime Corp. (which merged with Olsten Corp. in 1993).

The International Association of Career Management Professionals was formed in 1989. And in November of 1989, the Berlin Wall crumbled.

**THE NINETIES.** The 1990s started on a sad note with the passing of industry pioneer William Olsten in 1991. RHI started OfficeTeam, a clerical/administrative division in 1991.

STAFFING INDUSTRY SOURCEBOOK 2006

| 34 |

© 2006 Staffing Industry Analysts, Inc. • All rights reserved • Unauthorized photocopying and distribution is strictly prohibited by law.

The U.S.S.R. was finally dissolved by the end of 1991, and Express Personnel Services established its first strategic partnership in Moscow in 1993.

In 1992, Norrell Corp. introduced the master vendor concept, and H&R Block spun off Interim Services though an IPO.

Talent Tree, under Mike Willis, refined the vendor-on-premises idea for commercial staffing in the early '90s.

In 1993, Adia SA (Switzerland) bought out its U.S. investors to bring U.S. operations completely under corporate control. With venture capital backing, Mike Willis started Corestaff. Norrell offered its IPO and was listed on the Nasdaq, moving to the NYSE in 1995. Also in 1993, President Bill Clinton signed the Family and Medical Leave Act.

David Dunkel and several associates formed Romac International Inc. in 1994 and launched its IPO the following year; in 1998, Romac acquired Source Services Corp. Kelly Services stirred up the industry by acquiring Your Staff, a PEO, in 1994. The next year, Express Services bought another PEO, Rex Eley's TSC Human Resources.

In 1995, average daily temporary help employment reached 2.2 million, with payroll at $27.9 billion and revenue of $39.2 billion. Bill Gates turned Microsoft 180 degrees, declaring the Internet its highest priority. And Mark Twain Bank in St. Louis, possibly the first bank to do so, accepted digital money.

In 1996, Adia SA and Ecco SA (France) merged to form Adecco SA (Switzerland) and Adecco Inc. (U.S.). In the same year, the Brewers rolled together seven other staffing services to form StaffMark Inc., which then went public. Western Staff and PGA also went public and PGA formally entered the IT services market. And temporary help payroll passed the $30 billion mark.

In 1997, temporary help payroll grew by nearly 70% to exceed $50 billion.

Also in 1997, Adecco acquired TAD Resources International Inc., and Corestaff

acquired Metamor Technologies.

In 1998, the industry was saddened to lose another pioneer, William Russell Kelly. Corestaff changed its name to Metamor Worldwide, then sold off its commercial units to Corporate Services Group (London). Also in 1998, Dutch temp firm Randstad bought Strategix from AccuStaff.

In 1999, Interim Services merged with Norrell Services. Industry stalwart Mitchell Fromstein retired, Adecco acquired Olsten Corp. (sans the health care division, which continues to operate as a separate company), and Vedior N.V. (Netherlands) took over Select Appointments plc (London), which operates numerous brands in the United States.

Jan. 1, 2000 came and went. Y2K was a non-event, but IT staffing companies benefited much from compliance work.



In 2001, staffing companies along with the whole country struggled to cope with the horrific terrorist attacks on Sept. 11 in New York and Washington. The already shaky economy stumbled even more after the attacks, leading to depressed revenues, shuttered offices, staff reductions and consolidations. Meanwhile, the demise of many dot-coms sent information technology services plummeting.



By 2003, the much anticipated economic turnaround still evaded the industry. Even the charmed healthcare staffing sector suffered. As the recovery from the 2001 recession plodded along, there no longer appeared to be any question it indeed has been jobless -- a couple of Federal Reserve banks issued papers saying labor markets are changing and some jobs may never come back.

Several staffing firms moved to forsake the public markets to return to private status. They included Judge Group Inc., which was bought out by a management group, and SOS Staffing Services Inc., which was sold after bankers pressured it to seek a buyer. Headway Corporate Resources Inc. declared Chapter 11 bankruptcy reorganization and


STAFFING INDUSTRY SOURCEBOOK 2006

© 2006 Staffing Industry Analysts, Inc. • All rights reserved • Unauthorized photocopying and distribution is strictly prohibited by law.

emerged as a private company sans its headhunting business. The desire to go private was partly in an effort to get away from the costs of corporate governance enforced by the passing of the Sarbanes-Oxley Act of 2002.

By the end of 2004 the U.S. staffing industry finally appeared to be healthy, following three long years of suffering. Sales, profits and volumes were up for most industry segments, except for health-care. Strongest growth was seen in indus-trial and finance/accounting staffing, fueled by Sarbanes-Oxley compliance work. Adecco, the world's largest staffing company announced in January that it was investigating accounting irregularities in its North American operations. In addi-tion, a major shareholder threatened to resign from the board and the CFO and North American head lost their jobs. Finally, long-time chairman John Bowmer tendered his resignation.

While the economy started a slow pick up, offshore outsourcing caught the country's attention. While the number of layoffs caused by outsourcing U.S. jobs to low-wage countries such as India or China is still estimated to be a small fraction, the topic created a lot of anxiety in the staffing world.

In 2005, publicly traded staffing com-panies had something to celebrate – stocks stood at a high in November of 2005. Sales and margins for staffing companies took on a healthy look. More and more staffing companies reported an increase in their temp-to-hire business. Professional staffing firms in areas such as information technology and finance and accounting drove profit at a number of staffing firms. The year also saw the infusion of private capital in staffing. Gryphon Investors, on the heels of taking over Nursefinders Inc., bought Update Legal and two St. Louis physician-staffing firms. Leeds Weld & Co. made a big investment in Seaton Corp., the parent company of Staff Management. PEOs were part of the trend: Strategic Outsourcing Inc. has new majority owner-ship by Clarion Capital Partners, and General Atlantic acquired a controlling interest in TriNet Group Inc.

Volume and demand has continued to rise in 2006. Having a contingent work-force has become more acceptable in the corporate world.

Staffing companies are now expanding their professional services, even getting into more HR consulting. In the M&A field, staffing companies are buying more for strategic purposes, and expanding over-seas to serve global customers.

The financial health of the industry was strong as of mid-year 2006 and mar-gins are edging up. SIB

© 2006 Staffing Industry Analysts, Inc. • All rights reserved • Unauthorized photocopying and distribution is strictly prohibited by law.