# EXHIBIT 15

# INVESTIGATE
# BEFORE
# INVESTING

## *Guidance for Prospective Franchisees*

By

**Lewis G. Rudnick**
Rudnick & Wolfe
Chicago, Illinois

and

**H. Bret Lowell**
Brownstein Zeidman and Lore
Washington, D.C.

**INTERNATIONAL FRANCHISE ASSOCIATION**
1350 New York Avenue, N.W., Suite 900,
Washington, D.C. 20005-4709
Reprinted 2002

**REVISED - JULY, 1992**

# CONTENTS

The International Franchise Association ............................................................. 4

IFA Code of Ethics .......................................................................................... 5

What Is Franchising? ........................................................................................ 6

Protect Yourself - Watch For The Warning Signals ........................................ 8

Evaluating The Offer ........................................................................................ 9

The Franchise Business And The Prospective Franchisee ............................... 10

What Are Your Qualifications? ........................................................................ 10

What Is The Product Or Service?  - The Business Area? ................................ 11

Who Is The Franchisor? .................................................................................. 13

The Company - Generally ............................................................................... 14

Trademarks And Copyrights ............................................................................ 15

Management ..................................................................................................... 17

Litigation ......................................................................................................... 17

Profit Projections ............................................................................................. 18

Franchise Cost - Initial Fees And Cash Requirements .................................... 20

Training And Start-Up Aid ............................................................................... 23

Location, Territory And "Exclusivity" ............................................................ 25

Operating Practices, Assistance And Controls ................................................ 28

Premises And Equipment Rehabilitation ......................................................... 32

Assignment - Franchisee's Right To Sell ......................................................... 33

Term, Renewal And Termination ..................................................................... 34

Competition With Franchisor ........................................................................... 36

The Contract .................................................................................................... 36

Aids To Investigation ...................................................................................... 37

WASH1\4838466.1

Regulation Of The Offer And Sale Of Franchises ........................................ 38

Franchise Laws ........................................................................................ 42

Business Opportunity Laws ........................................................................ 46

Conclusion .............................................................................................. 49

About The Authors ................................................................................... 50

The authors wish to express their appreciation to Mark A. Kirsch of *Brownstein Zeidman and Lore* and Kim A. Goodhard of *Rudnick & Wolfe* for their assistance in the updating and preparation of the 1992 edition of "Investigate Before Investing."

WASH1\4838466.1

## THE INTERNATIONAL FRANCHISE ASSOCIATION

The International Franchise Association is a trade association representing firms in a wide variety of industries who use the franchising method of distribution.

IFA was formed in 1960 by forward looking franchise company executives who saw a need for an organization that would serve the interests of firms involved in franchising. Since its founding, the Association has grown in numbers and stature to the point where it has become the voice for responsible franchising.

Of primary importance to IFA is its effort to make membership connotative of the highest standards of business conduct. Membership applications are screened carefully and all members must pledge to adhere to a comprehensive Code of Ethics and Ethical Advertising Code. It is IFA's intent that its trademark symbolize these standards.

The Association shares the concern of its member companies that prospective franchisees or investors have at their disposal the maximum amount of information possible on which to base a business decision.

This booklet, first published in 1970, reflects the desire of IFA and its members to assist you in properly and fully evaluating franchise offerings. It is not intended as a substitute for consultation with your attorney and accountant, but as an aid to all.

Franchising today is one of the most innovative, dynamic and effective systems for distribution of goods and services the world has ever known. Well informed and satisfied franchisees are the backbone of this system, which combines the experience and expertise of the franchisor with the entrepreneurial drive and ambition of the independent business person.

The rewards for both parties can be considerable, but it is essential to success that you first **INVESTIGATE BEFORE INVESTING.**

We hope this booklet will help you in this task.

## IFA CODE OF ETHICS

I.  In the advertisement and grant of franchises or dealerships a member shall comply with all applicable laws and regulations and the member's offering circulars shall be complete, accurate and not misleading with respect to the franchisee's or dealer's investment, the obligations of the member and the franchisee or dealer under the franchise or dealership and all material facts relating to the franchise or dealership.

II.  All matters material to the member's franchise or dealership shall be contained in one or more written agreements, which shall clearly set forth the terms of the relationship and the respective rights and obligations of the parties.

III.  A member shall select and accept only those franchisees or dealers who, upon reasonable investigation, appear to possess the basic skills, education, experience, personal characteristics

and financial resources requisite to conduct the franchised business or dealership and meet the obligations of the franchisee or dealer under the franchise and other agreements. There shall be no discrimination in the granting of franchises based solely on race, color, religion, national origin or sex. However, this in no way prohibits a franchisor from granting franchises to prospective franchisees as part of a program to make franchises available to persons lacking the capital, training, business experience, or other qualifications ordinarily required of franchisees or any other affirmative action program adopted by the franchisor.

IV. A member shall provide reasonable guidance to its franchisees or dealers in a manner consistent with its franchise agreement.

V. Fairness shall characterize all dealings between a member and its franchisees or dealers. A member shall make every good faith effort to resolve complaints by and disputes with its franchisees or dealers through direct communication and negotiation. To the extent reasonably appropriate in the circumstances, a member shall give its franchisee or dealer notice of, and a reasonable opportunity to cure, a breach of their contractual relationship.

VI. No member shall engage in the pyramid system of distribution. A pyramid is a system wherein a buyer's future compensation is expected to be based primarily upon recruitment of new participants, rather than upon the sale of products or services.

## WHAT IS FRANCHISING?

Franchising frequently and inaccurately is described as an industry or business. It is neither but it is a method of doing business, of marketing a product and/or service, which has been adopted and used in a wide variety of industries and businesses. Some of those businesses may have only one thing in common — a franchise system of distribution — and be very diverse in most other critical respects. There is no simple, single definition of franchising.

Franchise arrangements are sometimes categorized by reference to two broad classes: (1) product distribution arrangements in which the franchisee is, to a significant degree, identified with a manufacturer's or supplier's product; and (2) business format franchising, in which the franchisee is identified with a method of operation chosen by the franchisor. In fact, many franchise arrangements are a combination of (1) and (2).

Franchising, and "franchise," are also defined in a variety of laws — under the federal law, various state laws, and in proposed model laws. While each of these laws varies to some degree, a general, comprehensive definition of a "franchise" maybe stated as: a contract or agreement, either expressed or implied, whether oral or written, between two or more persons pursuant to which:

(a)     The franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a *marketing plan* or system *prescribed in substantial part by the franchisor*; and

(b)     The operation of the franchisee's business pursuant to such plan or system is *substantially associated with the franchisor's trademark*, service mark, trade

5

name, logo-type, advertising or other commercial symbol designating the franchisor or its affiliate; and

(c)    the franchisee pays, or agrees to pay, *a fee* or other compensation to the franchisor.

Business format franchising provides a system for marketing and distributing goods, services, or both. Under such a system, a franchisor who has developed a business format for distributing or selling the product or service contracts with independent businessmen and businesswomen (franchisees) to give them the right to sell — and assists them to sell — these products and services to the public, under trademarks and service marks, and pursuant to the business format, designated by the franchisor. Many franchisors grant a franchisee not only a *contractually limited right* to use a trademark and its associated goodwill, but also certain other features such as know how, trade secrets, copyrights, confidential information, access to system-wide promotion, standardized operating procedures, product and service research, and group purchasing power. Many franchisors provide training for the franchisee in connection with both the establishment and the operation of the business, and provide continuing assistance in connection with numerous operational matters.

A franchise may offer many advantages, principally as a result of the "economies of scale" achievable through a network of similar operations. For example, aggregate marketing and distribution costs are divided between the franchisor and franchisee units, so that each unit may benefit from the contributions of all, particularly with respect to matters which each party might not have been able to afford if acting alone. A franchise system combines the efforts of an independent business person contributing some financing for his or her local business, the motivation of a person who owns his or her own business, and local management skills, with the experience of a strong "partner" who has a tested system for selling a product or service, management and marketing know-how, and standardized operating procedures. The precise combination of services provided, and the degree that each service is provided, will vary from franchisor to franchisor.

In return for the use of its trademark and system, the franchisor will require some monetary contribution from the franchisee. In addition, the franchisor will require certain conduct, and impose certain restraints, in order to achieve the system standardization and quality required to meet customer expectations and preserve the system's image and good will.

