# EXHIBIT 18

## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| DUNHILL STAFFING SYSTEMS, INC., | ) | |
| Claimant, | ) | Case No.  13 181 Y 01674 04 |
| | ) | |
| v. | ) | RESPONDENT FRANCHISEES TRUST'S POST-HEARING BRIEF |
| | ) | |
| DUNHILL FRANCHISEES TRUST, ET AL., | ) | |
| Respondents. | ) | |

## I.    What this Case is About

This case is about Bud Westover, Elias Zinn and Michael Wilcoxson, Harvey Auger and Michael Lamanna (collectively, the "Counterclaimants") four would be entrepreneurs who were induced into purchasing franchises in the Dunhill Staffing Systems franchise system. None of the Counterclaimants had any experience in the employment staffing industry and each of them reasonably relied, to their detriment, on the verbal and written representations made by Dunhill's franchise sales personnel. These representations were false and misleading.

The Dunhill system was represented to each of the Counterclaimants to be a premier employment staffing franchising company with a vibrant and growing nationwide network of 150 offices which were there "to assist" the new franchisees. Dunhill represented to each Counterclaimant that the services and support each of them would receive as a Dunhill franchisee, which included, but was not limited to, start-up assistance, initial training, ongoing training and support, software and technology, and national advertising and brand promotion, were of the highest quality and were "state-of-the-art." Further, each of the Counterclaimants were told by Dunhill, in numerous instances, both verbally and in writing, that they could expect to generate additional revenues of 25% to 40% beyond what they could expect to generate by using the Dunhill

franchise system, generally, simply by participating in Dunhill's Exchange Program. Dunhill's representations relating to the Exchange Program (both verbal and written) played a key role in each of the Counterclaimant's decision to purchase his Dunhill franchise, not only because they could (purportedly) increase their revenues, but also because each of them was new to the employment staffing industry and each of them had concerns about how quickly they could begin to make placements and earn revenues.

These various representations about the Dunhill franchise system were made verbally by either Robert Stidham or Joanne Naccarato, but were also in writing, primarily, but not exclusively, as part of a certain marketing brochure entitled "Dunhill Staffing Systems, Inc. Business Opportunities" (the "Brochure") which was provided to each Counterclaimant before he signed his Dunhill franchise agreement(s). Additionally, three out of the four Counterclaimants, Michael Lamanna, Elias Zinn and Harvey Auger, were provided with improper and illegal earnings projections by Dunhill, including a formal written proforma setting forth expected revenues, costs, and profits, under two different scenarios (an "expected case" scenario and a "conservative" case scenario) which was given to Mr. Lamanna. These earnings projections were intended to, and did in fact, induce the franchisees who received them, to purchase their respective Dunhill franchise.

Harvey Auger was induced to relocate his entire family (including his son and his wife) to Charlotte, North Carolina based upon Dunhill's representations that he was going to be provided an opportunity to operate a Dunhill temporary staffing franchise (under the Dunhill program entitled "Dunhill 2000") in addition to the Dunhill permanent placement franchise he purchased. However, this opportunity was never provided to him and he eventually had to "let his son go" from his failing Dunhill permanent placement business. As a result of the stress he was under in having moved his family to Charlotte and trying, unsuccessfully, to make his Dunhill franchise profitable, Harvey Auger suffered a heart attack which required him to have multiple bypass surgery in May of

2

2001 (five months after he moved to Charlotte, North Carolina with his family to open his Dunhill franchise).

Bud Westover purchased his Dunhill permanent placement franchise with an exclusive territory in Fort Worth, Texas, together with a "right of first refusal" to operate a Dunhill temporary staffing franchise business from that same location. However, after becoming a Dunhill franchisee, Mr. Westover discovered that Andrew Barham, another Dunhill franchisee, was operating both a Dunhill permanent placement and temporary staffing franchise in Mr. Westover's territory, in clear violation of Mr. Westover's franchise agreement. For all intents and purposes, this rendered Mr. Westover's "right of first refusal" devoid of any value.

All of the testimony and evidence presented in this case has clearly established that Bud Westover, Harvey Auger, Mike Lamanna and Elias Zinn and Mike Wilcoxson, are each entitled to have their respective franchise agreements rescinded, and are further entitled to be compensated for their losses suffered as a result of their investments in the Dunhill franchise system.

The Dunhill franchise system was founded in the mid-1960s by Bob and Edward Kushell, two entrepreneurs (who were brothers) who were committed to establishing a network of employment staffing service franchisees that would become the leader in its field by providing the highest level of service to its customers and clients and which would provide its franchisees with an opportunity to achieve a better than average return on their investments. By the time the Company ("Dunhill") was sold to the Canteen Corporation, a subsidiary of the Transworld Corporation, in 1977, Dunhill had grown to a network of close to 400 franchises.[1] During this period, the "Dunhill" name evoked a reputation for excellence and the company co-existed in harmony with its franchisees.

---

[1] See Edward Kushell's testimony, Hearing Transcript ("TR") from 38/07, Page 10.

In 1988, when the current owner of the Dunhill franchise system, Watsco, Inc., ("Watsco") acquired the franchise system, it included 253 permanent placement franchised offices and approximately another 35 temporary staffing offices. Robert Stidham testified that in the fall of 2001, Dunhill essentially suspended its attempts to sell franchises because of its system wide problems[2]. Bud Westover's undisputed testimony in this case was that after Dunhill sold him his permanent placement franchise in July of 2002, Dunhill sold only one additional permanent placement franchise.[3] Robert Freeman, Dunhill's chief financial officer, testified that today, Dunhill has only 25 permanent placement franchisees.[4] The testimony of the Counterclaimants showed that, beginning in 2000, the Dunhill franchise system began a protracted and steep decline, evidenced by high turnover of both management and staff personnel, mismanagement and neglect. While Dunhill languishes with approximately 25 (or 22 as the franchisees' research indicated) permanent placement franchisees, Management Recruiters, Inc. ("MRI"), its rival in the 1970's, remains a vibrant employment staffing franchising company with approximately 1,100 offices.[5] While other employment franchising companies, including MRI, Express Personnel, Inc., and Global Recruiters Network, among many others,[6] have grown and thrived in recent years, Dunhill has become all but irrelevant in the industry.

