According to the FAC/DSS minutes dated October 12-13, 2001, Robert Stidham stated words to the effect that Dunhill must remain above the 100 office level to have "critical mass."[53] The minutes from the October 2002, FAC/DSS Mega Regional meeting in Baltimore, indicate that Robert Stidham said words to the effect that "when we have less than 100 offices on the books, we don't look very credible."[54]   Mr. Stidham testified that his use of the phrase did not mean that there was anything "magical" about the number "100," but rather that his concern was that "it makes sense to me in the context of if you lose 26 offices that at some point a prospective franchisee is going to go: Gee, you have gone from triple digits to double digits you lost essentially 25 percent of your base. What happened?"[55]   Even if we take Mr. Stidham at his word, it is clear that he, Dunhill's then Vice President of Franchise Development, was very concerned about the fact that Dunhill was losing many franchisees at this time and how this would impact on prospective franchisees and the ability to "close" sales to them).   While Dunhill was selling significant numbers of franchises, Dunhill experienced a net loss of 5 permanent placement offices from the 90 offices operating at the end of 2000 (as reflected in Dunhill's 2001 UFOC) to 85 offices operating at the end of 2001 (as reflected in Dunhill's 2002 UFOC).   Dunhill's representations to the Counterclaimants that the franchise system was growing were false and misleading.

4.    Training

Dunhill's franchise sales personnel representatives made misrepresentations to the Counterclaimants, both verbally and in writing, which related to the high quality of initial and ongoing training that they would purportedly receive as Dunhill franchisees.  Mike Lamanna testified that Robert Stidham told him that Dunhill's training "was a strength of the system," that it was "state-of-the-art," the best in the industry, and also that it was delivered "on a personal level."[56]  Joanne

---

[53] See Zinn's Binder Exhibit #14, Bates 009131.
[54] See Dunhill's Exhibit #106 (Page 5 of 8).
[55] See TR from 3/6/07, Page 179.
[56] See TR from 1/29/07, Page 1543.

Naccarato provided Mike Lamanna with a form letter dated January 24, 2001 (which is deemed to be "sales literature" distributed to a prospective franchisee, and is therefore, part of Dunhill's franchise offering), which among other things, states:

> "Our professional and experienced staff provides unparalleled, continuous training, effective business development strategies and targeted research and development that help our franchisees realize their goals and potential."[57]

Additionally, Dunhill's Brochure, recognizing that most of Dunhill's new franchisees were new to the industry (as all of the Counterclaimants were), contained a representation that new franchisees would receive an intensive "nuts and bolts" training and then ongoing "hands on support" in your office. The Counterclaimants relied upon Dunhill's verbal and written representations regarding the training they were told they would receive.

With respect to Dunhill's initial training, each of the Counterclaimants testified in detail about how the President's NFT (initial) training that they received was woefully deficient and thoroughly ineffective in preparing them to operate their Dunhill franchises. The training was outdated and did not focus on how to use new technology, including the use of job boards and the Internet, which had become so crucial to achieving success in the employment staffing industry. Elias Zinn, testifying about this NFT training experience stated, "And the problem that we have here is that the training was good 20 years ago and that's what Dunhill still didn't understand."[58] Bud Westover testified, "After being in the business a very short period of time, I very quickly learned that everything I was taught was either dated or outmoded and not really factual in today's market."[59]

---

[57] See Lamanna Binder, Exhibit #15; We note that while Elias Zinn and Harvey Auger did not produce identical form letters from Joanne Naccarato, we submit that they would have, and id in fact, did receive identical form letters which would have also induced them into purchasing their franchises as they were prospective franchisees when Ms. Naccarato was Dunhill's Director of New Business Development.
[58] See TR from 1/24/07, Page 942
[59] See TR from 1/22/07, Page 530.

Harvey Auger testified that his NFT training was a "big disappointment to me not only on behalf of my son but on behalf of me."[60] He added that there was little to no training whatsoever in how to run an office, how to set up the office financially; how to set it up legally and how to manage it effectively.[61]  Harvey also testified that, "There was no technology brought into the picture, and this is 2000 we were in the start of the technology age. And there was none of that brought into it."[62] Harvey added that his NFT training experience was a "disappointment in many, many ways and my summary evaluation said that to Dunhill."[63]   (We note that Dunhill never produced Harvey's evaluation of his NFT training sessions even though it was requested.)

Mike Lamanna summarized his NFT training experience as "overall, it was ineffective."[64]  He testified that all of Dunhill's training was "paper trail based" and that it did not provide him with an opportunity to be successful.  Since leaving Dunhill he has learned how to use data bases, data mining and other technology in order to make placements.  He added, "I was not trained on any of that at Dunhill and those are the key ingredients in being a successful recruiter today."[65]  Mike testified that he was disappointed that Dunhill's training utilized "an old fashioned overhead projector" rather than using modern computer technology.[66]

With respect to the purported "ongoing training" that the Counterclaimants were offered, the major complaint was that what Dunhill provided was mostly repetition of specific aspects of the NFT training they had already received.  Dunhill did not update its training methods or techniques and the technology Dunhill used was out of date.  Bud Westover testified, "Every class was the same, there was no updated material from the original President's or Operation's Manual I received in Hauppauge

---

[60] See TR from 1/25/07, Page 1236.
[61] Id..
[62] Id at 1237.
[63] Id.
[64] See TR from 1/29/07, Page 1527.
[65] Id at 1528.
[66] See TR from 1/29/07, Pages 1543-1544.

at their initial training."[67]  Overall, the ongoing training offered by Dunhill was ineffective and of no benefit to Counterclaimants.

5.    R.A.T.I.F.Y. Program.

Dunhill used its R.A.T.I.F.Y. program (Recruiting and Training Individuals for You) as another inducement for the Counterclaimants to purchase Dunhill franchises. Dunhill recommended that they each hire consultants who would make additional permanent placements and therefore generate higher revenues (and higher royalties for Dunhill).  Through its R.A.T.I.F.Y. program, Dunhill obligated itself to take various specific actions in an effort "to assist franchisees (the Counterclaimants) in the acquisition of quality consultants."[68]  As referenced previously, Page 7 of the Brochure included the following representation: "Assistance in identifying hiring and training of your initial staff through our R.A.T.I.F.Y program."

