Bud testified that the fact that Andrew Barham had been operating a Dunhill temporary staffing office in his Territory prevented him from going into the temporary staffing business.[165]  As was explained by witnesses on both sides of this case, the temporary staffing business, much more so than the permanent placement side, was based almost entirely upon having a local presence with local contacts.  The fact that Andrew Barham had been operating as a Dunhill temporary staffing business in Bud's Territory, essentially, made Bud's right of first refusal worthless and squashed his hopes (and rights) of having a Dunhill temporary staffing office within his own Territory.  Bud testified that his business plan all along, which Dunhill was well aware of, was that in addition to operating a permanent placement business, Bud wanted to also operate a Dunhill temporary staffing business from his Territory.[166]  That is why he gave so much though to the territory he ultimately selected and why he negotiated the right of first refusal in the first place.

Dunhill attempted to minimize its responsibility with respect to this issue by producing at the hearing (why it was not part of Dunhill's earlier production is a mystery) a letter agreement between Dunhill and Mr. Barham dated December 29, 2000 (the "Barham Agreement")[167]  However, Section 6(a) of this agreement clearly indicates that the term of Mr. Barham's Dunhill <u>permanent</u> placement franchise agreement was "deemed renewed for a term ending May 31, 2008." While section 6(b) indicates that Mr. Barham was given "no territorial protection whatsoever" (meaning that Dunhill was permitted to grant the territory which included the location where Mr. Barham was operating from to another franchisee), this in no way made it permissible for Dunhill to sell Bud a franchise with an exclusive territory while having previously granted another franchisee to operate a permanent placement office in that same territory.   Section 3.02 of Bud's permanent placement franchise agreement[168] (entitled "Our Restrictions") states:

---

[165] See TR from 1/22/07, Page 598.
[166] Id at 598.
[167] See Dunhill Binder, Exhibit #61.
[168] See Westover Binder, Exhibit #7, Page 5.

"*Within the Territory, we*, our corporate parent, and our and our parent's affiliates, subsidiaries and designees *will not* operate a Company Owned business of the type franchised under this agreement or *grant a franchise for the operation of a similar or competitive business*, so long as you are not in default under this Agreement and all other related agreements…" (Emphasis added)

Dunhill also tried to defend its position by arguing that Section 1 of the Barham Agreement indicated that Mr. Barham's <u>temporary</u> staffing franchise agreement was terminating two days after it was executed (i.e., on December 31, 2000).  However, the Barham Agreement excepted the post-termination restrictions by which Barham would otherwise have been bound.  Bud proved at the hearing, beyond any question that Mr. Barham was in fact, operating both a Dunhill permanent placement business ("Dunhill Professional Search") and a Dunhill temporary staffing business ("Dunhill Staffing Systems") within Bud's territory from at least 1999 and continuing through 2004. Bud produced and testified concerning the various Ft. Worth White Pages listings indicating Mr. Barham's Dunhill's temporary staffing business and permanent placement business were operating at the 669 Freeway Airport address which is within Bud's Territory.  Dunhill is charged with knowing where its franchisees are located before selling a franchise based on a franchise agreement containing an exclusive territory and granting a (meaningless) right of first refusal.

In any event, these facts are clear: (i) Dunhill sold Bud a Permanent Placement Franchise and a Right of First Refusal for a Temporary Staffing Franchise together with an exclusive, protected territory applicable to each; (ii) at the time that Dunhill sold Bud these franchise rights, Mr. Barham had the right to operate a Dunhill Permanent Placement Franchise within Bud's protected Territory; (iii) similarly, at the time Dunhill sold Bud these franchise rights, Mr. Barham had the right to operate a temporary staffing business within Bud's protected Territory, since Dunhill had canceled his post-termination restrictions; (iv) at the time that Dunhill sold Bud these franchise rights, Mr. Barham was actually operating both a permanent placement business and a temporary staffing business under the Dunhill name, within Bud's exclusive protected Territory; (v) none of these facts or circumstances

were disclosed to Bud at the time that he purchased his Dunhill Franchise and Right of First Refusal;

(vi) had he known of these facts or circumstances he would not have purchased his Dunhill Franchise;

(vii) These failures to disclose the above information and circumstances violated Bud's rights, his

franchise agreement, and obviated a meaningful part of the consideration that Bud had bargained for

in purchasing his Dunhill Franchise and Right of First Refusal.[169]

C.    Failure to Re-Disclose.

Dunhill has produced a signed receipt for the UFOC dated May 22, 2001 that Bud received on

February 28, 2002.[170]  However, Bud did not sign his franchise agreement until July of 2002.  The

UFOC dated May of 2001 which was delivered to Bud was "stale" as it was issued more than 1 year

before Bud signed his franchise agreement.    When Bud visited Dunhill's corporate offices in

Hauppauge, New York in March or April 2002, Dunhill recognized this and he was handed a

"current" UFOC by Robert Stidham in a conference room.  Bud testified that Robert gave him the

new UFOC but then took it back when they started walking around the office so that Bud could be

introduced to Dunhill corporate staff.[171]  Bud then explained that while he had initially planned on

going out to dinner with Robert Stidham and staying in New York that night, and then coming back to

Dunhill's headquarters the next day, Bud had to fly back to Texas that night to take care of personal

matters relating to his wife's mother's estate.  Bud testified that he told Robert Stidham of these

changes in plans and that Robert Stidham told Bud that he would mail him the current UFOC.

However, he never did so.[172]

Mr. Westover testified that in July 2002, he attended Dunhill's initial training at its

headquarters in Hauppauge, New York where he received his Dunhill President's Manual (Dunhill's

Operation's Manual).  Mr. Westover also testified that he underwent Dunhill's initial training and

---

[169] Even after Bud advised Dunhill that Mr. Barham was operating under the Dunhill name within Bud's exclusive, protected Territory, Dunhill did nothing to prevent him from doing so or to otherwise "solve" the problem.

