a tradition of successful transactions and relationships which have allowed Dunhill Franchisees to generate 25% in additional revenues through shared resources over the past 15 years," have already been discussed in detail.

It is clear from the testimony and evidence in this case, that Dunhill's various statements and representations constitute oral and written earnings claims which are prohibited under §683(o) of the Act, as they were "representations of estimated or projected franchisee earnings or income" with respect to how much (additional) revenue each of the Counterclaimants could expect to generate as a Dunhill franchisee by participating in the Exchange Program.   As such, these statements and representations also violate the above referenced provisions of the FTC Rule. As set forth previously herein, Dunhill the evidence in this case clearly showed that these earnings claims wee false and that Dunhill had no reasonable basis to believe that they were true.   There can be no question that Dunhill made illegal and improper earnings claims to each Counterclaimant in connection with how much revenue each of them could generate through the Exchange Program.

Material.

The testimony in this case clearly indicates that Dunhill's statements and representations to the Counterclaimants with respect to how much they could expect to generate in additional revenues was an important and "critical" part of why they purchased their Dunhill franchises. The Counterclaimants each testified that they had no prior experience in the staffing industry and that they had concerns about generating revenues, especially in the short term, while they had to learn the business.   They further testified how they relied on the fact that they would, in fact, be generating significant revenues from the Exchange Program.

The FTC Rule states that the "terms 'material, 'material fact, and 'material change' shall include any fact, circumstance, or set of conditions which has a substantial likelihood of influencing a reasonable franchisee or a reasonable prospective franchisee in the making of a significant decision

79

relating to a named franchise business or which has any significant financial impact on a franchisee or prospective franchisee"[272]. "Material" information is information that a reasonable prospective franchisee or that a reasonable investor would consider significant in evaluating the "total mix" of available information relating to a transaction. See *United States v. Building Inspector of America*, 894 F. Supp. 507 (D. Mass. 1995);[273] *Enservco, Inc. v. Indiana Securities Division*, 623 N.E.2d 416 (Ind. 1993).[274] There can be no doubt that Dunhill's statements and representations with respect to the revenues that they could generate through the Exchange program was information that a reasonable prospective franchisee would consider significant in evaluating the "total mix" of the franchise opportunity. Dunhill's statements and representations were clearly "material."

Willful.

For purposes of the Act, "willfulness" has been held to mean no more than voluntary or intentional, as opposed to inadvertent. See *Reed v. Oakley*, 172 Misc.2d 655, 661 N.Y.S.2d 757 (1996).[275] There can be no doubt that Dunhill's statements and representations regarding the Exchange Program were made with the intent to induce the Counterclaimants to purchase their Dunhill franchises. These statements and representations were clearly used as a marketing tool in order to create the belief that Dunhill franchisees could generate significant revenues quickly, while they were still learning the business. Dunhill's statements and representations were made by Joanne Naccarato, and Robert Stidham, and of course, were also contained in the Brochure as well as in the President's Manuals. Dunhill communicated its various statements and representations to the Counterclaimants as a marketing tool. Furthermore, there can be no question that Dunhill knew that it was violating the law by providing the Counterclaimants with information relating to earnings of existing and prospective Dunhill franchisees.

---

[272] See FTC Rule §436.2(n) (CCH ¶6182) included in Submission Binder, Exhibit #5.
[273] See Submission Binder Exhibit #9.
[274] See Submission Binder Exhibit #10.
[275] See Submission Binder Exhibit #11.

Further, it is inconceivable that Dunhill and every individual with any involvement in Dunhill's franchise sales process, including, but not limited to, Joanne Naccarato and Robert Stidham did not know that the FTC (and most assuredly the Act) prohibited Dunhill from making any statements to prospective franchisees relating to the actual or potential sales, income or profits of existing or prospective Dunhill franchisees.    Indeed, Robert Stidham testified that he clearly understood the prohibitions relating to statements to prospective franchisees regarding earnings claims. Mr. Stidham testified, "Simply put, franchise companies are specifically barred from talking about revenues, expenses or profitability of their units without filing within the Uniform Franchise Offering Circular an Item 19 filing. There's no ability to speak to those issues unless that filing is done, and if it is done, the franchisor may only speak about those topics, again, revenues, expenses and profitability, in the context of that earnings claim."[276]    There can be no question that Dunhill's violation of the Act and the FTC Rule was intentional, and therefore, willfull.

2. <u>Other Earnings Claims</u>.

As discussed in some detail in Section V(2) above (relating to the specifics of Mike Lamanna's case), Dunhill provided Mike with a two page written, Proforma which set forth the <u>projected revenues, expenses and profits for Mike's Dunhill franchise, on a month by month basis for the first year of operation, under two different scenarios, one "expected" and one "conservative."</u>[277] The "bottom line," so to speak of what the Proforma indicates, is that under the "expected" scenario, Mike could expect to earn profits of approximately $131,000.00 in his first year of operation, and approximately $74,000.00 under the "conservative" scenario. On its face, the Proforma constitutes a <u>clear example</u> of the kind of earning claim/projection that is strictly prohibited by the Act and by the FTC Rule.

---

[276] See TR from 3/6/07, Page 19.
[277] See Lamanna Binder Exhibit #6.

. Elias Zinn and Mike Wilcoxson also received illegal and improper earnings claims from Dunhill. As discussed in Section V(3) (relating to the specifics of Elias Zinn and Mike Wilcoxson's case), they were shown, both by Joanne Naccarato and Tom Esposito, copies of Dunhill's Monthly Data Sales ("MDS") reports indicating the revenues that were generated by several top producing franchisees (on both the permanent and temporary sides of the business), and told that with their business experience, they will "make millions of dollars" just like the particular franchisees who Ms. Naccarato and Mr. Esposito referenced, were supposedly making. It is clear that Ms. Naccarato and Mr. Esposito's conduct of showing Elias and Mike the MDS reports and making the verbal statements that they did (which were not refuted in any way and which in fact were supported by Mr. Whitman's testimony that he also received MDS reports from Ms. Naccarato), are "representations of estimated or projected franchisee earnings or income" and therefore, constitute earning claims/projections that are strictly prohibited by the Act and by the FTC Rule.

Finally, Harvey Auger was also the recipient of an illegal and improper earnings claim. Harvey testified that he told Joanne Naccarato that he had previously earned $250,000.00 and that when he had asked her whether she thought that he could earn $250,000.00 as a Dunhill franchisee. She adamantly told him, that yes, he could. Ms. Naccarato's statement to Harvey was a "representations of estimated or projected franchisee earnings or income" and therefore, constituted an earnings claim/projection that is strictly prohibited by the Act and by the FTC Rule.

Material and Willful.

There can be no doubt that the earnings claims described above were both material and willful from the perspective of the Counterclaimant who received the particular statement or misrepresentation. Clearly, with respect to the written Proforma which was provided to Mike Lamanna, there can be no doubt at all, that this document was both willful and material. The Proforma, which indicated among other things that he could "expect" to earn approximately

$130,000.00 in the first year of operation, was clearly intended to induce Mike into going forward and purchasing his Dunhill franchise. Of course, it was material, because it was, in fact, a major reason why he did go forward and purchase his Dunhill franchise. Similarly, with respect to the conduct of Joanne Naccarato and Tom Esposito showing Elias and Mike Wilcoxson the MDS reports and telling them they "can make millions" like various existing franchisees were allegedly doing, and Joanne Naccarato's statements and assurances to Harvey Auger that he could earn $250,000.00 a year, were both material and willful inducements on Dunhill's part.

