<u>Merger / Disclaimer Clauses.</u>

It is well settled law in New York that a general merger clause is ineffective to exclude parol evidence to show fraud in inducing the contract. See *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714.[325] Indeed, in its Pre-Hearing Memorandum of Law, Dunhill acknowledged that "a general merger clause does not preclude an action for fraud in the inducement, or bar parol evidence concerning fraudulent representations."[326] See *Lee v. Goldstrom*, 522 N.Y.S.2d 917, 918 (App. Div. 1987)[327] As discussed above, in *A.J. Temple Marble,* supra, the court held that where the merger clause in the franchise agreement permitted the franchisee to rely upon misrepresentations made in the "offering circular, prospectus, disclosure document or other ... document ... required or permitted to be given to Franchisee pursuant to applicable law," such "other document" was held to encompass representations contained in the "promotional literature." Essentially, the court in *A.J. Temple Marble* recognized that the promotional literature provided to a prospective franchisee by a franchisor is, in fact, part of the "franchise offering" presented to him and therefore, may be relied upon by him in making his decision to purchase the franchise opportunity.

Should Dunhill contend that a specific disclaimer denying reliance on certain oral representations can render parol evidence inadmissible even to substantiate a claim for fraud, their contention should fail. See *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 157 N.E.2d 597 (Ct. App. 1959.[328] First, we note that the court in *Danann,* premised its decision on the assumption that if the "facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the existence of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." We note that

---

[325] See Submission Binder Exhibit #32.
[326] See Dunhill's Pre-Hearing Memorandum, Page 15.
[327] See Submission Binder Exhibit #33.
[328] See Submission Binder Exhibit #34.

subsequent New York cases following *Danann* upheld the "peculiarly within the sellers's knowledge" exception. See *Steinhardt Group, Inc. v. Citicorp*, 272 A.D.2d 255, 708 N.Y.S.2d 91 (App. Div. 2000)[329]; and *Tahini Investments, Ltd., v. Bobrowsky*, 99 A.D.2d 489, 470 N.Y.S.2d 431 (App. Div. 1984).[330] In any event, this case is distinguishable from the *Danann* case for several reasons.

The *Danann* case involved a single alleged oral misrepresentation made to a single party – our case involves a host of representations, which were made verbally and in writing (including, but not limited to the Brochure), by different Dunhill employees, to one or more Counterclaimants. Second, with respect to Dunhill's numerous misrepresentations, virtually all of the facts and circumstances relating to them were peculiarly within Dunhill's possession and control. They were, in fact, within Dunhill's knowledge and the Counterclaimants' "ordinary intelligence" would not have availed them of the truth. Whether it be Dunhill's misrepresentations about the 25% to 40% in additional revenues each of the Counterclaimants could earn by participating in the Exchange Program, the other specific earnings claims which were made to Mike Lamanna, Elias and Mike Wilcoxson, and to Harvey, or the numerous misrepresentations relating to the "bundle" of benefits and programs that Dunhill promised to provide including, for example, having a meaningful Exchange Program (i.e., with a network of 150 offices), meaningful ongoing training (for them and their staff of consultants), ongoing support with in-office field visits with a personal Franchise Development Manager, "state-of-the-art" proprietary software, technology, advertising, advice, guidance, etc.), Dunhill's representations to Harvey relating to Dunhill 2000 and the fact that he would have an opportunity to operate a Dunhill temporary staffing business, or Dunhill's representations to Bud about the "exclusive" nature of his protected Territory, the Counterclaimants had no "means available to him [them] by the exercise of ordinary intelligence" to conclude either that these claims were false, or that they should not be relied upon. In fact, the opposite was true – the Claimants' reliance on Dunhill's

---

[329] See Submission Binder Exhibit #35.

various misrepresentations was reasonable and was justified. For example, with respect to the Counterclaimant relying statements indicating told how much money they could earn, the Counterclaimants had no familiarity with franchise law and were unaware that Dunhill was prohibited from providing them with information relating to how much revenue or profit they could earn. For example, it would be reasonable for a prospective franchisee to believe that he was being furnished with important specific earnings information from the franchisor in order to assist him in the decision making process. (This is especially true in light of the fact that Harvey, Mike Lamanna, Elias and Mike Wilcoxson had no attorney to assist them in evaluating this process and Bud's attorney had no familiarity with franchise law.) In this regard, the Counterclaimants can be analogized to consumers, where a consumer's reliance upon the representations of the seller's sales agent is justified because the merchant presumably trains and presents its salespersons for purposes of providing them with information about the company's product or service. See *Cirillo v. Slomin's Inc.*, 196 Misc.2d 922, 768 N.Y.S.2d 759 (Sup. Ct. 2003);[331] In *Cirillo,* the court concluded that "Such merchant cannot be permitted to escape all responsibility for the information provided simply by including a disclaimer of authority in a form contract. It cannot cloak its agents with authority on the one hand, and then deny it on the other."

