UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of the Arbitration of certain
Controversies Between

DUNHILL FRANCHISEES TRUST,

        Petitioner,

v.                                                                              Case No.: 07-CV-6940 (VM)

DUNHILL STAFFING SYSTEMS, INC.

        Respondent.

---

**AFFIDAVIT OF RICHARD L. ROSEN**

State of New York  )
                        ) ss.:
County of New York  )

        RICHARD L. ROSEN, being duly sworn, deposes and says:

        1.        I am an attorney duly licensed to practice law before this Court. I am an attorney for Petitioner Dunhill Franchisees Trust (the "Trust") and Bud Westover, Harvey Auger, Michael Lamanna, Elias Zinn and Michael Wilcoxson (collectively, the "Franchisees"). I was lead counsel in the underlying arbitration proceeding and hearings which occurred in connection therewith. I am familiar with all of the documents and pleadings in this case and the underlying arbitration proceeding and I attended all thirteen days of the hearings in this arbitration proceeding.

        2.        I submit this affidavit in opposition to Respondent Dunhill Staffing Systems, Inc.'s ("Dunhill") motion to vacate the arbitration award dated May 25, 2007 (the "Award") issued by Michael D. Friedman, Esq. (the "Arbitrator"); and in support of the Notice of Petition and Petition filed in this case (in Supreme Court, New York County, Index No.: 109725/07) seeking to confirm the Award.

3.      On June 23, 2004, Dunhill commenced the underlying arbitration proceeding (the "Arbitration) under the auspices of the American Arbitration Association and in accordance with its Commercial Rules.[1]

4.      On or about September 10, 2004, the Trust, on behalf of its individual members who were named in Dunhill's Demand for Arbitration, submitted an Answering Statement and Counterclaims.[2]

5.      It is significant to note that both Dunhill, in its Demand for Arbitration, and the Trust, in its Answering Statement and Counterclaims, used a general and informal type of "legend" approach rather than a more formal and detailed description with respect to Dunhill's claims and the Trust's affirmative defenses and counterclaims, as would have been used in a court pleading. On more than one occasion, the Arbitrator, while conducting periodic preliminary hearings by telephonic conference calls, indicated to counsel that he would be flexible in permitting the parties to argue legal theories in the case which had not been articulated in the parties' pleadings, based upon the facts that were borne out at the hearings.

6.      In the Trust's post-hearing brief,[3] the Franchisees set forth a variety of bases as to why they were entitled to rescission of their franchise agreements and to recover the losses they had suffered. (The Franchisees also alternatively, argued, that each of them was entitled to compensatory damages even if the Arbitrator did not find that rescission of their franchise agreements was appropriate.) However, the underlying position of the Franchisees in the Arbitration was that based upon a cornucopia of factors, some "general" to all of the Franchisees, and some "specific" to one or more particular Franchisee(s), each Franchisee had been fraudulently induced by Dunhill to purchase

---

[1] A copy of Dunhill's Demand for Arbitration is annexed hereto as Exhibit 1.
[2] A copy of the Trust's Answering Statement and Counterclaims is annexed hereto as Exhibit 2.

2

his Dunhill employment placement/staffing franchise and was entitled to rescission of his Dunhill franchise agreement and to recover the damages that he had incurred.

7. One "common" basis of fraudulent inducement included Dunhill's representations that the Franchisees would be joining a premier employment/staffing franchising company with a vibrant and growing network of 150 offices which were there "to assist" them (primarily with respect to Dunhill's purported "Exchange Program" which will be discussed below), and that they would be receiving a wide range of valuable services and support which were of the highest quality and were "state-of-the-art," including, among other things: start-up assistance, initial training, ongoing training and support, software and technology, national advertising and brand promotion. Indeed, the Franchisees' expert witness, Edward Kushell, testified at the hearings, in detail about the various "elements of a franchise" which are the "essential ingredients" in what is being purchased by the franchisee and sold by the franchisor.[4] However, as the testimony and evidence showed during the thirteen (13) days of hearings made clear that the Franchisees received virtually nothing of value from Dunhill,[5] that Dunhill knew or should have known that this would be the case, and that as a result, each of them suffered losses of hundreds of thousands of dollars. Based upon the foregoing, and the fact that Dunhill omitted to disclose to the Franchisees that they would not be receiving these "essential ingredients" when they purchased their Dunhill franchise, each of the Franchisees was entitled to have his franchise agreement rescinded and to recover the damages that he had incurred.