## PROTECT YOURSELF — WATCH FOR THE WARNING SIGNALS

Franchising has achieved enormous growth. There has been much publicity about the franchise "boom." However, as IFA has frequently noted, the well earned and publicized success of the great majority has attracted the usual quota of unprincipled and unqualified promoters who customarily attempt to ride on the coattails of the successful. Many publications, government agencies, local and national offices of the Better Business Bureaus, and others have attempted to check on companies selling franchises and to publish information about them. Fundamentally, however, protection of the franchise prospect must rest with the prospect and his or her professional advisors. They must make proper investigation to evaluate the nature and

6

characteristics of a particular operation, the suitability of that operation to the personal traits of the prospect, the costs to the franchisee, the availability of financing, the prospective returns, and the training, experience and work involved, and they must compare these factors with the prospective competition.

## EVALUATING THE OFFER

A prospective franchisee should conduct a thorough evaluation of a franchise opportunity, as with any new business venture, before investing in the venture. While every prospective franchisee should consult his or her attorney and accountant to assist in the evaluation, the individual investor is able to obtain a significant amount of information from the franchisor early in the process. As discussed later in this publication, the Federal Trade Commission has enacted a trade regulation rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" (the "FTC Rule"), which requires the disclosure to prospective franchisees (but not registration with the FTC), of information related to the offer and sale of franchises throughout the United States. Under the FTC Rule, franchisors are required to disclose to prospective franchisees certain information which the FTC has determined to be important to franchisees. Various states also have laws which require disclosure of information (and, in some cases, these laws further require registration of the franchise offering with state authorities). The information required to be disclosed will be furnished to you in the form of a disclosure document, sometimes known as an offering circular or prospectus. If, as is often the case, the format of disclosure conforms to a version developed by the state franchise authorities, and also accepted by the FTC, you may also hear the disclosure document referred to as a Uniform Franchise Offering Circular or "UFOC." Regardless of its name, the disclosure document should answer many of the questions you have concerning the franchise opportunity, and provide you with information which is necessary to make an informed investment decision. If the franchisor has not provided you with a disclosure document or UFOC, you should ask for one. In addition, you should provide the UFOC to your professional advisors, and together with them you should refer to it in considering the following points and seeking answers to the following questions:

## THE FRANCHISE BUSINESS AND THE PROSPECTIVE FRANCHISEE

To properly evaluate a franchise offering, you must consider not only a specific franchisor, its system of franchising, its reputation, and its business record, but also the industry of which it is a part. Examine its status in that industry and your own competence and motivations in relation to that industry. Consider also your decision to be a long-term one, possibly for a lifetime. At the risk of over simplification, two primary issues to consider are (1) whether the business opportunity is in an industry in which you are interested, and (2) whether the business is one in which you have some training or experience or for which you have some interest and aptitude. It may be best to satisfy yourself first as to the type of business and industry in which you wish to become involved, and only then begin to investigate seriously prospective franchisors.

## WHAT ARE YOUR QUALIFICATIONS?

7

A franchisor worth your confidence will want to satisfy itself that you are right for the business, and that you are qualified to operate it. These are difficult evaluations to make; and, they should be made not only by the franchisor, but by you as well.

• Have you carefully considered whether you are qualified for the franchise offered — by experience, education, physical ability, learning capacity, temperament, and financial status?

• Does the subject of the business match your interests? If your interest is in food, should you be considering an auto-mobile repair shop; if it is in things mechanical, such as automotive parts and repairs, should your target be a food service business?

• Are you anticipating, prepared for, and equipped for hard work as well as financial risk? If you intend to have only a passive or investor's role, have you determined at the outset whether the franchisor will accept this? If so, have you considered whether adequate employees, particularly an appropriate manager, will be available to you?

• Can you manage others? What experience do you have in this regard? Is supervisory employee training available if your role is to be only that of a passive investor?

• Do your advisors, family, and friends think you are adaptable, trainable, and generally qualified?

• Most franchise contracts, especially in business format franchising, provide for controls reasonably necessary to protect all franchisees, the system and its image and good will; controls which require franchisees to maintain certain quality and uniformity standards. How will you react to such controls? Are you a "lone wolf? Do you resent "authority" or restraints? Are you a "confirmed bachelor" who is on the verge of a "business marriage"? If so, franchising may not he for you.

## WHAT IS THE PRODUCT OR SERVICE? — THE BUSINESS AREA?

If you have determined that you are prepared to become an independent business owner, who can and will rely on and need the advice of a franchisor, you should examine the business and industry which you may pursue.

• Is the type of business and the type of franchise distribution you are considering one for which you have an aptitude and strong motivations?

(Many franchises offered are for service businesses. Some involve both products and services. For convenience, in certain instances throughout this booklet, where the word "product" is used it will also include "service")

• Assess the market for the product. Is the product or service to be sold stable or seasonal, new or nearly obsolete? Is it proven and is there a market for it generally and in the territory in which you will operate? Is the product or service untested, speculative, a fad, or a gimmick? How long has it been on the market? Is the key product, or are other components of

8

the business, manufactured by the franchisor or a third party? How strong and reputable is the source? Is there data on the reliability of delivery and availability of the key product(s)?

• Determine who controls product price to you, and whether prices have been and are competitive. Is any suggested or projected selling price realistic in the light of competitive product conditions and anticipated returns?

• Evaluate your current and potential competition.

• Are there governmental standards and regulations governing the product or service? Does it meet the standards? Are there government restrictions on use?

• Determine whether warranty service is an aspect of the business. Are there product warranties or guarantees? If so, who makes them and who backs them? Are there arrangements for repair or replacement? If so, who will pay for repairs made and warranties honored? If the franchisor assumes warranty responsibility, what are the mechanics for, and what is the franchisor's track record on, warranty service?

• Is there some product line diversification existing or planned? What new products, if any, are to be added? When?

• Do the product and the supplier enjoy good reputations?

• Is the product patented? Is it protected by trademarks or copyrights? Does it involve formulas and trade secrets not available to others?

• Is the demand for the product or service expanding or contracting? What do demographics (e.g., aging population) suggest about the future for this business? Is there anything particular about your geographic region which indicates whether or not the business is likely to succeed — and, if so, to what degree — in your own area?

## WHO IS THE FRANCHISOR?

There are thousands of companies that distribute their products or services by franchising and there are directories which list them. If you receive a "kit" (of promotional literature and/or an offering circular) from a franchisor in response to an inquiry, read it carefully, but do not limit yourself to doing so. The purpose of your investigation should be to determine whether a franchisor is experienced, successful, strong financially with solid management, and reputable in its business area. Such characteristics are vital to any success you may hope to achieve. Moreover, if you will require financing and must find it yourself, the franchisor's reputation, credit rating, and track record (as well as its contract), may be vital considerations in your ability to obtain such financing.

The size of a franchisor need not be a controlling factor in your decision. A small company may meet the criteria discussed in this section. Many small companies are well man-aged and successful franchisors with very successful franchisees. Even in this age of mega-

9

mergers, relatively few franchisors (including the most successful) are "big business" as the term is commonly understood in business, banking and government circles.

Moreover, the fact that a franchisor has conducted business and franchised only in one region or market area (state or metropolitan area) does not mean that one should not consider operating under its franchise outside that region or area. Many franchisors who commenced business in one location or state have since become regional or national. And, if you are considering multiple units or multiple locations, the grant of franchise rights for a new territory may be the only opportunity to achieve your growth objectives.

You should also consider whether the success achieved by a franchisor (and its franchisees) in one area may be an indication that the franchisor and its franchisees will be similarly successful in another area. To evaluate this risk, consider whether the market conditions are similar, and whether the franchisor can and will devote the capital and effort, and select qualified franchisees who are likely to devote the effort, to duplicate and multiply any initial successes.

## THE COMPANY — GENERALLY

Determine whether the franchisor is a public or private company, and whether it is a subsidiary of a larger company. If it is a subsidiary, the reputation, stability and financial strength of both parent and subsidiary should be considered. In that regard, consider whether the parent stands behind the franchisor financially, and, if so, to what degree? Investigate the franchisor and its officers and directors. Evaluate the business experience behind the company, including how long it has been in business and how long it has been granting franchises. Much of this information will be in the UFOC,

Check the current financial condition of the franchisor; the franchisor's financial statements should be in the offering circular. If the franchisor is publicly held, additional data may be readily available.

There are a multitude of other questions you could ask about a franchisor, including:

• How many franchisees and company-owned outlets are there in the "territory" in which you would like to locate your business? Are there any restrictions on such future development?

• How long has the franchisor conducted business in its industry?

• How long has it granted franchises for the business?

• Has the company granted franchises in other lines of business? If so, how long in each line? And, are they competitive with, or significantly different from the franchise your are considering?