## II.    **The Elements of a Franchise**

Franchise expert Edward Kushell, who was also one of the two founders of Dunhill, testified that in 1977 and 1978 he served as President of the International Franchise Association, the world's largest franchise trade association,[7] and that since 1978 (i.e., after his involvement with Dunhill ended), he continuously owned and operated his own franchise consulting business and has consulted

---

[2] See TR from 3/6/07 Page 130.
[3] See TR from 1/22/07, Page 506.
[4] See TR from 1/18/07, Page186; We note that Dunhill's research revealed that the true number of Dunhill permanent placement franchisees was actually only 22;
[5] See TR from 3/7/07, Page 7; See also General Binder (Large) Exhibits #52 and 53.
[6] See Respondent's Exhibits #52, #53, #54, #55, #56, and #57 (Large General Binder)

4

with a range of domestic and international clients with respect to many franchising issues.[8]  Mr. Kushell testified that he has been retained approximately 50 times as an expert witness in connection with a wide range of franchise related claims and issues and that he has familiarity with the elements that normally comprise a franchise.[9]

Mr. Kushell testified that the sale of a franchise, from a sequential point of view, starts with the advertising and promotion that franchisors do to attract franchise prospects, for example, through print ads, websites or their attendance at trade shows.  Then, when an individual shows interest in a franchise, there are normally face-to-face meetings where a representative of the company, usually a salesperson (or conceivably a founder), will outline the various component parts of the offering.[10] Mr. Kushell then stated:

> "They will make available to them usually *brochures and other related materials.* It could be articles that have been in newspapers or magazines that talk about the franchise. In addition to that, franchisors are required to provide offering circulars which include the franchise agreement.  We will further spell out certain parts of the offering, *but I think it is very safe to say that the agreement itself in no way can represent all the component parts of a franchise offering.  It is all of these other verbal representations and offerings that are made by the franchisors.*"[11]  (Emphasis added.)

Mr. Kushell's testimony supports Respondent Counterclaimants' contention that the verbal representations made by Dunhill's sales representatives and the written representations contained in Dunhill's marketing materials (i.e., the Brochure) are a part of the franchise offering which was offered to each of the Respondent Counterclaimants and that they were entitled to rely on said representations.   Further, it is clear that under New York State law, franchise sales literature, including brochures and pamphlets, are deemed to be part of a franchisor's franchise offering as all such sales literature must be filed with the New York State Department of Law (the "Department")

---

[7] Id at 13-14.
[8] See TR. 3/8/07, Pages 6-7.
[9] Id at 18-19.
[10] Id at 17.
[11] Id at 17-18.

which regulates the sale of franchises in New York State. New York State Franchise Regulation ("Franchise Regulations") Part 200.9 ("The Filing of Sales Literature"), subsection (a)[12] states:

> "No pamphlet, circular, form letter, advertisement, sales literature  or advertising communication (hereafter sales literature) addressed to or intended for distribution or communication to prospective franchisees, shall be distributed or communicated unless it has been filed with the Department prior to distribution."

Prior to the hearings, our office was advised by the Department that Dunhill was exempt from registering its UFOCs and other documents which are related to and made part of the franchise offering with the Department, based upon an exemption which provides that subsidiaries of a large parent company (in this case, Watsco, Inc.) do not have to register such franchise offering documents. But the fact that the Department generally requires the filing of all such sales literature prior to distribution to prospective franchisees, clearly indicates that there can be no question that the Brochure must be considered part of Dunhill's franchise offering and that prospective franchisees such as the Counterclaimants could reasonably be expected to rely on the representations contained in the Brochure (and other "sales literature" such as form letters) with which they were provided.

In his testimony, Mr. Kushell set forth the various essential elements or ingredients that he believes constitute a franchise, i.e., what the franchisor is selling and what the franchisee is buying. The items that Mr. Kushell described are as follows: (1) the licensing of a trademark which has some "meaning and recognition"; (2) a proven business model that is viable; (3) stable and experienced management; (4) a growing network of franchises; (5) a protected territory; (6) a pre-training program (after the franchise agreement is signed and before the initial formal training takes place); (7) review of business plan, including financial forecasts (this is done _after_ the franchise agreement is signed); (8) the computer hardware/POS system; (9) software which may be proprietary but in all cases, is well integrated with the computer hardware/POS system; (10) formal initial training; (11) manuals

---

[12] See full text of 13 NYCRR Part 200.9 Page 23 of 30.  A copy of the complete set of Franchise Regulations is attached

dealing with operating procedures, marketing manuals, employee handbooks, etc.; (12) ongoing support which includes being given a field consultant/representative who will be assigned to a specific franchisee, field visits, ongoing training (retraining); regional meetings, telephone support, online support, national meetings; (13) a company website; (14) an operating system of procedures; (15) advertising (both local and national); (16) group purchasing power where the franchisor negotiates better deals for its franchisees; (17) uniqueness; (18) uniformity; (19) a "market niche"; and (20) a continuously evolving system where new products or services are introduced.[13]

In response to the Arbitrator's questioning, Mr. Kushell explained that while the elements he listed would vary somewhat from one franchising company to another, the listed elements are "essential ingredients in what is being sold and purchased."[14] Mr. Kushell, in describing a hypothetical individual walking around the 300 to 350 exhibitors at the annual International Franchise Exposition where franchising companies are looking to sell franchises to "prospects," stated:

> "And if you were to walk around from one to all of these people here, I think you would find that the ingredients that I mentioned that I believe are the constituent parts of franchises, are being offered by all of the people in different forms, different shapes and sizes, with a different emphasis. But nevertheless if you had that list and walked around to each one and said: Do you offer this and offer this. *They would go down the whole list and I can't conceive of them saying, no we don't do this or we don't do that.*" (Emphasis added.)