Further, Dunhill's President's Manual (Section R) (which was provided to Bud Westover and Mike Lamanna before purchasing their franchises) sets forth the written procedure for Dunhill's On-Site and Video R.A.T.I.F.Y. program.  This procedure indicates that Dunhill is responsible for writing the advertisement, fielding telephone responses, booking and paying for conference/seminar, conducting the seminar/video conference, screening the applicants, interviewing the applicants, profiling "serious" candidates and providing training after 60 days.

The "assistance" provided by Dunhill was limited and the training provided to the consultants was inadequate and ineffective for the same reasons that the NFT training was inadequate and ineffective.  The training was outdated and did not offer instruction with respect to the use of technology.  The Counterclaimants also testified that the training their consultants received through the R.A.T.I.F.Y. program was, like the President's NFT training and the ongoing training, outdated, and not focused on technology.  Dunhill's training of Counterclaimants' consultants was ineffective,

---

[67] See TR from 1/22/07, Page 548.

and Dunhill's screening process was haphazard and superficial. Accordingly, the consultants that were hired based upon Dunhill's recommendations generated very few placements. Bud Westover testified, "Every person they (Dunhill) recommended that I hire, produced almost no income for me. I had one person who made, I think, one placement out of all the people I hired through Dunhill's recommendation."[69]

Elias Zinn testified that in late 2000, his company hired 5 consultants which were screened by Dunhill, but that within 90 days all five were gone. When he made a second (and last) attempt to hire consultants screened by Dunhill in early 2001, he hired 3 people but they lasted only 60 days."[70] Elias told Dunhill that his consultants "weren't working out and we had to ask them for assistance."[71] Elias testified that Sandy Watkins, a Dunhill trainer told him that Dunhill was working on changes to the R.A.T.I.F.Y. system and that Elias should "hold off" doing any more hiring of consultants.[72] Elias testified that he, on behalf of the FAC, and Mike Wilcoxson as well, requested several times that Dunhill revise and improve the system.[73] Dunhill never did.

Harvey Auger testified that he relied on Dunhill's representations regarding what it would provide him with under the R.A.T.I.F.Y. system, but that Dunhill never provided Harvey with this assistance.[74] Similarly, Mike Lamanna testified that he relied on Dunhill's representations regarding what it would provide him with under this program, but he received no assistance from Dunhill.[75]

Bud Westover testified that the training his consultants received from year to year was repetitive (i.e., "the old stuff over and over") and that "their training did not change."[76] He further testified that when he and his consultants attended Dunhill's consultant training in San Antonio,

---

[68] See Westover Binder, Exhibit #13, Pages from President's Manual (Bates 001865).
[69] See TR from 1/24/07, Page 903.
[70] Id at 949-950.
[71] Id at 948.
[72] Id at 950.
[73] Id at 951.
[74] See TR from 1/25/07, Page 1257.
[75] See TR from 1/29/07, Page 1534.
[76] See TR from 1/23/07, Pages 613-614.

Texas, he found the training to be so poor that he submitted an evaluation to Dunhill grading the aspects of the training either "D"s or "F"s[77] and he then sent himself and his 4 consultants to an outside training seminar (with Bill Raden, an instructor in the recruiting industry) at an extra cost of approximately $1,000.00 (exclusive of travel expenses). Bud also ordered videotapes from another instructor, Steve Finkelman, which he used to train his consultants.[78] In comparing the consultant training his office received from Dunhill with the Raden seminar, Bud characterized the difference as between "daylight" (the Raden seminar) and "dark" (Dunhill's consultant training) and graded the Raden seminar an "A to A plus" as compared with the grades of "D" and "F" that he gave Dunhill.[79]

Each of the Counterclaimants was induced to purchase their Dunhill franchises based upon the R.A.T.I.F.Y. consultant training program. Bud and Elias, the two of the four that received any assistance from Dunhill at all, followed Dunhill's procedures and suggestions to their financial detriment. Bud lost "well over $200,000.00" in connection with the hiring of poor consultants that were recommended by Dunhill.[80] Pursuant to Rick Kean's suggestions, Bud hired 8-10 consultants over a 2½ year period and was paying them each between $3,000.00 and $4,000.00 per month.

6.    Ongoing Support and Services

Dunhill also induced the Counterclaimants to purchase their Dunhill franchises by making verbal and written misrepresentations which related to the ongoing support, services, guidance and assistance that they would purportedly receive as a Dunhill franchisee.

Page 8 of the Brochure states,

"The primary source of revenue for the franchisor, Dunhill Staffing Systems, Inc, is royalty. *In consideration for the ongoing services that we provide, the Dunhill Professional Search (permanent placement) franchisee pays a royalty of 7% of revenue*, plus an additional 1% of revenue, which is dedicated exclusively to the support of our national advertising program." (Emphasis added)

---

[77] Id at 614.
[78] Id at 614-615.
[79] See TR 1/23/07, Page 615.
[80] See TR from 1/22/07, Pages 581-582.

Page 5 of the Brochure states,

> "Field Support: You'll have a personal Franchise Development Manager to mentor you and assist your staff. Our Franchise Development Managers bring successful 'real world' experience to the task of setting up and organizing your office. Your Franchise Development Manager will continue to work with you (and your office) on an ongoing basis"

Page 7 of the Brochure (among other things) provides that "you'll get:

- ongoing field support for your Franchise Development Manager throughout the year; and
- unlimited advice, guidance and counsel from Dunhill Corporate."

Page 7 of the Brochure states that new franchisees will be provided with "Ongoing assistance with placement, business and operating issues as your business develops."