[170] See Westover Binder, Exhibit #6.

[171] See TR from 3/7/07, Page 55.

therefore, received the President's Manual, <u>before</u> he signed his franchise agreement.[173]    Therefore,

any misrepresentations which are contained in Westover's President's Manual take on additional

significance as they were not only confirmatory documents which evidence failures by Dunhill to

comply with its obligations, but also represent additional inducements upon which Bud relied in

making his decision to purchase his Dunhill franchise.

Paragraph H on Page 18 of the section of the President's Manual (under the heading

"Consultant Prospect Selling Points") which was provided to Mr. Westover[174] indicates that:

> "While most national recruiting networks have some kind of interoffice applicant and
> job order referral process in place, *Dunhill is an industry leader in exchange, with
> some 25% of its revenues being generated through interoffice referrals - placements
> that otherwise would not have been possible.  Dunhill is currently perfecting the first
> electronic exchange network to be implemented in a major franchise organization,
> a computerized system which will revolutionize the time frames for responding
> to urgent job orders and highly marketable candidates, both regionally and
> nationwide.*"[175]   (Emphasis added)

Based upon the above representation in Bud's President's Manual, not only did Dunhill claim

to be an "industry leader" with respect to the Exchange Program, but it was also claiming to have

been "perfecting an electronic exchange network" that will "revolutionize the time frames for

responding to urgent job orders and marketable candidates." Bud testified that he was never provided

with any such electronic exchange network and that he relied on this representation together with

Dunhill's other representations regarding the Exchange Program (i.e., relating to expecting to

generate 25% to 35% of additional revenues).[176]

Section 6.1 of Bud's franchise agreement (entitled "Start-Up Training or Assistance") states

that within the first 6 months after you open your business Dunhill "will provide a representative to

assist and consult with you on matters relating to the operation of the business at your first Office for

---

[172] Id at 56.
[173] Id at 571.
[174] See Westover Binder Exhibit #10.
[175] See TR from 1/22/07, Pages 573-574; See Respondent Westover Exhibit #10 (Bates 001864).
[176] See TR from 1/22/07, Pages 573-574.

a period of not less than 5 business days which may not be consecutive, at our option." Bud testified

that he only received "at most 1½ days" of training within the first 6 months after opening his

business and that he complained to Dunhill.[177] Dunhill then sent Jamie Owen to complete the training

which Bud testified was ineffective.[178]

Dunhill communicated to Bud, both verbally and in the Brochure, that in the last 5 years

Dunhill had, on average, achieved a system wide revenue growth of 20% annually and had doubled

the revenues of the Dunhill organization.  As stated previously, Robert Freeman testified that

Dunhill's revenues declined from almost $67,000,000.00 in the year 2000 to approximately

$44,000,000.00 in the year 2001 to approximately $33,500,000.00 in the year 2002.[179]  The decline

from 2000 to 2001 represents a decline of approximately 35% and the decline from 2001 to 2002

represents a further decline of almost 25%.  Cumulatively, the decline in Dunhill's total revenues

from 2000-2002 was 50%.  The above representation by Dunhill was false and misleading and Bud

testified that he relied on this statement in making his decision to purchase his Dunhill franchise.[180]

On March 5, 2004, Bud, through his former attorney, Robert Purvin, provided written notice

to Dunhill that he deemed his franchise agreement with Dunhill to be terminated for cause.[181]  Bud

testified that he de-identified his business and ceased using the Dunhill name in April of 2004.[182]

Bud's losses from his Dunhill franchise were devastating.  He testified that he and his

deceased wife, Terrye, lost virtually all of their life's savings in this franchise and that, for all of the

time, effort, blood sweat and tears that they put into their Dunhill franchise, they got almost nothing

back.  Bud's despair was evident in his testimony when he was asked why he "continued this

---

[177] See TR 1/23/07, Pages 612-613.
[178] Id at 613.
[179] See TR 1/18/07, Page 201.
[180] See TR from 1/22/07, Page 513.
[181] See TR from 1/23/07, Pages 644-645; Westover Binder Exhibit #14.
[182] See TR from 1/22/07, Page 604.

business, why didn't you close it down?" He answered, "I can't afford to quit. I lost so much money. I need to try to recoup that any way I can."[183]

Summary of Damages (Bud Westover)

Based upon all of the foregoing, and pursuant to law, Bud Westover is entitled to damages consisting of his franchisee fee paid, additional capital investment, royalties paid, advertising fund fees paid and lost income (based upon the income he had been making before he purchased his Dunhill franchise). These damages total $1,194,476.58 (including interest) and are set forth in a summary schedule of damages annexed hereto as Exhibit #2 of the Submission Binder. In addition, pursuant to his claim under the Act, and otherwise, Bud is also seeking reimbursement for attorneys' fees and arbitration costs and expenses.

2. Specific Misrepresentations Made to (and/or Dunhill's Failures to Meet the Obligations Contained in its Franchise Offering re:) Mike Lamanna
(Permanent Placement Franchise Agreement – June 2001)

After Mike Lamanna first expressed interest in learning more about the Dunhill franchise opportunity, Joanne Naccarato sent him a form letter dated January 24, 2001 as part of its "comprehensive information kit."[184] This form letter which constitutes "sales literature" and which forms part of Dunhill's franchise offering, states the following:

- "We enjoy a *reputation as one of the most thorough and professional permanent and temporary employment services in the industry*, qualities that lend themselves well to *strong client relationships and repeat business*"; and

- "Our *professional and experienced staff* provides *unparalleled, continuous training, effective business development strategies and targeted research and development that help our franchisees realize their goals and potential. Ongoing support is provided, from specific placement strategies to growing a franchise office.*" (Emphasis added)

---

[183] See TR from 1/23/07, Page 642.

With respect to being granted a license to use the Dunhill trademark, Mike testified that he was told that the name had recognition. Mike further, testified that "the fact that they had a national advertising program and 150 offices and they were 50 years old was very intriguing to me."[185]  Mike subsequently learned that these representations were false.