Additionally, Dunhill's violation of the Act and the FTC Rule in connection with these "other earnings claims" was intentional and therefore, willful. As stated above, there can be no question that individuals such as Joanne Naccarato, Tom Esposito, Robert Stidham and Sandy Watkins knew about the prohibitions in the Act and the FTC relating to the providing of earnings claims to prospective franchisees. Further, there is a definite pattern here, where Dunhill's sales representatives were repeatedly willing to flout the law in order to sell franchises. These earnings claims, which were false and for which Dunhill had no reasonable basis to make them, went to the heart of why someone makes an investment in a new business – to make money, and they induced inducing the respective Counterclaimants to purchase their respective Dunhill franchises. There can be no doubt that Dunhill's franchise sales representatives intentionally and willfully violated the Act and the FTC in providing the Counterclaimants with these "other" earnings claims.

2.    <u>Fraudulent and Unlawful Practices Under the Act and Unfair or Deceptive Acts or Practices Under the FTC Rule.</u>

Pursuant to the Act, it is unlawful for any person to violate any provision of this article, or any rule of the Department of Law promulgated hereunder...[278]  The Act, in pertinent part, expands the definition of common law fraud or deceit, by expressly stating that "fraud," "fraudulent practice," and "deceit" shall include the following:

"(a) Any deception, concealment, suppression, device, scheme, or artifice employed by a franchisor, franchise sales agent, subfranchisor or franchise salesman to obtain any money, promissory note, commitment or property by any false or visionary pretense, representation or promise;

(b) Any material misrepresentation in any registered prospectus filed under this article; or

(c) The omission of any material fact in any registered prospectus filed under this article."[279]

Section 687 of the Act (which is entitled "Fraudulent and Unlawful Practices") states:

"2.  It is unlawful for a person, in connection with the offer, sale or purchase of any franchise, to directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud.

(b) *Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.* It is an affirmative defense to one accused of omitting to state such a material fact that said omission was not an intentional act.

(c) Engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person" (Emphasis added).

The FTC Rule provides that "It is an unfair or deceptive act or practice within the meaning of

§5 of the Federal Trade Commission Act for any franchisor or franchise broker:

1.  to *fail to furnish prospective franchisees, within the time frames established by the Rule, with a disclosure document containing information containing information on 20 different subjects relating to the franchisor*, the franchise business and the terms of the franchise agreement;

2.  to make *any representations about the actual or potential sales, income, or profits of existing or prospective franchises except in the manner set forth in the Rule*;

3.  to make *any claim or representation (such as in advertising or oral statements by salespersons)* which is *inconsistent with the information required to be disclosed by the Rule*"[280] (Emphasis added).

Furthermore, the testimony in this case showed that each of the UFOCs provided to Counterclaimants

provides (on the second to last page, immediately before the form of "UFOC Receipt"), that:

"Dunhill Staffing Systems, Inc. hereby represents that this Offering Circular does not knowingly omit any material fact or contain any untrue statement of a material fact."

---

[278] See GBL §687(3) which is included in Submission Binder Exhibit #4.
[279] See GBL §681(10) which is included in Submission Binder Exhibit #4.
[280] See FTC Summary of the Franchise Rule (CCH) ¶6025 which is included in the Submission Binder, Exhibit #6.

A.    <u>Exchange Program.</u>

Dunhill has violated §687(2)(b) of the Act by having made numerous untrue statements of material facts to the Counterclaimants. For example, with respect to the Exchange Program, the Brochures that were provided to each of the Counterclaimants each stated that "<u>Today, almost 25% of our placements are a direct result of the Exchange Network.</u>" That statement is clearly an untrue statement of material fact. In this case, Dunhill has proffered no testimony or evidence to support that the statement is true or even any evidence to suggest that it had any reasonable basis for believing that the statement is true. Indeed, Robert Stidham testified that you could not predict what the exchange rate would be – and yet Dunhill did – from the fall of 1999 through 2002 (i.e., the relevant sales periods for the Counterclaimants), when it represented that it was approximately 25% (and that it might be high as 40%). Further, in October of 2001 (after the franchisees had been complaining to Dunhill about the Exchange Program through the FAC), Ray Cech submitted his Exchange Report to Dunhill and the FAC which indicated that the actual exchange rate was approximately 4%. Clearly, at that time, Dunhill <u>knew</u> that that their statements and representations regarding the Exchange Report were false and misleading and yet the statements were included in the Brochure that Dunhill provided to Bud Westover in February of 2002.

Furthermore, this statement, which was contained in the Brochure, satisfies the Act's definition of "fraud" and a "fraudulent practice" as it is a "<u>material misrepresentation in any registered prospectus filed under this article.</u>" As we have seen, the Brochure is "sales literature" which must be filed with the New York State Department of Law (unless the franchisor has an exemption) and therefore, is deemed to be part of the franchise offering, just like the UFOC. This statement is a clear violation of §687(2)(b) of the Act as it is an "untrue statement of a material fact." Further, this statement is also violation of §687(3) as Dunhill "engaged in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person." Dunhill, as

corroborated by the verbal statements regarding the Exchange Program, clearly intended to give (and did give) the Counterclaimants a false and misleading impression with respect to the Exchange Program. Each of the Counterclaimants was fraudulently induced to purchase his Dunhill franchise based upon, at least in part, that statement.

Additionally, Bud's President's Manual (which was provided to him before he signed his franchise agreement and is part of Dunhill's franchise offering) stated the following:

> "While most national recruiting networks have some kind of interoffice applicant and job order referral process in place, *Dunhill is an industry leader in exchange, with some 25% of its revenues being generated through interoffice referrals – placements that otherwise would not have been possible.* Dunhill is *currently perfecting the first electronic exchange network to be implemented in a major franchise organization, a computerized system which will revolutionize the time frames for responding to urgent job orders and highly marketable candidates,* both regionally and nationwide."[281]

The above quote contains several untrue statements of material fact. As stated above, Dunhill had absolutely no factual basis to make a representation that Dunhill is an "industry leader in exchange with some 25% of its revenues being generated through interoffice referrals – placements that otherwise would not have been possible." Again, by the fall of 2001, Dunhill had hard evidence that the exchange rate was approximately 4% and Dunhill chose not to change its Manual. Furthermore, Dunhill's statement that it was "currently perfecting" an electronic exchange network which would "revolutionize" time frames for responding to orders and candidates is another blatant untrue, material statement. Bud testified that he never had access to any such "revolutionary" exchange network, and testified quite extensively about the pathetic exchange network that Dunhill did have.

Dunhill's President's Manual which was provided to Mike Lamanna (before he signed his franchise agreement), stated in connection with the Exchange Program, that it has allowed "Dunhill Franchisees to generate 25% in additional revenues through shared resources over the past 15

years."[282] This statement constitutes a "fraudulent an unlawful practice" in violation of §687(2)(b) as it is an "untrue statement of a material fact" in connection with the offer, sale or purchase of a franchise, and constitutes an "unfair or deceptive act or practice" under §5 of the Federal Trade Commission Act, as it is essentially an earnings claim, which (i) constitutes a "claim or representation (such as in advertising or oral statements by salespersons) which is inconsistent with the information required to be disclosed by the Rule"; and (ii) also constitutes a "representation about the actual or potential sales, income, or profits of existing or prospective franchisees (except in the manner set forth in the Rule."

Of course, the verbal statements regarding the Exchange Program which were made by Robert Stidham to Bud and to Mike Lamanna, and the statements made by Joanne Naccarato to Elias and Mike Wilcoxson, as well as to Harvey, that they could expect to generate between 25% to 40% in additional revenues through participation in the Exchange Program were also constitute fraudulent and unlawful practices in violation of §687(2) as they are untrue statements of a material fact and also are a "practice or course of business which operates as a fraud or deceit." Similarly, these statements constitute an unfair or deceptive act under §5 of the Federal Trade Commission Act, as stated above, they constitute earnings claims which are inconsistent with the information required to be disclosed (in the UFOC) and as set forth in the FTC Rule. As has been discussed previously, these above statements were clearly, both material and willful.