The Counterclaimants were being told impressive things about Dunhill by salespeople who appeared to be knowledgeable and credible. They were being given marketing materials which confirmed what they had been told, which includes in some cases, being told by Dunhill's President that the company was a subsidiary of a publicly traded, billion dollar company, that the franchise system was growing and was expected to grow to a $100 million dollar company and that the company was embarking on a national advertising campaign. The fact of the matter is that the

---

[330] See Submission Binder Exhibit #36.
[331] See Submission Binder Exhibit #37.

Counterclaimants had no reason to doubt what they were told by Dunhill and were justified in relying on Dunhill's representations to them.

As the *Danann* case involved a real estate transaction, it was reasonable for the court to conclude that the purchaser could have and should have inspected the premises and financial documents carefully. But in our case, the Counterclaimants were buying the right to open a yet unopened new business under the trademark and operating procedures of the franchisor. Simply put, the Counterclaimants had nothing to review and rely on other than the verbal representations and written sales literature (and Mike Lamanna's written projection) that Dunhill provided to them.

In *Danann*, the court stated that "It is not alleged that this provision was not understood, or that this provision itself was procured by fraud. It would be unrealistic to ascribe plaintiff's officers such incompetence that they did not understand what they read and signed." However, in our case, none of the Counterclaimants had any prior experience with franchising. Further, the Counterclaimants testified that they did not read carefully nor had any understanding of the meaning and nuances of the technical, boilerplate disclaimer provisions which were contained in their UFOCs or franchise agreements. Additionally, none of them used an attorney at the time they were considering purchasing their Dunhill franchises to guide them or to negotiate their franchise agreements with Dunhill (other than for Bud who testified that his estate attorney, who as far as Bud knew had no franchise law experience at all, reviewed the franchise agreement and told Bud that it looked "like a standard franchise agreement.") The court in *Danann* said, "But the larger implication of the Ernst case is that, where a person has read and understood the disclaimer of representation clause, he is bound buy it." Clearly, that is not the case here. The Counterclaimants basically skimmed through the franchise documents and certainly had no understanding or appreciation of what the technical waivers and disclaimers meant. They trusted Dunhill's representatives and relied on what they were told.

Another difference from the *Danann* case, is in that case the purchaser confirmed the contract because he wanted the property. He did not seek rescission, rather he only sought damages. In our case, the Counterclaimants did not confirm or ratify their franchise agreements and they seek rescission of their franchise agreements as they were defrauded.

In *Danann*, Judge Feld wrote a thoughtful dissent which has been cited frequently. See *Cirillo*, supra, and *Schine v. Schine*, 250 F.Supp 822 (S.D.N.Y. 1966);[332] Judge Feld essentially stated that when a party has actually induced another to enter into a contract by means of fraud, no contractual language can be "devised to shield him from the consequences of such fraud. The law does not temporize with trickery or duplicity…" He reasoned that were that the case, "the maxim that fraud vitiates every transaction would no longer be the rule, but the exception." Judge Feld quoting Judge Augustus Hand, writing for the Federal Court of Appeals, states 'the ingenuity of draftsmen is sure to keep pace with the demands of wrongdoers, and if a deliberate fraud may be shielded by a clause in a contract that a writing contains every representation made by way of inducement or that utterances shown to be untrue were not an inducement to the agreement' a fraudulent seller would have a simple method of obtaining immunity for his misconduct. Judge Feld also admonished that:

> "In the realm of fact it is entirely possible for a party knowingly to agree that
> that no representations have been made to him, while at the same time believing
> and relying upon misrepresentations which in fact have been made and in fact are
> false but for which he would not have made the agreement. To deny this possibility
> is to ignore the frequent instances in every day experience where parties accept and
> act upon agreements containing exculpatory clauses in one form or another, but where
> they do so, nevertheless, in reliance upon the honesty of supposed friends, the plausible
> and disarming statements of salesmen… To refuse relief would result in opening the door
> to a multitude of frauds and in thwarting the general policy of the law."