8. Contrary to movant's focus on Dunhill's disclosure requirements (or lack thereof) with respect to its Uniform Franchise Offering Circulars ("UFOC"), Dunhill's marketing materials, which include its printed brochure entitled "*Dunhill Staffing Systems, Inc. – Business Opportunities*"

---

[3] A copy of the Trust's post-hearing brief is annexed hereto as Exhibit 3.
[4] See Exhibit 3 at pp. 4-9.

(the "Brochure")[6], Dunhill's form letters[7], and its "President's Manual" (a training manual which was given to both Bud Westover and Michael Lamanna before they signed their franchise agreements, and which each of them relied on in making their decisions to purchase their Dunhill franchises), [8] are all deemed to be "sales literature" and therefore, constitute part of Dunhill's franchise offering (in addition to the UFOCs and franchise agreements).[9] These marketing materials contained many omissions of material facts.[10] I point out, however, that the printed brochure that movant states was provided to the Franchisees (entitled *Dunhill Staffing Systems, Inc., Explore the Opportunities*) and "which the Arbitrator referred to in the Award as 'marketing materials'[11] is not in fact, the printed brochure which each of the Franchisees were shown at the hearings, which they testified about in detail, and which was admitted into evidence in each of the Franchisees' cases. In fact, it is not the brochure that the Arbitrator referred in the Award as "marketing materials."[12] (We further note that there is no basis to assume, as movant does, that the Brochure [the correct brochure] was the only document that the Arbitrator refereed to as "marketing materials.")[13]

9.    As one example, of what was contained in the Brochure,[14] page 4 of the Brochure

---

[5] Id at pp. 9-46, 49-75.
[6] A copy of this brochure is annexed hereto as Exhibit 4. Note: This brochure is not the same brochure identified as "Dunhill Staffing Systems, Inc. Explore the Opportunities" (See Wolf's Aff., Ex. 14) and inaccurately described as the "marketing materials" which the "Arbitrator referred to in the Award." While the document identified by movant was produced in discovery, it was not the brochure that was discussed repeatedly by all of the Franchisees and marked into evidence. See Hearing Transcripts; Wolf Aff. Ex. 19C at p. 509, Ex. 19D at p. 653, Ex. 19E at pp. 914-915, Ex. 19F at p. 1087, 1232-1233, Ex. 19G at p. 1330, Ex. 19H at pp. 1517, 1635
[7] See Rosen Aff., Exhibit 3 at pp. 33 and 59
[8] See Exhibit 3 at pp. 9, 30, 51, 57, 59, 61, 85-86
[9] Id at pp. 5-6, 86, 105-106.
[10] Id at pp. 9-15, 17-18, 21, 23-24, 30, 32-35, 42, 43, 50-52, 57-58, 59-61, 65, and 73.
11 See movant's Memorandum of Law at p. 4, last paragraph.
[12] See Hearing Transcripts (Wolf Aff., Ex. 19C at p. 509, Ex. 19D at p. 653, Ex. 19E at pp. 914-915, Ex. 19F at pp. 1087, 1232-1233, Ex. 19G at p. 1330, Ex. 19H at pp. 1517, 1635); We note that the brochure that Elias Zinn and Harvey Auger testified about and receiving and which was admitted into evidence (the "Brochure") was substantially similar to, although not identical to, the brochure that is attached hereto as Exhibit 4; However, none of the Franchisees gave any testimony relating to the brochure cited by movant which is significantly different from the Brochure.
[13] The sales form letter that was given to Michael Lamanna and the President's Manuals given to Bud Westover and Michael Lamanna and Bud Westover before they signed their franchise agreements also constitute "marketing materials."
[14] See Exhibit 3 at pp. 9-16 for a summary of the false and misleading statements contained in the Brochure which

4

stated:

> "Dunhill Exchange Program: Through Dunhill, you become part of a cooperative network of offices, giving you access to national and international candidates for challenging assignments. We encourage and support active cooperation between our offices. <u>Today, almost 25% of our placements are a direct result of the exchange network</u>." (emphasis added.)

In any event, movant's inclusion in its motion of the printed brochure included as its Ex. 14 is misleading to the Court, and was hopefully, inadvertent.