The answers to these and other such questions are often in the offering circular.

WASH1\4838466.1

Another gauge of the franchisor's business acumen is whether the franchisor is carefully checking your qualifications and otherwise indicating a long-term interest in you, or whether the franchisor appears interested only in selling quickly in order to deposit your initial fee. Do not let yourself be rushed into an investment decision; insist upon an opportunity to verify the information you receive, and adequate time to study the con-tract before signing.

You should obtain a list of, and contact, other franchisees in order to learn about the operation from the inside. Verify that performance generally matches promises. Franchisees will not hide complaints. Franchisee lists are required to be included in the UFOC. One will be a list of current franchisees — either for the entire system or more regional to your particular geographic area. The other list will be of former franchisees who have recently left the franchisor's system. If the lists are not complete or extensive enough for your purposes, ask for up-to-date and/or of current and former franchisees.

## TRADEMARKS AND COPYRIGHTS

The trademark, service mark, trade name, or logo which is associated with the franchise system is often the heart of the license granted to the franchisee. It is, therefore, crucial that the prospective franchisee understand the "strength" of the mark, and any infirmities or limitations on the use of the mark.

You should verify that the trademarks, tradenames and other commercial symbols are the ones you think they are — not merely similar ones. All trademarks, service marks, logotypes, tradenames, commercial symbols and registrations (federal and state) should be specifically described in the UFOC.

If you are told that you will have an "exclusive" right to use the trademark, you should evaluate what is meant by "exclusive." For example, the exclusive use of the mark may be limited geographically or limited to use in connection with the sale of certain products or services. Also, you may wish to verify whether the franchisor may operate or franchise others to operate a similar business under a different mark or logo within close proximity to your franchised unit.

You should determine whether there are any agreements currently in effect which significantly limit the rights of the franchisor to use, or license you to use, the trademarks, service marks, tradenames, logotypes or other commercial symbols in any manner material to the franchise. If such agreements exist, determine the effect on your business (e.g., will the new trademark owner assume the franchisor's responsibilities) if the franchisor's rights are curtailed.

If there are any currently effective determinations of the U.S. Patent and Trademark Office, a state trademark administrator or any court, or any pending interference, opposition or cancellation proceeding or material litigation involving the trademarks, such actions may limit your ability to open and operate the business under the specified mark. Further, if there are any actual or potentially infringing uses of the marks that may affect your business, those uses should be disclosed to you.

11

Other issues arise if the franchisor uses the name or likeness of a well-known person. For example, what is the duration, scope, and exclusivity of the franchisor's right to use such a well-known person's name? What are the limitations on such use? How will the use benefit you - as a franchisee? What are the prospects for this business if it is conducted without the endorsement of this famous person?

If a franchise involves the license of, or use of products with a patent or copyright, it is important to remember that patents and copyrights have a limited life by law; once expired, they provide no protection. Determine the duration of any patents or copyrights that are material to the franchise, and whether the franchisor may and intends to renew its rights. This may affect the viability and profitability of your franchise.

## MANAGEMENT

One of the principal benefits of investing in a franchise is the ability to receive advice and assistance from the franchisor's management regarding the operation of the business. The franchisor's management experience may prove critical in assisting you to start this new venture. You should consider and evaluate:

• Who are the principal officers, directors, partners and management personnel?

• What was the principal occupation of each during the preceding five-year period?

• What experience does each have in his field of management, in the business field and in franchising?

Much of this information should be in the offering circular, and can be secured by meeting with members of the franchisor's management team.

## LITIGATION

The litigation history of the franchisor and its principal officers, directors, partners, and management personnel may provide a window into past problems — whether of a system-wide nature, or related to individual franchisees. In the event you note such matters of concern, you may wish to inquire further in order to determine whether the problems continue to exist and, if so, whether they are likely to have any effect on your individual situation. You should determine:

• Whether there are any criminal or material civil actions (or a significant number of civil actions irrespective of materiality) recently concluded or pending against the franchisor and/or management alleging fraud, embezzlement, fraudulent conversion, restraint of trade, unfair or deceptive practices or misappropriation of property. If the action is pending, you may wish to inquire as to any more recent developments than that which is described in the offering circular.

• Whether the franchisor or any of its officers, directors or managers have been convicted of a felony or held liable in a civil action by final judgment if such felony or civil action involved

WASHI\4838466.1

fraud, embezzlement, fraudulent conversion, restraint of trade, unfair or deceptive practices or misappropriation of property.

• Whether any of them are subject to any currently effective restrictive court orders relating to the franchise or under any federal or state securities, antitrust, trade regulation or trade practice law,

• Whether any of such persons, during the preceding ten-year period, have been adjudicated a bankrupt or reorganized due to insolvency, or whether any such person was a principal officer or general partner of any company that has been adjudicated a bankrupt or reorganized due to insolvency Much of the foregoing information should appear in the franchisor's offering circular.

## PROFIT PROJECTIONS

Due to widespread abuse and questionable practices in the past, the current franchise laws contain specific requirements as to how and when a franchisor may furnish sales and profit projections. Due to these requirements, many franchisors will not provide such projections or even historical data on sales, profits, earnings, or revenues, or even continuing costs. If you do receive such information, which is commonly referred to as "earnings claims," you and your accountant should examine it carefully, particularly in the following respects:

• Were the earnings claims presented in an offering circular? Does the information you received conflict with statements in the offering circular in any way? If there is a conflict, consult your advisors, and advise the franchisor of the discrepancy.

• Analyze the earnings claims of the franchisor. Your accountant may have prepared a pro forma based on other data available to him and may provide you with a useful comparison.

• On what specific data is the franchisor's earnings claim based — on the franchisees' experience, the franchisor's experience or on the operations of others, and over what period of time? Is verification available?

• If the projection is based on actual experience of past and current franchisees, what was the mix and character of the locations included in the computation? What time period was involved?

• Determine the locations, length of time in business, territorial protection, type of business (e.g., full-service vs limited service), management (franchisee or employee managed), and number of franchisees whose earnings or other results were used in the projections.

• Compare your projected profit (considering, if you are to be active in the business, reasonable compensation for yourself, if allowance is not provided in the franchisor's projection) with what you would earn for equal work elsewhere, and from other investments you could acquire with the funds to be invested in the franchise. Verify these projections with other franchisees. Current and former franchisees are a primary source for determining whether performance matches promises in this and in other areas.

13

• If the returns are realized, will the results satisfy your needs economically and psychologically? Are you taking into account the history of new business ventures which face tough going for the first few years and limited savings opportunities?

## FRANCHISE COST — INITIAL FEES AND CASH REQUIREMENTS

Most franchises — especially business format franchises — require monetary contributions and expenditures by franchisees consisting of some or all of the following: an initial franchise or license fee; training cost (tuition and/or room, board and transportation) and on-site start-up aid and promotion charges (some or all of which may be included in the initial franchise or license fee or may in whole or in part be separately stated); periodic royalties or service fees; and an advertising contribution (usually payable monthly or weekly and based on a specified percentage of sales). Sometimes there is a charge for a soft-ware license, or for access to a centralized computer used for bookkeeping, accounting, sales, and/or reservation services (if applicable). There may also be initial payments for premises, equipment, supplies and opening inventory, whether acquired from the franchisor or from other approved sources. Get specific details on all cost items: amount, time of payment, financing arrangements, and warranty or other maintenance services.

Terms like "initial cost," "initial fee," "total cost" and royalties should be specifically defined and made quite clear to you. The terms "cash required," "initial cash required," "investment," "down payment," "equity investment" mean different things in different offerings. For example, "initial fees" probably do not include fees or payments for any equipment or a clown payment on product inventory.

Make certain your investigation is complete and your under-standing clear in the following areas:

Initial franchise fee:

• Is there one? How much is the total fee? Is it payable in a lump sum or in installments? If in installments, with or with-out interest? Is it refundable? Is it non-recurring?

• If the initial franchise fees are not the same for all franchises currently being granted, on what factors are the differences based?

• Does an initial franchise fee include compensation in full for any or all of the following: use of the then-current operations manual, training and start-up aid, including personal on site and promotional assistance from the franchisor? In many cases, it does not. The understanding should be clear and the contract explicit.

Continuing regular fees:

• Are there periodic royalties? How much are they? How are they determined? In business format franchising, generally, there is a periodic royalty (usually payable monthly or weekly) commonly based on a percentage of sales.

14

• How and when are sales reported and royalties paid? If royalties are paid on a weekly basis, consider how this affects your cash flow.