In response to another line of questions posed by the Arbitrator, Mr. Kushell explained why an individual would choose to buy a franchise as opposed to starting his own independent business. Mr. Kushell testified that primary reasons for buying a franchise are that you are "buying a proven business model, you are buying a company that has name recognition, you are buying a company that has support from day one, all the way through, of people who have been there and done that."[15] Mr. Kushell also explained that "another key item" is having an "exit" plan for the business if and when

---

in Counterclaimants' Submission Binder (the "Submission Binder") as Exhibit #3.
[13] Id at Pages 29-35.
[14] Id at Page 44.
[15] Id at 47.

the franchisee wants to sell the business. When comparing the benefits of having a franchised business or an independent business (in the context of transferring or selling the business), Mr. Kushell testified that "historically, it is very clear that the value of a franchised business with a known trademark is much greater than an independent business." The Counterclaimants were interested in purchasing a franchise for many of the same reasons cited by Mr. Kushell. They were looking for, among other things, a recognized and respected brand, a proven business model (so that they would not have to "reinvent the wheel"), ongoing training and support, and a business which would have a good resale value when they wanted to retire or otherwise exit the industry. It was Dunhill's false and misleading representations (both verbal and written) which persuaded each of them, to their regret, that purchasing a Dunhill franchise (a "premier, industry leader" in the employment staffing franchising company) was the "way to go."

These "elements" or ingredients of a franchise represented, in general terms, what the Counterclaimants expected (and were entitled) to receive when they purchased their Dunhill franchises. As we shall see below, it is clear from the testimony in this case, that Dunhill delivered virtually none of these elements of a franchise to Messrs. Westover, Auger, Lamanna and Zinn and Wilcoxson. As a result they each lost hundreds of thousands of dollars.

Mr. Kushell testified that having a "pre-training" program (element #6 above) typically includes the franchisor's assistance with issues like finding a location, the design and layout elements of the location; recruitment of staff and signage. The Counterclaimants testified that they received practically no such assistance from Dunhill and when they asked for assistance, they were essentially ignored.

Rick Kean analogized Dunhill's President's (Operations) Manual (the "Manual") to the Bible. If so, it must have been the "Old" Testament. Dunhill's Manual was outdated and not kept current at reasonable intervals. Dunhill's Manual, like its Brochure, contained false and misleading statements.

The references in the Counterclaimants' Manuals with respect to the 25% exchange rate "over the past 15 years" were false and misleading. Two Counterclaimants, Mr. Westover and Mr. Lamanna, received their Manuals before they signed their respective franchise agreements and testified that they relied on the false representations contained in the Manual in making the decision to purchase their Dunhill franchises.

### III.  Common Misrepresentations Made to (and/or Dunhill's Failures to Meet the Obligations Contained in its Franchise Offering re:) Counterclaimants

Each of the Counterclaimants testified that they had no prior experience in the employment placement/staffing industry and that they relied on the information and promotional materials that Dunhill provided to them about its franchise system. Dunhill's franchise sales staff made various verbal representations to the Counterclaimants which induced them into purchasing their Dunhill franchises. Many of these representations were also contained in a written marketing brochure entitled "Dunhill Staffing Systems, Inc. Business Opportunities" (the "Brochure") which was provided to each of the Counterclaimants prior to their signing their franchise agreements.

1.   The Brochure

Each of the Counterclaimants testified that he was induced, in part, to purchase his Dunhill franchises, based upon the representations which were contained in the Brochure.[16] The Brochure includes, among other things, each of the following statements (all of which were read into the record during Mr. Westover's testimony[17] and which throughout the testimony of Mr. Westover, Mr. Zinn, Mr. Auger and Mr. Lamanna, were shown to be false and misleading. (For accuracy, the actual text of the Brochure as opposed to the transcript was used):

---

[16] For Westover, see TR from 1/22/07, Pages 509-554; for Zinn, see TR from 1/24/07, Pages 915-951; for Auger, see TR from 1/25/07, Page 1232-1243; and Lamanna, see TR from 1/29/07, Pages 1517-1537.
[17] See TR from 1/22/07 on Pages 509, 510, 513, 514, 515, 528, 529-530, 534, 535-536, 536-537, 541-542, 545-546, 547-548, 549-550, 551 and 552.

9

1. "Over the past 50 years we have built one of the industry's premier staffing firms" (Page 1); Through the 1980s, Dunhill was a premier staffing firm with a recognized reputation. However, the Counterclaimants experienced nothing which indicated to them that Dunhill was still a "premier" staffing firm. Other staffing franchising companies have experienced tremendous growth and vitality over the last 20 years, while Dunhill's size, standing and reputation has declined to such an extent that it has become "insignificant" in the industry.[18] Dunhill's representation to the Counterclaimants that it was a "premier" staffing firm during the period 2000 to 2002, a period where it was undergoing major problems in many areas, was false and misleading.

2. "You want to invest in a business with a future. In the last five years at Dunhill we have on average, a system wide revenue growth of 20% annually and have doubled the revenues of the Dunhill organization" (Page 2);

   When this statement was made to the Counterclaimants, it was not true because Dunhill's CFO, Robert Freeman testified that Dunhill's revenues declined from almost $67,000,000.00 in the year 2000 to approximately $44,000,000.00 in the year 2001 to approximately $33,500,000.00 in the year 2002.[19]   The decline from 2000 to 2001 represents a decline of approximately 35% and the decline from 2001 to 2002 represents a further decline of almost 25%. Cumulatively, the decline in Dunhill's total revenues from 2000-2002 was 50%. The above representation by Dunhill was false and misleading.