Joanne Naccarato's form letter to Mike Lamanna (which was previously referenced in the "Training" section) also made the following representation, "Ongoing support is provided, from specific placement strategies to growing a franchise office."[81]

Based upon the above statements, it is clear that Dunhill not only represented that it would provide the Counterclaimants with meaningful ongoing support, service, guidance and assistance, but that it had an obligation to do so, as well. The fact that a Dunhill representative may have showed up at a Counterclaimant's office every 9 months or so and provided him with a redundant, outdated training session that he had seen and heard before does not constitute meaningful ongoing service, support, guidance and assistance. Dunhill failed to provide the Counterclaimants with meaningful support, guidance or assistance on a reasonably regular or consistent basis.

The Counterclaimants testified that Dunhill was continuously experiencing a high turnover of management and staff and that cut-backs were rampant. Ongoing support and services of any kind were hard to come by and on the rare occasions you could actually reach a representative, the assistance or guidance, if any, was usually unhelpful and ineffective.

---

[81] See Lamanna Binder Exhibit #15; Again, we submit that Elias Zinn and Harvey Auger would have and did in fact, receive an identical form letter from Joanne Naccarato which would have been another inducement to purchase their Dunhill franchises.

When discussing the ongoing support and services that he was promised, Elias Zinn testified, "It's a joke as we go through the years, but so obviously the answer is they weren't there and we were on our own, basically, and the temp side, it was worse because they didn't have anybody to support that area. I mean they were losing people left and right....Tom Esposito, the Vice President of the temp side...he was gone two weeks after we started."[82]

Bud Westover testified that in 2002, John Clementi and Jamie Owen were Dunhill's two field support representatives. (Sandy Watkins had left Dunhill and Rick Kean was not working on a full-time basis and was employed on a "consultant" basis.) However, John Clementi was fired by Dunhill shortly after Bud bought his franchise.[83] Bud testified that he was not provided with the services and support that he needed to succeed[84] and that in his opinion "there was no support, because the support was useless."[85]

Harvey Auger was very outspoken when he testified about his reliance on Dunhill's representations regarding support, guidance and training. He said, "it was very critical for me because of my son joining me, the training and the support ongoing was critical."[86] When asked whether he received ongoing services and support from Dunhill, he testified, "No, it went downhill from January 2001 and continued downhill."[87]

Mike Lamanna testified that Robert Stidham told him that he would receive "personalized service" from Dunhill which he would not get from MRI which was a much larger company.[88] While Dunhill representatives did make a few visits to Mike's office over approximately three years, he testified that "it was not enough for the ongoing support of my business."[89] Mike also testified that he

---

[82] See TR 1/24/07, Pages 940-941.
[83] See TR from 1/22/07, Page 536.
[84] Id at 528.
[85] See TR from 1/23/07, Page 813.
[86] See TR from 1/25/07, Page 1235.
[87] Id at 1280.
[88] See TR from 1/29/07, Page 1547.
[89] Id at 1526-1527.

relied on the representations in the Brochure regarding ongoing support and assistance and that he found the above referenced statements made in the Brochure on this issue to be untrue.[90] Mike also reiterated his testimony that Dunhill did not provide any of the ongoing services that were described in the Brochure and that he had expected to receive.[91]

The representations made to the Counterclaimants included having a "personal Franchise Development Manager to mentor you" or otherwise receiving "personalized" service and support. The fact of the matter is that not only did Dunhill fail to provide any meaningful ongoing support, services, guidance or assistance, but even worse, Dunhill's management (i.e., whoever was in charge that month) had to have known that they could not have made such representations in good faith. Yet Dunhill made them, as selling franchises was its goal, and dealing fairly and in good faith with prospective franchisees was obviously not a priority.

The Counterclaimants testified that the representations that were made to them regarding the ongoing support, services, guidance and assistance that they expected to receive as Dunhill franchisees were major factors in persuading them to purchase their Dunhill franchises.

7.    Proprietary Software

Page 5 of the Brochure states, "Technology: *You'll receive our "state-of-the-art" proprietary software package*, which you'll *use for external placement processes and the administration of your office*. You'll communicate with clients, candidates and other Dunhill offices through our Internet and Intranet presence." (Emphasis added)

Elias Zinn's Permanent Placement UFOC, Harvey Auger's UFOC and Mike Lamanna's UFOC each contain the following statements[92]:

---

[90] See TR from 1/29/07, Page 1532-1533.
[91] Id at 1535.
[92] See Zinn Binder, Exhibit #5, Page 22; Auger Binder, Exhibit #5, Page 24; Lamanna Binder, Exhibit #5, Page 25.

- "Dunhill has had *proprietary software* developed for it – the Dunstar Professional Search Software – which it requires for permanent placement franchisees"; (Emphasis added)

- "The primary function of the system is to help make your Office more productive in terms of placements per recruiter/account executive";

- "The system is designed to assist in the following tasks: organize, maintain and search applicant, job order and company files; provide recruiters with tools to help in daily planning, scheduling, interview tracking, etc.; maintain and print letters, resumes, reports, labels and envelopes; maintain interview information and provide valuable reports regarding applicants, clients and recruiters; provide management with financial reports regarding placements and analysis by recruiter; provide more quality phone time by reducing paperwork, filing and administrative overhead."

Page 23 of Bud Westover's UFOC[93] contains the following statements:

- "You must use *our proprietary* Professional Search Software"; (Emphasis added)

- "The primary function of the system is to help make your Office more productive in terms of placements per recruiter/account executive";

- "The system is designed to assist in the following tasks: organize, maintain and search applicant, job order and company files; provide recruiters with tools to help in daily planning, scheduling, interview tracking, etc.; maintain and print letters, resumes, reports, labels and envelopes; maintain interview information and provide valuable reports regarding applicants, clients and recruiters; provide management with financial reports regarding placements and analysis by recruiter; provide more quality phone time by reducing paperwork, filing and administrative overhead."

---

[93] See Westover Binder, Exhibit #5.

- "We pay the fees of Resummate, our designated supplier of our *proprietary* Professional Search software, for providing *initial training* in the software to you."