Like Mr. Westover, Mr. Lamanna testified that he received his President's Manual before he purchased his Dunhill franchise.[186] Mike testified that he reviewed the Manual when he received it on June 11, 2001.[187]  Mike testified that prior to signing his Dunhill franchise agreement, Robert Stidham, represented to him that he could generate 25% to 40% in additional revenues by participating in the Exchange Program.[188]  Mike further testified that these representations were, in general, confirmed by the Dunhill Brochure and his President's Manual.[189]  Mike testified that at his first meeting with Robert Stidham on February 9, 2001, Mr. Stidham discussed "a lot of things that were in this Brochure, among them the Exchange Program."[190]  Mike testified that "what Robert and I discussed was the ability to start making placements immediately because candidates and job orders were placed on the Exchange or part of the Exchange Program. So I wouldn't have to start generating job orders from day one, I could use somebody else's job order to find a candidate and make a placement of what I thought would be immediately."[191]

Mike testified that with respect to the Exchange Program, "all along I heard 150 offices to assist me and growing."[192]  When asked what he understood the "150 offices to assist you" meant, Mike answered, "...the primary reason was the Exchange Program which was represented to me as

---

[184] See TR from 1/29/07, Page 1517; See Lamanna Binder Exhibit #15
[185] See TR from 1/29/07, Page 1531.
[186] Id at 1559.
[187] Id.
[188] See TR from 1/29/07, Pages 1542 and 1716;
[189] Id at 1522-1523, 1559-1560; Also see Page 4 of Brochure; and See Lamanna Binder Exhibit #12, Bates 003674.
[190] See TR from 1/29/07, Page 1524.
[191] Id at 1524-1525.
[192] Id at 1541.

one of the things that Dunhill had built up and was kind of exclusive to them."[193]  Mike also testified that "My thought is that 150 offices would be very similar to my office, and that we would have similar businesses. I did not know that there was a difference between a temporary office and a permanent office or a company owned office as far as assisting me."[194]  Mike's President's Manual, under the heading "The Dunhill Exchange," states:

> "100% Participation – i.e., every Dunhill Permanent Placement Franchise and DPS Corporate have signed the Exchange Agreement."[195]  (Emphasis added)

Mike testified that he later learned that neither the temporary staffing nor the company owned offices participated in the Dunhill Exchange Program.[196]  He further testified that he did not generate any revenues at all from the Exchange Program.[197]

Mike began his hearing testimony stating that his yearly compensation at Mita was $130,000.00 (which was prior to his employment at Hitachi).  Subsequent to Mike's first meeting with Robert Stidham (Dunhill's then Vice-President of Franchise Development) on February 9, 2001, Mike testified that he had indicated to Mr. Stidham that "I was really not ready to make the [career] change unless I could get a handle on what the costs and potential earnings could be from a venture like this. So I felt that I needed additional information to that perspective."[198]  Mike added, "Robert was aware of that, he knew what I had been earning.  And I told him I would be comfortable if I could get an approach that in a start-up approach; that sort of income in a start-up approach and he was trying to get me into a March training class at the time and I was not ready to move."[199]  Mike also

---

[193] Id at 1520.
[194] Id at 1546.
[195] See Lamanna Binder Exhibit #12 (Bates 003674).
[196] Id at 1545-1546.
[197] Id at 1523.
[198] Id at 1549.
[199] Id.

testified, "In addition to the representations he made, we had discussions about specific profits and specifically setting up the business. And at that time he also connected me to Sandy Watkins."[200]

On February 26, 2001, several months <u>before</u> he purchased his Dunhill franchise, Mike received a two (2) page fax from Dunhill which provided a projection and analysis of revenues, expenses and profits for his (future) Dunhill franchise.  Specifically, the document was a formal written proforma indicating expected revenues, expenses and profits (the "Proforma") under two (2) different scenarios (a "Conservative Case" and an "Expected Case") in connection with the first 12 months of operation of a Dunhill permanent placement franchise to be owned by Mike.[201]  In the Proforma's "Conservative Case" scenario, Dunhill represented to Mike that in the first twelve (12) months of operation, he could expect to generate revenues of $246,000 and have a profit of approximately $74,000.00.  In the "Expected Case" scenario, Dunhill represented to Mike that in the first twelve (12) months of operation, he could expect to generate revenues of approximately $345,000 and have a profit of approximately $131,000.00.[202]  Contrary to the "Expected Case" projections, Mike testified that over the initial twelve (12) month period of his business's operation, he had a loss of $634.00.  On what basis did Dunhill believe that Mike could generate a profit of approximately $131,000.00 in his first twelve (12) months?   We suggest that the number is not a coincidence and that it was because Mike told Robert Stidham that he had previously made $130,000.00 at Mita and that he was not comfortable moving forward unless he was confident that he would make a similar amount of money in his first year.  Dunhill gave him the projection that Mike needed to see in order to go forward.  Dunhill gave him the bait and Mike took it.

The Proforma's title is indicated as "Dunhill Professional Search of Irvine, California – Year 1, Michael Lamanna, President."  At the top of the Proforma, the fax number "949-858-7392" is

[200] Id at 1550.
[201] Id at 1550-1556; See Lamanna Binder Exhibit #6.
[202] See TR from 1/29/07, Pages 1552-1556.