B.    Other Statements Constituting Fraudulent and Unlawful Practices Under the Act or Deceptive Acts or Practices Under the FTC Rule.

Dunhill's many untrue representations which are contained in the Brochure (many of which were also communicated verbally as well), also constitute violations of the Act and the FTC Rule, because they are "untrue statements of a material fact" and/or because they are statements which

---

[281] See Westover Binder Exhibit #10 (Bates 001864).
[282] See Lamanna Binder Exhibit #12 (Bates 003674).

evidence an act or practice which "would operate as a fraud or deceit" referred to as ["fraudulent act or practice"])  These include: (i) that Dunhill was "one of the industry's premier staffing firms" [untrue statement of material fact]; (ii) that Dunhill's revenues were growing an average of 20% annually and have doubled over the last 5 years [untrue statement of material fact]; (iii) Dunhill had a network of 150 offices "to assist you" [untrue statement of material fact]; (iv) that Dunhill will provide "intensive "nuts and bolts" training and then "ongoing hands on support in your office" ["fraudulent act or practice"]; (v) that Dunhill will provide a "personal Franchise Development Manager" to mentor you and assist your staff ["fraudulent act or practice"]; (vi) that Dunhill will provide a "state-of-the-art" proprietary software package ["fraudulent act or practice"]; (vii) that Dunhill will promote the Dunhill brand through advertising ["fraudulent act or practice"]; (viii) that Dunhill will provide various items of "start-up assistance" ["fraudulent act or practice"]; (ix) that Dunhill will provide "ongoing field support" including training, consultant training and "unlimited advice guidance, guidance and counsel ["fraudulent act or practice"]."

<u>Material and Willful.</u>

As the testimony in this case makes clear, the above statements and representations which were contained in the Brochures provided to the Counterclaimants (and many of which were made verbally to them as well) were false and played a major role in inducing them to purchase their Dunhill franchises.  These statements and representations were material in that they were significant factors in evaluating the "total mix" of the franchise opportunity.  See *United States v. Building Inspector of America*, and *Enservco, Inc., v. Indiana Securities Division*, supra.

These statements and representations were also intentionally communicated by Dunhill, as inducements for the Counterclaimants to purchase their Dunhill franchises, knowing that the factual aspects of the representations were not true and that it had no intention of providing the Counterclaimants with either tangible items (i.e., "state-of-the-art" proprietary software packages and

advertising) or the intangible services and support items as they had represented to them that it would provide.  For example, as mentioned previously, Dunhill <u>knew</u> that its statement that it had a network of 150 offices "to assist you" was false and misleading in connection with the franchisees' participation in the Exchange Program.  Also, Dunhill either knew or should have known of its limitations with respect to franchisee support, and therefore should have known that none of the Counterclaimants would get a "personal Franchise Development Manager" that would mentor them or their staff.  Further, Dunhill's representations that Dunhill's revenues on average were growing annually at an average of 20% and have doubled over the last 5 years, were clearly untrue.  Dunhill's financial statements indicate that from 1999 to 2000, Dunhill's revenues only increased from approximately $64 million to approximately $67 million (an increase of approximately 4.5%) and that from 2000 to 2001, Dunhill's revenues <u>declined</u> from approximately $67 million to approximately $44 million (a decrease of almost 35%).  Further, over the period 1997 to 2001, Dunhill's total revenues went from approximately $44.7 million in 1997[283] to approximately $44 million in 2001.  Dunhill had to be aware of these trends when they made the misrepresentations about the growth of the company to the Counterclaimants.

As set forth in prior sections above, Dunhill provided the Counterclaimants with practically nothing that they were promised, and Dunhill's violations of the Act and the FTC Rule with respect to the above statements and representations, were both material and willful.

3.    <u>Failure to Properly Re-Disclose Bud Westover.</u>

Section 683(8) of the Act states that any franchise which is subject to registration under this article shall not be sold without first providing the prospective franchisee with a copy of the "offering prospectus" (i.e. the UFOC) within certain enumerated guidelines.

---

[283] See Zinn Binder Exhibit #6 (Bates 011286)

Section 436.1(a) of the FTC Rule states that it is an unfair or deceptive act or practice within the meaning of §5 of the Federal Trade Commission Act for any franchisor to fail to furnish any prospective franchisee with the required information accurately, clearly and concisely stated in a legible, written document at the earlier of the "time for making disclosures" or the first "personal meeting."[284]

It is axiomatic, and as Robert Stidham acknowledged, Dunhill was obligated by law to provide Bud with a "current" UFOC when he met with him in April of 2002 at Dunhill's headquarters in Hauppauge, New York.[285]  While Bud had received a May 2001 UFOC in February of 2002, by April of 2002, the May 2001 UFOC had become "stale" (it contained financial and other information only through December 31, 2000) and Dunhill was obligated to provide him with a current (i.e., 2002) UFOC (which would have contained updated information through December 31, 2001).  Robert Stidham testified that he gave Bud a "current" UFOC at Dunhill's Hauppauge, New York headquarters[286] although Dunhill has produced no "receipt" for any current UFOC.  Bud testified that while Robert Stidham initially tendered the current UFOC to him, he never actually had it in his possession because later that afternoon he learned that he had to fly home to Texas that evening instead of staying over that night in New York, and that when he told Robert Stidham of his change in travel plans, Mr. Stidham told Bud that he would mail the current UFOC to him, which he never did. Therefore, Bud was never "disclosed" with Dunhill's current (2002) UFOC in April 2002 as both the Act and the FTC Rule require.  As indicated above, Dunhill's failure to provide Bud with a current UFOC (referred to technically, as "re-disclosing" him) is another violation of the Act and the FTC Rule.

---

[284] See 16 CFR 436.1(a) (CCH) ¶6090, 6100 which are included in the Submission Binder Exhibit #5.

<u>Material and Willful.</u>

Both the Act, through the New York State Franchise Regulations (the "Franchise Regulations") which have been promulgated thereunder, as well as the FTC Rule, provide requirements with respect to the substantive disclosures which must be provided by franchisors in their UFOCs, specifically, in connection with Item 20, the "List of Outlets." For example, the Franchise Regulations provide that the UFOC must disclose, among other things: (i) The number of outlets franchised by the franchisor and the number of franchisor-owned or operated outlets as of the close of each of the franchisor's last 3 fiscal years;[287] (ii) the estimated number of franchises expected to be sold during the 1-year period after the close of the franchisor's most recent fiscal years (i.e., the upcoming fiscal year);[288] and (iii) the number of franchisee outlets that have been "reasonably known by the franchisor to have otherwise ceased to do business in the system."[289] Further, the FTC Rule requires the franchisor to disclose among other things: (i) the total number of franchisees operating at the end of the preceding fiscal year;[290] and (ii) the number of franchisees voluntarily terminated or not renewed by franchisees within, or at the conclusion of, the term, of the franchise agreement, during the preceding fiscal year.[291]

As stated previously, the Act provides that the dissemination of a UFOC is essential "…for the purpose of providing prospective franchisees and potential franchise investors with material details of the franchise offering so that they may participate in the franchise system in a manner that may avoid detriment to the public interest…"[292] Dunhill's failure to re-disclose Bud in April of 2002 was in fact, material, and willful. Bud testified about how important the size and strength of the Dunhill franchise

---

[285] See TR from 3/6/07, Page 233
[286] Id at 234.
[287] See 13 NYCRR Part 202, Item 20(A) (Page 13 of 30) which is included in the Submission Binder as Exhibit #3.
[288] Id at Item 20(C).
[289] Id at Item 20(D)(v).
[290] See 16 CFR 436.1(a)(16)(i) (CCH) ¶ 6116(16)(i) which is included in the Submission Binder Exhibit #5.
[291] Id at (CCH) ¶6116(16)(iv).
[292] See GBL §680(2) which is included in Submission Binder Exhibit #4.