Judge Feld also points out that the specific disclaimer in *Danann*, which he characterized as "all embracing, encompassing every representation that a seller could possibly make about the property" was essentially boilerplate. In virtually every franchise agreement, the franchisor seeks to

---

[332] See Submission Binder Exhibit #38.

insulate itself from liability by creating barriers and hurdles for franchisees to overcome when they are defrauded and seek redress. The Counterclaimants franchise agreements are essentially contracts of adhesion between a franchisor who dictates the terms of the offer. The Counterclaimants would have been powerless to negotiate the waivers and disclaimers away had they even understood them to be a concern.

The disclaimer clauses in Dunhill's franchise agreements also smack of "unconscionability" and are part of a contract of "adhesion." A court will find adhesion when the party seeking to rescind the contract establishes that the contract was the product of a gross inequality of bargaining power. See *Aviall, Inc. v. Ryder Systems, Inc.*, 913 F.Supp 826 (S.D.N.Y. 1996).[333] While typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated and needy individuals on a take-it- or-leave-it basis, with no opportunity to change the contract's terms. See *Klos v. Polskie Linie Lotnicze*, 133 F. 3d 164 (2nd Cir. 1997),[334] nevertheless, courts have recognized the inequality that exists between franchisors and franchisees and have considered franchise agreements to be contracts of adhesion. See *Independent Association of Mailbox Center Owners, Inc. v. The Superior Court*, 133 Cal.App.4th 396 (Cal. App. 4th 2005).[335] The Court in *Mailboxes, etc.,* stated that "Case law has recognized that franchise agreements can have some characteristics of contracts of adhesion. There is a clear disparity in the bargaining power of franchisors versus franchisees. The [California] Supreme Court recognized that fact in *Keating v. Superior Court* (1982) 31 Cal.3d 584, 613-614, 645 P2d 1192[336] (overruled on other grounds in *Southland Corp. v. Keating* (1984) 465 U.S. 1, 104 S.Ct. 852.[337] In *Bolter v. The Superior Court*, 87 Cal.App.4th 900 (Cal.App. 4th 2001),[338] franchisees who bought a cleaning carpet franchise sued their

---

[333] See Submission Binder Exhibit #39
[334] See Submission Binder Exhibit #40.
[335] See Submission Binder Exhibit #41.
[336] See Submission Binder Exhibit #42.
[337] See Submission Binder Exhibit #43.
[338] See Submission Binder Exhibit #44.

franchisor for breach of contract. The Court of Appeal held that: (i) mandatory arbitration/forum selection provisions contained in franchise agreements were unconscionable and therefore were unenforceable against the franchisees; and (ii) unconscionability could be cured by striking the unduly oppressive clauses. The court reasoned that "unconscionability analysis begins with an inquiry into whether the contract is one of adhesion. The term 'contact of adhesion' signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." "To be considered an unenforceable contract of adhesion, the contact must also inflict substantive unfairness on the weaker party, because its terms are not within the reasonable expectations of that party, or because the terms are unduly oppressive, unconscionable, or contrary to public policy." See *Aviall*, supra.  In the Dunhill case, there can be no question that there was an inequality in bargaining power. Further, Dunhill's disclaimer provisions, if enforced, would be "unduly oppressive" "unconscionable" and "contrary to public policy" as it is clear that New York's public policy is to protect franchisees against fraudulent acts by franchisors, and that Dunhill's conduct was shown to have violated both the Act and the FTC Rule. The Counterclaimants had no prior experience with franchises, had (for all intents and purposes) no legal representation, and basically, negotiated no changes to their franchise agreements at all, or if they did, nominal changes. Dunhill's disclaimers certainly were on a "take-it-or-leave-it" basis as no franchisor would ever remove such boilerplate type disclaimers from its franchise agreements.

It is important to remember that this case is a franchise case and therefore, the merger/disclaimer issue must be taken in the context of the Counterclaimants' purchase of their franchises. The evidence has shown that the very misrepresentations that Dunhill would seek to suppress unequivocally violated the Act and the FTC Rule. Dunhill's fraudulent conduct broke the

law and Dunhill must not be permitted to be shielded by boilerplate disclaimers in a contract of adhesion.