10. Additionally, each Franchisee was induced to purchase his Dunhill franchise based upon Dunhill's oral and written representations with respect to the Dunhill's "Exchange Program." The Exchange Program was purportedly, a technology based program which would enable them to each generate at least 25% (and up to 40%) of additional revenues above what they would otherwise have been able to earn if they were Dunhill franchisees who chose not to participate in the program, by matching employment candidates with employment job orders made available by other participating Dunhill franchisees (and vice versa) and by splitting the fees which were earned.[15] However, as the testimony and evidence offered during the thirteen (13) days of hearings made clear, Dunhill omitted to disclose several material facts to the Franchisees with respect to the Exchange Program including: (i) that the Exchange Program existed in name only and that it was essentially worthless to the franchisees in the system;[16] (ii) that rather than having 150 offices participating in the Exchange Program who were capable of "assisting" the Franchisees, the temporary staffing franchised offices and the company owned (as opposed to franchised) offices did not participate in

---

Dunhill omitted to disclose to the Franchisees.
[15] For additional information relating to the Exchange Program, see Exhibit 3 hereto, pp. 16-24.
[16] Even Dunhill's one franchisee witness, Neil Whitman, who testified that he was among the top earning franchisees in the Dunhill franchise system, testified that he only made <u>one</u> exchange placement since becoming a franchisee in 2001; See Exhibit 3 hereto, p. 22.

5

the Exchange Program;[17] (iii) that the actual number of actual permanent placement franchises that were generating and reporting any meaningful revenues (and therefore even <u>capable</u> of participating in the Exchange Program) was only approximately 35 offices;[18] (iv) that an "exchange report" which was prepared utilizing information supplied by Dunhill, indicated that the "exchange rate" (e.g., business generated by the Exchange Program) was 4% (as opposed to 25%); and that the data purportedly used by Dunhill in representing to the Franchisees would earn 25% in additional revenues from the Exchange Program dated back to 1993 and that no one at Dunhill had taken any steps (since that time) to verify whether the 25% figure was still accurate.[19] The above and other omissions of material facts relating to the Exchange Program are examples of omissions which the arbitrator found to have operated as a fraud upon the Franchisees, as a result of which, each of the Franchisees was entitled to the rescission of their franchise agreements and to recover compensatory damages based upon common law fraud.[20]

11. In addition to the "common" bases for fraud, each of the Franchisees had additional, independent grounds which entitled the Arbitrator to make a determination that Dunhill perpetrated a fraud upon them and that they were entitled to have their franchise agreements rescinded. For example, while Bud Westover had initially received a UFOC from Dunhill, he was never properly re-disclosed with an updated UFOC prior to signing his franchise agreement[21] as both the New York Franchise Sales Act and the FTC Rule require. Based upon this willful and material violation of the New York Franchise Sales Act, Bud Westover (who was <u>within</u> the three year statute of limitations period), was entitled to rescission of his franchise agreement and compensatory damages (and an

---

[17] See Exhibit 3 at p. 18.
[18] See Exhibit 3 p. 97.
[19] Id. at p. 23.
[20] Id. at pp. 50-52, 57-58, 60-61, 65-66, 73-74, 76-81, 96-98.
[21] See Exhibit 3 at p. 56.

6

award of <u>attorneys' fees</u>, interest and costs as well).[22]

12.  Bud Westover purchased a Dunhill permanent placement franchise which had an exclusive territory, together with a "right of first refusal" to operate a Dunhill temporary staffing franchise business. However, Dunhill omitted to disclose to Bud that it sold him a franchise while a purportedly "former" Dunhill franchisee was still operating both a Dunhill permanent placement and temporary staffing business from within Bud's exclusive territory with Dunhill's knowledge and approval.[23] Essentially, Dunhill vitiated Bud's rights under his right of first refusal with respect to opening a Dunhill temporary staffing business.[24] Based upon the foregoing facts, the Arbitrator was entitled to conclude, and did in fact conclude, that Dunhill "breached its contractual obligation with respect to [Bud's] exclusive 'territory' but compensatory damages for this breach are subsumed within the award on his rescission claim."[25]

13.  Michael Lamanna, Harvey Auger, and Elias Zinn/Michael Wilcoxson, were each, prior to the time they purchased their Dunhill franchises, given illegal and improper earnings claims,[26] which were false and which Dunhill either knew to be false or were made recklessly, without having knowledge or a genuine belief in the statement's truth or veracity.[27] Accordingly, each of them was entitled to rescission of their franchise agreements based upon common law fraud.[28]

---

[22] Id. at pp. 89-96.
[23] Id at pp. 52-56, 107-109.
[24] Id at p. 109.
[25] See Ex. 5, bottom of page 2.
[26] A copy of the two page proforma (earnings claim) which was given to Michael Lamanna by Dunhill is annexed hereto as Exhibit 6. While Michael Lamanna, Harvey Auger and Elias Zinn/Michael Wilcoxson did not seek a remedy either under the New York Franchise Sales Act or the FTC Rule, nor were any of them granted any such remedy under either statutes, it is clear that Franchisors are prohibited from making any kinds of earnings projections to prospective franchisees (unless it makes a formal disclosure in Item 19 of its UFOC which Dunhill did not do). See Exhibit 3 at pp. 62-63, 67-69, 76-81, 81-84.
[27] Id at pp. 96, 98-99.
[28] Id.