• Royalties are not only payment for use of a trademark and trade name, but may also constitute a fee for services to be performed by franchisors. If the periodic payment is in part a service fee, what on-going services are you to receive from the franchisor? Are accounting services included or avail-able? Are they computerized? Will updated merchandising services, operating manuals, field visits, buying services, and training be furnished without additional, or at a nominal, cost?

Other fees and costs:

• Advertising fees — Many franchisors assess fees for advertising and promotion, and these fees may be segregated into (I) payments made to the franchisor for a system-wide advertising fund and (2) payments made to a local or regional advertising cooperative, formed with other franchisees {and possibly franchisor-owned outlets) within the city, region, or county. The franchisor may also require the franchisee to spend money on local or individual store advertising and promotional activities.

• Property lease payments — Are you required to purchase or rent business premises? Who finds the site? What is its cost to you as purchaser or lessee? How is it to be financed, if purchased? What, if any, are the projected construction, remodeling and decorating costs, security deposits, and costs for lease-hold improvements?

• Equipment leasing costs — Are you required to purchase or lease specified equipment or supplies? Will you be required to pay a down payment on equipment and fixtures?

• Other fees — Depending upon the nature of the business, and what is required to be purchased, leased, or accessed from the franchisor, additional fees may be assessed. For example, a franchisee may incur an initial fee for a computer software license, and ongoing fees for computer services. Each franchise system is different, and, therefore, each system may require different fees and payments. The first place to check for a description of these fees and costs is the disclosure document.

Total cost:

• Do not confuse "initial fees," "initial cash required," "initial investment" or "initial costs" with total costs. Initial cost or investment *may* require computation and inclusion of some of the previously described fees and costs (in addition to initial franchise or license fees and royalties).

• The "initial" cost or investment may also include the "opening" inventory of products and supplies required to be purchased; initial payments for the equipment, fixtures, and/or lease of the premises, as discussed above; required initial property and/or casualty insurance premiums; or governmental fees for business and occupancy permits. You should determine what amount is attributable to each such item.

15

• Do not confuse down payment or initial cost with ultimate cost. What are deferred balances? Who finances any deferred balances? At what rate of interest? If the franchisor does not provide financing, does the franchisor offer help in finding a source of financing or in preparing your loan application? Have you received a commitment for financing offered? Have you received commitment for financing before committing yourself?

• In determining total costs, check every aspect of the deal. Do not overlook the cost of finding, buying or leasing, and improving and equipping a business location, obtaining zoning licenses for the operation at that location, and the financing costs involved. In determining total opening costs, do not overlook working capital and rent (where applicable), inventory, payroll, insurance, legal and accounting fees, and your own promotions and salary during the first year.

The offering circular should provide an estimate of these initial investment costs. Those estimates may not be accurate for every situation, however. You should consult an advisor and contact existing franchisees to learn from their experiences.

## TRAINING AND START-UP AID

In most instances you will be assuming ownership responsibilities for the first time and will be entering a relatively new and unfamiliar field of business. You will require proper training in each area. Successful and reputable franchisors treat the proper training of franchisees as a serious and essential responsibility. **This is a critical area!** The contract provisions relating to training should be reasonably specific. You should determine all of the following:

• Is experience or training required? If not, why not? If training is not mandatory, do new franchisees customarily enroll in the training program?

• What is the nature, duration and extent of training? What are the costs and who pays them? In assessing training costs, determine whether there is tuition, and who pays room, board and transportation. What is to be the location of the training facilities — the franchisor's home office training facility, an operating franchised business, a franchisor-owned unit in your area, your own outlet, or more than one of these?

• Is the training of any of your employees included in any training cost charge or allowance agreed upon? If employee training is not at the franchisor's training facility but at the franchisee's outlet, how much of the training will be done by the franchisor's field representatives, and to what extent are you to assist in training your employees? Remember also that you will be paying wages to your employees while they are in training.

• Determine whether supplemental training will be available to cover routine management employee turnover; whether it is required or permitted; at what cost; and who bears the cost. Is it included in the initial franchise or license fee, or under the periodic service fee or royalty?

• Is there, and will there, be a continuing training program, not only to cover routine employee turnover, but to keep you and your management personnel "updated" periodically on

16

management improvements and product and marketing changes? Will such training be at a franchisor's facility or on your premises? Will there be personal training, video or audio tapes, or mailed written materials? Will there be a charge?

• Determine whether there will be start-up assistance provided by the franchisor such as for supervision of equipment layouts, pre-opening business operations, pre-opening promotions, and assistance by franchisor personnel at the franchised out-let, immediately before and/or for a limited time after opening the unit. If such assistance is not included in the initial franchise fee, what is the cost?

The franchise agreement should be specific and should clearly set forth all initial and continuing training obligations of the franchisor and franchisee.

## LOCATION, TERRITORY, AND "EXCLUSIVITY"

Many franchises are granted for the operation of a business at or from a particular location, or within a specified territory. Site location, and the expertise with which it is selected, may be a factor of critical importance in determining the success of the venture.

As generally used, the terms "site," "location," and "facility" refer to the specific premises from which you are to conduct business. If a fixed location is a requirement of the system, the term "territory" is frequently used to describe the geographical area in which the site is to be located and which may be assigned to you as a "protected" or "exclusive" area.

If the marketing system is based upon customers coming to your place of business, the feasibility of the proposed location and facility may be of overriding importance. In the vast majority of cases, the expertise in this area will be in the franchisor's staff. The franchisor is most likely to have location standards and a profile of successful site criteria; techniques for measuring traffic counts, accessibility, traffic "quality," average income in the area and its character (single family, apartments, young/old families, etc.). Particular attention should be paid to the foregoing and to the following specific items:

Site selection:

• Who is to find the site, negotiate the lease and/or purchase, build and equip the facility — you or the franchisor? Will the franchisor specify the location and provide for facility construction?

• If a particular territory and site is specified, on what basis was it determined? Have you evaluated it with the assistance of your advisors focusing on neighborhood character and quality, zoning, traffic patterns, population density, and surrounding business establishments, including competitive ones and the apparent activity in them? Have you checked other franchised out-lets and franchisees, and compared their locations and yours in the light of the foregoing characteristics?

17

• Will the franchisor arrange with a third party to build, finance and lease to you, or will the franchisor obtain and "build out" a site and sublease it to you? On what terms and within what time period?

• If you are to lease from third parties directly and arrange for any required construction, what aid will you receive from the franchisor in site selection and construction, and how expert is the franchisor in this regard? If you are to find, lease the site or lease or build the facility, be certain of site and facility availability and financing before you are committed.

Be certain lease terms and renewals are co-extensive with the term (and any renewals) of the franchise.

Site development:

• Building plans and specifications for premises and layout may be an essential part of the system image. Are you to receive plans and specifications from the franchisor if you or your lessor build-out the site? Is the cost included in the initial fee? The mutual responsibilities should be clearly stated in the franchise agreement and any preliminary agreements.

"Exclusivity":

Many franchisees seek, and many franchisors claim to offer, an "exclusive" franchise. If the franchise agreement or the franchisor claims to promise "exclusivity," determine precisely what is meant by "exclusive." Exclusivity is generally a way of expressing *what the franchisor will not do within a territory assigned to you.*

The franchisor may agree not to conduct business or have a company place of business under the same trademarks in the territory assigned to you. Or, the franchisor may agree not to franchise others to engage in the same type of business, under a same or similar trademark, in that territory.

Your lawyer should advise you as to legal limitations on the extent to which an "exclusive franchise" protects you. The terms "exclusive" or "protected" frequently only mean that the franchisor will not operate a facility and will not franchise others to do business from a location in the territory. A franchisor may still be able to operate or franchise others to operate within the territory using a different trade name, or may be able to sell products in your territory through a distribution method different from your business (such as through mail order sales). While these possibilities may be acceptable to you from a business perspective, you should nevertheless be aware of them in advance of their occurrence,

A so-called "exclusive" franchise may also exist as a result of restrictions placed on you and other franchisees. That is, each franchisee may be, to the extent permitted by law, restricted in its efforts to sell or solicit outside of a geographic area granted to that franchisee. It is important to find out if such sales or marketing restrictions exist (they will be spelled out in your franchise agreement) and the full and true implications of them. Also, explore whether all other franchisees (particularly those in your surrounding areas) are, and will continue to be, subject to such restrictions.

18

Also, be sure to consider whether your territory will be reduced, or your exclusivity modified, if you fail to meet specified quotas or for other reasons.