3. "You'll rely on your franchise partner [Dunhill] to have the experience, the knowledge and proven methods to guide and support you, not just at start-up, but throughout the relationship. We've got 50 years of experience and a network of 150 offices nationwide to assist you" (Page 2);

---

[18] See Elias Zinn's testimony, TR from 1/24/07, Page 917.

The Counterclaimants testified that they never experienced Dunhill's "knowledge" or "proven methods" and described how Dunhill <u>failed</u> to guide and support them, at <u>any</u> time, and certainly not continuing throughout the time they were Dunhill franchisees. The representation that Dunhill had a network of 150 offices "to assist you" is especially meaningful when taken in conjunction with Dunhill's misrepresentations regarding the Exchange Program, because each Counterclaimant testified that he believed, based upon Dunhill's representations, that they could expect to generate additional revenues of between 25% to 40% (above and beyond what they could generate alone within the Dunhill franchise system) by simply participating in the Exchange Program. Dunhill intentionally misrepresented the true nature of the Exchange Program where temporary staffing and company owned offices did not participate in the Exchange Program. The only way that Dunhill franchisees "assisted" one another was through the Exchange Program. The fact that, in reality, there were no more than 30 to 35 Dunhill permanent placement franchisees in any way truly "available" to assist in the Exchange Program made it a virtual certainty that the fraudulent 25%-40% projections could not be met.

4. "Once we agree to commit to each other, we'll dedicate the full resources of our organization to helping you succeed" (Page 3);

The testimony of the Counterclaimants makes it clear that Dunhill never dedicated itself to anything positive or constructive with respect to its franchisees. Dunhill's management "cried poverty" when making excuses as to why it was not able to provide the franchisees (including Counterclaimants) with the ongoing training and support that was promised to them. Dunhill's parent, Watsco, which clearly had the resources to do so, never lifted a finger to help support Dunhill financially.

---

[19] See TR 1/18/07, Page 201.

5.  "We know you need expert help, especially if you're new to the industry (and most of our new franchisees are!), that's why we provide intensive "nuts and bolts" training at out corporate facility and then ongoing hands on support in your office" (Page 3);

   The Counterclaimants testified that they had no prior experience in the employment staffing industry and that they were induced to purchase Dunhill franchises, in no small part, based upon Dunhill's representations that they would receive a proven business system, and solid training, guidance and support on an ongoing basis. However, the NFT training they received was outdated and failed to focus on the Internet or other technology, although this was necessary to operate a successful staffing office in the 21st Century. The Counterclaimants testified that they never received the personal guidance and "hands on support" which Dunhill promised them.

6.  "Dunhill Exchange Program: Through Dunhill, you become part of a cooperative network of offices, giving you access to national and international candidates for challenging assignments. We encourage and support active cooperation between our offices. *Today, almost 25% of our placements are a direct result of the exchange network"* (Emphasis added) (Page 4);

   The representations regarding the Exchange Program go to the heart of what the Counterclaimants were promised. They were each promised that by participating in the Dunhill Exchange Program (which was represented to them as consisting of the entire 150 office Dunhill network), they could expect to generate additional revenues of at least 25% (some verbal representations to Counterclaimants were higher) above what they could otherwise expect to generate on their own as a Dunhill franchisee. The written representation in the Brochure provides important confirmatory evidence with respect to the verbal representations which each Counterclaimant testified to. Based on the evidence

12

in the case, for the years 2000 through 2002, Dunhill had no basis whatsoever to represent to Counterclaimants that "Today, almost 25% of our placements are a direct result of the exchange network."

7. "Field Support: You'll have a personal Franchise Development Manager to mentor you and assist your staff. Our Franchise Development Managers bring successful "real world" experience to the task of setting up and organizing your office. Your Franchise Development Manager will continue to work with you (and your office) on an ongoing basis" (Page 5);

Dunhill never provided the Counterclaimants with a "Franchise Development Manager" to mentor them and their staff. The Counterclaimants testified that Dunhill provided them with little, if any, "real world" experience with respect to setting up and organizing their offices. Furthermore, when the Counterclaimants asked Dunhill for assistance in this regard, they were ignored.

8. "Technology: You'll receive our "state-of-the-art" proprietary software package, which you'll use for external placement processes and the administration of your office. You'll communicate with clients, candidates and other Dunhill offices through our Internet and Intranet presence" (Page 5);

Once again, this written representation supports the testimony proffered by the Counterclaimants that they were promised a high technology, "state-of-the-art" proprietary software with which to operate their business. The Counterclaimants testified that the Resummate software they received was too difficult to work with and that Dunhill failed to provide them with any meaningful training or training manual to help them utilize the program. Mr. Westover testified that Mr. Kean was unable to instruct him on the use of the Resummate program at his NFT training.

13

9. "Marketing Services: Our national advertising, marketing, communications and public relations programs are available to promote your office and position you in your market" (Page 5);

Dunhill failed to proffer any evidence that it placed a single national advertisement or marketed or promoted the "Dunhill" brand in any way. Simply put, Dunhill was charging its franchises (including Counterclaimants) a 1% contribution to Dunhill's national advertising fund, while failing to provide the franchise system with any national advertising or brand promotion. More meaningful, however, is the fact that Dunhill failed to provide its franchisees with one of the essential elements of any franchise system, the promotion of its brand in the marketplace.