Elias Zinn's Temporary Staffing UFOC states that the franchisee is required to use the "employment service management software comprehensive resource management" for the Temporary Business as specified by Dunhill which is obtained from Allegro Software, Inc. The section continues, "These programs, provided to you by Dunhill, include work (job) order; search and retrieval; prospecting; integrated payroll and billing; accounts receivable; and worker's compensation (risk management) programs."[94]

Before entering into their franchise agreements, the Counterclaimants were promised verbally and in writing, that they would receive "state of the art", proprietary software to help them operate their business. Bud Westover testified that Robert Stidham told him that Dunhill used its own proprietary software called Resummate.[95] Bud also testified that he understood the term "proprietary" in this context to mean that it was exclusive to the Dunhill franchisees and the Dunhill company stores; that it was not available to anyone except for Dunhill offices.[96] He also testified that at his NFT training, Rick Kean, his instructor, was unable to use the Resummate software and was therefore unable to train Bud on the software. In fact, Bud testified that during his training session, Mr. Kean called Resummate several times in order to try to get assistance from them.[97] Bud further testified that the Resummate software he received was not installed as it had been promised by Dunhill and that it did not work properly.[98] Bud eventually gave up trying to figure out how to use Resummate and never did use it in his business.[99]

---

[94] See Zinn Binder, Exhibit #6, Pages 11-12.
[95] See TR from 1/22/07, Page 508.
[96] See TR from 1/22/07, Pages 537-538.
[97] Id at 533.
[98] See TR from 1/23/07, Page 772.
[99] See RE from 1/22/07, Page 537.

Bud also testified that he never received a Resummate training manual and that in January 2003 (six months after he purchased his franchise), he spoke to Rick Kean at a President's meeting and asked him when he could expect to receive the Resummate training manual. Mr. Kean responded that he didn't know, but then sarcastically added that Bud could ask him again.[100] It is undisputed that Dunhill never provided the Counterclaimants with any kind of Resummate training or user's manual.

Elias Zinn testified that at his November 1999 meeting with Dan Abramson, he was told by Mr. Abramson, in connection with the permanent placement franchise, that Dunhill had state-of-the-art proprietary software and that he would be provided with one computer loaded with this software "ready to go." Elias testified that Mr. Abramson said that he would be able to turn on the computer and be in business, that this software package was proprietary to Dunhill and that it was one of the reasons why we should buy a Dunhill franchise.[101] Elias testified that in his experience, which included working for a public company that had manufactured computers, he understood "proprietary" in this context to mean that "you couldn't find it anywhere else and you had to get support through Dunhill and it was theirs only."[102]

Elias testified that he and his partner, Mike Wilcoxson (who oversaw the permanent placement side of the business), had major problems with the Resummate software in connection with their permanent placement business. For example, Elias testified that the software they received could not be installed on their computer and so he and Mike had constantly asked Dunhill for software support for the Resummate package.[103] Elias testified that for basically two years, the software sat in the box unused as he and Mike kept waiting for Dunhill to provide them with a user's manual which never came.

[100] See TR from 1/22/07, Page 600.
[101] See TR from 1/24/07, Pages 984-985.
[102] Id at 985 and 986.
[103] See TR from 1/24/07, Pages 945-946.

Elias testified that he, through the FAC,[104] had asked for assistance with respect to software support and that Mike made several requests to Dunhill representatives, including Rick Kean, Jeff Rose (who was in charge of technology) and Sandy Watkins, a Dunhill trainer. But Dunhill never provided them with any training or user's manual. Elias testified that Rick Kean's response was always that he was working on the manual (and Elias reminded everyone that Rick Kean left Dunhill for about a year as a full-time employee and only worked on a limited basis as a consultant).[105] Elias explained that Jeff Rose told him that Dunhill was considering getting rid of Resummate and using a different software "so nothing happened there," and that Sandy Watkins "kind of shook his head and said it's a problem." Elias testified that in approximately 2003, he and Mike called Resummate directly and that its technical support staff provided them with assistance, sent them some "new modules" and that the software finally became operational.[106] Elias and Mike then had to purchase a training package for approximately $400.00.[107] Elias testified that from 2000 through 2003, his staff had no "resume based" software to operate his business and instead was stuck using a much inferior Microsoft Word program which was "ridiculous."[108]

With respect to his temporary staffing business, Elias testified that he also had serious problems with the software he received. He explained that the software was called "Maestro"[109] and that it was different from Resummate. Elias explained that the software was on the temporary staffing side was even "more critical" because on the temporary side of the business, the software also had to perform tasks relating to the employees' payroll and additional reports. He testified that

---

[104] Id at 989.
[105] Id.
[106] Id at 990.
[107] Id
[108] Id at 991.
[109] Id at 992.

he requested software support from Dunhill for his temporary business "probably 50 times" but to no avail.[110]

Elias testified that he was told by Tom Esposito, Dunhill's Vice President of the Temporary Division that the Maestro software package was "state-of-the-art," that it would work great and integrate with any computer system that he had and that he would be up and running immediately.[111]  Unfortunately, the reality was that Elias and his staff could not get Maestro online (operational) and as a result, they had to fax Dunhill the reports which would otherwise have been generated through the software program and accessible directly by Dunhill.  In a time consuming and cumbersome procedure, Elias and his staff had to manually list every employee (there were several hundred of them) and fax Dunhill the time records and social security numbers for all of the employees.[112]

Elias was told by Dunhill that it was going to get rid of the Maestro software package and use another system and that they would send training personnel to train his office staff.  But in 2002, Dunhill's accounting department told Elias to keep sending in the reports manually (as Dunhill had scrapped its plans to have its temporary staffing franchisees utilize a new software system).  However, by that time, Elias and Mike's temporary staffing business was "losing a considerable amount of money" and they decided to "de-emphasize" the temporary staffing side of their business.[113]

In Mr. Wolf's cross-examination of Elias, Mr. Wolf suggested to Elias that he could have "made an independent investigation" into whether or not the software was "state-of-the-art" or "proprietary."  On redirect, Elias testified that he did not believe that he was obligated or bound in any way to perform an independent investigation into the truth or accuracy of what he was told by

---

[110] Id at 947-948.
[111] Id at 992.
[112] Id.
[113] Id at 995.