62

indicated. Mike testified that he received the Proforma via fax at Hitachi at that fax number.[203]
During the case, Robert Stidham pointed out that the Proforma did not have a Dunhill "tag" or any
cover sheet. While this is true, there can be no doubt that the Proforma was faxed to Mr. Lamanna by
someone at Dunhill. Mr. Stidham testified quite clearly, that he was aware that providing Mr.
Lamanna with the information contained in the Proforma would have constituted a violation of FTC
Rules and Regulations with respect to making earnings claims.[204]  Therefore, it is not surprising that
whoever faxed Proforma to Mike made sure that the fax transmission contained no Dunhill "tag" or
cover sheet which would have clearly tied this illegal earnings claim to the Franchisor. In any event,
the way that we know that the Proforma came from Dunhill, beyond any reasonable doubt,  is that, as
was pointed out in the case by Mr. Rosen, the formatting of the facsimile's imprint on the top of the
Proforma's pages which indicates "FEB-26-2001 MON 10:41 AM    FAX NO.    P. 01 (and P. 02)"
matches and lines up identically with the formatting of the Barham Agreement[205] which indicates
"DEC-29-2000 FRI 03:08 PM    FAX NO.    P. 03 (through P. 07)" which Dunhill has produced and
admitted into evidence as a document that was faxed from Dunhill to its counsel's office, Kaufmann,
Feiner et al.  There can be no doubt at all that the Proforma was in fact, sent to Mike Lamanna on
February 26, 2001, by someone at Dunhill, from Dunhill's fax machine.

On June 8, 2004, Mike, through his former attorney, Robert Purvin, provided written notice to
Dunhill that he deemed his franchise agreement with Dunhill to be terminated for cause.[206]  Mike
testified that he de-identified his business and ceased using the Dunhill name in approximately the
middle of 2004.[207]

---

[203] Id at 1551.
[204] See TR from 3/6/07, Pages 118-119.
[205] See Dunhill's Exhibit #61.
[206] See TR from 1/29/07, Page 1562.

Summary of Damages (Mike Lamanna)

Based upon all of the foregoing, and pursuant to law, Mike Lamanna is entitled to damages consisting of his franchisee fee paid, additional capital investment, royalties paid, ad fund fees paid and lost income (based upon the income he had been making before he purchased his Dunhill franchise). These damages total $671,610.52 (including interest) and are set forth in a summary schedule of damages annexed hereto as Exhibit #2 of the Submission Binder. In addition, Mike is also seeking reimbursement for attorneys' fees and arbitration costs and expenses.

3.    Specific Misrepresentations Made to (and/or Dunhill's Failures to Meet the Obligations Contained in its Franchise Offering re:) Elias Zinn & Mike Wilcoxson
(Permanent Placement Franchise Agreement & Temporary Staffing Franchise Agreement – January 2000)

Elias testified that when he first contacted Dunhill, he communicated to Dunhill that he was interested in obtaining information about a Dunhill permanent placement franchise as he and Mike Wilcoxon was already considering purchasing a temporary staffing franchise from a company called TRC.[208]

Elias testified that when he met with Daniel Abramson in November 1999, Mr. Abramson's "sales pitch" was that Dunhill was a 50 year old company which would be growing to a $100 million company in sales by the end of 2001. Mr. Abramson told Elias that within the three years (i.e., by the end of 2002), Dunhill was going to open 40 new permanent franchises, 20 new temporary franchises and between 5 company owned offices.[209]   In April of 2000, Mr. Abramson essentially confirmed these numbers in writing when he distributed a memorandum setting forth Dunhill's "growth strategies" to the FAC Office Growth Committee Members.[210]   However, from the evidence in the case, we know that the number of Dunhill permanent placement franchises that were operating at the end of 1999 was 84, at the end of 2000 was 90 and at the end of 2001 was 85. We also know that of

---

[207] Id at 1580-1581.
[208] See TR from 1/24/07, Page 914.
[209] Id at 923, 956, 957.

those offices, barely one-third of them were actually generating revenues in excess of $60,000.00 per year. Further, in terms of revenues, Dunhill's revenues declined by 50% between 2000 (almost $67,000,000) and 2002 (approximately $33,500,000.00). What basis did Daniel Abramson have to make such unrealistic claims of projected growth, in terms of number of units as well as revenues, to prospective franchisees? None.

Elias testified that prior to signing his Dunhill franchise agreement, Dunhill, through Joanne Naccarato and the Brochure, represented to him and Mike Wilcoxson that they could generate between 25% to 35% in additional revenues by participating in the Exchange Program.[211] Elias also testified that Rick Kean told him that the Exchange Program was unique or proprietary to Dunhill and that MRI did not have such a system of exchanges.[212] Further, Elias testified that "it was clear" from his discussions with Ms. Naccarato and from the Brochure that he and Mike would be working with Dunhill's network of 150 offices in connection with the Exchange Program.[213] However, Elias later learned that none of Dunhill's temporary staffing or company owned offices participated in the Exchange Program.[214] Also, Elias testified that he was unaware until the hearings that participation in the Exchange Program was voluntary.[215] Elias testified that he and Mike generated no revenues from the Exchange Network during the years 2000, 2001, 2002 and the first half of 2002. In the second half of 2003 and in 2004 they made a few exchange placements through one contact that they had established with a Dunhill franchisee.[216]

---

[210] See Zinn Binder Exhibit #13
[211] See TR from 1/24/07, Pages 931and 937.
[212] Id at 936 and 938.
[213] See TR from 1/24/07, Pages 918-919.
[214] See TR from 1/25/07, Pages 1207-1208.
[215] See TR from 1/25/07, Page 1104.
[216] See TR from 1/24/07, Pages 961-962.

As previously stated, Elias testified about the inadequacy of Dunhill's technology and website in connection with the Exchange Program.[217]   When testifying about what he was told about the Exchange Program, Elias became animated and said,

> "So I mean I get upset about this because this was one of the main reasons why we bought a Dunhill franchise over other franchises; this sounded – and you got to take the date late '99, everything, the computer boom is going on; all the job boards are becoming and the world is changing. Dunhill didn't, but the world is changing and this sounded like this company had it together; it was going to be on the breaking end of the permanent placement business with this Exchange Program."[218]

Elias and Mike's temporary staffing franchise agreement obligates Dunhill to provide them with five (5) business days of "start-up assistance" at their office within the first 120 days of operation.[219]   However, Elias testified that he and Mike received no such start-up assistance from Dunhill.[220]

In the above section relating to "Proprietary Software," we set forth a fairly comprehensive summary of Elias' and Mike's horrific problems with both Dunhill's permanent placement software package (Resummate) and Dunhill's temporary software package (Maestro).  For the sake of brevity, we will not reiterate the points that were previously made.  Suffice to say, Dunhill's egregious failures to provide Elias and Mike with state-of-the-art proprietary software which could be installed and which actually functioned, coupled with the utter lack of any software support for years, had very serious negative ramifications for Elias and Mike's businesses.