system was to him in making a decision to purchase his franchise. (For example, Bud testified that he stayed away from the Sanford Rose franchise system because it only had approximately 50 franchisees.) In any event, the May 2001 UFOC that Bud received in February of 2002, indicated that Dunhill had 90 permanent placement franchises operating at the end of 2000[293] and that Dunhill expected to open an additional 20 permanent placement franchises during 2001.[294] Additionally, Bud testified that Robert Stidham told him at the time that he delivered the May 2001 UFOC to him that Dunhill was "adding units" and projected to add about 20 permanent placement franchises in 2002 and to grow from there.[295] However, Dunhill's October 2002 Permanent Placement UFOC indicates that as of the end of 2001, there were a total of 85 permanent placement franchises operating.[296] Therefore, had Bud been properly disclosed in April 2002, he would have been aware that the number of permanent placement offices declined from 90 to 85 from the end of 2000 to the end of 2001, when the 2001 UFOC indicated that there would likely have been approximately 110 (the 90 operating at the end of 2000 plus the 20 expected to be opened during 2001) permanent placement franchises operating by the end of 2001. This information would have been a "red-flag" for Bud and certainly was "material" to him. While Bud would obviously not have received Dunhill's October 2002 in April of 2002, the current (2002) UFOC which should have been provided to Bud in April of 2002, would have disclosed that were only 85 Dunhill permanent placement franchisees at the end of 2001, not the 110 that he had expected. In addition, had Bud been properly re-disclosed with a 2002 UFOC, he would have been able to use the other above referenced information, and where applicable, track or compare the numbers to those contained in his May 2001 UFOC (for the year 2000), including the number of franchisees expected to be sold in 2002, number of franchisee outlets that had been "reasonably known by the franchisor to have otherwise ceased to do business in the system for the

---

[293] See Westover Binder Exhibit #5, Page 38.
[294] Id at Page 39.
[295] See TR from 1/22/07, Page 495.
[296] See General Binder (Size of Dunhill System) Exhibit #7, Page 38.

year 2001, and the number of franchisees who had voluntarily terminated or not renewed as franchisees during the year 2001.

Lastly, both the Act and the FTC Rule require that all franchisors, in Item 21 of their UFOCs, provide the prospective franchisee with the franchisor's financial statements for the last 3 fiscal years.[297]  Therefore, had Bud received the 2002 UFOC as he should have, he would have seen that Dunhill's total revenues had declined from approximately $67 million in 2000 to approximately $44 million in 2001, a decline of almost 35%.  Essentially, had Bud been properly re-disclosed in April of 2002, he would have had additional information that he, as a reasonable prospective franchisee, would have considered material in making an informed investment decision regarding whether or not he should purchase a Dunhill franchise.  When Robert Stidham failed to mail Bud the 2002 UFOC, Bud did not have this material information available to him when he made his decision to purchase his Dunhill franchise.

With respect to whether Dunhill's failure to re-disclose Bud was "willful," we note that Stidham did <u>not</u> testify that his failure to disclose Bud was accidental.  Rather, he denied saying that he would mail the current UFOC to Bud.  If the Arbitrator believes that Bud's testimony is credible, then Mr. Stidham's denial would lead to the conclusion that his conduct must be intentional and therefore, "willful."

<u>Civil Liability Under the Act</u>.

Section 691 of the Act (entitled "Civil Remedies") sets forth the remedies available for violations of the Act.  Subsection 1 states, "A person who offers or sells a franchise in violation of §683, §684 or §687 of this article is liable to the person purchasing the franchise for <u>damages</u>, and if such violation is <u>willful and material, for rescission</u>, with <u>interest at six percent per year</u> from the date of purchase, <u>and reasonable attorneys fees and court costs</u>" (Emphasis added).

---

[297] See 13 NYCRR 200.2 (Item 21(A) – Page 14 of 30 contained in the Submission Binder Exhibit #3.

93

Fortunately for Dunhill, only Bud Westover is able to assert a claim under the Act, because the otherwise valid claims that Mike Lamanna, Harvey Auger, and Elias Zinn and Michael Wilcoxson, would have against Dunhill are slightly outside of the Act's three (3) year statute of limitations."[298]   (Note: although Mssrs. Lamanna, Auger, Zinn and Wilcoxson are not able to avail themselves of remedies under the Act, it has been shown, that Dunhill violated the law in numerous respects with respect to each of said other Counterclaimants.   Accordingly, said Counterclaimants (together with Bud as well) will assert below, claims based upon other legal theories.)   Bud's claims are timely because he entered into his Dunhill franchise agreement in July 2002 and his counterclaims against Dunhill were asserted in the Respondent Franchisees Trust's Answering Statement which was filed with the American Arbitration Association in September 2004.[299]

Based upon the foregoing, and pursuant to §691(1) of the Act, Dunhill is liable to Bud Westover for statutory damages in the amount of $1,255,490.00 (excluding attorneys' fees, interest and arbitration costs) as set forth in the Schedule of Damages pertaining to Bud Westover, contained herein.   With respect to Bud, Dunhill violated: (i) §683(2)(o) with respect to the illegal earnings claims that they made to him, including the several examples of oral and written earnings claims in connection with the Exchange Program; (ii) §687(2)(b) with respect to "fraudulent and unlawful practices," including the various examples of oral and written statements and representations of material fact (or omissions) in connection with the Exchange Program as well as with the many other untrue statements and representations discussed in Section VI(2)(B) herein; and §683(8) in connection with its failure to provide Bud with proper disclosure in April 2002.

Further, pursuant to §691(1), because Dunhill's violations of the Act have been shown to be both "material" and willful," Bud is entitled to (i) have his franchise agreement with Dunhill rescinded; interest at 6%, attorneys fees' and costs incurred in connection with this proceeding.

---

[298] See GBL §691(4) which is included in Submission Binder Exhibit #4.

In the event that Dunhill argues that the Act is inapplicable to Bud Westover's claims because his Dunhill franchise was located in Texas, and therefore not "covered" under the Act, such an argument is totally erroneous and without merit. The Act provides that its disclosure requirements apply to all written or oral arrangements between a franchisor and franchisee in connection with the offer or sale of a franchise "in this state"[300] and defines an "offer" or "sale" of a franchise to be made "in this state" not only when it is directed by the offeror to this state and received at the place to which it is directed but also when the offer originates, is extended, or is accepted in New York (See *Mon-Shore Management, Inc. v. Family Media, Inc.*, 584 F. Supp. 186 (S.D.N.Y. 1984).[301]

There can be no question that Dunhill's sale of Bud's franchise originated from New York State. In 2002, Dunhill's headquarters were in Hauppauge, New York[302] and that is where Bud met with Robert Stidham in approximately April of 2002. Bud also attended his training at the Hauppauge headquarters in July 2002, prior to signing his franchise agreement. Bud hand delivered his $5,000.00 territory deposit check to Robert Stidham in New York, and of course, signed his franchise agreement in New York. It is clear that Dunhill's offer to sell Bud his franchise "originated" in New York. Furthermore, nothing contained in Bud's franchise agreement may be used by Dunhill to attempt to preclude the applicability of the Act to Bud's franchise or his franchise agreement. The Act provides that "Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated hereunder, shall be void."[303] Additionally, the Act provides that "It is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would

---

[299] See Westover Binder Exhibit #2.
[300] See GBL §682, 683 which is included in Submission Binder Exhibit #4.
[301] See GBL §681 12(a) and (b) which is included in Submission Binder Exhibit #4; See Mon-Shore Management case included in Submission Binder Exhibit #12.
[302] See Westover Binder Exhibit #5 (Bates 001648, 001652)
[303] See GBL §687(4) which is included in Submission Binder Exhibit #4.

relieve a person from any duty or liability imposed by this article."[304]  Essentially, the Act has a "no-waiver" provision provides that the Act's applicability cannot be waived or vitiated by contract.