Notwithstanding Mr. Wolf's implications in this case, there is no statutory or other obligation on any prospective franchisee to independently investigate the statements and facts being represented to them by a franchisor. On the contrary, as evidenced by the Act and the FTC Rule, it is Dunhill who had the legal obligation to make only true statements of material facts to the Counterclaimants and not to omit any material facts necessary to make the statements made, in the circumstances under which they were made, not misleading.

We have shown that the Act contains anti-fraud provisions. Section 687(5) which specifically prohibits a franchisee from assenting to a merger or release or waiver of any <u>duty</u> or liability imposed by the Act, states, "It is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article." Also, Subsection 4 also states, "Any condition, stipulation, or provision purporting to bind any person acquiring a franchise to waive compliance with any provision of this law, or rule promulgated hereunder, shall be void." Therefore, Dunhill is not permitted to circumvent either: (i) liability under the Act based upon the merger clause contained in Bud's franchise agreement; or (ii) its duty to all of the Counterclaimants to not make any material misrepresentations or untrue statements of material fact in connection with its Franchise Offering, etc.

<u>Miscellaneous Items.</u>

1.    <u>Review of Franchise Offering by Attorneys.</u>

None of the Counterclaimants used a franchise attorney to assist them in connection with their respective purchases of their Dunhill franchises. Elias Zinn, Mike Lamanna and Harvey Auger each testified that they did not use an attorney at all in this process.[339] Bud testified that he had his estate

---

[339] See TR from 1/24/07, Page 1013 (Elias); TR from 1/29/07, Page 1538 (Mike L.); and TR from 1/26/07, Page 1388 (Harvey).

attorney, Steven Westerman (who Bud did not believe had any franchise law experience), take a look at the franchise agreement that he received from Dunhill. Bud testified that Mr. Westerman did not review the UFOC, and that Mr. Westerman made no specific comments about the franchise agreement, nor did he prepare any memorandum of any kind or negotiate any changes in the agreement on Bud's behalf. [340] Mr. Westerman's only comment was that "it looks like a basic franchise agreement" which of course, is meaningless.

Bud's testimony was clear that while he read the UFOC and his franchise agreement (we note that Dunhill had him sign a form of agreement that was not the same as the agreement contained in his UFOC as an exhibit), he did not understand many of the technical implications that were contained in the offering documents. Bud was somewhat unsophisticated and relied on Dunhill's representations and statements of fact, to his detriment. In fact, Dunhill had Bud sign a franchise agreement which was <u>different</u> from that disclosed to him in his UFOC which in and of itself, is a violation of both the Act and the FTC Rule. Similarly, while Harvey, Mike Lamanna and Elias testified that they had read the UFOC and franchise agreement, it was clear that they did not fully understand the import of various provisions containing legal and technical disclaimer and waiver language. They had no attorney to help them understand these technical provisions.

General Releases (signed by Bud Westover).

Frankly, we would be surprised if Claimants make an argument that Bud Westover's claims are precluded because he signed two (2) General Releases at the time he signed his franchise agreement. It was our understanding that at the hearings, Mr. Wolf was in agreement with our position that it was improper for Dunhill to have asked Bud to sign the general releases in the first place. But "just in case" Claimant makes an argument that Bud's claims should be precluded based

---

[340] See TR from 1/22/07, Pages 583-584.

121

upon these two general releases, we feel that we need to "be on record" with our argument as to why the general releases are unenforceable.

These two general releases were actually exhibits to the franchise agreement (Exhibits I and J) contained in the UFOC which was provided to Bud.[341] They were the form of general release that Dunhill would require the franchisee (in this case, Bud) to sign upon one of two potential occurrences, during the term of the franchise: (i) the renewal of the franchise agreement, or (ii) the assignment of Bud's franchise agreement. Obviously, neither of these potential events had occurred when he initially signed his franchise agreement in July of 2002, and in fact, never did occur. The releases were merely signed in error and of course, should be disregarded. Furthermore, as referenced above, §687(5) of the Act states, "It is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article." It was clearly improper for Dunhill to ask Bud to sign these general releases, and they are unenforceable.

<u>Limitation of Damages</u>.