14.     Harvey Auger testified that he made it clear to Dunhill that he was interested in having a "one-stop shop," meaning that he wanted to purchase and operate from the same office location, both types of Dunhill's employment/staffing franchises: (i) a permanent placement franchise; and (ii) a temporary staffing franchise. Harvey was induced to purchase his permanent Dunhill franchise based upon representations by Dunhill (in its UFOC and otherwise) that he would soon be granted an opportunity to also operate a Dunhill temporary placement under a new program that Dunhill would be offering called "Dunhill 2000" which was to be launched sometime during the year 2000.[29] In reliance on these representations, Harvey moved his family (he and his wife, and his son and his wife) to Charlotte, North Carolina from his home in Wilton, Connecticut. Dunhill knew or should have known that it was not going to be launching Dunhill 2000 imminently, when Harvey signed his franchise agreement in mid-October 2000. (In fact, Dunhill never did launch the program.) Yet Dunhill omitted to disclose that fact to Harvey, nor did it permit him to rescind his franchise agreement at that time.

15.     The movant states that the "crux" of the Award[30] was that "Dunhill failed to opine in its 'Uniform Franchise Offering Circulars and marketing materials...' that '[by] December 2000 [it] knew or should have known that a Dunhill Staffing Systems, Inc. permanent placement franchise no longer presented an opportunity with a reasonable chance of success for a new entrant to the business, without prior experience in the industry."[31] The movant then asserts that in so deciding, the Arbitrator exceeded his authority in that the issue of whether Dunhill breached its disclosure duties by failing to characterize the viability of the franchises was never submitted to him. (The issue of

---

[29] The Dunhill 2000 program was referred to on page 4 of Harvey Auger's UFOC. See Exhibit 3, pp. 71-72, 101-102.
[30] A copy of the Award is annexed hereto as Exhibit 5.
[31] See movant's Memorandum of Law at p. 1.

8

whether or not the Arbitrator had the authority to award attorneys' fees to the Franchisees will be discussed separately.)

16. Essentially, movant is contending that the Arbitrator found that "one purported omission" namely, that Dunhill failed to disclose to the Franchisees that a Dunhill permanent staffing franchise was no longer viable as of a certain point in time, or that a prospective franchisee without prior experience in the business did not have a viable opportunity to succeed,[32] was the sole reason that the Arbitrator found for the Franchisees. We disagree with movant's characterizations as to what the "crux" of the Award is and indeed, submit that such a reading of the Award is a distortion of what it says.

17. Before I set forth my understanding of what the Award says, a key fact to bear in mind when considering movant's arguments as to what was stated or not stated by the Arbitrator in the Award is that <u>the parties had agreed that the Award would be in the form of a "standard" rather than a "reasoned" award</u> (We note that this fact was conveniently omitted from movant's papers.) In Item 10 of the Arbitrator's Scheduling Order No. 1 dated June 8, 2006[33] the Arbitrator stated:

> "Claimant and Respondent Trust have **stipulated that the Award issued by the Arbitrator shall be in the form of a 'standard' (as opposed to a 'reasoned') Award."**
> (emphasis added.)

Accordingly, the parties had agreed that the <u>Arbitrator was not required, in making his award, to set forth any findings of fact or conclusions of law, or his reasons for any of the conclusions that he reached</u>. While the Award included some findings and conclusions made by the Arbitrator, he was not required to set forth his findings of fact, conclusions of law or his reasons for the conclusions he reached, and thus undoubtedly, he did not include in the Award, many of the findings of fact and

---

[32] See movant's Memorandum of Law at p. 12.
[33] A copy of said Scheduling Order No. 1 is annexed hereto as Exhibit 7.

9

conclusions of law that he made. Therefore, it is improper for movant to argue that because a particular finding, conclusion, or reason for a conclusion is not set forth in the Award, that somehow the Award is deficient, that the Arbitrator exceeded the scope of his authority, or that the Award is in "manifest disregard of the law."