If your area is not exclusive, determine the existence of any alleged company policy which has the practical effect of granting limited exclusivity. What is company policy and how faithfully and successfully is it implemented? How near has the franchisor placed company and franchised outlets in other territories? What steps has the franchisor taken when franchisees have sold or marketed in the territories granted to others?

If you do not have an "exclusive territory" and if the franchisor proposes to franchise an outlet at a new location closer to you than to any other franchisee, do you have a right of first refusal to acquire the franchise for that outlet? If you have been told that you do, make sure the terms are spelled out specifically in your franchise agreement.

Territorial rights and restrictions are a critical aspect of the franchise agreement, and any questions, confusion, or ambiguity should be resolved before you sign any agreement. Check this carefully with your lawyer's assistance.

## OPERATING PRACTICES, ASSISTANCE AND CONTROLS

As indicated before, uniformity and standardization of product character and quality is an important characteristic of franchising. It is important in preserving franchise identity and in continuing the value of trade names and trademarks. The contract will undoubtedly contain many controls and restrictions concerning: facility appearance; equipment, fixtures and furnishings — kind, quantity, quality, specifications and layout (where the facility is important to the enterprise); product/service specifications, availability, and standards (and determination of sources of supply of inventory); advertising and promotion; accounting, recordkeeping, and reporting procedures; and internal procedures and controls.

Understand the franchise contract provisions relative to operating controls, practices and assistance before you sign the agreement. Neither you nor the franchisor will desire a relationship which is unhappy because of misunderstanding.

Some items merit special attention.

Franchisor management assistance:

What continuing management assistance will you receive? Is this service included in the royalty fee or is there some additional charge?

Franchisee involvement in the business:

Must the franchisee participate personally in conducting the franchised business? If so, to what extent? Is such participation a policy matter or an express requirement of the contract? Did you compare projected net receipts from the franchise with your family needs and in doing so take the value of your time and loss of other employment into account?

19

Advertising and promotion:

What advertising and promotion will there be? At what level — national, regional, local? Under whose direction and control will the advertising programs operate? At whose expense and at what cost? What is the franchisor's past practice and record? What is the promise? What does the contract say? Check particularly the following:

• Are there to be any advertising charges to you, over and above initial fees and continuing royalties? Are they specifically stated? Are they limited to a maximum percentage of sales? Is there an undertaking by the franchisor to expend on advertising and promotion not less than the aggregate franchisee advertising fees collected?

• Will the stores operated by the franchisor be required to contribute to the advertising fund on the same basis as your stores? Do all franchisee stores contribute on the same basis, or do older stores — or another category of stores — pay a lesser amount?

• Will advertising be local, or in your market region, or national? Is any percentage of each specified?

• If the franchisor promises to spend not less than specified sums or percentages of sales on "advertising and promotion," what does the term include? Is the cost of the franchisor's advertising for additional franchisees included, or are included costs limited to advertising the system as a whole and the products being sold by franchisees? Has the franchisor promised to segregate a part of the fund for development and production purposes, and another part for media buys? If so, does the allocation sound reasonable?

• Is the local advertising/promotion an extension of the national or regional program or is it solely at your expense? If it is partly or all at your expense, to what extent (if at all) is it mandatory? Determine whether your cost of local advertising is limited to your local agency, media and printing costs and charges. Will you receive continuing aids from the franchisor in areas which reduce duplication and thus costs for all franchisees, such as art work, mats, charts, photographs, standard copy with space for price and outlet identification inserts? If so, are they "camera ready" or not? Does the franchisor distribute adaptable scripts, programs or point of purchase or mail promotion materials? At what cost?

• If an advertising fund is already established, what have been its annual revenues and expenses for the past few years? Ask whether a financial statement related to the fund is available for your review.

Bookkeeping, accounting and reporting:

What are the bookkeeping, accounting and reporting requirements? Are the accounting system and report forms furnished? At whose expense and at what cost? If there is centralized, franchisor-maintained accounting and data processing, is it available or required, and at whose expense and at what cost? If accounting is required to be done on software supplied by the franchisor, what is the cost, if any, for the software? Also, what type of hardware is needed to run the software and what is its cost?

20

WASH1\4838466.1

Sales quotas:

• Are there quotas? Are they realistic? What are the penalties for not meeting them (for example, reduction of territory, loss of "exclusivity", or termination)? Contact other franchisees to discuss their quotas, whether they can readily satisfy them, and their understandings if quotas are not met.

• Are facility business hours and days specified? Do you consider them practical in your area? (Many franchisors provide for such things in the operating manual. )

Product, inventory, and equipment restrictions:

What are the general provisions on equipment and premises maintenance, product/service quality, and enforcement of system standards? Will you benefit from the franchisor's mass purchasing power? Is that purchasing power merely available or is it mandatory that you purchase from the franchisor or its designated suppliers some or all of the items you will need? Are the prices of these items fair and competitive? Ascertain in particular:

• Does the contract specify what you must offer for sale or limit what you may sell?

• What goods, services, supplies, fixtures, equipment, inventory or real estate are required to be purchased or leased from the franchisor or its designated sources of supply, if any?

• Whether, and if so, the means by which, the franchisor will or may derive income based on or as a result of any such required purchases or leases.

• Whether prices charged to you are or must be competitive.

• What goods, services, supplies, fixtures, equipment, inventory or real estate, if any, are required to be purchased or leased in accordance with specifications of the franchisor or from sup-pliers approved by the franchisor? In what manner does the franchisor issue and modify specifications or grant and revoke approval of suppliers?

• Will the franchisor or persons affiliated with the franchisor derive income from franchisee purchases made from the franchisor or from other suppliers?

You and your attorney should carefully examine the operating control policies and contract provisions of the franchisor. Be certain you understand them and understand the extent to which noncompliance may be grounds for termination. Do you agree with the controls, the objectives of such restraints and the consequences of non-performance? Do you readily accept the premise of the franchisor that its controls and specifications are required to assure the product quality, standardization and uniformity necessary to protect all franchisees and the system's integrity, image, and good will? Are you mentally and temperamentally attuned to accepting such direction from others? Answering that question should be one of the critical objectives of your exercise in "self-examination" at the outset.

## PREMISES AND EQUIPMENT REHABILITATION

21

Most franchise contracts require the franchisee to keep the business premises, equipment and furnishings clean and in good repair and working condition. Many such agreements provide that:

(1) If any item of equipment or furnishing requires replacement for the proper and efficient operation of the business in accordance with the system, the franchisee will replace the same with items then required by the then-current operations manual and the franchisor's specifications.

(2) The franchisor, from time to time, may require the franchisee to refurbish the business premises to conform to then-current system standards. Such remodeling or refurbishing may include: replacement of depreciated, malfunctioning or obsolete equipment and furnishings; redecorating; repair of the premises; repair and resurfacing of any parking area adjacent to the facility; and structural modifications and remodeling of the premises. There may be a limitation on the expenditures required of the franchisee expressed as a dollar amount or as a percentage of aggregate sales from the start of the franchise term to the rehabilitation date or related to the amount of depreciation.

The franchise agreement should be explicit. You should make certain you understand these terms.

## ASSIGNMENT — FRANCHISEE'S RIGHT TO SELL

A franchise agreement is expected to be a long-term arrangement, in which the franchisee may operate the business for 10, 20, or more years. The time may come, however, when you wish to sell your business, bring in new partners or investors, "retire" and transfer your interest to your child or children, or you may want the business to transfer to your heirs upon your death. The ability to assign or transfer all or a portion of your franchised business is another critical aspect of the franchise agreement. The following are some issues and questions to consider:

• Can you sell the franchised business and assign the franchise agreement to the buyer?

• Is the franchise assignable to your family or may it be sold by your estate on death or disability?

• What are the specific conditions to your right to assign the franchise contract?

• May you assign your lease to any permitted assignee of the franchise?

• There are limitations on assignment in virtually every franchise agreement. Know and check the specific details of the contract and of your proposed franchisor's practices and policies in this area. It should be uncommon for a franchisor to unreasonably refuse assignment to a qualified assignee.

• If you require and must secure your own financing, check your lender's requirements in this area. Your lender may request an assignment of the franchise and facility lease as security?

If so, the franchisor may need to consent to the assignment and, if so, may impose certain conditions on any assignment to the lender.

Give your lawyer an opportunity to examine the franchise contract, related leases, equipment purchase agreements and financing documents before any are signed.

## TERM, RENEWAL AND TERMINATION

Most agreements will specify a term of years during which the franchisee may operate the business. Upon expiration, the right and license to operate that business will end. Many agreements, however, provide for renewal rights, so that a franchisee may extend the term of the contract. Determine what specific conditions are imposed, and on what terms the franchisee may renew the contract.