10. "The Dunhill Advantage: Getting started on the right foot is critical to your subsequent success. That's why we offer personalized support from the beginning. Our consultation services will assist you with:

- Selecting a suitable office location;
- Designing and layout of your new office;
- Furnishings and equipment recommendations;
- Appropriate telephone systems and initial office telephone wiring;
- Initial computer hardware and operating system software; selection of your Internet service provider (ISP);
- Installation of your Dunhill provided computer software package, including our database and business management software;
- Development of your office Internet site: links to the Dunhill Corporate website;
- For temporary staffing franchises [i.e., Mr. Zinn & Mr. Wilcoxson]: all of the administrative system and support for your office;
- For permanent placement franchisees: Help you select the "desk specialty" (area of business) that you and your Consultants will work." (Page 6);

The Counterclaimants testified that they received little, if any, start-up assistance (including the above referenced items) in connection with setting up their new Dunhill office and businesses. They further testified that when they asked Dunhill for assistance regarding these items, Dunhill ignored their requests for assistance.

11. "That's just the beginning our commitment to you. Ongoing field support from your personal

Franchise Development Manager and Dunhill Corporate Staff are yours, on site at your

location. Here's where you'll get:

- Ongoing field support from your Franchise Development Manager throughout the year;
- Additional owner training to complement the New Franchisee Training (NFT) class you will have completed;
- Assistance in identifying hiring and training of your initial staff through our R.A.T.I.F.Y program; advanced consultation and staff training programs;
- Access to worldclass training through our "Dunhill University" (intranet based) program; access to Internet-based training through our exclusive partnership with Learn2.com;
- Access to training provided at Corporate Headquarters or at area, regional and national events and meetings;
- Unlimited advice, guidance and counsel from Dunhill Corporate" (Page 7);

The above representations were made to the Counterclaimants (verbally as well as in the

Brochure). As none of the Counterclaimants had any prior experience in the employment

staffing industry, they relied on Dunhill's representations to provide them with a proven

business model as well as with ongoing training and support for them and their consultants.

The Counterclaimants were never assigned a "Franchise Development Manager" to provide

them with assistance, support or guidance. The training provided to the Counterclaimants'

consultants through the R.A.T.I.F.Y. program was outdated and woefully inadequate to

prepare them to succeed in the industry (and they did not succeed). The "Dunhill University"

training (which was accessible on Dunhill's intranet system), offered Counterclaimants

nothing new beyond the regular, outdated, deficient, Dunhill training techniques that they had

already received. There was nothing "world-class" about the "Dunhill University" training or

any other kind of training offered by Dunhill.

12. "Our Mission Statement – We the members of the Dunhill family of Companies are dedicated

to providing quality professional search and staffing services. We pledge to meet the needs

and exceed the expectations of our internal and external customers through the process of

continuous improvement" (Page 11);

Rick Kean acknowledged that Dunhill's reference to "internal customers" includes Dunhill's franchisees.[20] Therefore, Dunhill's mission statement can only be interpreted as a pledge to "meet the needs and exceed the expectations" of its franchisees "through the process of continuous improvement." As the testimony in the case clearly indicated, not only did Dunhill not exceed the expectations of the Counterclaimants, but it also miserably failed to meet their needs at all. At Dunhill, there was no "process of continuous improvement"; in fact, there was *not even an attempt* to achieve continuous improvement. Rather, there was a pattern of franchisees leaving the system, high management and staff turnover, no meaningful training, support or services, no advertising, and a constant flow of empty promises from management stating that they would address all of the problems in due course.

13. "Our 'Statement of Core Values.' – Ethics: We practice the highest level of business ethics and integrity" (Page 11);

The above representation sounds noble, but bears absolutely no relation to how Dunhill actually conducted its franchise system. Dunhill and its sales staff induced the Counterclaimants into purchasing their Dunhill franchises based upon numerous false, misleading and improper representations about the nature of the Dunhill franchise system and what each of them would achieve within the system. Based upon the testimony presented during the hearings, there can be no doubt that Dunhill did <u>not</u> practice the highest level of business ethics and integrity, but that, in fact, the very opposite was the case.

2. <u>Dunhill's Exchange Program</u>

Edward Kushell, the co-founder of the Dunhill franchise system testified he conceived and developed the Dunhill Exchange Program in the 1960's as a unique feature which enabled the system

---

[20] See TR from 1/22/07, Page 437.

to increase the number of placements made in the franchise system and to give the franchised system a much larger presence in the marketplace.[21]  He further indicated that during the time he was affiliated with Dunhill, the franchisees in the Dunhill franchise system "could generate enough revenue to offset their royalties"[22] (which have always been 7% of gross revenues) through their participation in the Exchange Program.

As none of the Respondent Counterclaimants in this case had prior experience in the employment staffing industry, they had reasonable concerns about being able to generate sufficient revenues to operate and sustain their businesses, especially in the short term when they were "getting started."  An important component of Dunhill's marketing approach to its prospective franchisees, including Counterclaimants, was for Dunhill's franchise sales staff to make repeated verbal representations and give repeated assurances with respect to how much additional revenue each of them could expect to generate (above what they might otherwise expect to generate working alone as Dunhill franchisees) merely by participating in Dunhill's Exchange Program.

Mr. Westover testified that Robert Stidham explained that The Dunhill Exchange Program worked in the following way: "where one office will have an order for a candidate and another office will have an order from a client for a candidate and they try to match the two together and do a split commission on it."[23]  The Counterclaimants were told that by participating in the Exchange Program they would expand their pool of candidates and job orders so that they could expect to generate between 25% to 40% more business than they would otherwise do.