Dunhill. Elias had met with Dunhill's President, Dan Abramson and Mr. Abramson had told him that Dunhill was a subsidiary of a public company which was traded on the NYSE. Elias testified that he had no reason to question or suspect that what he was being told was not correct and that he "presumed that what he was telling me was factual."[114] Similarly, Elias testified that he had no reason to suspect that the information he received from Tom Esposito was incorrect.[115] The fact of the matter is that before Elias and Mike purchased their Dunhill franchises, they had no reason to question or suspect that what Dunhill was representing to them (about anything, not just relating to technology and software issues) was not correct. Prospective franchisees have no legal obligation to perform such an "independent investigation." Dunhill, on the other hand, as a franchisor, *had a legal obligation* to <u>not</u> make any false or misleading representations which may induce prospective franchisees into purchasing franchises. As the evidence in this case has shown, Dunhill has repeatedly failed to comply with its legal obligations.

Mike Lamanna testified that he was told by Robert Stidham that he was going to receive a Dunstar proprietary software package and that this package had Internet and Intranet capabilities which would allow him to communicate with other Dunhill offices, and also be connected to the Internet and his database. Mike testified that Robert "played up" to his technology background (which is the industry Mike came from) and told him that Dunhill has the technology to help him to succeed.[116]

However, Mike testified that Dunhill's representations were untrue because he received Resummate as opposed to Dunstar and because he did not consider Resummate to be either state-of-the-art or proprietary in any way.[117] Mike testified that Resummate was a very difficult database

---

[114] Id at 1196-1197.
[115] Id at 1197.
[116] See TR from 1/29/07, Pages 1528-1529.
[117] See TR from 1/29/31, Pages 159-1530.

41

program to learn, especially without instruction or training, and that because he received no training or assistance from Dunhill, he was unable to use the Resummate software package.

Harvey Auger testified that he did not believe that Resummate was proprietary, as anyone could purchase it directly from Resummate's website. Harvey added that he relied on Dunhill's representations that he would receive proprietary, "state-of-the-art" software but that he did not.[118]

Dunhill, both verbally and in writing (in its UFOCs and the Brochure), represented to the Counterclaimants that they would be provided with "state-of-the-art" proprietary software. Dunhill failed to do so. The franchisees were promised Dunstar but they received Resummate. Resummate was a very difficult program to install (the Counterclaimants were told it would be installed for them) and operate, and Dunhill provided them with no training, no manual and no software support or assistance despite repeated requests. Neither Bud nor Mike could get the software package operational at all and they never used it. Elias, three years after purchasing his franchise, got Resummate operational through Resummate's (and not Dunhill's) assistance. Furthermore, Resummate was not "state-of-the-art." The program was not customized for their respective businesses and each franchisee had to customize the program to be efficient in his respective business. Elias and Mike Wilcoxson's Maestro software package on the temporary staffing side was another nightmare situation where the software program was not operational and his staff had to manually transmit information to Dunhill that it should have been granted access to through the software program. Dunhill's failure to provide Elias and Mike with software support with respect to Maestro was a major reason why their temporary staffing business failed.

The one person who testified in this case that he used Resummate and was happy to do so was Dunhill's witness, Neil Whitman. Of course, Mr. Whitman not only testified that he had experience

---

[118] See TR from 1/25/07, Page 1241.

developing his own software but he had even "won an international award for it."[119] Furthermore, he acknowledged that the Resummate program was not customized for his business and that he had to take additional steps in order to make it customized for his office.[120]

With respect to Dunhill's technology, Robert Stidham made a statement at the October 2002 FAC/DSS meeting in Baltimore in effect, acknowledging that Dunhill's technology was out of date.[121] The minutes reflect that Robert Stidham made the following statement, "We have an MDS system [monthly data reporting system] that requires investment and resources to configure to our website *and a website that is using a software language that has been dead for five years.*"[122] (Emphasis added)

8.    <u>National Advertising</u>

Each of the Counterclaimants were required to pay Dunhill 1% of his gross receipts, as an "advertising fee" under his respective (permanent placement) franchise agreement.[123]

As previously referenced, Page 8 of the Brochure states,

"The primary source of revenue for the franchisor, Dunhill Staffing Systems, Inc, is royalty. In consideration for the ongoing services that we provide, the Dunhill Professional Search (permanent placement) franchisee pays a royalty of 7% of revenue, *plus an additional 1% of revenue, which is dedicated exclusively to the support of our national advertising program.*" (Emphasis added)

On Page 5, the Brochure also states, "Marketing Services: Our *national advertising,* marketing, communications and public relations programs are available to promote your office and position you in your market." (Emphasis added)

Elias Zinn's (permanent placement) UFOC, Harvey Auger's UFOC, and Mike Lamanna's UFOC each state in Item 11, "The Franchisor's Obligation's" under the section headed "Advertising

---

[119] See TR from 1/30/07, Page 1810.
[120] See TR from 1/30/07, Page 1756.
[121] See TR from 1/22/07, Page 539.
[122] See Dunhill Exhibit #106 (Page 3 of 8 – end of 6th Paragraph)
[123] See Zinn Binder, Exhibit #7, Page 11; Auger Binder, Exhibit #6, Page 11; Lamanna Binder, Exhibit #8, Page 12; Westover Binder, Exhibit #7, Page 36.

and Promotion" the following: "Dunhill *will* expend the proceeds of the Advertising Fund for *national advertising*, publicity and promotions and activities."[124] (Emphasis added)

Item 11 of Bud Westover's UFOC, which was slightly modified, states in the section describing how Dunhill will administer its Permanent Placement Advertising Fund (the "Fund"), states,