As previously set forth above in the section relating to "National Advertising," Elias testified that Daniel Abramson's statements that Dunhill was going to run advertisements for Dunhill in such national newspapers such as the USA Today and the Wall Street Journal served as an inducement for Elias and Mike to purchase their Dunhill franchises.  This representation, when taken together with Mr. Abramson's projections about Dunhill's future growth in terms of numbers of offices and

---

[217] Id at 934.
[218] Id at 931.
[219] See Zinn Binder Exhibit #8, Section 8B.01 Page 16.

revenues, not to mention the promised training, proprietary software, and ongoing support and services, paints a false and misleading picture that differed greatly from what Dunhill's reality was.

In November 1999, Elias and Mike visited Dunhill's corporate headquarters in Hauppauge, Long Island. At one point, Joanne Naccarato, Dunhill's Director of New Business Development, took them into her office and told them that with the kind of business background they had, they would be extremely successful.[221] Then Ms. Naccarato said words to the effect, "let me show you some guys that don't have your business background and what they are doing."[222] She then pulled out a monthly data sales ("MDS") report (from either September or October 1999), which is a summary of the monthly revenues generated and reported to Dunhill by permanent placement franchises, and showed it to them and said that the permanent placement franchisees in North Carolina, the Martineaus, were "making millions" with Dunhill.[223] Then, still showing them the MDS report, Ms. Naccarato told Elias and Mike that the Emerson franchisees in Cherry Hill, New Jersey were "making millions" with Dunhill. And he told Elias and Mike that "you are going to make millions."[224]

With respect to the temporary staffing side, Elias testified that Tom Esposito, Dunhill's then National Director of the Staffing Division took him and Mike into his office to speak to them about the temporary staffing side of the business.[225] Elias testified that Mr. Esposito told them about why Dunhill was the premier agency in the temporary staffing business. Then Mr. Esposito pulled out a monthly data report with respect to the temporary staffing offices and told them that a temporary staffing franchisee in Long Island, New York, Phil Misserlian, was "making millions" in the temporary business, that Jerry Joseph, another temporary staffing franchisee (located in Texas), was also "making millions," and that various temporary staffing franchisees "are making millions and you

---

[220] See TR from 1/24/07, Page 943.
[221] See TR from 1/24/07, Pages 996-997.
[222] Id at 997.
[223] Id.; An example of an MDS report (from February 2000) is in Zinn's Binder, Exhibit #9.
[224] See TR from 1/24/97, Page 997.
[225] Id at 998.

can do that too."[226]  Mr. Esposito then made a statement to Elias and Mike to the effect that "these franchisees are no better than what you guys could do."[227]  Elias testified that he and Mike relied on the statements made to them by Ms. Naccarato, and Mr. Esposito, which were essentially illegal earnings claims, in making their decision to purchase their Dunhill permanent placement and temporary staffing franchises.[228]

Elias also testified that in June of 2000 (after he and Mike had purchased their Dunhill Franchises), he learned that both of the temporary staffing franchisees that Mr. Esposito had discussed with Elias and Mike, Mr. Misserlian and Mr. Joseph, had actually sued Dunhill and had been in litigation with Dunhill at the time that Elias and Mike had met with Mr. Esposito in his office before they purchased their Dunhill franchises.  Subsequently in the year 2000, both Mr. Misserlian and Mr. Joseph left the Dunhill system.[229]

Elias' testimony with respect to the representations that Joanne Naccarato and Tom Esposito made to him and Mike are uncontroverted.  Dunhill has failed to introduce any testimony or other evidence to contradict any aspect of this testimony.  In fact, we submit that the testimony of Dunhill's own franchisee witness, Neil Whitman, provides strong support for Elias' testimony and confirms that Joanne Naccarato provided illegal earnings claims to other prospective Dunhill franchisees.  Mr. Whitman testified that his initial contacts with Dunhill in the middle of July of 2000 were primarily with Joanne Naccarato.[230]  When Mr. Whitman was asked if he was given a marketing kit when he was considering purchasing his Dunhill franchise, he testified, "As I recall, they gave me a folder that had some information, it was a newsletter, with some of their sales collateral and a listing of their offices in what they call the MDS, which shows the listing by office and by consultant and who is

---

[226] Id.
[227] Id at 998-999.
[228] Id at 999-1000.
[229] Id at 999.
[230] See TR from 1/30/07, Page 1746.

doing what."[231]    There can be no doubt whatsoever that Ms. Naccarato improperly gave Mr. Whitman, a prospective franchisee, written information concerning actual or potential sales or income relating to a permanent placement franchise and that she evidently had a propensity for this type of illegal activity.

Furthermore, Robert Stidham testified that Joanne Naccarato had a number of personal problems and had been institutionalized after having a nervous breakdown.[232] Mr. Stidham testified that he had only worked with Ms. Naccarato for approximately three weeks, but that Dunhill had terminated her because "she had some real challenges with her personal skills with our internal staff" and that "there were problems with some of our franchisees."[233] Mr. Stidham added that it was his understanding that her personal problems had affected her job performance.[234]   Mr. Stidham acknowledged that "he would have no idea" whether or not Ms. Naccarato had made any kind of earnings claims to Elias and Mike (or to Harvey Auger as well).[235]

On June 8, 2004, Elias Zinn and Mike Wilcoxson, through their former attorney, Robert Purvin, provided written notice to Dunhill that they deemed their permanent and temporary franchise agreements with Dunhill to be terminated for cause.[236] Elias testified that he and Mike de-identified their business and ceased using the Dunhill name in the summer of 2004, prior to July 7th.[237] Elias also testified that as of the date of his testimony in this case, Dunhill had still not removed his and Mike's names from the Dunhill website,[238] notwithstanding numerous requests to do so by the Dunhill Respondent Trust's counsel since 2004.