4.    Common Law Fraud.

In addition to remedies under the Act (for Bud), each of the Counterclaimants is entitled to damages as well as rescission of their respective franchise agreement based upon common law fraud. Under New York law, in order to prove fraud, a plaintiff must establish that the defendant: 1) made a misrepresentation or a material omission of fact which was false and known to be false; 2) for the purpose of inducing the plaintiff to rely upon it; 3) justifiable reliance; and 4) injury. *Lama Holding Co., v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 80 (1996).[305]  Reliance is justified if the fact represented is one that a reasonable person would consider important in reaching a decision regarding the transaction in question.  Falsity does not necessarily mean that any specific statement must be proved false.  Rather, the question is whether or not, looking at the circumstances in their entirety, there was a false representation. *Downey v. Finucane*, 205 N.Y. 251, 98 N.E. 391 (1912).[306]  Fraud includes the pretense of knowledge when there is no such knowledge.  Furthermore, intent to defraud can be inferred from proof that the representation was made recklessly, without knowledge of or a genuine belief in its truth or accuracy. *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931).[307]  In determining whether or not reliance was justified, the existence of a relationship of trust or confidence or superior knowledge or means of knowledge on the part of the person making the representation are factors to be considered. *Rothmiller v. Stein*, 143 N.Y. 581, 38 N.E. 718 (1894).[308]

As previously set forth, Dunhill made various types of earnings claims to the Counterclaimants which were false, and which Dunhill either knew to be false or were made recklessly, without having knowledge or a genuine belief in the statements' truth or accuracy.  (Also,

---

[304] See GBL §687(5) which is included in Submission Binder Exhibit #4.
[305] See Submission Binder Exhibit #13
[306] See Submission Binder Exhibit #14.
[307] See Submission Binder Exhibit #15.

it must be noted that as previously discussed, Dunhill's various earnings claims were shown to be violations of the Act and the FTC Rule as they were false and fraudulent.) For example, with respect to the Exchange Program, Dunhill knew that its statements that its network of 150 offices were there "to assist you" were false and misleading because: (i) its temporary staffing and company owned offices did not participate in the Exchange Program; and (ii) the actual number of permanent placement franchisees that were generating and reporting my meaning revenues was only approximately 35. Furthermore, Dunhill's statements including: (i) the Brochures' representations that "Today, almost 25% of our placements are a direct result of the Exchange Network;" (ii) the verbal statements made by Joanne Naccarato to Harvey Auger, and to Elias Zinn and Michael Wilcoxson, and the verbal statements by Robert Stidham to Michael Lamanna and to Bud Westover, regarding how much additional revenues each of them could expect to generate by participating in the Exchange Program; and (iii) the statements contained in the President's Manuals that the Exchange Program is a set of procedures "and a tradition of successful transactions and relationships which have allowed Dunhill Franchisees to generate 25% in additional revenues through shared resources over the past 15 years," were all either known by Dunhill to be false, or at the very least, were made recklessly, without having knowledge or a genuine belief in the statements' truth or accuracy. As was shown in the case, the Exchange Program was practically non-existent, as it had awful technology and relied on 2 year old job orders and job candidates. The evidence in the case showed that practically no Dunhill franchisees were making any placements through the Exchange Program, not even Dunhill's top producers such as Mike Green and Neil Whitman. As stated previously, Dunhill introduced no evidence whatsoever that Dunhill's Exchange Program was had an exchange rate of anything approaching 25%, either for the years leading up to the period of the fall of 1999 through the spring of 2002, or during this time period. There can be no question that Dunhill's statements were

---

[308] See Submission Binder Exhibit #16.

misrepresentations of material facts which were false and known to be false, or at the least, were made recklessly, without having knowledge or a genuine belief that in the statements were truthful or accurate.

In addition to Dunhill's earnings claims relating to the Exchange Program, as discussed above, also made additional statements of earning claims which were false and fraudulent. These include the written Proforma which was provided to Mike Lamanna, which essentially, represented to Mike that he could expect to make approximately $130,000.00 in his first year of operation as a Dunhill franchisee. Mike had told Dunhill that he had needed to feel comfortable knowing what he could make in his first year and Dunhill provided him with a Proforma telling him <u>he can expect to make approximately $130,000.00</u>. However, the $130,000.00 number provided to Mike "coincidentally" happened to be the salary that he made at Mita. Unfortunately, for Mike, he relied on this Proforma and he <u>lost</u> $634.00 in his first year of operation. It is submitted that Dunhill either knew that the statement it made to Mike was false or at the very least, Dunhill had no knowledge or genuine belief that it was true or accurate.

As previously discussed, Joanne Naccarato and Tom Esposito showed monthly sales reports of then existing Dunhill franchisees to Elias Zinn and Mike Wilcoxson (which the law prohibited them from doing) and told them that they could "make millions" like those franchisees were doing. In addition to violating the Act and the FTC Rule, Dunhill's statements were fraudulent. First, whatever monthly sales reports containing revenues of the franchisees that were shown to Elias and Mike Wilcoxson were "snapshots" at best, of any particular franchisee's monthly revenues and did not prove that those franchisees actually had been "making millions" on a yearly basis. Dunhill had no factual basis or knowledge to make such reckless statements to Elias and Mike. Also, Elias testified that several months after he and Mike purchased their Dunhill franchises they learned that 2 of the 4 franchisees whose monthly reports they were shown had actually sued Dunhill and were in litigation

with the Franchisor at the time Dunhill showed them the reports and that the 2 franchisees had left the system thereafter. (We submit that it is not likely that franchisees that were "making millions" would be suing the franchisor and leaving the system.) Dunhill's attempt to induce Elias and Mike to purchase franchises based upon the revenues of franchisees which <u>at that time</u> had sued Dunhill is egregious and constitutes a fraudulent omission of a material fact. Unfortunately for Elias and Mike, they relied on Joanne Naccarato and Tom Esposito's fraudulent statements to their detriment. Elias testified that he and Mike Wilcoxson earned nothing in their several years as Dunhill franchisees.

Joanne Naccarato's statement to Harvey Auger that he could earn $250,000.00 per year not only constituted an illegal earnings claim under the Act and the FTC Rule, but was also fraudulent. Harvey was looking to get some feedback from Dunhill with respect to how much money he could make as a Dunhill franchisee. When Harvey told Joanne Naccarato that he had previously earned $250,000.00 a year and asked her whether he could earn that kind of money as a Dunhill franchisee, she emphatically answered that yes, he could. Ms. Naccarato had no legal right to make such a statement, and had no factual basis or knowledge which could reasonably support such a reckless statement. Unfortunately for Harvey, he relied on Joanne Naccarato's fraudulent statement to his detriment. Harvey testified that he earned nothing in his several years as a Dunhill franchisee.