Any purported limitation or "cap" of the amount of damages that may be awarded to Bud, for example $25,000.00, is unenforceable. First, if the Arbitrator finds that Bud's agreement is rescinded, no such contractual limitation exists. Also, such a provision reflects the unequal bargaining strength of the parties and evidences the fact that the franchise agreement was clearly a contract of adhesion. Such a provision is fundamentally unfair and must not be enforced, especially in light of Dunhill's egregious conduct in this case, generally, and specifically, with respect to Bud's protected Territory. As an illustration of the absurdity of the provision, Bud's damages would be limited to less than one-half of the initial franchisee that he paid Dunhill ($55,000.00).

---

[341] See Westover Binder Exhibit #7, Pages 101-106.

Attorneys' Fees and Arbitration Costs

1,    Attorneys Fees.

The amount of attorneys' fees (including disbursements) incurred in this case on behalf of Counterclaimants is $696,331.25 incurred over approximately three years, plus disbursements of $56,078.19 (including both internal and 3rd party disbursements and including the fees paid to Edward Kushell, the expert witness), (cumulatively referred to as "Attorney's Fees") for a total amount of $752,409.44. A copy of a schedule of attorneys' fees together with copies of all of the bills and time records are included herein as Exhibit #49, and a duplicate copy of the schedule (which also indicates the 3rd party disbursements), together with copies of the 3rd party invoices, is included in Exhibit #50 of the Submission Binder.

With respect to Attorneys' Fees, the Counterclaimants submit that Bud Westover is clearly entitled to be reimbursed for the Attorneys' Fees that have been incurred. While the overall case ultimately involved 4 Counterclaimants, we would submit to the Arbitrator that the amount of Attorneys' Fees that would have been incurred even if Bud were the only Counterclaimant would be estimated to be 60% of the total amount referenced above (i.e., $451,445.66), since a great deal of the services rendered applied to this case, generally. We would submit that the remaining 40% (i.e., $300,963.78) should be allocated equally amongst the 3 other Counterclaimant cases, namely: (i) Harvey; (ii) Mike Lamanna; and (iii) Elias & Mike Wilcoxson (i.e., $100,321.26 each).

That having been said, the Counterclaimants submit to the Arbitrator that if he were to find that a particular Counterclaimant is the "prevailing party" with respect to his case against Dunhill, the Arbitrator would be well within his discretion to award that particular Counterclaimant an award of attorneys' fees based upon: (i) Dunhill's egregious conduct in this case; and (ii) because the provisions in the Counterclaimants' franchise agreements which provide that Dunhill is entitled to recover attorneys fees from the Counterclaimants if Dunhill prevails, should be deemed to be

123

reciprocal in the event that any one or more of the Counterclaimants is successful in this case (in order to avoid an unconscionable result).

2. Arbitration Costs.

The franchise agreements of Harvey Auger, Mike Lamanna and Elias Zinn & Michael Wilcoxson each provide that "The award of the arbitrators may include reasonable costs to the prevailing party." (As previously stated, we submit that Bud Westover is entitled to arbitration costs as a result of Dunhill's violation of the Act.)

The total amount of <u>arbitration costs</u> (including AAA fees and the Arbitrator's compensation) incurred in this case on behalf of Counterclaimants is $42,106.00 plus disbursements. A copy of the AAA Financial History is included herein as Exhibit "51" in the Submission Binder. We submit that this amount should be paid by Dunhill and allocated equally amongst the 4 Counterclaimants (i.e., $10,526.50 each).

Dunhill's Claims Against the Counterclaimants

In his opening statement, Jeff Wolf stated that Dunhill is not seeking in this case to enforce any purported non-competition or restrictive covenants against any of the Counterclaimants.[342]

Dunhill has sued the Counterclaimants for "current royalties" and "future royalties." The Counterclaimants contend that they are entitled to rescission of their franchise agreement because of they were fraudulently induced to purchase them and because they received no value from Dunhill. If the agreements are rescinded, it is axiomatic that the Counterclaimants would have no obligation to pay Dunhill anything. The Counterclaimants contend that whether or not the Arbitrator makes a finding of "rescission," Dunhill must be estopped from collecting any monetary award from the Counterclaimants.

---

[342] See TR from 1/18/07, Page 6.