 18. <u>The parties did not submit to the Arbitrator, any specific list of issues which were to be addressed or decided by him.</u>

 19. Movant has chosen to focus on the Arbitrator's findings in Paragraphs 1 and 2 of the Award (i.e., that by December 2000, Dunhill knew or should have known that its permanent placement franchises no longer presented an opportunity for a reasonable chance of success for a new entrant to the business, and that Dunhill failed to disclose this to the Franchisees in its UFOCs and marketing materials). However, in Paragraph 3 of the Award, the Arbitrator stated that: "The evidence presented at the hearings established that...:

> "3. Claimant intended that the Trust Respondents rely upon the statements contained in Claimant's Uniform Franchise Offering Circulars and marketing materials in connection with their respective purchases of a franchise…Thus **Dunhill Staffing Systems, Inc., Uniform Franchise Offering Circulars and marketing materials given to the Trust Respondents *omitted to state material facts*, known to Claimant which *under the circumstances in their entirety operated as a fraud upon these Respondents*…**"
> (Emphasis added.)

The Arbitrator: (i) read the Trust's pre-hearing brief; (ii) sat through thirteen (13) days of testimony and evidence at the hearings; (iii) read the Trust's 135 page post-hearing brief recounting Dunhill's many failures to disclose material facts; and (iv) was <u>not required</u> to set forth a comprehensive "reasoned award" setting forth all of his findings of fact and conclusions of law. That having been said, the Arbitrator made a determination, as he stated in Paragraph 3 above, that Dunhill's UFOCs and marketing materials "omitted to state material <u>facts</u> known to Claimant which <u>under the</u>

---

10

circumstances in their entirety, operated as a fraud" upon the Franchisees. It is this finding, that Dunhill omitted to state material facts that entitled the Arbitrator to properly and reasonably conclude that the Franchisees were "entitled to rescission of their franchises and damages." This finding alone is more than sufficient to justify the Arbitrator's finding that Dunhill committed fraud against the Franchisees and that therefore, they were entitled to rescission of their franchise agreements and damages.

20. Movant's contention that the Arbitrator exceeded his authority by deciding an issue "that was not before him" namely, whether Dunhill breached its disclosure duties and/or engaged in common law fraud by "failing to opine that Dunhill's permanent placement franchise no longer presented an opportunity with a reasonable chance of success for new entrants to the business" is completely unfounded, is irrational, and is a distortion of what the Award says. As stated above, the Arbitrator found that Dunhill omitted material facts from its UFOC(s) and marketing materials, which were known to it and which under the circumstances, operated in their entirety as a fraud against the Franchisees. The fact that the Arbitrator made a further finding (which was not necessary to justify his finding of rescission and damages), that went beyond this, namely that Dunhill's omissions of material facts were so egregious that there came a time when Dunhill as a franchisor, no longer presented to new entrants in the business, an opportunity with a reasonable chance of success, is merely "icing on the cake" as far as how badly Dunhill defrauded the Franchisees, and cannot reasonably be used to penalize the Franchisees and strip them of what the Award has given to them.

21. With respect to the issue of the Arbitrator's award of attorneys' fees to the Franchisees, movant does not dispute that both parties requested an award of attorneys' fees.

22. The movant contends however, that (other than in its Answering Statement), the

11

Franchisees "made no reference to attorneys' fees during the course of the arbitration,"[34] and that they "indeed, made no mention of their pursuit of such relief."[35] The fact is that in addition to requesting attorneys' fees in its Answering Statement and Counterclaims,[36] the Franchisees raised this issue a number of times during the course of the case and I am incredulous that Dunhill's counsel would state otherwise.

23.     During Dunhill's examinations before trial of the Franchisees, I asked Mr. Lamanna whether he sought to be reimbursed by Dunhill for attorneys' fees that he has incurred in connection with this case and he responded in the affirmative. During the examinations before trial of Harvey Auger and Elias Zinn, Mr. Wolf asked them what damages they were seeking to recover from Dunhill. Harvey and Elias replied that in addition to other specified damages, they were also seeking attorneys' fees.[37]

24.     Furthermore, the Trust's pre-hearing legal brief contained a request for an award of attorneys' fees.[38] In fact, in Item (iv) on Page 20 (under Paragraph IX. "Remedies"), the Trust made clear that attorneys' fees were being sought based upon Dunhill's "egregious conduct." Additionally, immediately below that section, in the section entitled "Damages Sought by Franchisees," the brief states that in order to simplify the presentation of the Franchisees' claimed damages, a schedule of the Franchisees' damages (the "Schedule of Damages") was being attached thereto. That section also stated that "This Schedule has been produced to Jeff Wolf and is included in each of the

---

[34] See movant's Memorandum of Law at p. 22.
[35] Id. at p. 24.
[36] See Ex. 2, Page 5.
[37] A copy of the relevant pages of the transcripts of the examinations before trial of Michael Lamanna, Harvey Auger, and Elias Zinn are annexed hereto as Exhibit 8. We note that due to the fact that Bud Westover's examination before trial was rushed because he had to catch a return flight home to Texas, the general issue of damages was never discussed.
[38] A copy of the Trust's pre-hearing brief is annexed hereto as Exhibit 9.