Due to the long term nature of a franchise contract, and the fairly comprehensive list of obligations and duties imposed on the parties, a franchise agreement will often have a fairly lengthy provision concerning defaults under, and termination of the agreement. You should consider and evaluate:

• What does the contract provide about termination?

• Are the defaults for which there may be a termination "good cause" in your opinion?

• Are you entitled to notice of default and reasonable time to cure the default?

• Does the franchisor have any option to cancel the agreement other than for "good cause"?

• Under what conditions and on what terms may you, the franchisee, terminate the agreement, if at all?

If you have invested time and money in building the franchised business, you may be concerned what happens to your investment in the event of the expiration, non-renewal, or termination of the franchise. The franchise agreement should address issues, such as:

• Does the franchisor have an option or a duty to buy any or all of your equipment, furnishings, inventory or other assets in the event it terminates for good cause, or if it elects not to renew on expiration of the term of the franchise, or if you elect not to renew? Do the franchisor's rights and obligations differ depending on the reason for termination or non-renewal? How?

• If the franchisor has an option or duty to buy the assets of your business at the expiration of the term or upon termination, what are the purchase terms? How and by whom are the terms determined? Will there be independent appraisal? Will there be consideration for good will or franchisee equity?

• Does the franchisor have the right to take over your lease? If so, will you be relieved of all your liabilities under the lease? Also, are there any circumstances in which you will receive any compensation for the value of the lease?

You should determine what your obligations will be after termination of the relationship (whether terminated before expiration of the term or upon expiration without renewal), including your obligations to the franchisor and others under facility or equipment purchase agreements or leases.

In some cases, the provisions of the franchise agreement relating to renewal upon expiration, termination by the franchisor, and post-termination obligations may be superseded by provisions of a franchise or dealership law. Your attorney can advise you regarding any such laws that may apply to your relationship.

## COMPETITION WITH FRANCHISOR

Many franchise contracts restrict the franchisee from engaging in other businesses or ventures which are in competition with the franchisor's system during the term of the franchise. They also may restrict any competing activity or business after the term for a limited area and for a limited period. Check specific terms of the contract in this regard, and consult your attorney. Not all "non-competition" restrictions are enforceable.

## THE CONTRACT

Franchisors should expect and encourage you to read and understand the contract. Submit it to your attorney and accountant and discuss it with them. They will understand it. Be sure that you do and that they know your objectives.

Check the contract against your objectives and the representations made which attracted you. Are they specifically covered? Resolve misunderstandings in advance. Your contract governs your legal relationship.

Some sources suggest that prospective franchisees bargain for modification of provisions or for better terms. There may be areas which the franchisor is willing to modify for good reasons. Your reasonable suggestions should not be ignored. If a franchisor is entering a new area which is known to you, your suggestions, for example, about inventory and product type requirements, operating hours or other modifications justified by special or local geographic, climatic, ethnic, religious or local merchant association or trade customs, rules or practices, may be of value to all parties.

However, a franchisor generally will not bargain away major essential points of the system. If he is willing to do so, it would be difficult to justify their inclusion in the first place. Also, the franchisor will not want to compromise his position with other franchisees, and will not want to have to administer a system in which agreements granted at the same time have significantly different terms.

WASH1\4838466.1

The quality and operating control sections should be structured to preserve product uniformity and quality, and thus protect the business image, all franchisees, the system, and the public. If bargaining away of such controls were common, a franchisor could erode by bits and pieces the standardization and quality controls necessary to protect each franchisee and the public who relies on the franchisor's trade name. There would remain no goodwill and no national or chain image worth your investment. What you have today could be bargained away tomorrow. If a franchisor will bargain away the quality and standardization controls in order to get your initial cash, you may want to look elsewhere for a franchise opportunity.

## AIDS TO INVESTIGATION

There are directories which list franchisor companies by name and classification, such as IFA's FRANCHISE OPPORTUNITIES GUIDE. You may find others at your local bookstore or library.

You and your advisors may obtain additional aids from the Small Business Administration Regional Offices and National Office (particularly the S.B.A. Office of Management Assistance and its Small Business Administration Management Series publications); the Better Business Bureau local office and the Council of Better Business Bureaus, Inc., 4200 Wilson Boulevard, Suite 800, Arlington, Virginia 22203; Federal Trade Commission Bureau of Consumer Affairs, 6th St., and Pennsylvania Ave., N.W., Washington, D.C. 20580, and Federal Trade Commission field offices; the Attorney General's office, Securities and Business Registration Division, and/or Consumer Affairs Department of your state; and the local Chamber of Commerce in your area.

If a franchisor is publicly held, reports are available which will assist your accountant in analyzing company financial records and track record in its industry. University and public libraries will have reference works with much of the required information.

In addition, if the franchisor is a private company, seek a Dun & Bradstreet or other credit report; and check supplier, bank and franchisee references, as well as local Better Business Bureau data. Of all these, the most useful references will, undoubtedly, be other franchisees. The names, addresses, and telephone numbers of these franchisees can be obtained in the franchise offering circular or from the franchisor.

In general, the single most useful source of information about a particular franchisor may be the franchisor's offering circular.

## REGULATION OF THE OFFER AND SALE OF FRANCHISES

Since 1970, there has been extensive development of state laws regulating the offer and sale of franchises, generally termed "franchise disclosure laws." Also, in 1979, the Federal Trade Commission promulgated the FTC Rule, requiring disclosure of pertinent information to every prospective franchise owner. Not all business opportunities which are characterized as "franchises" are covered by these laws. For example, distributorships and dealerships that involve no more than the sale of goods by a supplier to a distributor or dealer generally are not covered by these laws. However, many business opportunities that are called "dealerships" or

"licenses", or some other name are covered by these laws. If you are considering a business opportunity that has the characteristics of a franchise as described earlier, but the seller claims that it is not a franchise, be sure to discuss with your attorney whether the seller is complying with franchise laws.

A state franchise law typically requires a franchisor to register the offer of its franchises within the state and to provide each prospective franchise purchaser with a disclosure statement. This document will contain information about the franchisor, the franchise being offered, and the terms and conditions of the legal relationship into which the franchisee will enter. In certain states, an agency which administers the state's franchise disclosure law typically reviews the franchisor's application to register franchises, the proposed disclosure statement, financial statements, franchise advertising materials, information about persons who will engage in the sale of its franchises, a copy of the franchise agreement, and all other agreements which the franchisee must sign to acquire the franchise.

The purposes of this review are to determine initially whether the franchisor has fully complied with all requirements of the law; whether the application, proposed disclosure statement, and other documents contain all required information in a clear and understandable form; if there is any inconsistency between the proposed disclosure statement and the franchise agreement (or any other agreement), or any other materials or information filed by the franchisor; if franchise advertising materials contain any prohibited claims or representations; and if the franchise being offered or the method by which it is offered or sold is fraudulent, deceptive, unfair or inequitable.

State franchise laws also typically authorize the administrative agency to determine whether a franchisor has demonstrated that adequate financial arrangements have been made to fulfill obligations to provide assistance, real estate, improvements, equipment, inventory, training, or other items to be included in the establishment and opening of the franchise business being offered. If the agency determines that the franchisor has insufficient financial resources, it can require the franchisor to escrow initial franchise fees and other amounts paid by franchisees until such obligations have been fulfilled. In lieu of an escrow of franchise fees and other funds, a franchisor typically has the option to post a surety bond.

Administrative agencies may deny or revoke the registration of the franchise offering on a variety of grounds, including the franchisor's failure or refusal to comply fully with the state's law; an incomplete or misleading disclosure statement; any false, fraudulent or deceptive practice by the franchisor, or any person acting on its behalf; because the franchisor's financial condition would adversely affect its ability to perform its obligations to franchisees; or, the franchise or the method of its sale is fraudulent, deceptive, unfair or inequitable to the franchisee.

**You should not assume that the registration of a franchise or the preparation of a disclosure statement means that the information in the franchisor's disclosure statement is complete, accurate and free of excessive claims and misleading statements, or that the administrative agency of your State or the Federal Trade Commission has made such a determination or has in any way approved the franchise. The resources of administrative agencies are limited, and they are not able to fully investigate all franchises offered.**

WASH1\4838466.1

**Independent verification (e.g., by checking with existing franchisees) of the information contained in a disclosure statement is essential if you are to do a thorough job of investigating before you invest.**

Franchise disclosure laws generally require the franchisor to provide the prospective franchisee with the information that this booklet recommends you obtain, including:

(1) The identity of the franchisor and of its directors, principal officers or general partners, their business backgrounds, and certain criminal convictions, civil judgments, administrative orders and bankruptcy history involving any of them.