As described above, Dunhill represented to the Counterclaimants that the Dunhill network of 150 offices was able to "assist them" through the Exchange Program.  As referenced above, the Brochure stated "Dunhill Exchange Program: Through Dunhill, *you become part of a cooperative network of offices,* giving you access to national and international candidates for challenging

---

[21] See TR from 3/8/07, Page 32.

assignments. We encourage and support active cooperation between our offices. *Today, almost 25% of our placements are a direct result of the exchange network."* (Emphasis added)

However, as the Counterclaimants testified, Dunhill misrepresented the nature of the Exchange Program to them in several ways. For one thing, it knew that Dunhill's temporary staffing offices and company owned offices did not participate in the Exchange Program. Therefore, only the 84, or 90 or 85 Dunhill permanent placement offices at most (and not the 150 as represented) could have possibly been participating in the Program, depending on the year. The reality, as the Counterclaimants testified, was that so few permanent placement franchisees actually participated on a consistent basis that it was extremely difficult to achieve an exchange placement.

Each of the Counterclaimants testified as to how important it was to them to have an opportunity to generate significant additional revenues (above what they could expect to earn through their own efforts as a Dunhill franchisee) quickly, and with less work, as they would only need to have one of the two key elements necessary to make a permanent placement (i.e., a job candidate or a job order). Dunhill represented to them that they would be able to find a "match" for their job candidate (or job order) through their participation in the Exchange Program. Mr. Stidham referred to the Exchange Program as being a "safety net."[24]

While Dunhill argues that participation in the Exchange Program was voluntary amongst permanent placement franchisees prior to 2002, Dunhill did not tell the Counterclaimants this. When Mssrs. Westover, Auger, Lamanna and Zinn and Wilcoxson were told that the Dunhill network of 150 offices was there to "assist them" in connection with the Exchange Program, they reasonably assumed that the entire network was participating. Dunhill's "voluntary" policy is inconsistent with the statement "100% Participation – i.e., every Dunhill Permanent Placement Franchise and DPS Corporate have signed the Exchange Agreement" which is contained in the Counterclaimants'

---

[22] See TR from 3/8/07, Page 32.

President's Manuals.[25]  Indeed, Mr. Zinn testified that he was unaware that the Exchange Program was a "voluntary" program until Mr. Wolf made this point at the hearings.[26]

In addition, Dunhill greatly exaggerated the number of viable, operating permanent placement franchisees that were in the system.  While we will not reiterate the detailed exposition regarding this point as set forth in Section 3 below ("Dunhill's Misrepresentations Regarding the Number of Active Permanent Placement Franchised Offices"), it is clear that the fact that there were only 35 or so active permanent placement franchisees (defined by generating revenues of at least $60,000.00 per year) "to assist" in the Exchange Program, rather than the 150 as represented, was false and misleading and made it a virtual certainty that the 25% to 40% in additional revenues as represented, would not be achieved.

Finally, as the Counterclaimants testified, the Exchange Program essentially existed in name only and was practically worthless.  They attempted to participate in the Program because they were relying on the revenues that Dunhill represented that they could generate from participating in the Program.  But the information relating to the job orders was stale, over 2 years old and few franchisees actually participated because it was perceived to be a waste of time.

When recalling a conversation Mr. Zinn had had with Rick Kean, Mr. Zinn said that Mr. Kean had told him:

> "you got to have the core of offices to make it work because the two keys are offices and technology. You got to have the offices because if you don't have the offices you are not going to get the jobs or the candidates. You got to have the technology because if you don't have the technology then you can't place your job or your candidate onto a Dunhill-only website because you need a Dunhill-only, you couldn't do it through Monster or job board because you wouldn't be able to see a Dunhill"[27] [i.e., a Dunhill-only site on Monster.com]

---

[23] Mr. Westover's testimony at TR from 1/22/07, Page 508.
[24] Id at 525; See TR 1/24/07, Pages 853-854
[25] See Westover's Binder Exhibit #10, Bates 001870; Zinn's Binder Exhibit #11, Bates 011544; and Lamanna's Binder Exhibit #12, Bates 003674.
[26] See TR from 1/25/07, Page 1104
[27] See TR from 1/24/07, Page 928.

Mr. Zinn further testified that Dunhill never had the technology to facilitate a true exchange network. He stated, "I mean they were making this statement knowing that their website was inadequate for the Exchange Program. That the only website they had at the time was Monster, where that wasn't an exchange."[28]

Mr. Westover, Mr. Auger and Mr. Lamanna each testified that they made <u>no placements or exchanges whatsoever through their participation in the Dunhill Exchange Program</u> despite their efforts to make such placements. Mr. Zinn testified that he made no exchange placements for the first 3½ years that he was a franchisee and that he made a total of 4 exchange placements in the second half of 2003 and in 2004 with a Dunhill franchisee that he had built up a rapport with.

Mike Green, a former Dunhill franchisee and former Chairman of the Franchise Advisory Council (the "FAC") testified that he was one of the top revenue earners with respect to Dunhill permanent placement franchisees beginning in 1997 and continuing through 2004. Mr. Green testified that he generated no revenues at all from the Exchange Program during his entire tenure as a Dunhill franchisee.[29]

In this case, the Counterclaimants proffered minutes of a joint FAC (Franchisee) / DSS (Dunhill Management) meeting from October 2001 which indicated that Ray Cech, a Dunhill franchisee, had disseminated an "exchange report" to the participants.[30] The minutes reflected that the report indicated that there was only a 4% inter-office exchange rate. Mike Green testified that he had asked Mr. Cech where he had received the reporting data and that Mr. Cech had told him that he got the information directly from Dunhill's accounting department.[31] Mr. Zinn testified that he sat in

---

[28] See TR from 1/24/07, Page 934.
[29] See TR from 1/26/07, Page 1485.
[30] See Zinn Binder, Exhibit #14 (Bates 009131).
[31] See TR from 1/26/07, Page 1486-1487.

on this October meeting by teleconference and that there was "no question" about the accuracy of the 4% exchange rate cited in Mr. Cech's report.[32]

As referenced above, Dunhill made verbal representations to the Counterclaimants that they could expect to generate between 25% and 40% of additional revenues by participating in the Exchange Program. The Brochure, which was given to each of the Franchisees before they signed their particular franchise agreements, stated that: "Today, almost 25% of our placements are a direct result of the exchange network." The President's Manuals which were provided to the Counterclaimants stated that the Exchange Program has "allowed Dunhill Franchisees to generate 25% in additional revenues through shared resources over the past 15 years."