> "We may use the Fund to meet all costs of administering, directing, preparing, placing and paying for *national*, regional or local advertising. This includes the *cost of preparing and conducting television, radio, magazine and newspaper advertising campaigns* and other public relations activities and the cost of employing advertising agencies."[125] (Emphasis added)

Bud Westover's franchise agreement, which also includes the sum and substance of the above statement from his UFOC, further states that, "You acknowledge that the Fund is intended to further general public recognition and acceptance of the Proprietary Marks for the benefit of the Dunhill System." [126]

It is clear from the above written provisions that Dunhill represented to the Counterclaimants that the 1% of gross receipts paid to Dunhill was to be spent on national and other advertising, or other promotion of the Dunhill name. While Counterclaimants acknowledge that their franchise agreements reserve to Dunhill, the right to choose the particular form of media or where the advertising dollars were to be spent, Dunhill was clearly obligated to provide national and other advertising which would have benefited the system generally, and therefore, would benefit each of the Counterclaimants, as well.

Elias Zinn testified that when, prior to purchasing his Dunhill franchises, he met with Daniel Abramson, Dunhill's then President, in November of 1999, he was told by Mr. Abramson that Dunhill was going to be placing national advertisements in two of the most widely read newspapers,

---

[124] See Zinn Binder, Exhibit #5, Page 20; Auger Binder, Exhibit #5, Page 20; Lamanna Binder, Exhibit #5, Page 23;
[125] See Westover Binder, Exhibit #5, Page 20.
[126] See Westover Binder, Exhibit #7, Page 36 (Section 9.04 B)

USA Today and the Wall Street Journal.[127]  Elias testified that this was an inducement to purchase the Dunhill franchise because Mr. Abramson told him that while the advertising might not benefit any particular office directly, all of the franchisees would benefit because the advertisements would discuss "Dunhill's strengths" in both the permanent placement and temporary staffing contexts.[128] Elias explained that Abramson said that calls would come into Dunhill's corporate headquarters and would then be sent to the specific Dunhill offices, which would obviously increase opportunities to generate additional revenues for those offices.  Bud Westover and Harvey Auger also testified that they relied on Dunhill's representations that they were going to provide national advertising.[129]

Each of the Counterclaimants testified that they never saw or were aware of any advertisements, national or otherwise, which were placed by Dunhill.[130]   This testimony is undisputed. Dunhill has not offered any testimony or other evidence that it placed even one advertisement, or spent $1.00 on any form of advertising (or brand promotion), whether it be in the national, regional or local context.

The lack of advertising was a frequent issue raised by the FAC, especially because the franchisees were never provided with statements of the Advertising Fund's revenues and expenditures. Elias Zinn testified that he was on the advertising committee of the FAC and that he and the advertising committee requested at every FAC/DSS meeting, copies of such Advertising Fund statements. However, no statements or reports were ever provided.[131]  Dunhill's failure to provide such statements is egregious because the UFOC which Dunhill provided to Bud Westover dated May 22, 2001, states:

---

[127] See TR from 1/24/07, Page 983.
[128] Id.
[129] Id at 842 (Westover); and See TR from 1/25/07, Page 1241 (Auger).
[130] See TR from 1/22, Page 542 (Westover); TR from 1/24/07, Pages 1033-1034 (Zinn); TR from 1/25/07, Pages 1241-1242 (Auger); and TR from 1/29, Pages 1531-1532 (Lamanna);
[131] See TR from 1/24/07, Page 1031 and TR from 1/25/07, Page 1206.

"We *must* distribute a *statement detailing advertising Fund income and expenses for the fiscal year to all Dunhill permanent placement franchisees within 120 days after the end of the Fund's fiscal year.*" (Emphasis added)

Therefore, Dunhill was <u>obligated</u> to provide <u>all permanent placement franchisees</u> with statements detailing the revenues and expenses of the Advertising Fund <u>beginning with the year 2001</u>. The fact that Dunhill refused to provide such statements, even when it was consistently being asked for them by the FAC's advertising committee, is truly egregious. It is undisputed that none of the Counterclaimants were provided with any such Advertising Fund Statements by Dunhill. As Dunhill was providing no advertising, we can, in retrospect, perhaps understand its unwillingness to disclose this information to its franchisees.

## IV.    **Dunhill's Franchise Advisory Council**

In this case, Dunhill seeks to avoid responsibility and liability for its egregious actions by trying to hide behind a provision in its various franchise agreements which provides that its franchisees are required to provide written notice to Dunhill, within one year, with respect to any alleged misfeasance or nonfeasance by Dunhill. However, in his opening statement in this case, Jeff Wolf acknowledged that this provision would only be applicable for alleged violations of the agreement or "post-agreement" misrepresentations.[132] Therefore, Dunhill's counsel acknowledges that this contractual provision is wholly inapplicable with respect to misrepresentations made by Dunhill representatives that were communicated to the Counterclaimants *prior to the time* that they entered into their respective franchise agreements. Furthermore, with respect to Dunhill's argument that this provision should bar the Counterclaimants from recovering with respect to their contentions that Dunhill breached its obligations, this technical argument should not prevail because sending Dunhill formal notices to cure was not reasonable or practical under the circumstances as set forth below.

---

[132] See TR from 1/18/07, Page 19, Lines 23-25 and Page 20, Lines 1-4.

As the testimony of the Counterclaimants, as well as the testimony of Mike Green (the former chairman of the FAC), indicated, the FAC functioned as the venue by which the franchisee base interacted with and resolved the issues and complaints the franchisees had with Dunhill's management. The Counterclaimants testified that they (and many other franchisees) conveyed their concerns and complaints to the FAC. For example, Bud Westover testified that he conveyed various complaints and concerns he had about the franchise system to Mike Green, then Chairman of the FAC and Dennis Garton, another FAC franchisee member. These complaints were with respect to problems such as the turnover of Dunhill's Presidents, the Exchange Program and the fact that he had not received a Resummate training manual.[133] (No franchisee received the Resummate training manual because Dunhill never provided one.)