---

[231] Id at 1747.
[232] See TR from 3/6/07, Page 47.
[233] Id at 46-47.
[234] Id at 48.
[235] Id at 168.
[236] See TR from 1/24/07, Page 1034; See Zinn Binder Exhibit #18.
[237] See TR from 1/24/07, Page 1037.
[238] Id.

Summary of Damages (Elias Zinn and Mike Wilcoxson)

Based upon all of the foregoing, and pursuant to law, Elias Zinn and Mike Wilcoxson are entitled to damages consisting of his franchisee fee paid, additional capital investment, royalties paid, ad fund fees paid and lost income (for each of them, based upon the income that they had been making before they purchased their Dunhill franchises). These damages total $1,256,983.56 (including interest) and are set forth in a summary schedule of damages annexed hereto as Exhibit #2 of the Submission Binder. In addition, Elias and Mike are also seeking reimbursement for attorneys' fees and arbitration costs and expenses.

4.    Specific Misrepresentations Made to (and/or Dunhill's Failures to Meet the Obligations Contained in its Franchise Offering re:) Harvey Auger
(Permanent Placement Franchise Agreement – October 2000)

Harvey Auger testified that his first contact with Dunhill in June or July of 2000 was with Joanne Naccarato and that most of his contact with Dunhill regarding the sales process was with her.[239]    Harvey testified that he received the Brochure from her and that he relied on the representations contained therein in making his decision to purchase his Dunhill franchise.[240]

Harvey testified that on at least one occasion, he told Ms. Naccarato that he had been earning approximately $250,000.00 per year and he asked her whether she thought he could earn that kind of money with a Dunhill permanent placement franchise. Harvey stated that she told him, adamantly, that yes he could.[241] (The arbitrator may recall that Harvey hit his arm on the desk to indicate duplicating the adamant gesture that Ms. Naccarato had made when she told him that he could make

---

[239] See TR from 1/25/07, Pages 1230-1231 and 1243.
[240] Id at 1233-1235, etc.
[241] Id at 1246, 1257-1258; At the hearings, there seems to have been some confusion as to when Harvey had a conversation with Pat Cacho, a Dunhill franchisee with respect to how much money he made. Harvey testified that he began receiving MDS reports from Dunhill after he became a franchisee in October 2000. Harvey also testified that after he was a franchisee and had been receiving Dunhill's MDS reports he noticed that his friend, Pat Cacho, another Dunhill franchisee, had been named in January 2001, Dunhill's President of the Year for the year 2000 (See TR from 1/25/07, Page 1268). It was after Harvey received the notification from Dunhill that Mr. Cacho had received this award, that Harvey called Mr. Cacho and heard from Mr. Cacho that he had made approximately $450,000.00 during the year 2000. Dunhill may argue that Harvey testified in his deposition that he learned that Mr. Cacho made $450,000.00 before he

approximately $250,000.00 per year.) Sadly for Harvey, he earned nothing during the time that he was a Dunhill franchisee (i.e., he received no salary or any other compensation for his efforts operating his Dunhill permanent placement franchise).[242]

In the year 2000, Harvey resided in Wilton, Connecticut with his wife. His son and daughter-in-law also resided in Connecticut. When Harvey became interested in purchasing a Dunhill franchise, he asked Joanne Naccarato if he could open an office in Connecticut. She responded that there was nothing available in Connecticut because Dunhill was opening an office in Norwalk, Connecticut. She told him that there were however, opportunities in the South and she gave him a list of cities there.[243]

After speaking with Ms. Naccarato, Harvey agreed with her that the temporary staffing market was growing very rapidly and that there was a lot of money to be made in the temporary staffing business. Ms. Naccarato told Harvey that that if he purchased a permanent placement franchise (in the South), he would then be permitted to operate a temporary staffing business as well, through a new Dunhill program called "Dunhill 2000."[244] She explained to Harvey that Dunhill 2000 was a program whereby Dunhill permanent placement franchisees would be able to also operate a temporary staffing business from the same office location.[245] She told Harvey that the program was not yet available but that it was due out within six months. Harvey testified that he relied on Ms. Naccarato's statements that the Dunhill 2000 program would be available within six months of when he signed his franchise agreement.[246]

Harvey's UFOC states the following:

"Dunhill intends to launch a new franchise product, known as 'Dunhill 2000' sometime

---

purchased his Dunhill franchise. That is not accurate. Harvey never learned how much money Mr. Cacho was making or made as a Dunhill franchisee until after Harvey became a franchisee.

[242] Id at 1258 and 1321.
[243] Id at 1248-1249.
[244] Id at 1249-1251.
[245] Id at 1250-1251, 1263-1264.
[246] Id at 1251.

in the year 2000. Under the Dunhill 2000 franchise, the Dunhill franchisee will operate
a full service staffing business offering professional search (permanent placement),
professional staffing (temporary help – professionals) and commercial staffing
(temporary help – nonprofessionals) services."[247]

Harvey was "on board" with the "one-stop shop" concept[248] and based upon Ms. Naccarato's

statements to him and the above statement in the UFOC, Harvey reasonably relied on Dunhill's

representations that he would be offered a temporary franchise (shortly) after purchasing a permanent

placement franchise.

While permanent placement franchises can be located virtually anywhere because the local

workforce is not a factor, Harvey chose the location of Charlotte, North Carolina, very carefully

because he wanted to operate from a geographic area which had a growing business market with

many opportunities for temporary staffing.  Based upon the representations made to him by Dunhill

that he would be permitted to operate a temporary staffing business in addition to the permanent

placement business in Charlotte, North Carolina, Harvey purchased his Dunhill permanent placement

franchise and relocated his entire family (Harvey, his wife, and his son and daughter-in-law) to

Charlotte.  Harvey's son was looking for a good business opportunity and welcomed an opportunity

to work with his father.