As previously set forth in Section VI(2)(B) above, Dunhill made many additional untrue representations and statements of fact, either in the Brochure, or verbally or both, which it knew to be false when it made them, or at the very least, had no knowledge or genuine belief that they were true. Among others, these untrue statements included: (i) that that Dunhill was "one of the industry's premier staffing firms"; (ii) that Dunhill was a growing and vibrant franchise system; (iii) that Dunhill will provide "intensive "nuts and bolts" training and then "ongoing hands on support in your office"; (iv) that Dunhill will provide a "personal Franchise Development Manager" to mentor you and assist your staff; (v) that Dunhill will provide a "state-of-the-art" proprietary software package; (vi) that

Dunhill will promote the Dunhill brand through advertising; (vii) that Dunhill will provide various items of "start-up assistance"; and (viii) that Dunhill will provide "ongoing field support" including training, consultant training and "unlimited advice guidance, guidance and counsel." At the time that these statements were being made to the Counterclaimants, Dunhill knew that many if not all of these statements were false, and certainly had no knowledge or genuine belief that they were true. Dunhill had to have known it had already fallen from its once well respected place in the employment staffing industry; Dunhill was making reckless projections about how many additional offices they were going to open and that Dunhill would be a $100 million company, all while Dunhill was in decline, some of its major offices were leaving the system and only about 35% of the permanent placement franchisees were generating and reporting any significant revenues (all of which Dunhill had to know); Dunhill had to know that its training, which was outdated and which essentially ignored the role of technology and job boards in the process of operating an employment staffing business, was fatally flawed; Dunhill had to know that it was not going to actually be providing the Counterclaimants a "personal Franchise Development Manager" to mentor them and assist their staff (with what resources and with what support staff?); Dunhill had to know that it was providing the Counterclaimants with a software package that was not "state-of-the-art" or proprietary; Dunhill had to know that it had no intention of promoting the Dunhill brand through advertising (and we note that Elias Zinn was specifically induced to purchase his Dunhill franchises when Daniel Abramson told him that Dunhill was planning to run advertising in national newspapers such as USA Today and the Wall Street Journal). This was just another untrue and fraudulent statement that Dunhill used to sell franchises; Dunhill failed to provide the Counterclaimants with the various items of "start-up assistance," and it had to have known that it had no intention of doing so; Dunhill failed to provide the Counterclaimants with the "ongoing field support" including training, consultant training and "unlimited advice guidance, guidance and counsel" that it promised, and it had to have known that it had no intention of doing so.

Dunhill 2000.

As previously discussed, Harvey Auger moved his entire family (including his son and daughter-in-law) to Charlotte, North Carolina, from Connecticut, when Joanne Naccarato told him that he would be able to operate a Dunhill temporary staffing business in addition to his permanent placement business. Ms. Naccarato told him that the "Dunhill 2000" program would be taking effect shortly and that within six months, he would have an opportunity to open a temporary staffing business if he chose to. Page 4 of Harvey's UFOC[309] states:

> "Dunhill intends to launch a new franchise product, known as "Dunhill 2000", sometime in the year 2000. Under the Dunhill 2000 franchise, the Dunhill franchisee will operate a full-service staffing business offering professional search (permanent placement), professional staffing (temporary help – professionals) and commercial staffing (temporary help – nonprofessionals) services. Dunhill will allow its existing franchisees to convert their franchises to a Dunhill 2000 franchise for an additional fee of $3,500.00. Except for purposes of renewal of franchise agreements originally disclosed under this Offering Circular, Dunhill will stop offering the franchise offered through this Offering Circular once we launch the Dunhill 2000 product."

Based upon what Harvey was told by Joanne Naccarato about the "Dunhill 2000" program, together with the above statements contained in his UFOC, it is clear that from Harvey's perspective, Dunhill was telling him, in no uncertain terms, that he was going to have the opportunity to operate a "one stop shop" combining both the permanent placement and temporary staffing businesses. This was a major inducement in his decision to purchase his Dunhill franchise. As Harvey testified, Dunhill did not introduce the Dunhill 2000 and did not otherwise offer Harvey or permit him to operate a Dunhill temporary staffing business. Further, as the name "Dunhill 2000" suggests, and as the above excerpt from his UFOC states, the Dunhill 2000 program was to be launched sometime in the year 2000. However, Harvey did not sign his franchise agreement until mid-October of 2000. If Dunhill had any reason to think that the program could or would not be launched imminently, or at all, it had a duty to tell Harvey that. Also, after Dunhill failed to introduce the program and it knew that it Harvey had

relied on his being offered the opportunity to operate a Dunhill temporary staffing business should have offered Harvey if he wanted to cancel (rescind) his franchise agreement. Dunhill never did so.

Measure of Damages.

Under New York law, the measure for damages for a fraud claim is the so called "out-of-pocket rule." See *Reno v. Bull*, 226 N.Y. 546 (Ct. App. 1919).[310]  Under the out-of-pocket rule, the party who has been damaged is entitled to recover the difference between the value of what the damaged party gave up or lost and the value of what the damaged party received. "Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud…" *Lama Holding v. Smith Barney*, supra.  Counterclaimants are entitled to recover consequential damages to the extent necessary to restore them to the same position prior to the commission of the fraud.  The evidence in this case supports Counterclaimants' position that the Dunhill franchises that they purchased and what they "received" from Dunhill, essentially had no value, whether one considers Dunhill's name, its system or procedures, or Dunhill's failures with respect to training, the software, advertising, ongoing service and support, etc.

Therefore, there are two components of each Counterclaimant's fraud damages: (i) the losses each Counterclaimant sustained by virtue of his investment in purchasing his Dunhill franchise(s); and (2) the losses each Counterclaimant suffered as a result of his giving up his prior employment in order to purchase and operate his Dunhill franchise(s).  Separate schedules of damages for each of the Counterclaimants are included herein in Submission Binder Exhibit #2.

Rescission.

In addition to the Counterclaimants' counterclaims for damages, each of them is also entitled to have his franchise agreement rescinded because of Dunhill's fraud.  The seminal case of *Vail v.*

---

[309] See Auger Binder Exhibit #5.
[310] See Submission Binder Exhibit #17.

*Reynolds*, 118 N.Y. 297, 302-03, 23 N.E. 301, 303 (1890)[311] sets forth the various remedies available

to a person who has been induced by fraudulent representations. These remedies include rescission,

where a party brings an action within a reasonable time after learning of the alleged fraud, and seeks

to recover the consideration paid and offers to restore to the other party whatever may have been

received by him by virtue of the contract. As stated above, the Counterclaimants essentially received

nothing from Dunhill and therefore, have nothing to return. Notwithstanding this however, they have

de-identified and given up any right to use the Dunhill name and they have directed Dunhill to take

them off the Dunhill website. As a practical matter, the Counterclaimants are entitled, under the legal

theory of rescission which "avoids" the franchise agreements *ab initio*, to be awarded the same two

kinds of losses set forth above in connection with the fraud damages. Dunhill's many fraudulent

misrepresentations involve matters many of which were not readily "discoverable" (i.e., the various

earnings claims, the falsity of which would be ascertained over a period of time, as well as the

representations relating to the receiving of ongoing training, support, guidance, advertising, etc.), as

compared to say, a misrepresentation (or omission) relating to a specific piece of real property which

might easily be discoverable shortly after the closing of the transaction.

    In each of the above examples of fraudulent representations, Dunhill's verbal and written

statements and representations, in each case, were made with the intent and purpose of inducing the

particular Counterclaimant (or all of them as the case may be), into purchasing his (or their) Dunhill

franchise(s). In each case, the misrepresentation and untrue statement was made to the

Counterclaimant (or all of them as the case may be) by a Dunhill franchise sales representative (or by

Dan Abramson, Dunhill's then President) and the particular Counterclaimant (or all of them as the

case may be) and the statements carried an aura of credibility and gravitas. Each of the

Counterclaimants was justified in relying on what they were told by Dunhill's representatives and

---

[311] See Submission Binder Exhibit #18.

what was represented to them in writing. Each of the Counterclaimants testified that had they known the truth with respect to Dunhill's untrue statements and fraudulent misrepresentations, they would not have purchased their Dunhill franchises. In reliance on Dunhill's untrue statements and fraudulent misrepresentations, each of the Counterclaimants has suffered very significant financial injury.

<u>Rescission Based Upon Non-Fraudulent Misrepresentations</u>.