124

As the evidence has shown in this case, Dunhill materially and willfully violated the Act and the FTC Rule by making various illegal earning claims, and by fraudulently (common law fraud) inducing the Counterclaimants with a host of other false (and known to be false) representations and misstatements of material facts.  The Counterclaimants essentially received nothing from Dunhill and a failure of consideration resulted which constitutes a defense to Dunhill's claims for royalties.  See *First Investment Co., v. Andersen*, 621 P.2d 683 (Supreme Court of Utah 1980).[343]  Further, Dunhill materially breached both the specific terms of the various agreements of the Counterclaimants and failed in a wholesale and material way to comply with essentially, any of its obligations under its Franchise Offerings, generally.  It is well settled that a party who materially breaches an agreement has no right to insist on performance by the other party.  "A breach of contract by one party relieves the other from obligations under it and renders the covenants unenforceable by the one who has breached it." *Hartzell v. Burdick*, 91 Misc.2d 758[344]; See *Sherry v. Federal Terra Cotta Co.*, 172 App.Div. 57, 158 N.Y.S. 241.[345]  Lastly, Dunhill breached its implied duty of good faith and fair dealing with respect to each of the Counterclaimants.  All of the above are valid defenses to Dunhill's claims for royalties.

Further, with respect to Dunhill's claims for "future royalties," it would simply be unreasonable, unconscionable and oppressive to award Dunhill with such amounts.  See *Postal Instant Press, Inc. v. Sealy,* 43 Cal.App.4[th] 1704 (Ct. App. 1996).[346]  Further, Dunhill's calculation is too speculative as to be allowed for contract damages, especially as here where no expert testimony was offered to prove the damages.  Additionally, such an award would allow Dunhill to potentially "double dip" by collecting future royalties from the Counterclaimants and also collect from other franchises which are granted their territory.

---

[343] See Submission Binder Exhibit #45.
[344] See Submission Binder Exhibit #46.
[345] See Submission Binder Exhibit #47.
[346] See Submission Binder Exhibit #48.

<u>Request for Relief - Basil M. Westover</u>

Based upon all of the foregoing, Respondent Counterclaimant Basil M. Westover (referred to herein as Bud) seeks an Award from the Arbitrator:

(i)    Determining that Respondent Counterclaimant Westover was improperly induced by Dunhill, either through fraud or through material misrepresentations and/or material omissions, to purchase his Dunhill permanent placement franchise, and that as a result, he is entitled pursuant to the New York Franchise Sales Act, to have his franchise agreement rescinded and that he is therefore awarded the following: the sum of $1,194,476.58, representing Mr. Westover's (and his late wife's) total investment in the franchised business (including interest), together with the franchise fees, royalties and advertising contributions paid to Dunhill, and lost income, as well as the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Westover) in the amount of $10,526.50, and Attorneys' Fees, all of which (interest, arbitration costs and attorneys fees) are specifically provided for by the New York Franchise Sales Act (allocable to Mr. Westover) in the amount of $451,445.66;

(ii)   Determining that Respondent Counterclaimant Westover was improperly induced by Dunhill, either through fraud or through material misstatements, misrepresentations and/or material omissions, to purchase his Dunhill permanent placement franchise, and that as a result, he is entitled based upon the common law fraud which was perpetrated by Dunhill upon him, to have his franchise agreement rescinded and that he is therefore awarded the following: the sum of $1,194,476.58, representing Mr. Westover's (and his late wife's) total investment in the franchised business (including interest and lost profits), together with the franchise fee, royalties, advertising contributions paid to Dunhill as well as the costs incurred by Respondent Dunhill

126

Franchisees Trust in this proceeding (allocable to Mr. Westover) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Westover) in the amount of $451,445.66;

(iii)    Determining that Claimant Dunhill breached Respondent Counterclaimant Westover's franchise agreement and other obligations it had to him to such an extent that Mr. Westover was justified in terminating his franchise agreement, and that he is awarded damages in the amount of $1,194,476.58, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Westover) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Westover) in the amount of $451,445.66;

(iv)    Determining that Claimant Dunhill's failure to meet its obligations and promises to Respondent Counterclaimant Westover as provided in its Franchise Offering constituted a failure of consideration of sufficient magnitude so as to warrant the rescission of Respondent Counterclaimant Westover's franchise agreement and the award to him of damages in the amount of $1,194,476.58, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Westover) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Westover) in the amount of $451,445.66;

(v)    Determining that Claimant Dunhill breached its implied duty of good faith and fair dealing with respect to Respondent Counterclaimant Westover and that its breach is of sufficient magnitude so as to warrant the award to him of damages in the amount of $1,194,476.58, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Westover) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Westover) in the amount of $451,445.66;