12

Franchisees' [hearing] exhibit binders [as Bates No. 000578 (Revised)]."[39]

25. The "Schedule of Damages" which was included in each of the Franchisees' hearing exhibit binders, included a column entitled "Attorneys' Fees" and <u>indicated that each of the four Franchisees were seeking an award of $125,000.00 for the attorneys' fees incurred by the Trust to defend against and prosecute the Arbitration case</u>. These hearing exhibit binders containing the Schedule of Damages were sent by overnight delivery to Mr. Wolf's office on January 11th, one week before the hearings commenced.

26. In my opening statement at the hearings, I made the following statement:

"They all paid royalties, for which they got nothing; and made contributions to the ad fund, for which they got nothing; and they all gave up prior positions, and chose to be Dunhill franchisees, rather than being in a market place where they could have made a reasonable livelihood, instead they made nothing. <u>They all incurred attorneys' fees and they are all entitled to be compensated for what they lost</u>" (emphasis added).[40]

27. While the Schedule of Damages (which indicated that each of the Franchisees were seeking $125,000.00 in attorneys' fees) was not itself admitted into as evidence at the hearings, I referred to it during the hearings while eliciting direct testimony from the Franchisees in connection with the various types of damages that they suffered at the hands of Dunhill.

28. In the Trust's post-hearing brief, we indicated that a total of $696,331.25 had been incurred by my law firm in attorney's fees since the inception of the case, together with disbursements of $56,078.19 (which included both internal and 3rd party disbursements) for a total of $752,409.44 and that a "copy of a schedule of attorneys' fees together with copies of all of my firm's bills and time records are included therein as Exhibit #49 of the Trust's Submission Binder.[41]

---

[39] A copy of the Schedule if Damages is annexed hereto as Exhibit 10. This document which was Bates labeled "000578 Revised" and entitled "Claimed Damages – Respondents: Harvey Auger, Michael Lamanna, Bud Wetsover and Elias Zinn & Michael Wilcoxson" was included in Mr. Auger's hearing binder as Exhibit 33; Mr. Lamanna's hearing binder as Exhibit 37; Mr. Westover's hearing binder as Exhibit 23; and Messrs. Zinn and Wilcoxson hearing binder as Exhibit 25.
[40] Hearing Transcript; See Wolf Aff., Ex. 19A at p. 101.

13

29.     Therefore, the movant's statements that the Franchisees "made no reference to attorneys' fees during the course of the arbitration," and that they "indeed, made no mention of their pursuit of such relief" are untrue.

30.     In paragraph 10 of his affidavit, Mr. Wolf complains that he never had an opportunity to examine the "purported evidence" of the Franchisees' attorneys' fees before receiving the Franchisee's post-hearing brief. Frankly, we did not think it would have been meaningful to provide supporting documentation for my firm's attorneys' fees to the Arbitrator and/or to Mr. Wolf during the hearing, as the post-hearing briefs still had to be prepared. Therefore, any documentation which would have been submitted at that time would necessarily have been incomplete.

31.     Also in paragraph 10 of his affidavit, Mr. Wolf states, "In fact, although the Franchises represented that they served Dunhill's counsel with a post-hearing binder containing detailed time entries, no such binder was ever served." The above statement is flat out wrong.

32.     On April 30, 2007, my office sent the Trust's "Submission Binder #2" to Mr. Wolf's office by UPS overnight delivery service together with our transmittal letter to Mr. Wolf[42] indicating that we were enclosing "our Submission Binder #2 which includes the case law and statutory authority cited in Counterclaimants' brief as well as counterclaimants Schedules of Damages and various invoices/statements and related schedules" (emphasis added). The Trust's Submission Binder #2 did in fact, contain Exhibit #49 (the schedule of attorneys' fees) together with all of the bills to the Trust and time records that were sent to the Arbitrator [collectively, the "Billing Records"].[43]

---

[41] See Exhibit 3 p. 123.
[42] A copy of my firms letter dated April 30, 2007 together with a UPS Delivery Service Notice is attached hereto as Exhibit 11
[43] A copy of the Billing Records is annexed hereto as Exhibit 12.