(2) The business and franchising experience of the franchisor, a description of the franchise offered and the goods, training programs, supervision, advertising and other services to be provided by the franchisor.

(3) All initial and continuing fees that the franchisee will be required to pay; how fees are determined if they are not uniform; the extent to which fees are refundable; and an estimate of the total investment to be made by the franchisee.

(4) The franchisor's trade names, trademarks or service marks, and other commercial symbols to be licensed to the franchisee, and any restrictions on or litigation involving the franchisor's and the franchisee's rights and obligations relative to such trade names and trademarks or service marks.

(5) Whether the franchisee is required to purchase or lease goods or services from the franchisor or from suppliers designated by the franchisor, and whether and by which means the franchisor derives income from any such requirement.

(6) Whether the franchisee is required to purchase goods or services in accordance with specifications of the franchisor or from suppliers approved by the franchisor and a description of any specification or approved supplier program.

(7) A description of any financing offered by the franchisor, including any waiver of defenses contained in a note, contract, or other obligation of the franchisee, and whether the franchisor has in the past assigned, or expects to assign, any such note, contract, or other obligation containing any such waiver.

(8) The conditions under which the franchise may be terminated or renewal refused; the franchisee's rights and obligations upon expiration and termination; any option or right of first refusal that the franchisor has in order to acquire the franchise; a description of any covenant not to compete to which the franchisee will be subject; and the franchisee's right to assign and otherwise transfer the franchise.

(9) Limitations on the goods or services the franchisee may sell.

(10) A description of the territorial protection which the franchisee will have.

27

(11) Any historical or projected sales, expense or income figures which the franchisor elects to disclose concerning the franchised business. If the franchisor chooses to provide this information, the data and methods used by the franchisor in preparing such information must also be disclosed.

(12) The number of franchised and franchisor-owned outlets currently operating, and the number of franchises proposed to be sold in the next year.

(13) Names and addresses of current franchisees, and names and addresses of former franchisees who were terminated or left the system within 12 months prior to the date of the disclosure statement,

(14) Copies of the most recent balance sheet and profit and loss statement of the franchisor (or, if the franchisor has a guarantor, the financial statements of this guarantor) audited by an independent certified public accountant.

(15) Copies of the franchise agreement and all other related agreements (e.g., leases, promissory notes) which you may be required to execute.

The laws give the administrative agencies broad discretion to require disclosure of additional information and the highlighting of alleged "risk factors" in the disclosure statement, discretion which is used freely in certain states.

The FTC requires that the offering circular be provided at the earlier of: (1) the first personal meeting to discuss the sale of the franchise, or (2) at least ten business days before signing a contract or paying money to the franchisor or an affiliate of the franchisor. Copies of the franchise agreement and all other agreements that the franchisee must sign to acquire the franchise must be given to the prospective franchisee at least five business days in advance of the signing of any agreement or payment of any money to the franchisor.

Each of the state franchise disclosure laws provides for civil and criminal penalties for fraud or misrepresentation in the offer and sale of franchises and for other violations of the law, and persons damaged by such violations are given a statutory right to sue the franchisor, its officers and any other persons who commit any such violation. Fraud and misrepresentation are generally defined in these laws far more broadly than their traditional legal meaning.

Several of the state franchise disclosure laws do not require registration of the offer of franchises by large and experienced franchisors (the Oregon law does not contain a registration requirement for any franchisor) and other laws may provide other exemptions from registration. If a franchisor representative or salesman claims that the franchisor is exempt from registration in your state, you can verify this claim with the agency that administers your state's franchise disclosure law. However, either the FTC Rule or the state law requires all franchisors to disclose certain information to all prospective franchise purchasers, and the civil and criminal penalties for fraud and misrepresentation and other violations of the law apply to all offers and sales of franchises within the jurisdiction of such laws. Stated simply, the franchisor must give you a disclosure statement in advance of accepting any payment from you or of having you sign any agreement.

28

## FRANCHISE LAWS

As this publication goes to press, the Federal Trade Commission and 15 states have enacted franchise disclosure laws. The administrative agency of each which administers its law (and from which information about franchisors may be obtained) follows:

**Federal Trade Commission**
6th Street and
Pennsylvania Avenue, NW
Washington, D.C. 20580
(202) 376-2805

---

**California**
Commission of Corporations
Department of Corporations
6th Floor, 3700 Wilshire Blvd.
Los Angeles, CA 90010
(213) 736-2741

**Hawaii**
Business Registration Division
Department of Commerce and
　Consumer Affairs
1010 Richards Street
Honolulu, HI 96813
(808) 548-5317

**Illinois**
Chief, Franchise Division
Office of the Attorney General
500 S. Second Street
Springfield, IL 62707
(217) 782-4465

**Indiana**
Deputy Commissioner
Franchise Division
Indiana Securities Commission
Secretary of State
302 West Washington, Room E-111
Indianapolis, IN 46204
(317) 232-6681

**Maryland**
Office of the Attorney General

**Michigan** (filing — not registration)
Department of the Attorney General's Office
Consumer Protection Division
Attn: Franchise
670 Law Bldg.
Lansing, MI 48913
(517) 373-7117

**Minnesota**
Minnesota Department of Commerce
133 East Seventh Street
St. Paul, MN 55101
(612) 296-6328

**New York**
New York Department of Law
Bureau of Investor
　Protection and Securities
120 Broadway, 23rd Floor
New York, NY 58505
(212) 416-8211

**North Dakota**
Securities Commission
Capitol Building
Bismarck, ND 58505
(710) 224-4712

**Oregon** (no filing or registration)
Corporation Commission
Department of Commerce
Corporations Division
Commerce Building
Salem, Oregon 97310

**Rhode Island**
Chief Securities Examiner
Department of Business Regulation
Securities Division, Franchise Section
Suite 232

29

Maryland Division of Securities
200 St. Paul Place, 20th Floor
Baltimore, MD 21202-2020
(410) 576-6360

**South Dakota**
Department of Commerce and Regulation
Division of Securities
State Capitol Building, 910 E. Sioux
Pierre, SD 57501-5070
(605) 773-4823

**Virginia**
State Corporation Commission
Division of Securities and
    Retail Franchising
1220 Bank Street
Richmond, VA 23219
(804) 786-7751

Providence, RI 02903-4232
(401) 277-3048

**Washington**
Securities Division
Washington Department of Licensing
Second Floor
405 Black Lake Boulevard, S.E.
Olympia, WA 98502
(206) 753-6928

**Wisconsin**
Commissioner of Securities
Franchise Investment Division
111 W. Wilson Street
Madison, WI 53701
(608) 266-1365

IFA has supported strongly the principle of full advance disclosure of relevant information to prospective franchisees. IFA for several years urged the enactment of a federal franchise disclosure law and supported in principle the FTC Rule requiring such advance disclosure to prospective franchisees.

The FTC Rule requires franchisors to make essentially the same advance disclosure to prospective franchisees as is required by the state franchise disclosure laws. The FTC Rule applies to offers and sales of franchises anywhere in the United States.

IFA has encouraged the development of effective and uniform state franchise disclosure laws. In addition to extensive assistance given to state legislatures and administrators in drafting laws and regulations, IFA has assisted a committee of state franchise law administrators in developing uniform registration forms and disclosure requirements, a project which is now completed and in operation. While complete "uniformity" has not been achieved, prospective franchisees are often provided with disclosure statements entitled "Uniform Franchise Offering Circular," which vary only slightly from state to state. At times, the state-to-state differences may appear in an addendum. The opportunity to prepare one disclosure statement that can be used in each state is also a procedure used by a few franchisors.

Several states have enacted legislation limiting the right of a franchisor to terminate or refuse to renew a franchise (Arkansas, California, Connecticut, Delaware, Hawaii, Illinois, Indiana, Iowa, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, Virginia, Washington, and Wisconsin). These laws, and other laws, may provide you with additional protections after the execution of the franchise agreement. Your attorney can advise you on your rights as an existing franchisee.

WASHI\4838466.1

Franchising has entered the age of full disclosure long advocated by IFA and its members. The regulation of the offer and sale of franchises which the states have enacted should not be expected to be an iron-clad guarantee. It will not protect all prospective franchisees from purchasing a misrepresented or unsound franchise or from all potential problems of the franchise relationship. But it will have a strong effect on these problems. All prospective franchisees should take full advantage of the information available on franchisors and their franchises as a result of these laws.