Notwithstanding all of Dunhill's representations relating to the high percentage of additional revenues that the franchisees could expect to generate from the Exchange Program, Robert Stidham, a former President of Dunhill, testified that Dunhill <u>could not predict</u> the percentage (or amount) of a franchisee's revenues which could be generated from the Exchange Program because there were too many factors and variables involved. But Dunhill *did* in fact, make specific representations to the Counterclaimants (and Mr. Stidham himself did, with respect to Mr. Westover and Mr. Lamanna), regarding how much additional revenues they could generate by participating in the Exchange Program.

While discussing the Dunhill Exchange Program in his opening remarks, Jeff Wolf made the following statement:

"And the evidence that you will hear from Dunhill witnesses is that they were not given any specific assurance of a certain amount, but that they were told that speaking historically many people achieved in the 25 percent range, *but the range could be from zero to 100. There are Dunhill offices that today operate on the basis of 100 percent referrals through the exchange program* and some that don't get any success out of that."[33] (Emphasis added.)

---

[32] See TR from 1/24/07, Page 974
[33] See TR from 1/18/07, Pages 40-41.

Mr. Wolf's statement is noteworthy in at least two respects. First, he assures us that Dunhill will proffer "evidence" from "Dunhill witnesses" that franchisees were told not that Dunhill franchisees would in fact, generate a "certain amount" through the Exchange Program, "but the range could be from zero to 100%." Apparently, Mr. Wolf's point is that Dunhill did not explicitly "guaranty" or provide "specific assurance" as an exact amount that would be generated. However, such an argument must be rejected. Dunhill made representations setting forth how much additional revenue the Counterclaimants could expect to generate and even if Dunhill did not "guarantee" them, they were still representations that Dunhill either knew to be false (for example, based upon the exchange report indicating an exchange rate of 4%) or, with respect to which they had no reasonable basis to believe that they were true. Further, such representations as to how much money the Counterclaimants could expect to make constitute improper and illegal earnings projections. The fact that they may not have been "guaranteed" is irrelevant.

Also, in the above statement and in the context of his telling us that he will proffer "Dunhill witnesses," Mr. Wolf indicates that that "there are Dunhill offices that today operate on the basis of 100% referrals through the Exchange Program..." In this case, Dunhill produced only one current or past franchisee witness, Neil Whitman (a current franchisee) who testified on cross examination that he has been one of Dunhill's top revenue producers for the period 2003-2006 and that he made only one exchange placement since becoming a permanent Dunhill franchisee in 2001.[34] (We note that the evidence showed that Mr. Whitman had been so frustrated with Dunhill that in March 2004 he had Robert Purvin prepare a notice of termination to Dunhill on his behalf,[35] he was included as an "anonymous" Dunhill franchisee in Mr. Purvin's May 5, 2004 letter to Dunhill which referenced the franchisees' continuing concerns,[36] he was a named Respondent in this proceeding,[37] and as a

[34] See TR from 1/30/07, Pages 1786 and 1814.
[35] See TR from 1/30/07, Page 1825, Line 24 – Page 1832; See General Binder (Miscellaneous Section) Exhibit #1.
[36] See TR from 1/30/07, Pages 1839-40; See General Binder (Miscellaneous Section) Exhibit #3.

22

member of the Dunhill Franchisees Trust, he asserted through counsel, various counterclaims against Dunhill, including among others: fraudulent inducement, breach of contract, failure of consideration and rescission of his franchise agreement,[38] before settling his claims with Dunhill and deciding to remain a Dunhill franchisee.)

As stated above the Counterclaimants' President's Manuals cite a 25% historical exchange rate "over the past 15 years." However, Dunhill failed to produce or demonstrate any credible evidence that Dunhill had any reasonable basis to represent to prospective franchisees that such a historical basis was accurate. In trying to defend Dunhill's 25% historical exchange rate contained in the Manuals (which Rick Kean authored), specifically, Michael Green's manual from 1996, Mr. Kean could only testify, that he got the 25% figure, as an estimate, by reviewing Dunhill purported "earnings data" going as far back as 1993.[39] However, Mr. Kean also testified that he could not recall taking any additional or subsequent steps to check whether or not this "estimate" of 25% was accurate.[40] In fact, the only thing he did recall was getting some information to Ray Cech,[41] the Dunhill franchisee who had submitted the exchange report at an FAC/DSS meeting in 2001 which indicated an exchange rate of 4%. We note that if the 4% figure is based on recent historical data, the information should have been disclosed to each of the Counterclaimants.

Notwithstanding the fact that Dunhill produced no evidence proving that the historical data of 25% ever existed, Dunhill also produced no testimony or evidence to support the written representation contained in its Brochure which stated "Today, almost 25% of our placements are a direct result of the exchange network." (Emphasis added). In fact, all of the testimony in the case,

---

[37] See TR from 1/30/07, Pages 1840-1841; See Dunhill's Demand for Arbitration which is included as Exhibit #1 in each of the 4 Counterclaimant's Exhibit Binders.
[38] See TR from 1/30/07, Pages 1841-1843; See Respondent Trust's Answering Statement which is included as Exhibit #2 in each of the 4 Counterclaimant's Exhibit Binders.
[39] See TR from 1/31/07, Page 1938.
[40] Id at 1949-1950.
[41] Id at 1950.

even that of Dunhill's witnesses, indicated that few, if any, franchisees generated any (or certainly no meaningful) revenues at all from the Exchange Program.