Elias Zinn testified that from mid-2000 on there were various committees set up by Dunhill to improve the system through the FAC. He also testified that "there were many what were called emergency meetings because of all the problems, every meeting – we kept minutes of the meeting, either the Dunhill representative was there or by phone or they were there in person. And they were made aware of all the problems that we had from the Dunhill Staffing Systems from mid-2000 on."[134] He further testified that as a member of the FAC, he personally asked Dunhill to provide better President's training, consultant training (through the R.A.T.I.F.Y. Program) and software support.[135] Mr. Zinn also testified that he was on the technology committee and was asking Dunhill when the technology would be operational in order for the Exchange Program to be viable[136] and that the FAC had expressed its concern that the exchange rate was "well below" where it should be.[137] Elias testified that through these meetings, Dunhill was continuously made aware of all of the concerns that the FAC (and the franchise base) had and that a dialogue was always open with Dunhill corporate.

---

[133] See TR from 1/22/07, Pages 600-602
[134] See TR 1/25/07, Pages 1201-1202.
[135] See TR from 1/24/07, Pages 947-948.
[136] Id at 948.

When Elias was shown Item #8 on page Bates 009123 of Exhibit #14 of his binder (the Minutes of the October 2001 FAC/DSS meeting), he testified that John Mills, Dunhill's acting President, in response to the FAC's complaints that its input and concerns were not being heard by Dunhill, suggested at the October 2001 FAC/DSS meeting that the FAC committee chairpersons (for example, with respect to the following committees: Technology, Advertising, Training, and Office Growth) should have discussions with specific "go to persons" at Dunhill in order to better communicate regarding the various complaints raised by the FAC.[138]  Elias testified that:

> "The context was we complained that we had constantly been making these recommendations to Dunhill. All these things were not new. This had been happening for several years, and that we needed to have – if we have input this is input from the franchisees – we need somebody at corporate to get the input and do something about it, because we were tired of continuing to have these meetings and getting nothing done."[139]

Elias also testified that Dunhill Memoranda such as Dunhill's Exhibit #84 "President's Only Teleconference Report March 19, 2003" evidences the fact that Dunhill was well aware of all of the problems in the system as raised by the FAC. Elias testified that this particular document reflected what was discussed at an emergency meeting led by Rick Kean and which included a discussion of 12 key action items which were the "key points" that the FAC felt needed to be addressed at that time.[140] Elias testified that during his involvement with the FAC from the beginning of 2002 through "late 2003", there were approximately 8 FAC/DSS meetings, including those that were scheduled quarterly and a "couple" of emergency meetings.[141]

Elias testified that the minutes of all FAC meetings were sent in the regular course to all FAC members as well as to Dunhill's leadership.[142]  Mike Green, who testified he was an FAC member since 1998 and Chairman from 2002 through 2004, testified that after each combined FAC/DSS

---

[137] See TR from 1/24/07, Page 971.
[138] See TR from 1/24/07, Pages 974-977.
[139] Id at 976-977.
[140] Id at 1018-1028.
[141] See TR from 1/24/07, Pages 979-980.

meeting, where at least one member of Dunhill management was always present, the minutes of the meetings, which were prepared by the Secretary of the FAC, and which were reviewed by him as FAC Chairman together with some of the other FAC members, were then submitted to Dunhill's management, to be reconciled and approved by Dunhill management before they could be "published."[143]

From the testimony in the case, from the Counterclaimants as well as from Mike Green, it is clear that Dunhill, through its continuing interactions with the FAC, was made fully aware on a continuing and ongoing basis, for several years, of the wide range of serious problems and complaints that the franchise base had. From a practical standpoint, providing Dunhill with formal written "notices to cure" would have provided them with no information or "notice" that they did not, in fact, already have. The Counterclaimants tried hard to communicate their issues and complaints to Dunhill, and to work together with Dunhill in good faith, in order to make necessary changes and improvements and essentially, help save the Dunhill franchise system.

During the first half of 2004, each of the Counterclaimants, through their former counsel, Mr. Purvin, gave Dunhill written notice that they deemed their franchise agreements with Dunhill to be terminated for cause.

## V.    **The Individual Cases**

In prior sections of this brief, we have addressed many of the various false and misleading representations which Dunhill made to the Counterclaimants (and these representations and the underlying facts also represent breaches of contract as well), including, but not limited to oral false statements and misrepresentations, misrepresentations set forth in the Brochure and the UFOCs (and omissions therefrom) including those relating to such things as the Exchange Program; Dunhill being comprised of a growing, vibrant network of 150 offices that were there "to assist" new franchisees;

---

[142] Id at 978-979; also 968.

the number of permanent placement franchisees that were actually generating revenues; training (initial, ongoing and consultant), ongoing support and services, guidance and assistance; "state-of-the-art" proprietary software and technology; and national advertising.  We do not intend to reiterate these various points again, below.  However, there are additional, specific misrepresentations, false statements and omissions, which apply to the individual Counterclaimants, some of which may have been referenced above (and some of which also constitute breaches of contract), which should also be discussed.  We do so now.

1.    Specific Misrepresentations Made to (and/or Dunhill's Failures to Meet the Obligations Contained in its Franchise Offering re:) Bud Westover
        (Permanent Placement Franchise Agreement – July 2002)

       A.    Exchange Program.

       Bud Westover testified that prior to signing his Dunhill franchise agreement, Dunhill, by virtue of statements made by Robert Stidham and by statements set forth in the Brochure and in his Manual, represented to him that he could generate 25% to 35% in additional revenues by participating in the Exchange Program.[144]  A stated above, the Brochure stated that "Today, almost 25% of our placements are a direct result of the Exchange Network."    Bud's Manual also stated that:

> "While most national recruiting networks have some kind of interoffice applicant and job order referral process in place, *Dunhill is an industry leader in exchange, with some 25% of its revenues being generated through interoffice referrals – placements that otherwise would not have been possible. Dunhill is currently perfecting the first electronic exchange network* to be implemented in a major franchise organization, *a computerized system which will revolutionize the time frames for responding to urgent job orders and highly marketable candidates,* both regionally and nationwide."[145] (Emphasis added)

---

[143] See TR from 1/26/07, Pages 1468-1469.
[144] See TR from 1/24/07, Page 841; See Brochure, Page 4; and See Westover Binder Exhibit #10 (Bates 001870).
[145] See Westover Binder Exhibit #10 (Bates 001864).