As it turned out, Dunhill never introduced the "Dunhill 2000" program[249] and Dunhill never

permitted Harvey to operate a temporary staffing business.  Harvey was stuck doing only permanent

placements, which he could have done from any geographic location[250] (including his home in

Connecticut).  Harvey had agreed to uproot himself and his family and move to Charlotte, North

Carolina, based upon Dunhill's representations that he would be permitted to operate a temporary

staffing business.  These representations proved to be false.

---

[247] See Auger Binder Exhibit #5, Page 4 (2nd full paragraph).
[248] See TR from 1/25/07, Pages 1244-1245.
[249] Id at 1267.
[250] Id.

Harvey testified that prior to signing his Dunhill franchise agreement, Dunhill, through Joanne Naccarato and the Brochure, represented to him that he could generate at least 25% in additional revenues by participating in the Exchange Program.[251] Harvey testified that this representation was "critical" and was "huge for me" because he was new to the employment staffing industry and he believed that there was a network of 150 offices that were there to assist him in making sure that he had at least a "base of business" to sustain him, a base of business that would be generated from the Exchange Program.[252] When he was asked whether he relied on the representation in the Brochure that he could expect to generate 25% in additional revenues from the Exchange Program, Harvey testified "I certainly did."[253] Harvey testified that he was looking to create a "one-stop shop" for his clients and that based upon Dunhill's representations regarding the network of 150 offices which were there to assist him and the Exchange Program, he believed that he would be able to tell his clients to call him with any kind of job order they had, regardless of specialty, and that he would be able to locate a suitable candidate for them.[254]

Harvey testified that the number of offices actually participating in the Exchange Program was important to him because the greater the number of offices participating, the "bigger my opportunity is."[255] Harvey further testified that he did not learn before becoming a franchisee that neither Dunhill temporary staffing offices or company owned offices participated in the Exchange Program.[256] Unbeknownst to Harvey, this left a maximum of 84 permanent placement franchisees which could be participating in the Exchange Program assuming 100% participation and assuming that all offices were actively generating revenues and making placements. However, as the testimony in this case showed, this was not the case. Of course, Harvey later realized that Dunhill's technology for the

---

[251] Id at 1234, 1235, 1238;
[252] Id at 1238.
[253] Id.
[254] Id at 1244-1245.
[255] Id at 1239.
[256] Id.

Exchange Program was so inadequate and that the job orders and candidates listed were so out of date, that practically no one was generating revenues from the Exchange Program. Harvey testified that he generated no revenues whatsoever from the Exchange Program while he was a Dunhill franchisee.[257]

Harvey testified that he relied on Dunhill's representations regarding their training and ongoing support.[258] Harvey stated, "It was very critical for me because of my son joining me, the training and the support ongoing was critical."[259] As described in the above section relating to training, Harvey testified that his NFT training was a "big disappointment to me not only on behalf of my son but on behalf of me." Harvey felt that the initial training did not focus on the new technology that was emerging at that time in the industry and that it did not prepare him to set up and operate his office successfully. Harvey concluded that his NFT training experience was a "disappointment in many, many ways and my summary evaluation said that to Dunhill."[260]

Harvey relied on all of Dunhill's representations and promises and, having relocated his entire family to a new and different part of the country to operate his Dunhill franchise, Harvey was under a tremendous amount of stress and pressure to succeed. However, not only did he not succeed, but he made not one penny from his Dunhill franchise. The pressure and stress of the failure of his Dunhill Franchise was too much for Harvey and he suffered a severe heart attack in May of 2001. Harvey testified that he believed that the stress that Dunhill created for him directly contributed to his health problems and was a cause of his heart attack.

On March 9, 2004, Harvey, through his former attorney, Robert Purvin, provided written notice to Dunhill that he deemed his franchise agreement with Dunhill to be terminated for cause.[261] Harvey testified that in April of 2004, he closed his office, moved his office to his home, changed the

---

[257] Id at 1241.
[258] Id at 1235.
[259] Id.
[260] Id.

phone number and the fax number but probably did not complete the de-identification process until approximately September of 2004.[262]

At this time, we would like to remind the arbitrator that in addition to the bulk of Harvey's testimony which was given on January 25th and 26th, Harvey also testified relating to his tax returns and the damages that he has suffered in connection with his case on January 30th.[263]

Summary of Damages (Harvey Auger)

Based upon all of the foregoing, and pursuant to law, Harvey Auger is entitled to damages consisting of his franchisee fee paid, additional capital investment, royalties paid, advertising fund fees paid, lost income (based upon the income he had been making before he purchased his Dunhill franchise) and unreimbursed medical expenses. These damages total $1,551,997.52 (including interest) and are set forth in a summary schedule of damages annexed hereto as Exhibit #2 of the Submission Binder. In addition, Harvey is also seeking reimbursement for attorneys' fees and arbitration costs and expenses.