The Counterclaimants contend that the various misrepresentations referenced herein were communicated to them by Dunhill intentionally and with fraudulent intent. However, even if the Arbitrator were to find that certain representations of material fact were not intentional misstatements or communicated with fraudulent intent or deceit, he may still grant rescission to the Counterclaimants with respect to their Dunhill franchise agreements. "An action may be maintained in equity to rescind a transaction which has been consummated through misrepresentation of material facts not amounting to fraud. Unlike an action at law for damages, intentional misstatements need not be proved." *Lent-Agnew Realty Co., v. Trebert*, 212, A.D. 460, 208 N.Y.S. 598 (App. Div. 1925);[312] See also *Bloomquist v. Farson*, 222 N,Y. 375, 118 N.E. 855 (Ct. App. 1918).[313]

<u>Breach of Contract.</u>

A.    Dunhill breached Bud Westover's franchise agreement in specific and material ways in connection with his protected territory ("Territory") (see Section V(1)(B) herein). Section 3.02 of Bud's franchise agreement granted him an exclusive Territory to operate his Dunhill permanent placement business – no other Dunhill franchisee was permitted to operate within this Territory. Also, Bud had a right of first refusal (contained in an amendment to his franchise agreement) to operate a Dunhill temporary staffing business within his exclusive Territory.

---

[312] See Submission Binder Exhibit #19.
[313] See Submission Binder Exhibit #20.

Dunhill clearly breached these provisions of Bud's franchise agreement because the evidence proved that Andrew Barham was operating a Dunhill permanent placement business and a temporary staffing business within Bud's Territory. Dunhill's breaches with respect to Bud's Territory, go to the heart of the "benefit of his bargain" and are clearly material. The fact that Andrew Barham was operating a Dunhill temporary staffing business within Bud's Territory, essentially, made Bud's right of first refusal meaningless and devoid of value. The testimony from Bud (as well as other witnesses) in this case was that the temporary staffing business is all about having a local presence and <u>local</u> contacts. Mr. Barham had already been working Bud's Territory for several years, effectively foreclosing Bud's opportunity to operate a Dunhill temporary staffing business in the same (Bud's) Territory.

B.    <u>Failure to Comply with the Terms of its Franchise Offering</u>

As shown above, Dunhill violated the provisions of the Act and the FTC Rule in several meaningful ways. It is apparently, Dunhill's position in this case, that the terms of the franchise agreement, alone, govern the relationship and the obligations between Dunhill, on the one hand, and each of the Counterclaimants, on the other. However, in the context of a franchise, especially one which is governed by New York law (a "registration" state where a franchisor must register its UFOCs and all of its other franchise offering documents with the Department of Law), the <u>franchisor's obligations to prospective franchisees are set forth not only in the franchise agreement,</u> <u>but also in the UFOC and all of the other writings distributed to prospective franchisees before they</u> <u>sign their franchise agreements (collectively, the "Franchise Offering").</u> In *A.J. Temple Marble,* supra, the court held that where the merger clause in the franchise agreement permitted the franchisee to rely upon misrepresentations made in the "offering circular, prospectus, disclosure document or other ... document ... required or permitted to be given to Franchisee pursuant to applicable law," <u>such "other document" was held to encompass representations contained in the "promotional</u>

literature." Therefore, the court recognized that the promotional literature provided to a prospective franchisee by a franchisor is, in fact, part of the "franchise offering" presented to him, together with the franchise agreement and the UFOC, and therefore, may be relied upon by him in making his decision to purchase the franchise opportunity. In this case, Dunhill's Franchise Offering includes the franchise agreements, the UFOCs, the "sales literature" such as the Brochures, and form letters, such as the one provided to Mike Lamanna, and for Bud and Mike Lamanna, the President's Manuals which they received before signing their franchise agreements.

Therefore, while Dunhill may argue that the Counterclaimants cannot prove a "breach of contract" if for example, the Counterclaimants' franchise agreements do not provide that Dunhill was going to provide them with "state-of-the-art" proprietary software, Dunhill did in fact, obligate itself to provide each of them with "state-of-the-art" proprietary software, because each of the UFOCs provided to the Counterclaimants stated that they would receive "proprietary" software and the Brochures Dunhill provided to the Counterclaimants each stated that they would receive a "state-of-the-art" proprietary software package. The UFOCs and the Brochures are part of Dunhill's Franchise Offering to each of the Counterclaimants and Dunhill should be held liable for damages under a "breach of contract" theory. Each of the Counterclaimants contend that Dunhill breached its obligations with respect to the Franchise Offering that it presented to each of them as Dunhill failed to provide them with any of the things that Dunhill represented it would provide to them including, but not limited to, the Exchange Program which would generate additional revenues for them of between 25% and 40% above what they could expect to otherwise generate as a Dunhill franchisee; a growing, vibrant network of 150 offices that were there "to assist" new franchisees; training (initial, ongoing and consultant), ongoing support and services, guidance and assistance; "state-of-the-art" proprietary software and technology; and national advertising.

<u>Failure of Consideration</u>

Consideration is defined as either a bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor. See *Startech, Inc. v. VSA Arts*, 126 F.Supp.2d 234 (S.D.N.Y. 2000).[314] When it is clear that a party "received nothing of value" a failure of consideration results. See *BNI New York Ltd. v. DeSanto*, 177 Misc.2d 9, 675 N.Y.S.2d 752 (N.Y. City Ct. 1998)[315] citing *Rossi v. 21st Century Concepts, Inc.*, 162 Misc.2d 932, 618 N.Y.S.2d 182 (N.Y. City Ct. 1994).[316] In *Mais v. Futuristics Foods Inc.*, 90 Misc.2d 259, 394 N.Y.S.2d 359 (Civ. Ct. 1977),[317] the court held that the purchaser of a food delivery service franchise was entitled to rescission based upon failure of consideration, where the franchisor failed to supply the delivery service. In *Krause v. Mariotto*, 66 Wash.2d 919, 406 P.2d 16 (Sup. Ct. of Washington 1965),[318] the defendants sold a business to plaintiffs including equipment, machinery, good will of the business together with an ice vending franchise for a particular territory. The court held that plaintiff was entitled to rescission based upon failure of consideration where the franchise was not in effect and was not available to defendants to transfer to plaintiffs at the time the agreement was entered into. In *Hamlet v. Mr. Zippy, Inc.*, 163 Ga.App. 865, 294 S.E.2d 671 (Ct. App. Georgia 1982),[319] the appellants sued for rescission and alternatively, for damages contending a failure of consideration based upon the franchisor's failure to honor its obligation to establish a franchise organization and to provide training, advertising, consulting, and other services called for in the Agreement. The court denied the franchisor's motion for summary judgment, finding that the case presented a factual issue.

As stated above, the Counterclaimants essentially received nothing from Dunhill for the initial franchise fees, royalties and advertising fund contributions that they paid to Dunhill. The

---

[314] See Submission Binder Exhibit #21.
[315] See Submission Binder Exhibit #22.
[316] See Submission Binder Exhibit #23.
[317] See Submission Binder Exhibit #24.
[318] See Submission Binder Exhibit #25.
[319] See Submission Binder Exhibit #26.

107

Counterclaimants expected to receive a "bundle" of benefits, programs and items of value in exchange for their respective investments and instead received virtually nothing of value. They invested many hundreds of thousand of dollars into their Dunhill businesses and essentially received nothing but a worthless initial training program and a useless President's Manual. Based upon the elements that constitute a franchise, and specifically, based upon what Dunhill represented that they would receive as part of its Franchise Offering, the Counterclaimants had a reasonable expectation that they would be receiving a valuable package which included, among other things, a valuable trade name; being part of a growing network of 150 offices which were there to assist them in an Exchange Program which was going to generate an additional 25% to 40% beyond what they could generate on their own; being provided an "intensive 'nuts and bolts' training" and then "ongoing hands on support in your office"; being provided with a "personal Franchise Development Manager" to mentor them and assist their staff; (v) being provided with a "state-of-the-art" proprietary software package; that the franchisor would promote the Dunhill brand through advertising; being provided with various items of "start-up assistance"; and being provided with "ongoing field support" including training, consultant training and "unlimited advice, guidance, and counsel." All of the above items are what the Counterclaimants reasonably understood Dunhill to be selling and what they were purchasing. However, Dunhill provided them, essentially, with nothing, and whatever Dunhill it did provide to the Counterclaimants was of nominal value, if any.