(vi)    Determining that Respondent Counterclaimant Westover's franchise agreement, in its entirety (including, but not limited to, any competitive restriction which may be contained therein), is deemed and declared to be null and void and of no further force or effect; and

(vii)    Determining that Claimant Dunhill's claims against Respondent Counterclaimant Westover (and/or against Respondent Dunhill Franchisees Trust on behalf of Mr. Westover), are hereby dismissed in their entirety with prejudice;

<u>Request for Relief – Mike Lamanna</u>

Based upon all of the foregoing, Respondent Counterclaimant Michael Lamanna seeks an Award from the Arbitrator:

(i) Determining that Respondent Counterclaimant Lamanna was improperly induced by Dunhill, either through fraud or through material misstatements, misrepresentations and/or material omissions, to purchase his Dunhill permanent placement franchise, and that as a result, he is entitled based upon the common law fraud which was perpetrated by Dunhill upon him, to have his franchise agreement rescinded and that he is therefore awarded the following: the sum of $671,610.52, representing Mr. Lamanna's total investment in the franchised business (including interest), together with the franchise fee, royalties, advertising contributions paid to Dunhill, and lost income, as well as the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Lamanna) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Lamanna) in the amount of $100,321.26;

(ii) Determining that Claimant Dunhill breached Respondent Counterclaimant Lamanna's franchise agreement and other obligations it had to him to such an extent that Mr. Lamanna was justified in terminating his franchise agreement, and that he is awarded damages in the amount of $671,610.52, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Lamanna) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Lamanna) in the amount of $100,321.26;

(iii) Determining that Claimant Dunhill's failure to meet its obligations and promises to Respondent Counterclaimant Lamanna as provided in its Franchise Offering constituted a failure of consideration of sufficient magnitude so as to warrant the

rescission of Respondent Counterclaimant Lamanna's franchise agreement and the award to him of damages in the amount of $671,610.52, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Lamanna) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Lamanna) in the amount of $100,321.26;

(iv)    Determining that Claimant Dunhill breached its implied duty of good faith and fair dealing with respect to Respondent Counterclaimant Lamanna and that its breach is of sufficient magnitude so as to warrant the award to him of damages in the amount of $671,610.52, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Lamanna) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Lamanna) in the amount of $100,321.26;

(v)    Determining that Respondent Counterclaimant Lamanna's franchise agreement, in its entirety (including, but not limited to, any competitive restriction which may be contained therein), is deemed and declared to be null and void and of no further force or effect; and

(vi)    Determining that Claimant Dunhill's claims against Respondent Counterclaimant Lamanna (and/or against Respondent Dunhill Franchisees Trust on behalf of Mr. Lamanna), are hereby dismissed in their entirety with prejudice;

Request for Relief – Elias Zinn and Mike Wilcoxson

Based upon all of the foregoing, Respondent Counterclaimants Elias Zinn and Michael Wilcoxson seek an Award from the Arbitrator:

(i)    Determining that Respondent Counterclaimants Elias Zinn and Michael Wilcoxson were improperly induced by Dunhill, either through fraud or through material misstatements, misrepresentations and/or material omissions, to purchase their Dunhill permanent placement and temporary staffing franchises, and that as a result, they are entitled based upon the common law fraud which was perpetrated by Dunhill upon them, to have their two franchise agreements rescinded and that they are therefore awarded the following: the sum of $1,256,983.56, representing Mr. Zinn and Mr. Wilcoxson's total investment in the franchised business (including interest), together with the franchise fee, royalties, advertising contributions paid to Dunhill, and lost income, as well as the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Zinn and Mr. Wilcoxson) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Zinn and Mr. Wilcoxson) in the amount of $100,321.26;

(ii)   Determining that Claimant Dunhill breached Respondent Counterclaimants Zinn and Wilcoxson's two franchise agreements and other obligations it had to them to such an extent that Mr. Zinn and Mr. Wilcoxson were justified in terminating their two franchise agreements, and that they are awarded damages in the amount of $1,256,983.56, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Zinn and Mr. Wilcoxson) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Zinn and Mr. Wilcoxson) in the amount of $100,321.26;