14

33.    I know that Mr. Wolf's office did in fact, receive the Billing Records on May 1st because I have a UPS Delivery Service Notice which indicates (on page 3 of 3)[44] that one package of 10 lbs. was picked up from my office on April 30th and delivered to Jeff Wolf's office the next day. The reason that I know that the Billing Records were in fact, included in the binder which was delivered to Mr. Wolf's office is because I have weighed the Billing Records alone (approximately 2¾ lbs.), the Submission Binder #2 without the Billing Records (approximately 7 lbs) and the binder with the Billing Records included therein (approximately 10 lbs). Based upon the above, <u>there can be no doubt that the Billing Records were in fact, delivered to Mr. Wolf's office on May 1</u>. I also saw Submission Binder #2 which contained the Billing Records and observed it being placed in the UPS box for delivery to Mr. Wolf.

34.    The Arbitration was an extensive case in terms of the number of documents involved and the number of witnesses (party and non-party) who needed to testify. As a result, from the commencement of the hearings until their conclusion, the Arbitrator and counsel tried to move the hearings along expeditiously in order that they would be completed within the ten hearings days that had been scheduled.[45]

35.    Not surprisingly (in my view), the hearings were not able to be completed within the ten scheduled days and three additional dates were added in March in order to complete the hearings.

36.    At the conclusion of the hearings, the Arbitrator directed counsel to simultaneously submit post-hearing briefs in lieu of closing arguments. He also stated that no further responsive briefs could be accepted.

---

[44] See Exhibit 11 annexed hereto.

[45] Several weeks before the hearings commenced, Mr. Wolf made a motion to reduce the number of hearing days from 10 to 5 and I opposed the motion contending that it may take approximately 14 days to complete the hearings and that any reduction would be severely prejudicial to the Franchisees' case. The Arbitrator declined to either increase or decrease the 10 hearing days allotted, but during the hearings, an additional three (3) days were added within which the case was to

15

37. At the conclusion of the hearings, neither the Arbitrator nor counsel raised the issue of how the Arbitrator would handle the parties' respective requests for attorneys' fees. However, it is illogical to conclude from this that the Arbitrator did not believe that both sides were seeking an award of attorneys' fees in the case. It is clear that there was no time at the conclusion of the hearings for the parties to present documentation or evidence in support of their respective claims for attorneys' fees. But more likely, the Arbitrator presumed that the parties would, simultaneously with the submission of their respective post-hearing briefs, also submit whatever documentation that each party felt was appropriate for the Arbitrator's consideration, in support of their claim for attorneys' fees.

38. Assuming for the moment that the Arbitrator was permitted to make an award of attorney's fees to either party (we understand that this issue is contested by movant; this issue will be addressed in the Trust's Memorandum of Law), I submit to the Court that the Arbitrator (as the fact-finder and person charged with determining all of the issues in the case), was clearly acting within the scope of his authority to handle this issue as he did. I believe there is nothing untoward or improper for the parties, after the close of the evidence in the case, to submit to the Arbitrator for his consideration, their supporting documentation for their respective claims for attorneys' fees. Why is it somehow inappropriate or "unfair" for the Arbitrator to consider the submissions and to make a decision as to whether or not an award of attorneys' fees to a particular party was appropriate? Presumably, the Arbitrator would base his decision on a number of factors, including, among others, the evidence in the case, the length of the case, the complexity of the case, the amounts of time spent by the attorneys (and staff), the hourly rate of the attorneys (and staff), the competency and quality of the representation, etc., the reasonableness of the fees sought, etc., the amount of the recovery, and

---

be completed "without fail."                              16

there is no reason for movant to believe that the Arbitrator did not do this.

39.     Moreover, it is clear that movant believes that it was entitled to an award of attorneys' fees (and clearly, the Arbitrator believed that movant requested an award of attorneys' fees). If movant believed that it was entitled to an award of attorneys' fees, and if it is also true that movant had not submitted any "evidence" or supporting documentation during the hearings (which it did not), the logical presumption is that in order for the Arbitrator to make an award of attorneys' for movant, the Arbitrator would have to have had the authority to handle this issue as he did, namely to consider whatever documentation the movant would have submitted (presumably, simultaneously with its post-hearing brief), together with such other factors (e.g., as set forth above) as the Arbitrator might have considered, and then make a determination as to: (i) whether or not such an award was appropriate; and (ii) if he determined that such an award was appropriate, to make a determination as to the amount of such an award. Based upon the above circumstances, how else could the Arbitrator have made an award of attorneys' fees in movant's favor? Certainly movant is not contending that it had waived its request for attorneys' fees.