These laws should provide you with a good starting point for obtaining the information which this pamphlet recommends that you secure and carefully consider before you purchase a franchise.

## BUSINESS OPPORTUNITY LAWS

As this edition of INVESTIGATE BEFORE INVESTING  published, 24 states have enacted business opportunity laws. While these laws are not applicable to most franchisors, the nature of a particular franchise offering may result in your receiving disclosure, or otherwise being protected, through the application of one or more of these laws. These states and the administrative agency of each which administers its law (and from which information about business opportunities may be obtained) lows:

WASH1\4838466.1

**Alabama**
Consumer Division of
   Attorney General's Office
11 South Union
Montgomery, Alabama  36130
(205) 242-7334

**California**
Office of Attorney General
110 West A Street, Suite 700
P.O Box 85266
San Diego, CA  92186-5266
(619) 237-6553

**Connecticut**
Office of the Banking Commissioner
Securities and Business
   Investments Division
44 Capital Avenue
Hartford, CT  06106
(203) 566-4560

**Florida**
Division of Consumer Services
Attn:  Business Opportunities
Department of Agriculture &
   Consumer Affairs
Mayo Bldg., Room 508
Tallahassee, FL  32399-0800
(904) 488-2221

**Georgia**
Office of the Governor
Office of Consumer Affairs
Martin Luther King Drive, S.E.
Plaza Level, East Tower
Atlanta, GA  30334
(404) 656-4731

**Indiana**
Consumer Protection Division
Attorney General's Office
219 State House
Indianapolis, IN  46204
(317) 232-6331

**Iowa**
State of Iowa, Insurance Division
Department of Commerce
Lucas Bldg., 6th Floor
Des Moines, IA  50319
(515) 281-5705

**Kentucky**
Attorney General's Office
Consumer Protection Division
209 St. Clair
Frankfort, KY  40601-1875
(502) 564-2200

**Louisiana**
Department of Urban & Community
   Affairs
Consumer Protection Office
P.O. Box 94455
Capital Station
Baton Rouge, LA  70804
(504) 925-4401

**Maine**
Securities Administrator
State House Station
Augusta, ME  04333
(207) 582-8760

**Maryland**
Office of the Attorney General
Maryland Division of Securities
200 St. Paul Place
20th Floor
Baltimore, MD  21202-2020
(410) 576-6360

**Michigan**
Michigan Department of Attorney General
Consumer Protection Division
670 Law Bldg.
Lansing, MI  48913
(517) 373-7117

32

**Minnesota**
Department of Commerce
133 East Seventh Street
St. Paul, MN  55101
(612) 296-6328

**Nebraska**
Department of Banking & Finance
P.O. Box 95006
Lincoln, NE 68509-5006
(402) 471-2171

**New Hampshire**
Attorney General
Consumer Protection and Antitrust
State House Annex
25 Capital Street
Concord, NH  03301-6397
(603) 271-3641

**North Carolina**
Secretary of State's Office
Securities Division
Room 302
300 North Salisbury Street
Raleigh, NC  27611
(919) 733-3924

**Ohio**
Attorney General
Consumer Fraud & Crime Section
State Office Tower
25th Floor
30 East Broad Street
Columbus, OH  43215
(614) 466-8831

**Oklahoma**
Oklahoma Department of Securities
P.O. Box 53595
Oklahoma City, OK 73152
(405) 521-2451

**South Carolina**
Secretary of State
Capitol Complex
Wade Hampton Office Building
Room 105
Columbia, SC  29211
(803) 734-2169

**South Dakota**
Department of Commerce and Regulation
Division of Securities
910 E. Sioux Avenue
Pierre, SD  57501-5070
(605) 773-4823

**Texas**
Secretary of State
Business Opportunities Section
1019 Brazos
Austin, TX  78711
(512) 463-5559

**Utah**
Consumer Protection Division
160 East 300 South
P.O. Box 45804
Salt Lake City, UT  84145-0804
(801) 530-6601

**Virginia**
Consumer Affairs
1100 Bank Street
Richmond, VA  23209
(804) 786-2042

**Washington**
Securities Division
Washington Department of Licensing
405 Black Lake Boulevard, S.E.
Olympia, WA  98502
(206) 753-6928

WASH1\4838466.1

**CONCLUSION**

We summarize by restating our opening advice:

KNOW YOUR FRANCHISOR AND PRODUCT!

KNOW YOURSELF!

KNOW AND UNDERSTAND THE TERMS OF THE CONTRACT! CONSULT YOUR LAWYER!

If you do, you will have to rely much less on good luck than someone who invests before investigating.

To those who ultimately decide to invest in a franchise opportunity, we extend our best wishes for financial success and a totally rewarding and fulfilling business experience.

WASH1\4838466.1

**ABOUT THE AUTHORS**

LEWIS G. RUDNICK

Lewis Rudnick is a partner in Rudnick & Wolfe, and heads the firm's franchising, distribution and intellectual property law departments. A graduate of the University of Illinois, Columbia University Graduate School of Business, and Northwestern University School of Law, Mr. Rudnick has practiced law in the fields of franchising and distribution law for twenty-seven years. Mr. Rudnick served as assistant general counsel (1965-1973) and general counsel (1973-1981) to the International Franchise Association and is currently its special counsel and a member of its Strategic Advisory Group. Mr. Rudnick was a member of the Governing Committee of the American Bar Association (ABA) Forum on Franchising from its establishment in 1977 until 1984, and served as chairman of the Forum from 1981 to 1983. Mr. Rudnick has been a member of the Illinois Franchise Advisory Board since 1974 and has served on the Industry Advisory Committee to the Franchising Regulation Committee of the North American Securities Administrators Association. He is an associate editor of the *Journal of International Franchising and Distribution Law*, a contributing editor of IFA's *Franchise Legal Digest*, and co-author of *Franchising: A Planning and Sales Compliance Guide*, published by Commerce Clearing House. Mr. Rudnick participates in programs about franchising for the International Franchise Association, the ABA Forum on Franchising, the Practicing Law Institute and other organizations. Mr. Rudnick has authored and edited numerous papers, monographs and articles on franchising law for the *Franchise Legal Digest, The Journal of the ABA Forum on Franchising,* the *Journal of International Franchising and Distribution Law*, law reviews and other publications, and is a frequent speaker on the topic of franchising and distribution law. He serves as an expert witness in franchise relationship litigation. In addition to franchising and distribution law, Mr. Rudnick practices general corporate, intellectual property and estate planning law.

H. BRET LOWELL

Bret Lowell is a partner in the Washington, D.C. law firm of Brownstein Zeidman and Lore. Mr. Lowell is a leader in franchise and distribution law, and has counseled and represented clients across a broad spectrum of industries (including restaurants and food service, car rental, hotel/motel, health care, financial services, high tech, real estate, and retail). His experience includes drafting and negotiating domestic and international franchise, distribution and license agreements; preparation and filing of disclosure documents; counsel and advice regarding the establishment and operation of franchise and distribution systems; dispute resolution including representation before federal and state government agencies; due diligence reviews and document preparation in connection with public offerings, mergers, and acquisitions; and trademark and other intellectual property matters.

Mr. Lowell is also the author of numerous articles and books on trade regulation and franchise law, and is a frequent lecturer on those subjects. He is a member of the American Bar Association's ("ABA") Forum on Franchising; Franchising Committee of the ABA's Section of General Practice (Co-Chair); International Franchise Association's Legal/Legislative Committee; Licensing and Franchising Law Committees of the American Intellectual Property Law

Association; Licensing Executives Society; and Franchising Committee of the International Bar Association.  He is the former editor of the *Franchise Law Journal*, author of *Multiple-Unit Franchising: The Key to Rapid System Growth,* and co-author of Franchising: *Regulation of Buying And Selling A Franchise, Franchise Sales and Full Agreement Compliance,* and *Managing the Franchisor's Legal Concerns*.  He has been appointed to numerous leadership positions in the franchise community, including:  Chair, Governing Committee, ABA Forum on Franchising; Program Chair, 1990 Annual Forum on Franchising; Franchise Advisor, Franchise and Business Opportunities Committee, North American Securities Administrators Association; Arbitrator, Franchise Arbitration and Mediation, Inc.; and Delegation Leader, Citizen Ambassador Program, International Franchise Delegation to the Far East.

Bret Lowell received his law degree from Georgetown University Law Center in 1978.

WASH1\4838466.1