3.     <u>Dunhill's Misrepresentations Regarding the Number of Active Permanent Placement Franchised Offices</u>

Dunhill represented to the Counterclaimants that the Dunhill franchise system consisted of 150 offices nationwide "to assist them." It also represented to them that the Dunhill franchise system was a growing and vibrant and that Dunhill expected to open many new offices. For example, Elias Zinn testified that before he purchased his Dunhill franchises, Daniel Abramson, Dunhill's then President, told him that Dunhill was going to open 40 new permanent franchises in the next 3 years (2000, 2001 and 2002), as well as 20 new temporary staffing offices and 5 company owned offices during that period.[42] Mr. Zinn testified that Mr. Abramson provided a memorandum to the FAC Office Growth Committee Members dated April 4, 2000, which, among other things, included a chart which indicated that Dunhill's growth strategy was to add 14 new permanent placement offices, 6 temporary staffing offices and 2 company owned offices in the year 2001; and to add 16 new permanent placement offices, 10 temporary staffing offices and 2 company owned offices in the year 2002.[43] Mr. Westover testified that he was told by Robert Stidham in February 2002 (before he purchased his Dunhill franchise), that Dunhill planned to open 20 new offices during 2002.[44] Mr. Westover further testified that he had been exploring several other franchise opportunities, including Sanford Rose, and that it would have been a "red flag" or "negative" to purchase a franchise that only had approximately 50 offices.[45]

Notwithstanding the above representations, Dunhill's October 2002 UFOC, shows that only 90 permanent placement franchised offices were operating at the end of 2000 and 85 permanent placement franchised offices were operating at the end of 2001. (Dunhill produced no 2003 UFOC).

---

[42] See TR from 1/24/07, Page 923.
[43] See TR from 1/24/07, Pages 1015-1016 and Zinn Binder Exhibit #13 (Bates 011517).
[44] See TR from 1/23/07, Page 795.

We note that the minutes from the October 2002, FAC/DSS Baltimore Mega-Regional Meeting indicate that Robert Stidham said that there was a "net loss" of 9 offices from January 2001 to now (October 2002).[46]    Clearly, notwithstanding Dunhill's projections, and despite the representations Dunhill made to the Counterclaimants, the system was not growing and was in fact, declining.

As stated earlier, Dunhill's representations regarding its network of 150 offices "to assist you," were misleading to the Counterclaimants in the context of the Exchange Program.  Not only did Dunhill's temporary staffing offices and company owned offices not participate in the Exchange Program, leaving a potential maximum of 84 permanent placement offices participating in 2000 (the number operating at the end of 1999), 90 in 2001 (the number operating at the end of 2000) and 85 in 2001 (the number operating in 2002), the reality is that many permanent placement franchisees were not making placements or reporting revenues to Dunhill.  As Mike Green testified in connection with the fax dated October 10, 2001 that he had received from John Mills, Dunhill's Acting President, for the period January through August 2001, only 66 Dunhill permanent placement offices "were generating any revenue at all."[47] Mr. Green also testified that in 2001, only 38 permanent placement franchisees generated revenues of more than $60,000.00.[48] (This was calculated on an annualized basis.)

Mike Lamanna also testified in detail about the number of permanent placement franchisees who were actually operating from a business perspective, rather than a technical perspective (i.e., merely having signed a franchise agreement).  Mr. Lamanna testified, after reviewing Dunhill's monthly data reports for the year 2000, that of the 90 permanent placement offices listed in Dunhill's 2001 UFOC, 43 offices reported no revenues at all and only 35 offices generated revenues of more

[45] See TR from 1/22/07, Page 527.
[46] See Dunhill's Exhibit #106 (Page 1 of 8) .
[47] See TR from 1/26/07, Pages 1497 and 1498; See General Binder, Exhibit #8.
[48] See TR from 1/26/07, Page 1498.

than $60,000.00.[49]  After reviewing Dunhill's monthly data reports for 2001, Mr. Lamanna testified that of the 85 offices listed in Dunhill's 2002 UFOC, 23 offices reported no revenues at all and only 38 offices generated revenues of more than $60,000.00.[50] (This confirmed the testimony of Mike Green.) After reviewing Dunhill's monthly data reports for 2002 (he had 9 months of the 12 months), Mr. Lamanna testified that 43 offices reported no revenues at all and only 30 permanent placement offices generated more than $60,000.00 (calculated on an annualized basis).[51]  After reviewing Dunhill's Statement 3 Report which listed permanent placement revenues for the months January through October 2003, Mr. Lamanna testified that 28 offices reported no revenues at all and only 36 permanent placement franchisees generated more than $60,000.00 (calculated on an annualized basis).[52] Dunhill's representations to the Counterclaimants that the franchise system was a network of 150 offices which was growing, strong and vibrant and there "to assist you" were false and misleading.

This means that in the context of the Exchange Program, which the Counterclaimants relied upon to generate additional revenues, there were not 150 offices participating in the Exchange Program as had been represented to them, but rather, at most, 35 active franchisees in 2000, 38 active franchisees in 2001, 30 active franchisees in 2002 and 36 active franchisees in 2003. And in reality, the numbers were far less due to the fact that the franchisees perceived the Exchange Program to be worthless, based upon Dunhill's failed technology and the stale listings of job orders. Dunhill's representations to the Counterclaimants that Dunhill's network of 150 offices would be there to assist them in connection with the Exchange Program were false and misleading.

---

[49] See TR from 1/29/07, Page 1610-1611.
[50] Id at 1624.
[51] Id at 1626-1627.
[52] Id at 1627-1630.