Bud testified in detail about the flaws and problems relating to the Exchange Program. He also specifically, testified that Dunhill failed to provide him with any such "electronic exchange network" which was supposed to "revolutionize" time frames for making placements.[146]

When speaking about the oral and written misrepresentations made to him regarding the Exchange Program, Bud emphasized that "That was one of the major selling points in fact to get my business started and work with other people and I could find the candidates or the clients and not have to do both. So I was counting on that revenue stream coming in to get my business established."[147] Mr. Stidham referred to the Exchange Program as a "safety net."[148]

Bud also testified that Robert Stidham "went over" the Brochure with him (not that Mr. Stidham read the Brochure to Bud as was later mischaracterized by Dunhill at the hearings) at their first meeting and at that meeting, Mr. Stidham confirmed that Dunhill had 150 franchisees to assist him.[149] Bud's testimony was that he understood the references in the Brochure and Mr. Stidham's statements as to Dunhill having "150 offices to assist him" to be in connection with the Exchange Program and that they meant that all of Dunhill's offices participated in the Exchange Program. Bud also noted that his franchise agreement indicated that participation in the Exchange Program was required and that his President's Manual, which was given to him during his training which occurred before he signed his franchise agreement and therefore was part of Dunhill's franchise offering, stated in connection with the Exchange Program:

> "100% Participation – i.e., every Dunhill Permanent Placement Franchise and DPS Corporate have signed the Exchange Agreement." (Emphasis Added)

However, Bud testified that he later learned that neither Dunhill's temporary staffing offices nor its company owned offices participated in the Exchange Program.[150] Therefore, this left at most, the 90

---

[146] See TR from 1/22/07, Pages 573-574.
[147] Id at 534-535.
[148] Id at 525; See TR from 1/24/07, Pages 853-854.
[149] See TR from 1/24/07, Pages 524-525.
[150] See TR from 1/22/07, Pages 515-516.

permanent placement franchises who might have participated in the Exchange Program. However, as the testimony in the case clearly indicated, practically no permanent placement franchisees were actively participating in the Exchange Program because it was worthless. Bud testified that the job orders listed on the exchange network were over 2 years old and that he asked Rick Kean to "clean up" the network.[151] Rick Kean said he was "working on it," but he and Dunhill never fixed the problem. Bud testified that he did not generate any revenues at all from the Exchange Program.[152]

        B.     Protected Territory.

Bud testified that Dunhill had suggested to him that he initially operate a Dunhill permanent placement office and then later, expand into the temporary staffing business.[153] Bud testified that he attempted to follow this policy or "profile" of Dunhill as he referred to it. Bud testified that when he met with Robert Stidham in February 2002, he initially wanted to purchase the Arlington, Texas territory, but that Mr. Stidham told him that this was not possible because Dunhill already had an office in Arlington and that Dunhill's policy was that only one franchisee could operate in a "protected Territory." When Bud then asked if he could purchase the territory in Mansfield, Texas which is just south of Arlington, Mr. Stidham again told him that Dunhill already had an office in Mansfield. Bud testified that he discussed with Mr. Stidham the fact that he wanted to also operate a temporary staffing business "in the near future" after his permanent placement business was up and running.[154] Bud asked Mr. Stidham if he could purchase the portion of Tarrant County which included the Alliance Airport area, which Bud believed represented a great opportunity for the temporary staffing side of the business based on the amount of light industrial and light manufacturing work that was concentrated in that area. Mr. Stidham told Bud that there was no one

---

[151] Id at 519-520.
[152] Id at 517-518.
[153] Id at Page 598.
[154] Id at 591.

in that area and that he could have that territory.[155]  In approximately March of 2002, Bud paid Dunhill a $5,000.00 territory deposit in connection with said territory[156] and in July of 2002, he signed a Dunhill permanent placement franchise with respect to this "protected" territory (as described in his franchise agreement as Exhibit "A" and as set forth in the map that was introduced into evidence[157] (the Territory"), and at or about that time, signed an amendment to his franchise agreement setting forth Bud's "right of first refusal"[158] with respect to the operation of a Dunhill temporary staffing business within said Territory.[159]

Bud testified that in approximately the fall of 2002, he received several phone calls from prospective clients at his office and, after questioning them, soon realized that there was another Dunhill office operating within his Territory.  Bud determined that Andrew Barham, a Dunhill franchisee, was operating both a permanent placement and temporary staffing franchise from 669 Airport Freeway in Tarrant County, which was almost in the exact geographic center of Bud's Territory.[160]  At some point, but not later than 1999, Mr. Barham had moved his office from Downtown, Ft. Worth to the Airport Freeway address.[161]  Bud testified that within one week of his finding out that Mr. Barham was operating in his Territory, he contacted Jamie Owen, who is listed in Dunhill's October 2002 UFOC as the Director of Franchise Development,[162] about this problem.[163] Bud spoke to Ms. Owen several times about this problem and she promised that she would look into the matter and get back to him.  As far as Bud is aware, this matter was never addressed by Dunhill.[164] No testimony to the contrary was introduced in this case.

---

[155] Id at 591and 599.
[156] Id at 587.
[157] See Westover Binder, Exhibit #23.
[158] See Westover Binder Exhibit #8.
[159] See TR from 1/22/07, Pages 591-592
[160] Id at Page 593.
[161] See TR from 1/23/07, Page 611; and Westover Exhibit #25.
[162] See General Binder (Large), Exhibit #6, Page 3.
[163] See TR from 1/22/07, Page 594.
[164] See TR from 1/23/07, Pages 609-610.