## VI.    **Legal Argument**

The testimony and evidence in this case prove that Dunhill has violated and breached the Counterclaimants' rights, under a variety of legal theories, including franchise statutory law as well as common law. These include: (i) Dunhill violated various provisions of New York's Franchise Sales Act[264] (the "Act") and the Federal Trade Commission Franchise Rule[265] (the "FTC Rule"); (ii) Dunhill's conduct constituted common law fraud; (iii) Dunhill breached and failed to comply with its obligations with respect to its franchise offering; (iv) Dunhill's wholesale failure to provide what it

---

[261] Id at 1271-1278; Auger Binder Exhibit #12.
[262] Id at 1278.
[263] See TR 1/30/07, Pages 1727-1732.
[264] See McKinney's Consolidated Laws of New York, General Business Law, Chapter 20, Article 33, Franchises. A copy of the full text of the statute is included in Respondent Franchisees Trust's Post-Hearing Submission Binder (the "Submission Binder"), Exhibit #4.
[265] See Code of Federal Regulations, Title 16, Chapter I, Subchapter D, Part 436 (16 CFR 436). A copy of the full text of the FTC Rule is included in the Submission Binder, Exhibit #5.

obligated itself to provide constituted a failure of consideration; and (v) Dunhill's conduct breached the implied covenant of good faith and fair dealing which is implied into every contract under New York law. As will be shown below, each of the Counterclaimants is entitled to damages from Dunhill as well as rescission of each of his Dunhill franchise agreements based upon Dunhill's conduct. The Counterclaimants successfully proved the elements of each of the above counterclaims at the hearing.

1.      The New York Franchise Sales Act and the FTC Rule.

Dunhill's panoply of misrepresentations, untrue statements and omissions which were made to the Counterclaimants violated the New York Franchise Sales Act (the "Act") as well the FTC Rule. The Act, which was enacted in June of 1980 with an effective date of January 1, 1981, is a broad remedial statute intended to prevent fraud and curb abuses in connection with the sale of franchises in New York or which originate from New York. The Act's "legislative findings and declaration of policy" states, among other things, that "it is the intent of this law to prohibit the sale of franchises where such sale would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled."[266] The Act, as a remedial statute, must be liberally construed to effectuate the legislature's intent. See *A.J. Temple Marble & Title, Inc. v. Union Carbide Marble Care, Inc.*, 162 Misc. 941, 951, 618 N.Y.S.2d 155, 161 (Sup. Ct.1994).[267]

The FTC Rule which was promulgated in July of 1979 with an effective date of October 21, 1979, was adopted in response to widespread evidence of deceptive and unfair practices in connection with the sale of the types of franchised businesses covered by the Rule. These practices often occur when prospective franchisees lack a ready means of obtaining essential and reliable information about their proposed business investment. This lack of information reduces the ability of prospective franchisees either to make an informed investment decision or otherwise verify the representations of the franchisor's salespersons...The Rule requires disclosure of material facts. It does not regulate the

---

[266] See GBL §680.

substantive terms of the franchisor-franchisee relationship. It does not require registration of the offering or the filing of any documents with the Federal Trade Commission in connection with the sale of franchises.[268]

A.     <u>Illegal Earnings Claims</u>

Section 683(2)(o) of the Act states that if the Franchisor makes a representation to the prospective franchisee of estimated or projected franchisee earnings or income, the Franchisor's UFOC must provide "a statement setting forth the data, methods and computations upon which such estimate or projection is based."

The FTC Rule "<u>prohibits earnings representations about the actual or potential sales, income, or profits of existing or prospective franchises unless</u>: (i) reasonable proof exists to support the accuracy of the claim; (ii) the franchisor has in its possession, at the time the claim is made, information sufficient to substantiate the accuracy of the claim; (iii) the claim is geographically relevant to the prospective franchisee's proposed location (except for media claims); and (iv) <u>an earnings claim disclosure document is given to the prospective franchisee at the same time that the other disclosures are given</u>"[269] (Emphasis added). Further, as part of the "reasonable proof" element, the FTC Rule requires that the franchisor is obligated to disclose the fact that it is in possession which constitutes a reasonable basis for such representation and that such material is available to the prospective franchisee.[270]

Further, the FTC Rule mandates that all UFOCs contain a reference to "earnings claims" in Item 19 therein.  Specifically, the FTC Rule states, "An <u>earnings claim made in connection with an offer of a franchise must be included in full in the offering circular and must have a reasonable basis</u>

---

[267] See Submission Binder Exhibit #8.
[268] See FTC Summary of the Franchise Rule (Introduction) (CCH) ¶6021, which is included in Submission Binder Exhibit #6.
[269] See C.F.R. §436.1(C) Earnings Claims (CCH) ¶6024; This page is included in the Submission Binder Exhibit #6.
[270] Id at (CCH) ¶6133 (See Exhibit #6).

at the time it is made. If no earnings claim is made, Item 19 of the offering circular must contain the negative disclosure prescribed in this instruction"[271] (Emphasis added).

As the testimony showed, Item 19 of each of the UFOCs which Dunhill provided to the Counterclaimants states, in almost identical language, the following representation:

> "Dunhill does not furnish or authorize our salespersons or anyone else to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of a franchised Dunhill business. Actual results vary from unit to unit and we cannot estimate the results of any particular franchise."

It is undisputed that in this case, Dunhill failed to provide any of the Counterclaimants with any earnings claim disclosure document at the time that Dunhill provided them with UFOCs. Contrary to the above provisions of the Act, the FTC Rule and Item 19 in each of the Counterclaimants' UFOCs, Dunhill did, in fact, provide the Counterclaimants with various earnings claims which are illegal and improper under applicable law. It is also abundantly clear that Dunhill had no "reasonable proof to support the accuracy of the claim" and did not "have in its possession, at the time the claim is made, information sufficient to substantiate the accuracy of the claim." Dunhill's various illegal and improper earnings claims are set forth below.

1. The Exchange Program.

Dunhill's various oral and written statements and representations relating to the Exchange Program, including: (i) the statement contained in the Brochure that "Today, almost 25% of our placements are a direct result of the Exchange Network; (ii) the verbal statements made by Joanne Naccarato to Harvey Auger, and to Elias Zinn and Michael Wilcoxson, and the verbal statements by Robert Stidham to Michael Lamanna and to Bud Westover, regarding how much additional revenues each of them could expect to generate by participating in the Exchange Program; and (iii) the statement contained in the President's Manuals that the Exchange Program is a set of procedures "and

---

[271] See FTC Rule – Guidelines (1993) for Preparation of the UFOC, Item 19 Earnings Claims (CCH) ¶5750 et al., included in Submission Binder, Exhibit #7.