In addition to the above, Dunhill's misrepresentations (and omissions) to Bud with respect to his protected Territory go to the essential nature of what he purchased from Dunhill – a protected territory where he would be the only Dunhill franchisee operating a Dunhill permanent placement franchise in his Territory. In *Secklir v. Penney*, 148 Misc. 807 (Sup. Ct. 1933),[320] the court held that if an assignment of a supposed right is made on the justifiable assumption by the assignee that he is to

---

[320] See Submission Binder Exhibit #27.

receive not merely such possible right as the assignor may have, but an actual right, the assignee's defense to any promise made by him in consideration of the assignment, if it turns out that no right was conveyed thereby, seems to be failure of consideration. The fact that Mr. Barham was operating a Dunhill temporary staffing business in Bud's Territory essentially vitiated Bud's rights under his right of first refusal. These territorial rights were so fundamental to the purchase of Bud's Dunhill franchise that he is entitled to have his franchise agreement rescinded based upon lack of consideration.

Similarly, Dunhill's representations to Harvey Auger that he would be offered an opportunity to operate a Dunhill temporary staffing business (in addition to a permanent placement business) was a fundamental benefit that Harvey thought he was purchasing from Dunhill. Harvey made it clear to Dunhill that he wanted to offer his clients a "one stop shop" and he testified that he only agreed to move his family to Charlotte, North Carolina because Dunhill had assured him that he would be given the opportunity to operate a temporary staffing business there. Harvey simply did not receive what he had bargained for and he is entitled to have his franchise agreement rescinded.

<u>Implied Covenant of Good Faith and Fair Dealing</u>

Under New York law, every contract contains an implied covenant of good faith and fair dealing. See *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228 (2nd Cir. 1991);[321] and *Dalton v. Educational Testing Service*, 206 A.D.2d 402, 614 N.Y.S.2d 742 (App. Div. 1994).[322] Implicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included. See *New York University v. Continental Insurance Company, et al.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283 (Ct. App. 1995).[323] "The law contemplates fair dealing and not its opposite. Persons invoking the aid of contracts are under implied obligation to exercise good faith not to frustrate the contracts into which they have entered."

---

[321] See Submission Binder Exhibit #28.

See *Grad v. Roberts*, 14 N.Y.2d 70, 198 N.E.2d 26 (Ct. App. 1964).[324]  In the *Dalton* case, an SAT

testing service refused to release a student's second set of SAT scores which were significantly higher

that the student's first set of scores after it conducted a limited investigation into the matter and

suspected that the student had not actually taken the second test.  The court held that the testing

service company had breached its implied duty of good faith and fair dealing when it ignored various

evidence provided by the student and the test proctor indicating that the student had in fact, taken the

second test, and had refused to release the student's second set of scores.     Essentially, Dunhill was

required to deal honestly and in good faith with the Counterclaimants, to observe commercial

standards of fair dealing in the trade and to refrain from doing anything that has the effect of

destroying or injuring the Counterclaimants' right to receive the benefit of their contracts.

Based upon all of the evidence in this case, it is clear that Dunhill breached this implied

covenant of good faith and fair dealing.  For example, Dunhill fraudulently induced each of the

Counterclaimants to purchase their franchises by intentionally misrepresenting the nature of the

franchise system as well as the Exchange Program, and also by making additional illegal earnings

claims to the Counterclaimants which it knew to be false or which it had no reason to believe to be

true.  Dunhill also promised the Counterclaimants, verbally and in writing, a Franchise Offering

which included a host of purportedly valuable items and services but failed to provide what it

promised.  Under the implied covenant of good faith and fair dealing, where a party has discretion to

act under a contract, that party is under an implied duty to act reasonably in exercising that discretion.

See *Carvel Corp. v. Diversified*, supra.  Therefore, when a franchisor promises and represents to a

prospective franchisee that he will be provided with a specific item such as training or support, the

implied covenant of good faith and fair dealing requires that the item that is provided by the

franchisor is meaningful and is not worthless.  Further, even after the franchisees (including the

---

[322] See Submission Binder Exhibit #29.

Counterclaimants), complained to Dunhill, primarily through the FAC, that it had failed to provide them with the "bundle" of benefits and programs that it promised to provide (including a meaningful Exchange Program, meaningful ongoing training (for them and their staff of consultants), ongoing support with in-office field visits with a personal Franchise Development Manager, "state-of-the-art" proprietary software, technology, advertising, advice, guidance, etc.), Dunhill repeatedly disregarded these complaints, made excuses and empty promises to take corrective actions and to address the complaints. Unfortunately, Dunhill was never serious about making substantive changes and nothing ever changed or improved – in fact, things became worse.

In addition to the above, Dunhill also breached the implied covenant of good faith and fair dealing in at least two other ways. Dunhill granted Bud the right to operate a Dunhill permanent placement franchise within his protected Territory. Bud testified that soon after learning that Andrew Barham was operating a Dunhill permanent placement and a Dunhill temporary staffing business from within his protected Territory, he complained on numerous occasions to Jamie Owen who promised to look into the matter. As stated above, the fact that Dunhill had previously granted Andrew Barham the right to operate a Dunhill permanent placement franchise at a location which was within Bud's protected Territory, constituted an egregious breach of Bud's franchise agreement. However, the fact that Bud complained to Dunhill on several occasions about this problem, and Dunhill did absolutely nothing to address the problem, constituted an egregious breach by Dunhill of its implied covenant of good faith and fair dealing to Bud. Further, with respect to Bud's right of first refusal to operate a Dunhill temporary staffing business within his protected Territory (which was fundamental to his purchase of his Dunhill franchise), the fact that Dunhill permitted Andrew Barham to continue operating his Dunhill temporary staffing business within Bud's protected Territory, especially notwithstanding he fact that Barham (under the Barham Agreement with Dunhill) was

---

[323] See Submission Binder Exhibit #30.

precluded from using the "Dunhill" name in connection with his temporary staffing business, was egregious and clearly constituted a breach by Dunhill of its implied covenant of good faith and fair dealing to Bud.  It is clear that as a result of Dunhill's conduct, as well as its failure to act in connection with Andrew Barham, that Dunhill destroyed Bud's right to receive what he bargained for. Dunhill has breached its implied duty of good faith and fair dealing to Bud in connection with his protected "Territory."  As a result, Bud is entitled to the damages in the amount of $1,194,476.58, as set forth in the summary schedule of his damages included as Exhibit #2 in the Submission Binder herein.

Dunhill also breached its implicit duty of good faith and fair dealing to Harvey, by failing to provide him with an opportunity to operate a Dunhill temporary staffing business.  As stated above, Harvey testified that he made it very clear to Joanne Naccarato that he was willing to move his family to Charlotte, North Carolina based on the understanding that he would be offered the "Dunhill 2000" opportunity within six months.  Dunhill has no basis to contend that it was unreasonable for Harvey to have understood that Ms. Naccarato's promises and representations to him that he would be offered an opportunity to operate a Dunhill temporary staffing business in combination with his permanent placement business were part of his "deal."  When Dunhill made the decision to not introduce this program to the franchisees, Dunhill had an implied duty of good faith and fair dealing to either offer Harvey the opportunity to operate a Dunhill temporary staffing business, or alternatively, to offer him to rescind his franchise agreement (and reimburse him for his investment, etc.)  However, Dunhill did neither, and in so doing, destroyed Harvey's right to receive what he bargained for.  Dunhill breached its implied covenant of good faith and fair dealing to Harvey.  As a result, Harvey is entitled to the damages in the amount of $1,551,597.52, as set forth in the summary schedule of his damages included as Exhibit "2" of the Submission Binder herein.

---

[324] See Submission Binder Exhibit #31.