131

(iii)   Determining that Claimant Dunhill's failure to meet its obligations and promises to Respondent Counterclaimants Zinn and Wilcoxson as provided in their Franchise Offerings constituted a failure of consideration of sufficient magnitude so as to warrant the rescission of Respondent Counterclaimants Zinn and Wilcoxson's two franchise agreements and the award to them of damages in the amount of $1,256,983.56, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Zinn and Mr. Wilcoxson) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Zinn and Mr. Wilcoxson) in the amount of $100,321.26;

(iv)   Determining that Claimant Dunhill breached its implied duty of good faith and fair dealing with respect to Respondent Counterclaimants Zinn and Wilcoxson and that its breach is of sufficient magnitude so as to warrant the award to them of damages in the amount of $1,256,983.56, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Zinn and Mr. Wilcoxson) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Zinn and Mr. Wilcoxson) in the amount of $100,321.26;

(v)   Determining that Respondent Counterclaimants Zinn and Wilcoxson's two franchise agreements, in their entirety (including, but not limited to, any competitive restriction which may be contained therein), are deemed and declared to be null and void and of no further force or effect; and

(vi)   Determining that Claimant Dunhill's claims against Respondent Counterclaimants Zinn and Wilcoxson (and/or against Respondent Dunhill Franchisees Trust on behalf of Mr. Zinn and Mr. Wilcoxson), are hereby dismissed in their entirety with prejudice;

<u>Request for Relief – Harvey Auger</u>

Based upon all of the foregoing, Respondent Counterclaimant Harvey Auger seeks an Award from the Arbitrator:

(i)    Determining that Respondent Counterclaimant Auger was improperly induced by Dunhill, either through fraud or through material misstatements, misrepresentations and/or material omissions, to purchase his Dunhill permanent placement franchise, and that as a result, he is entitled based upon the common law fraud which was perpetrated by Dunhill upon him, to have his franchise agreement rescinded and that he is therefore awarded the following: the sum of $1,551,597.52, representing Mr. Auger's total investment in the franchised business (including interest), together with the franchise fee, royalties, advertising contributions paid to Dunhill, lost income, unreimbursed medical expenses, as well as the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Auger) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Auger) in the amount of $100,321.26;

(ii)    Determining that Claimant Dunhill breached Respondent Counterclaimant Auger's franchise agreement and other obligations it had to him to such an extent that Mr. Auger was justified in terminating his franchise agreement, and that he is awarded damages in the amount of $1,551,597.52, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Auger) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Auger) in the amount of $100,321.26;

(iii)    Determining that Claimant Dunhill's failure to meet its obligations and promises to Respondent Counterclaimant Auger as provided in its Franchise Offering constituted a

133

failure of consideration of sufficient magnitude so as to warrant the rescission of Respondent Counterclaimant Auger's franchise agreement and the award to him of damages in the amount of $1,551,597.52, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Auger) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Auger) in the amount of $100,321.26;

(iv)    Determining that Claimant Dunhill breached its implied duty of good faith and fair dealing with respect to Respondent Counterclaimant Auger and that its breach is of sufficient magnitude so as to warrant the award to him of damages in the amount of $1,551,597.52, together with the costs incurred by Respondent Dunhill Franchisees Trust in this proceeding (allocable to Mr. Auger) in the amount of $10,526.50, and Attorneys' Fees (allocable to Mr. Auger) in the amount of $100,321.26;

(v)    Determining that Respondent Counterclaimant Auger's franchise agreement, in its entirety (including, but not limited to, any competitive restriction which may be contained therein), is deemed and declared to be null and void and of no further force or effect; and

(vi)    Determining that Claimant Dunhill's claims against Respondent Counterclaimant Auger (and/or against Respondent Dunhill Franchisees Trust on behalf of Mr. Auger), are hereby dismissed in their entirety with prejudice;

Dated: New York, New York
     April 27, 2007

                Respectfully submitted,

                DUNHILL FRANCHISEES TRUST, ET AL.,
                On Behalf of the following Respondent Counterclaimants
                Basil ("Bud") M. Westover
                Michael Lamanna
                Harvey Auger
                Elias Zinn/Michael Wilcoxson
                By its attorneys,

                s/_____
                Richard L. Rosen
                Leonard S. Salis
                THE RICHARD L. ROSEN LAW FIRM, PLLC
                110 East 59th Street
                23rd Floor
                New York, New York 10022
                (212) 644-6644