40.     The fact is that Movant had the opportunity to submit to the Arbitrator simultaneously with its post-hearing brief, whatever documentation that it felt was appropriate for his consideration. The fact that movant chose not to do so is not an indication that the Arbitrator failed to handle this issue properly; that the Trust's submission of its Billing records was "unauthorized"; that the Arbitrator exceeded his authority, or that this process was "fundamentally unfair" to movant.

41.     In paragraph 12 of his affidavit, Mr. Wolf states that "At no time was Dunhill ever afforded the opportunity to either specifically contest the proprietary of the Franchisees' claims for attorneys' fees or to examine and respond to the schedule of legal fees that the Franchisees attached

17

to their post-hearing brief." As set forth above, this argument is fallacious. First, I point out that while movant did not have access to the Billing Records until after the hearings, <u>prior to the hearings</u> the movant had received the Franchisees' "Schedule of Damages" which indicated that they were seeking an award of attorneys' fees in the amount of $500,000.00 ($125,000.00 for each Franchisee).

42. While it true that Mr. Wolf did not have an opportunity to "contest the propriety of" or "respond to" the Franchisees' claims for attorneys' fees, the Franchisees understood and accepted that they would not have had any such opportunity had movant chosen to submit documentation in support of its claim for attorneys' fees. The point is that neither side needed to have such an opportunity to "contest the propriety of" the other party's documentation. This matter was properly left to the discretion of the Arbitrator who was charged with making all of the other determinations in the case.

43. In paragraph 7 of Mr. Wolf's affidavit, he references an understanding between counsel that "no new claims or evidence" would be added in the post-hearing submissions. This understanding reflected an acknowledgment that it would not be appropriate for the parties to raise <u>new substantive matters</u> relating to the issues in the case which had not been contemplated or previously raised in any manner in the context of the case. That understanding was certainly not intended to preclude (either) counsel from submitting documentation supporting their respective claims for attorneys' fees. It was clear that both sides were seeking an award of attorneys' fees (as this issue had already been raised "in the case"), notwithstanding the fact that neither side had introduced any supporting documentation on this issue at the hearings.

44. I also note that notwithstanding the "no new evidence" understanding between counsel which is cited by Mr. Wolf, Dunhill chose to include as "Exhibit A" to each of Dunhill's

four post-hearing memoranda, a document (entitled "Staffing Industry Sourcebook 2006 Edition").[46] This document was not included as an exhibit in Dunhill's hearing binders, was not shown to any witnesses at the hearings, marked as an exhibit or introduced into evidence by Dunhill in the hearings. This document is an example of the type of "new evidence" which relates to substantive issues that were raised in the case which would not be raised after the hearings had been concluded.

45.     As a practical matter, Mr. Wolf's concern that he did not have any opportunity to contest the proprietary of the Billing Records is much ado about nothing. As stated above, the Franchisees' Schedule of Damages which was produced to Mr. Wolf prior to the hearings and which I used as an aide or summary on many occasions during the hearings set forth a demand of attorneys' fees of $125,000.00 for each Franchisee for a total of $500,000.00. The Arbitrator, in fact, awarded each of the four Franchisees, the sum of $125,000.00 for attorneys' fees. Therefore, it appears that the Arbitrator based his award of attorneys' fees on the information contained in the Schedule of Damages and that he disregarded the larger request for attorneys' fees ($696,331.25 plus disbursements of $56,078.19 for a total of $752,409.44) which was stated in the Franchisees' post-hearing brief[47] and supported by the Billing Records.

Richard L. Rosen

Sworn to before me this
27 day of August, 2007.

Notary Public

LEONARD SALIS
Notary Public, State of New York
No. 02SA6080759
Qualified in Queens County
Commission Expires September 23, 20 10

---

[46] A copy of "Exhibit A" to each of Dunhill's post-hearing Memoranda of Law are annexed hereto as Exhibit 13. We note that while these documents were also annexed to Wolf Aff., Ex. 3 (Auger) Ex. 4 (Lamanna) and Ex. 5 Westover), the document corresponding to Zinn and Wilcoxson was omitted from the Wolf Aff., Ex. 2.
[47] See Exhibit 3 at p. 123.

19