## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| DUNHILL STAFFING SYSTEMS, INC., | ) | Case No. 13 181 Y 01674 04 |
| Claimant, | ) | |
| | ) | RESPONDENT FRANCHISEES |
| v. | ) | TRUST'S POST-HEARING |
| | ) | BRIEF |
| | ) | |
| DUNHILL FRANCHISEES TRUST, ET AL., | ) | |
| | ) | |
| Respondents. | ) | |

## I.    What this Case is About

This case is about Bud Westover, Elias Zinn and Michael Wilcoxson, Harvey Auger and Michael Lamanna (collectively, the "Counterclaimants") four would be entrepreneurs who were induced into purchasing franchises in the Dunhill Staffing Systems franchise system. None of the Counterclaimants had any experience in the employment staffing industry and each of them reasonably relied, to their detriment, on the verbal and written representations made by Dunhill's franchise sales personnel. These representations were false and misleading.

The Dunhill system was represented to each of the Counterclaimants to be a premier employment staffing franchising company with a vibrant and growing nationwide network of 150 offices which were there "to assist" the new franchisees. Dunhill represented to each Counterclaimant that the services and support each of them would receive as a Dunhill franchisee, which included, but was not limited to, start-up assistance, initial training, ongoing training and support, software and technology, and national advertising and brand promotion, were of the highest quality and were "state-of-the-art." Further, each of the Counterclaimants were told by Dunhill, in numerous instances, both verbally and in writing, that they could expect to generate additional revenues of 25% to 40% beyond what they could expect to generate by using the Dunhill

franchise system, generally, simply by participating in Dunhill's Exchange Program. Dunhill's representations relating to the Exchange Program (both verbal and written) played a key role in each of the Counterclaimant's decision to purchase his Dunhill franchise, not only because they could (purportedly) increase their revenues, but also because each of them was new to the employment staffing industry and each of them had concerns about how quickly they could begin to make placements and earn revenues.

These various representations about the Dunhill franchise system were made verbally by either Robert Stidham or Joanne Naccarato, but were also in writing, primarily, but not exclusively, as part of a certain marketing brochure entitled "Dunhill Staffing Systems, Inc. Business Opportunities" (the "Brochure") which was provided to each Counterclaimant before he signed his Dunhill franchise agreement(s). Additionally, three out of the four Counterclaimants, Michael Lamanna, Elias Zinn and Harvey Auger, were provided with improper and illegal earnings projections by Dunhill, including a formal written proforma setting forth expected revenues, costs, and profits, under two different scenarios (an "expected case" scenario and a "conservative" case scenario) which was given to Mr. Lamanna. These earnings projections were intended to, and did in fact, induce the franchisees who received them, to purchase their respective Dunhill franchise.

Harvey Auger was induced to relocate his entire family (including his son and his wife) to Charlotte, North Carolina based upon Dunhill's representations that he was going to be provided an opportunity to operate a Dunhill temporary staffing franchise (under the Dunhill program entitled "Dunhill 2000") in addition to the Dunhill permanent placement franchise he purchased. However, this opportunity was never provided to him and he eventually had to "let his son go" from his failing Dunhill permanent placement business. As a result of the stress he was under in having moved his family to Charlotte and trying, unsuccessfully, to make his Dunhill franchise profitable, Harvey Auger suffered a heart attack which required him to have multiple bypass surgery in May of

2001 (five months after he moved to Charlotte, North Carolina with his family to open his Dunhill franchise).

Bud Westover purchased his Dunhill permanent placement franchise with an exclusive territory in Fort Worth, Texas, together with a "right of first refusal" to operate a Dunhill temporary staffing franchise business from that same location. However, after becoming a Dunhill franchisee, Mr. Westover discovered that Andrew Barham, another Dunhill franchisee, was operating both a Dunhill permanent placement and temporary staffing franchise in Mr. Westover's territory, in clear violation of Mr. Westover's franchise agreement. For all intents and purposes, this rendered Mr. Westover's "right of first refusal" devoid of any value.

All of the testimony and evidence presented in this case has clearly established that Bud Westover, Harvey Auger, Mike Lamanna and Elias Zinn and Mike Wilcoxson, are each entitled to have their respective franchise agreements rescinded, and are further entitled to be compensated for their losses suffered as a result of their investments in the Dunhill franchise system.

The Dunhill franchise system was founded in the mid-1960s by Bob and Edward Kushell, two entrepreneurs (who were brothers) who were committed to establishing a network of employment staffing service franchisees that would become the leader in its field by providing the highest level of service to its customers and clients and which would provide its franchisees with an opportunity to achieve a better than average return on their investments. By the time the Company ("Dunhill") was sold to the Canteen Corporation, a subsidiary of the Transworld Corporation, in 1977, Dunhill had grown to a network of close to 400 franchises.[1] During this period, the "Dunhill" name evoked a reputation for excellence and the company co-existed in harmony with its franchisees.

---

[1] See Edward Kushell's testimony, Hearing Transcript ("TR") from 38/07, Page 10.

In 1988, when the current owner of the Dunhill franchise system, Watsco, Inc., ("Watsco") acquired the franchise system, it included 253 permanent placement franchised offices and approximately another 35 temporary staffing offices. Robert Stidham testified that in the fall of 2001, Dunhill essentially suspended its attempts to sell franchises because of its system wide problems[2]. Bud Westover's undisputed testimony in this case was that after Dunhill sold him his permanent placement franchise in July of 2002, Dunhill sold only one additional permanent placement franchise.[3] Robert Freeman, Dunhill's chief financial officer, testified that today, Dunhill has only 25 permanent placement franchisees.[4] The testimony of the Counterclaimants showed that, beginning in 2000, the Dunhill franchise system began a protracted and steep decline, evidenced by high turnover of both management and staff personnel, mismanagement and neglect. While Dunhill languishes with approximately 25 (or 22 as the franchisees' research indicated) permanent placement franchisees, Management Recruiters, Inc. ("MRI"), its rival in the 1970's, remains a vibrant employment staffing franchising company with approximately 1,100 offices.[5] While other employment franchising companies, including MRI, Express Personnel, Inc., and Global Recruiters Network, among many others,[6] have grown and thrived in recent years, Dunhill has become all but irrelevant in the industry.

## II.    The Elements of a Franchise

Franchise expert Edward Kushell, who was also one of the two founders of Dunhill, testified that in 1977 and 1978 he served as President of the International Franchise Association, the world's largest franchise trade association,[7] and that since 1978 (i.e., after his involvement with Dunhill ended), he continuously owned and operated his own franchise consulting business and has consulted

---

[2] See TR from 3/6/07 Page 130.

[3] See TR from 1/22/07, Page 506.

[4] See TR from 1/18/07, Page 186; We note that Dunhill's research revealed that the true number of Dunhill permanent placement franchisees was actually only 22;

[5] See TR from 3/7/07, Page 7; See also General Binder (Large) Exhibits #52 and 53.

[6] See Respondent's Exhibits #52, #53, #54, #55, #56, and #57 (Large General Binder)

with a range of domestic and international clients with respect to many franchising issues.[8]  Mr. Kushell testified that he has been retained approximately 50 times as an expert witness in connection with a wide range of franchise related claims and issues and that he has familiarity with the elements that normally comprise a franchise.[9]

Mr. Kushell testified that the sale of a franchise, from a sequential point of view, starts with the advertising and promotion that franchisors do to attract franchise prospects, for example, through print ads, websites or their attendance at trade shows.  Then, when an individual shows interest in a franchise, there are normally face-to-face meetings where a representative of the company, usually a salesperson (or conceivably a founder), will outline the various component parts of the offering.[10]  Mr. Kushell then stated:

> "They will make available to them usually *brochures and other related materials*. It could be articles that have been in newspapers or magazines that talk about the franchise. In addition to that, franchisors are required to provide offering circulars which include the franchise agreement.  We will further spell out certain parts of the offering, *but I think it is very safe to say that the agreement itself in no way can represent all the component parts of a franchise offering. It is all of these other verbal representations and offerings that are made by the franchisors.*"[11]  (Emphasis added.)

Mr. Kushell's testimony supports Respondent Counterclaimants' contention that the verbal representations made by Dunhill's sales representatives and the written representations contained in Dunhill's marketing materials (i.e., the Brochure) are a part of the franchise offering which was offered to each of the Respondent Counterclaimants and that they were entitled to rely on said representations.  Further, it is clear that under New York State law, franchise sales literature, including brochures and pamphlets, are deemed to be part of a franchisor's franchise offering as all such sales literature must be filed with the New York State Department of Law (the "Department")

---

[7] Id at 13-14.
[8] See TR. 3/8/07, Pages 6-7.
[9] Id at 18-19.
[10] Id at 17.
[11] Id at 17-18.

which regulates the sale of franchises in New York State. New York State Franchise Regulation ("Franchise Regulations") Part 200.9 ("The Filing of Sales Literature"), subsection (a)[12] states:

> "No pamphlet, circular, form letter, advertisement, sales literature or advertising communication (hereafter sales literature) addressed to or intended for distribution or communication to prospective franchisees, shall be distributed or communicated unless it has been filed with the Department prior to distribution."

Prior to the hearings, our office was advised by the Department that Dunhill was exempt from registering its UFOCs and other documents which are related to and made part of the franchise offering with the Department, based upon an exemption which provides that subsidiaries of a large parent company (in this case, Watsco, Inc.) do not have to register such franchise offering documents. But the fact that the Department generally requires the filing of all such sales literature prior to distribution to prospective franchisees, clearly indicates that there can be no question that the Brochure must be considered part of Dunhill's franchise offering and that prospective franchisees such as the Counterclaimants could reasonably be expected to rely on the representations contained in the Brochure (and other "sales literature" such as form letters) with which they were provided.

In his testimony, Mr. Kushell set forth the various essential elements or ingredients that he believes constitute a franchise, i.e., what the franchisor is selling and what the franchisee is buying. The items that Mr. Kushell described are as follows: (1) the licensing of a trademark which has some "meaning and recognition"; (2) a proven business model that is viable; (3) stable and experienced management; (4) a growing network of franchises; (5) a protected territory; (6) a pre-training program (after the franchise agreement is signed and before the initial formal training takes place); (7) review of business plan, including financial forecasts (this is done _after_ the franchise agreement is signed); (8) the computer hardware/POS system; (9) software which may be proprietary but in all cases, is well integrated with the computer hardware/POS system; (10) formal initial training; (11) manuals

---

[12] See full text of 13 NYCRR Part 200.9 Page 23 of 30. A copy of the complete set of Franchise Regulations is attached

dealing with operating procedures, marketing manuals, employee handbooks, etc.; (12) ongoing support which includes being given a field consultant/representative who will be assigned to a specific franchisee, field visits, ongoing training (retraining); regional meetings, telephone support, online support, national meetings; (13) a company website; (14) an operating system of procedures; (15) advertising (both local and national); (16) group purchasing power where the franchisor negotiates better deals for its franchisees; (17) uniqueness; (18) uniformity; (19) a "market niche"; and (20) a continuously evolving system where new products or services are introduced.[13]

In response to the Arbitrator's questioning, Mr. Kushell explained that while the elements he listed would vary somewhat from one franchising company to another, the listed elements are "essential ingredients in what is being sold and purchased."[14]    Mr. Kushell, in describing a hypothetical individual walking around the 300 to 350 exhibitors at the annual International Franchise Exposition where franchising companies are looking to sell franchises to "prospects," stated:

> "And if you were to walk around from one to all of these people here, I think you would find that the ingredients that I mentioned that I believe are the constituent parts of franchises, are being offered by all of the people in different forms, different shapes and sizes, with a different emphasis. But nevertheless if you had that list and walked around to each one and said: Do you offer this and offer this. *They would go down the whole list and I can't conceive of them saying, no we don't do this or we don't do that.*" (Emphasis added.)

In response to another line of questions posed by the Arbitrator, Mr. Kushell explained why an individual would choose to buy a franchise as opposed to starting his own independent business. Mr. Kushell testified that primary reasons for buying a franchise are that you are "buying a proven business model, you are buying a company that has name recognition, you are buying a company that has support from day one, all the way through, of people who have been there and done that."[15]    Mr. Kushell also explained that "another key item" is having an "exit" plan for the business if and when

---

in Counterclaimants' Submission Binder (the "Submission Binder") as Exhibit #3.
[13] Id at Pages 29-35.
[14] Id at Page 44.
[15] Id at 47.

the franchisee wants to sell the business.  When comparing the benefits of having a franchised business or an independent business (in the context of transferring or selling the business), Mr. Kushell testified that "historically, it is very clear that the value of a franchised business with a known trademark is much greater than an independent business."  The Counterclaimants were interested in purchasing a franchise for many of the same reasons cited by Mr. Kushell.  They were looking for, among other things, a recognized and respected brand, a proven business model (so that they would not have to "reinvent the wheel"), ongoing training and support, and a business which would have a good resale value when they wanted to retire or otherwise exit the industry.  It was Dunhill's false and misleading representations (both verbal and written) which persuaded each of them, to their regret, that purchasing a Dunhill franchise (a "premier, industry leader" in the employment staffing franchising company) was the "way to go."

These "elements" or ingredients of a franchise represented, in general terms, what the Counterclaimants expected (and were entitled) to receive when they purchased their Dunhill franchises.  As we shall see below, it is clear from the testimony in this case, that Dunhill delivered virtually none of these elements of a franchise to Messrs. Westover, Auger, Lamanna and Zinn and Wilcoxson.  As a result they each lost hundreds of thousands of dollars.

Mr. Kushell testified that having a "pre-training" program (element #6 above) typically includes the franchisor's assistance with issues like finding a location, the design and layout elements of the location; recruitment of staff and signage.  The Counterclaimants testified that they received practically no such assistance from Dunhill and when they asked for assistance, they were essentially ignored.

Rick Kean analogized Dunhill's President's (Operations) Manual (the "Manual") to the Bible. If so, it must have been the "Old" Testament.  Dunhill's Manual was outdated and not kept current at reasonable intervals.  Dunhill's Manual, like its Brochure, contained false and misleading statements.

The references in the Counterclaimants' Manuals with respect to the 25% exchange rate "over the past 15 years" were false and misleading. Two Counterclaimants, Mr. Westover and Mr. Lamanna, received their Manuals before they signed their respective franchise agreements and testified that they relied on the false representations contained in the Manual in making the decision to purchase their Dunhill franchises.

**III.  Common Misrepresentations Made to (and/or Dunhill's Failures to Meet the Obligations Contained in its Franchise Offering re:) Counterclaimants**

Each of the Counterclaimants testified that they had no prior experience in the employment placement/staffing industry and that they relied on the information and promotional materials that Dunhill provided to them about its franchise system. Dunhill's franchise sales staff made various verbal representations to the Counterclaimants which induced them into purchasing their Dunhill franchises. Many of these representations were also contained in a written marketing brochure entitled "Dunhill Staffing Systems, Inc. Business Opportunities" (the "Brochure") which was provided to each of the Counterclaimants prior to their signing their franchise agreements.

1.    The Brochure

Each of the Counterclaimants testified that he was induced, in part, to purchase his Dunhill franchises, based upon the representations which were contained in the Brochure.[16] The Brochure includes, among other things, each of the following statements (all of which were read into the record during Mr. Westover's testimony[17] and which throughout the testimony of Mr. Westover, Mr. Zinn, Mr. Auger and Mr. Lamanna, were shown to be false and misleading. (For accuracy, the actual text of the Brochure as opposed to the transcript was used):

---

[16] For Westover, see TR from 1/22/07, Pages 509-554; for Zinn, see TR from 1/24/07, Pages 915-951; for Auger, see TR from 1/25/07, Page 1232-1243; and Lamanna, see TR from 1/29/07, Pages 1517-1537.

[17] See TR from 1/22/07 on Pages 509, 510, 513, 514, 515, 528, 529-530, 534, 535-536, 536-537, 541-542, 545-546, 547-548, 549-550, 551 and 552.

1. "Over the past 50 years we have built one of the industry's premier staffing firms" (Page 1); Through the 1980s, Dunhill was a premier staffing firm with a recognized reputation. However, the Counterclaimants experienced nothing which indicated to them that Dunhill was still a "premier" staffing firm. Other staffing franchising companies have experienced tremendous growth and vitality over the last 20 years, while Dunhill's size, standing and reputation has declined to such an extent that it has become "insignificant" in the industry.[18] Dunhill's representation to the Counterclaimants that it was a "premier" staffing firm during the period 2000 to 2002, a period where it was undergoing major problems in many areas, was false and misleading.

2. "You want to invest in a business with a future. In the last five years at Dunhill we have on average, a system wide revenue growth of 20% annually and have doubled the revenues of the Dunhill organization" (Page 2);

   When this statement was made to the Counterclaimants, it was not true because Dunhill's CFO, Robert Freeman testified that Dunhill's revenues declined from almost $67,000,000.00 in the year 2000 to approximately $44,000,000.00 in the year 2001 to approximately $33,500,000.00 in the year 2002.[19] The decline from 2000 to 2001 represents a decline of approximately 35% and the decline from 2001 to 2002 represents a further decline of almost 25%. Cumulatively, the decline in Dunhill's total revenues from 2000-2002 was 50%. The above representation by Dunhill was false and misleading.

3. "You'll rely on your franchise partner [Dunhill] to have the experience, the knowledge and proven methods to guide and support you, not just at start-up, but throughout the relationship. We've got 50 years of experience and a network of 150 offices nationwide to assist you" (Page 2);

---

[18] See Elias Zinn's testimony, TR from 1/24/07, Page 917.

The Counterclaimants testified that they never experienced Dunhill's "knowledge" or "proven methods" and described how Dunhill <u>failed</u> to guide and support them, at <u>any</u> time, and certainly not continuing throughout the time they were Dunhill franchisees. The representation that Dunhill had a network of 150 offices "to assist you" is especially meaningful when taken in conjunction with Dunhill's misrepresentations regarding the Exchange Program, because each Counterclaimant testified that he believed, based upon Dunhill's representations, that they could expect to generate additional revenues of between 25% to 40% (above and beyond what they could generate alone within the Dunhill franchise system) by simply participating in the Exchange Program. Dunhill intentionally misrepresented the true nature of the Exchange Program where temporary staffing and company owned offices did not participate in the Exchange Program. The only way that Dunhill franchisees "assisted" one another was through the Exchange Program. The fact that, in reality, there were no more than 30 to 35 Dunhill permanent placement franchisees in any way truly "available" to assist in the Exchange Program made it a virtual certainty that the fraudulent 25%-40% projections could not be met.

4. "Once we agree to commit to each other, we'll dedicate the full resources of our organization to helping you succeed" (Page 3);

The testimony of the Counterclaimants makes it clear that Dunhill never dedicated itself to anything positive or constructive with respect to its franchisees. Dunhill's management "cried poverty" when making excuses as to why it was not able to provide the franchisees (including Counterclaimants) with the ongoing training and support that was promised to them. Dunhill's parent, Watsco, which clearly had the resources to do so, never lifted a finger to help support Dunhill financially.

---

[19] See TR 1/18/07, Page 201.

5.  "We know you need expert help, especially if you're new to the industry (and most of our new franchisees are!), that's why we provide intensive "nuts and bolts" training at out corporate facility and then ongoing hands on support in your office" (Page 3);

The Counterclaimants testified that they had no prior experience in the employment staffing industry and that they were induced to purchase Dunhill franchises, in no small part, based upon Dunhill's representations that they would receive a proven business system, and solid training, guidance and support on an ongoing basis. However, the NFT training they received was outdated and failed to focus on the Internet or other technology, although this was necessary to operate a successful staffing office in the 21st Century. The Counterclaimants testified that they never received the personal guidance and "hands on support" which Dunhill promised them.

6.  "Dunhill Exchange Program: Through Dunhill, you become part of a cooperative network of offices, giving you access to national and international candidates for challenging assignments. We encourage and support active cooperation between our offices. *Today, almost 25% of our placements are a direct result of the exchange network"* (Emphasis added) (Page 4);

The representations regarding the Exchange Program go to the heart of what the Counterclaimants were promised. They were each promised that by participating in the Dunhill Exchange Program (which was represented to them as consisting of the entire 150 office Dunhill network), they could expect to generate additional revenues of at least 25% (some verbal representations to Counterclaimants were higher) above what they could otherwise expect to generate on their own as a Dunhill franchisee. The written representation in the Brochure provides important confirmatory evidence with respect to the verbal representations which each Counterclaimant testified to. Based on the evidence

12

in the case, for the years 2000 through 2002, Dunhill had no basis whatsoever to represent to Counterclaimants that "<u>Today</u>, almost 25% of our placements are a direct result of the exchange network."

7. "Field Support: You'll have a personal Franchise Development Manager to mentor you and assist your staff. Our Franchise Development Managers bring successful "real world" experience to the task of setting up and organizing your office. Your Franchise Development Manager will continue to work with you (and your office) on an ongoing basis" (Page 5);

Dunhill never provided the Counterclaimants with a "Franchise Development Manager" to mentor them and their staff. The Counterclaimants testified that Dunhill provided them with little, if any, "real world" experience with respect to setting up and organizing their offices. Furthermore, when the Counterclaimants asked Dunhill for assistance in this regard, they were ignored.

8. "Technology: You'll receive our "state-of-the-art" proprietary software package, which you'll use for external placement processes and the administration of your office. You'll communicate with clients, candidates and other Dunhill offices through our Internet and Intranet presence" (Page 5);

Once again, this written representation supports the testimony proffered by the Counterclaimants that they were promised a high technology, "state-of-the-art" proprietary software with which to operate their business. The Counterclaimants testified that the Resummate software they received was too difficult to work with and that Dunhill failed to provide them with any meaningful training or training manual to help them utilize the program. Mr. Westover testified that Mr. Kean was unable to instruct him on the use of the Resummate program at his NFT training.

13

9. "Marketing Services: Our national advertising, marketing, communications and public relations programs are available to promote your office and position you in your market" (Page 5);

Dunhill failed to proffer any evidence that it placed a single national advertisement or marketed or promoted the "Dunhill" brand in any way. Simply put, Dunhill was charging its franchises (including Counterclaimants) a 1% contribution to Dunhill's national advertising fund, while failing to provide the franchise system with any national advertising or brand promotion. More meaningful, however, is the fact that Dunhill failed to provide its franchisees with one of the essential elements of any franchise system, the promotion of its brand in the marketplace.

10. "The Dunhill Advantage: Getting started on the right foot is critical to your subsequent success. That's why we offer personalized support from the beginning. Our consultation services will assist you with:

- Selecting a suitable office location;
- Designing and layout of your new office;
- Furnishings and equipment recommendations;
- Appropriate telephone systems and initial office telephone wiring;
- Initial computer hardware and operating system software; selection of your Internet service provider (ISP);
- Installation of your Dunhill provided computer software package, including our database and business management software;
- Development of your office Internet site: links to the Dunhill Corporate website;
- For temporary staffing franchises [i.e., Mr. Zinn & Mr. Wilcoxson]: all of the administrative system and support for your office;
- For permanent placement franchisees: Help you select the "desk specialty" (area of business) that you and your Consultants will work." (Page 6);

The Counterclaimants testified that they received little, if any, start-up assistance (including the above referenced items) in connection with setting up their new Dunhill office and businesses. They further testified that when they asked Dunhill for assistance regarding these items, Dunhill ignored their requests for assistance.

11."That's just the beginning our commitment to you. Ongoing field support from your personal

Franchise Development Manager and Dunhill Corporate Staff are yours, on site at your

location. Here's where you'll get:

- Ongoing field support from your Franchise Development Manager throughout the year;
- Additional owner training to complement the New Franchisee Training (NFT) class you will have completed;
- Assistance in identifying hiring and training of your initial staff through our R.A.T.I.F.Y program; advanced consultation and staff training programs;
- Access to worldclass training through our "Dunhill University" (intranet based) program; access to Internet-based training through our exclusive partnership with Learn2.com;
- Access to training provided at Corporate Headquarters or at area, regional and national events and meetings;
- Unlimited advice, guidance and counsel from Dunhill Corporate" (Page 7);

The above representations were made to the Counterclaimants (verbally as well as in the

Brochure). As none of the Counterclaimants had any prior experience in the employment

staffing industry, they relied on Dunhill's representations to provide them with a proven

business model as well as with ongoing training and support for them and their consultants.

The Counterclaimants were never assigned a "Franchise Development Manager" to provide

them with assistance, support or guidance. The training provided to the Counterclaimants'

consultants through the R.A.T.I.F.Y. program was outdated and woefully inadequate to

prepare them to succeed in the industry (and they did not succeed). The "Dunhill University"

training (which was accessible on Dunhill's intranet system), offered Counterclaimants

nothing new beyond the regular, outdated, deficient, Dunhill training techniques that they had

already received. There was nothing "world-class" about the "Dunhill University" training or

any other kind of training offered by Dunhill.

12. "Our Mission Statement – We the members of the Dunhill family of Companies are dedicated

to providing quality professional search and staffing services. We pledge to meet the needs

and exceed the expectations of our internal and external customers through the process of

continuous improvement" (Page 11);

Rick Kean acknowledged that Dunhill's reference to "internal customers" includes Dunhill's franchisees.[20] Therefore, Dunhill's mission statement can only be interpreted as a pledge to "meet the needs and exceed the expectations" of its franchisees "through the process of continuous improvement." As the testimony in the case clearly indicated, not only did Dunhill not exceed the expectations of the Counterclaimants, but it also miserably failed to meet their needs at all. At Dunhill, there was no "process of continuous improvement"; in fact, there was *not even an attempt* to achieve continuous improvement. Rather, there was a pattern of franchisees leaving the system, high management and staff turnover, no meaningful training, support or services, no advertising, and a constant flow of empty promises from management stating that they would address all of the problems in due course.

13. "Our 'Statement of Core Values.' – Ethics: We practice the highest level of business ethics and integrity" (Page 11);

The above representation sounds noble, but bears absolutely no relation to how Dunhill actually conducted its franchise system. Dunhill and its sales staff induced the Counterclaimants into purchasing their Dunhill franchises based upon numerous false, misleading and improper representations about the nature of the Dunhill franchise system and what each of them would achieve within the system. Based upon the testimony presented during the hearings, there can be no doubt that Dunhill did <u>not</u> practice the highest level of business ethics and integrity, but that, in fact, the very opposite was the case.

2.    Dunhill's Exchange Program

Edward Kushell, the co-founder of the Dunhill franchise system testified he conceived and developed the Dunhill Exchange Program in the 1960's as a unique feature which enabled the system

---

[20] See TR from 1/22/07, Page 437.

to increase the number of placements made in the franchise system and to give the franchised system a much larger presence in the marketplace.[21]  He further indicated that during the time he was affiliated with Dunhill, the franchisees in the Dunhill franchise system "could generate enough revenue to offset their royalties"[22] (which have always been 7% of gross revenues) through their participation in the Exchange Program.

As none of the Respondent Counterclaimants in this case had prior experience in the employment staffing industry, they had reasonable concerns about being able to generate sufficient revenues to operate and sustain their businesses, especially in the short term when they were "getting started."  An important component of Dunhill's marketing approach to its prospective franchisees, including Counterclaimants, was for Dunhill's franchise sales staff to make repeated verbal representations and give repeated assurances with respect to how much additional revenue each of them could expect to generate (above what they might otherwise expect to generate working alone as Dunhill franchisees) merely by participating in Dunhill's Exchange Program.

Mr. Westover testified that Robert Stidham explained that The Dunhill Exchange Program worked in the following way: "where one office will have an order for a candidate and another office will have an order from a client for a candidate and they try to match the two together and do a split commission on it."[23]  The Counterclaimants were told that by participating in the Exchange Program they would expand their pool of candidates and job orders so that they could expect to generate between 25% to 40% more business than they would otherwise do.

As described above, Dunhill represented to the Counterclaimants that the Dunhill network of 150 offices was able to "assist them" through the Exchange Program.  As referenced above, the Brochure stated "Dunhill Exchange Program: Through Dunhill, *you become part of a cooperative network of offices*, giving you access to national and international candidates for challenging

---

[21] See TR from 3/8/07, Page 32.

assignments. We encourage and support active cooperation between our offices. *Today, almost 25% of our placements are a direct result of the exchange network.*" (Emphasis added)

However, as the Counterclaimants testified, Dunhill misrepresented the nature of the Exchange Program to them in several ways. For one thing, it knew that Dunhill's temporary staffing offices and company owned offices did not participate in the Exchange Program. Therefore, only the 84, or 90 or 85 Dunhill permanent placement offices at most (and not the 150 as represented) could have possibly been participating in the Program, depending on the year. The reality, as the Counterclaimants testified, was that so few permanent placement franchisees actually participated on a consistent basis that it was extremely difficult to achieve an exchange placement.

Each of the Counterclaimants testified as to how important it was to them to have an opportunity to generate significant additional revenues (above what they could expect to earn through their own efforts as a Dunhill franchisee) quickly, and with less work, as they would only need to have one of the two key elements necessary to make a permanent placement (i.e., a job candidate or a job order). Dunhill represented to them that they would be able to find a "match" for their job candidate (or job order) through their participation in the Exchange Program. Mr. Stidham referred to the Exchange Program as being a "safety net."[24]

While Dunhill argues that participation in the Exchange Program was voluntary amongst permanent placement franchisees prior to 2002, Dunhill did not tell the Counterclaimants this. When Mssrs. Westover, Auger, Lamanna and Zinn and Wilcoxson were told that the Dunhill network of 150 offices was there to "assist them" in connection with the Exchange Program, they reasonably assumed that the entire network was participating. Dunhill's "voluntary" policy is inconsistent with the statement "100% Participation -- i.e., every Dunhill Permanent Placement Franchise and DPS Corporate have signed the Exchange Agreement" which is contained in the Counterclaimants'

---

[22] See TR from 3/8/07, Page 32.

President's Manuals.[25]  Indeed, Mr. Zinn testified that he was unaware that the Exchange Program was a "voluntary" program until Mr. Wolf made this point at the hearings.[26]

In addition, Dunhill greatly exaggerated the number of viable, operating permanent placement franchisees that were in the system.  While we will not reiterate the detailed exposition regarding this point as set forth in Section 3 below ("Dunhill's Misrepresentations Regarding the Number of Active Permanent Placement Franchised Offices"), it is clear that the fact that there were only 35 or so active permanent placement franchisees (defined by generating revenues of at least $60,000.00 per year) "to assist" in the Exchange Program, rather than the 150 as represented, was false and misleading and made it a virtual certainty that the 25% to 40% in additional revenues as represented, would not be achieved.

Finally, as the Counterclaimants testified, the Exchange Program essentially existed in name only and was practically worthless.  They attempted to participate in the Program because they were relying on the revenues that Dunhill represented that they could generate from participating in the Program.  But the information relating to the job orders was stale, over 2 years old and few franchisees actually participated because it was perceived to be a waste of time.

When recalling a conversation Mr. Zinn had had with Rick Kean, Mr. Zinn said that Mr. Kean had told him:

> "you got to have the core of offices to make it work because the two keys are offices and technology. You got to have the offices because if you don't have the offices you are not going to get the jobs or the candidates. You got to have the technology because if you don't have the technology then you can't place your job or your candidate onto a Dunhill-only website because you need a Dunhill-only, you couldn't do it through Monster or job board because you wouldn't't be able to see a Dunhill"[27] [i.e., a Dunhill-only site on Monster.com]

---

[23] Mr. Westover's testimony at TR from 1/22/07, Page 508.
[24] Id at 525; See TR 1/24/07, Pages 853-854
[25] See Westover's Binder Exhibit #10, Bates 001870; Zinn's Binder Exhibit #11, Bates 011544; and Lamanna's Binder Exhibit #12, Bates 003674.
[26] See TR from 1/25/07, Page 1104
[27] See TR from 1/24/07, Page 928.

Mr. Zinn further testified that Dunhill never had the technology to facilitate a true exchange network. He stated, "I mean they were making this statement knowing that their website was inadequate for the Exchange Program. That the only website they had at the time was Monster, where that wasn't an exchange."[28]

Mr. Westover, Mr. Auger and Mr. Lamanna each testified that they made <u>no placements or exchanges whatsoever through their participation in the Dunhill Exchange Program</u> despite their efforts to make such placements. Mr. Zinn testified that he made no exchange placements for the first 3½ years that he was a franchisee and that he made a total of 4 exchange placements in the second half of 2003 and in 2004 with a Dunhill franchisee that he had built up a rapport with.

Mike Green, a former Dunhill franchisee and former Chairman of the Franchise Advisory Council (the "FAC") testified that he was one of the top revenue earners with respect to Dunhill permanent placement franchisees beginning in 1997 and continuing through 2004. Mr. Green testified that he generated no revenues at all from the Exchange Program during his entire tenure as a Dunhill franchisee.[29]

In this case, the Counterclaimants proffered minutes of a joint FAC (Franchisee) / DSS (Dunhill Management) meeting from October 2001 which indicated that Ray Cech, a Dunhill franchisee, had disseminated an "exchange report" to the participants.[30] The minutes reflected that the report indicated that there was only a 4% inter-office exchange rate. Mike Green testified that he had asked Mr. Cech where he had received the reporting data and that Mr. Cech had told him that he got the information directly from Dunhill's accounting department.[31] Mr. Zinn testified that he sat in

---

[28] See TR from 1/24/07, Page 934.
[29] See TR from 1/26/07, Page 1485.
[30] See Zinn Binder, Exhibit #14 (Bates 009131).
[31] See TR from 1/26/07, Page 1486-1487.

on this October meeting by teleconference and that there was "no question" about the accuracy of the 4% exchange rate cited in Mr. Cech's report.[32]

As referenced above, Dunhill made verbal representations to the Counterclaimants that they could expect to generate between 25% and 40% of additional revenues by participating in the Exchange Program. The Brochure, which was given to each of the Franchisees before they signed their particular franchise agreements, stated that: "Today, almost 25% of our placements are a direct result of the exchange network." The President's Manuals which were provided to the Counterclaimants stated that the Exchange Program has "allowed Dunhill Franchisees to generate 25% in additional revenues through shared resources over the past 15 years."

Notwithstanding all of Dunhill's representations relating to the high percentage of additional revenues that the franchisees could expect to generate from the Exchange Program, Robert Stidham, a former President of Dunhill, testified that Dunhill could not predict the percentage (or amount) of a franchisee's revenues which could be generated from the Exchange Program because there were too many factors and variables involved. But Dunhill *did* in fact, make specific representations to the Counterclaimants (and Mr. Stidham himself did, with respect to Mr. Westover and Mr. Lamanna), regarding how much additional revenues they could generate by participating in the Exchange Program.

While discussing the Dunhill Exchange Program in his opening remarks, Jeff Wolf made the following statement:

"And the evidence that you will hear from Dunhill witnesses is that they were not given any specific assurance of a certain amount, but that they were told that speaking historically many people achieved in the 25 percent range, *but the range could be from zero to 100. There are Dunhill offices that today operate on the basis of 100 percent referrals through the exchange program* and some that don't get any success out of that."[33] (Emphasis added.)

---

[32] See TR from 1/24/07, Page 974
[33] See TR from 1/18/07, Pages 40-41.

Mr. Wolf's statement is noteworthy in at least two respects. First, he assures us that Dunhill will proffer "evidence" from "Dunhill witnesses" that franchisees were told not that Dunhill franchisees would in fact, generate a "certain amount" through the Exchange Program, "but the range could be from zero to 100%." Apparently, Mr. Wolf's point is that Dunhill did not explicitly "guaranty" or provide "specific assurance" as an exact amount that would be generated. However, such an argument must be rejected. Dunhill made representations setting forth how much additional revenue the Counterclaimants could expect to generate and even if Dunhill did not "guarantee" them, they were still representations that Dunhill either knew to be false (for example, based upon the exchange report indicating an exchange rate of 4%) or, with respect to which they had no reasonable basis to believe that they were true. Further, such representations as to how much money the Counterclaimants could expect to make constitute improper and illegal earnings projections. The fact that they may not have been "guaranteed" is irrelevant.

Also, in the above statement and in the context of his telling us that he will proffer "Dunhill witnesses," Mr. Wolf indicates that that "there are Dunhill offices that today operate on the basis of 100% referrals through the Exchange Program..." In this case, Dunhill produced only one current or past franchisee witness, Neil Whitman (a current franchisee) who testified on cross examination that he has been one of Dunhill's top revenue producers for the period 2003-2006 and that he made <u>only</u> <u>one</u> exchange placement since becoming a permanent Dunhill franchisee in 2001.[34] (We note that the evidence showed that Mr. Whitman had been so frustrated with Dunhill that in March 2004 he had Robert Purvin prepare a notice of termination to Dunhill on his behalf,[35] he was included as an "anonymous" Dunhill franchisee in Mr. Purvin's May 5, 2004 letter to Dunhill which referenced the franchisees' continuing concerns,[36] he was a named Respondent in this proceeding,[37] and as a

---

[34] See TR from 1/30/07, Pages 1786 and 1814.
[35] See TR from 1/30/07, Page 1825, Line 24 – Page 1832; See General Binder (Miscellaneous Section) Exhibit #1.
[36] See TR from 1/30/07, Pages 1839-40; See General Binder (Miscellaneous Section) Exhibit #3.

member of the Dunhill Franchisees Trust, he asserted through counsel, various counterclaims against Dunhill, including among others: fraudulent inducement, breach of contract, failure of consideration and rescission of his franchise agreement,[38] before settling his claims with Dunhill and deciding to remain a Dunhill franchisee.)

As stated above the Counterclaimants' President's Manuals cite a 25% historical exchange rate "over the past 15 years." However, Dunhill failed to produce or demonstrate any credible evidence that Dunhill had any reasonable basis to represent to prospective franchisees that such a historical basis was accurate. In trying to defend Dunhill's 25% historical exchange rate contained in the Manuals (which Rick Kean authored), specifically, Michael Green's manual from 1996, Mr. Kean could only testify, that he got the 25% figure, as an estimate, by reviewing Dunhill purported "earnings data" going as far back as 1993.[39] However, Mr. Kean also testified that he could not recall taking any additional or subsequent steps to check whether or not this "estimate" of 25% was accurate.[40]  In fact, the only thing he did recall was getting some information to Ray Cech,[41] the Dunhill franchisee who had submitted the exchange report at an FAC/DSS meeting in 2001 which indicated an exchange rate of 4%. We note that if the 4% figure is based on recent historical data, the information should have been disclosed to each of the Counterclaimants.

Notwithstanding the fact that Dunhill produced no evidence proving that the historical data of 25% ever existed, Dunhill also produced no testimony or evidence to support the written representation contained in its Brochure which stated "Today, almost 25% of our placements are a direct result of the exchange network." (Emphasis added). In fact, all of the testimony in the case,

---

[37] See TR from 1/30/07, Pages 1840-1841; See Dunhill's Demand for Arbitration which is included as Exhibit #1 in each of the 4 Counterclaimant's Exhibit Binders.
[38] See TR from 1/30/07, Pages 1841-1843; See Respondent Trust's Answering Statement which is included as Exhibit #2 in each of the 4 Counterclaimant's Exhibit Binders.
[39] See TR from 1/31/07, Page 1938.
[40] Id at 1949-1950.
[41] Id at 1950.

even that of Dunhill's witnesses, indicated that few, if any, franchisees generated any (or certainly no meaningful) revenues at all from the Exchange Program.

3.    Dunhill's Misrepresentations Regarding the Number of Active Permanent Placement Franchised Offices

Dunhill represented to the Counterclaimants that the Dunhill franchise system consisted of 150 offices nationwide "to assist them." It also represented to them that the Dunhill franchise system was a growing and vibrant and that Dunhill expected to open many new offices. For example, Elias Zinn testified that before he purchased his Dunhill franchises, Daniel Abramson, Dunhill's then President, told him that Dunhill was going to open 40 new permanent franchises in the next 3 years (2000, 2001 and 2002), as well as 20 new temporary staffing offices and 5 company owned offices during that period.[42] Mr. Zinn testified that Mr. Abramson provided a memorandum to the FAC Office Growth Committee Members dated April 4, 2000, which, among other things, included a chart which indicated that Dunhill's growth strategy was to add 14 new permanent placement offices, 6 temporary staffing offices and 2 company owned offices in the year 2001; and to add 16 new permanent placement offices, 10 temporary staffing offices and 2 company owned offices in the year 2002.[43] Mr. Westover testified that he was told by Robert Stidham in February 2002 (before he purchased his Dunhill franchise), that Dunhill planned to open 20 new offices during 2002.[44] Mr. Westover further testified that he had been exploring several other franchise opportunities, including Sanford Rose, and that it would have been a "red flag" or "negative" to purchase a franchise that only had approximately 50 offices.[45]

Notwithstanding the above representations, Dunhill's October 2002 UFOC, shows that only 90 permanent placement franchised offices were operating at the end of 2000 and 85 permanent placement franchised offices were operating at the end of 2001. (Dunhill produced no 2003 UFOC).

---

[42] See TR from 1/24/07, Page 923.
[43] See TR from 1/24/07, Pages 1015-1016 and Zinn Binder Exhibit #13 (Bates 011517).
[44] See TR from 1/23/07, Page 795.

We note that the minutes from the October 2002, FAC/DSS Baltimore Mega-Regional Meeting indicate that Robert Stidham said that there was a "net loss" of 9 offices from January 2001 to now (October 2002).[46]    Clearly, notwithstanding Dunhill's projections, and despite the representations Dunhill made to the Counterclaimants, the system was not growing and was in fact, declining.

As stated earlier, Dunhill's representations regarding its network of 150 offices "to assist you," were misleading to the Counterclaimants in the context of the Exchange Program.  Not only did Dunhill's temporary staffing offices and company owned offices not participate in the Exchange Program, leaving a potential maximum of 84 permanent placement offices participating in 2000 (the number operating at the end of 1999), 90 in 2001 (the number operating at the end of 2000) and 85 in 2001 (the number operating in 2002), the reality is that many permanent placement franchisees were not making placements or reporting revenues to Dunhill.  As Mike Green testified in connection with the fax dated October 10, 2001 that he had received from John Mills, Dunhill's Acting President, for the period January through August 2001, only 66 Dunhill permanent placement offices "were generating any revenue at all."[47] Mr. Green also testified that in 2001, only 38 permanent placement franchisees generated revenues of more than $60,000.00.[48] (This was calculated on an annualized basis.)

Mike Lamanna also testified in detail about the number of permanent placement franchisees who were actually operating from a business perspective, rather than a technical perspective (i.e., merely having signed a franchise agreement).  Mr. Lamanna testified, after reviewing Dunhill's monthly data reports for the year 2000, that of the 90 permanent placement offices listed in Dunhill's 2001 UFOC, 43 offices reported no revenues at all and only 35 offices generated revenues of more

---

[45] See TR from 1/22/07, Page 527.
[46] See Dunhill's Exhibit #106 (Page 1 of 8) .
[47] See TR from 1/26/07, Pages 1497 and 1498; See General Binder, Exhibit #8.
[48] See TR from 1/26/07, Page 1498.

than $60,000.00.[49]  After reviewing Dunhill's monthly data reports for 2001, Mr. Lamanna testified that of the 85 offices listed in Dunhill's 2002 UFOC, 23 offices reported no revenues at all and only 38 offices generated revenues of more than $60,000.00.[50] (This confirmed the testimony of Mike Green.)  After reviewing Dunhill's monthly data reports for 2002 (he had 9 months of the 12 months), Mr. Lamanna testified that 43 offices reported no revenues at all and only 30 permanent placement offices generated more than $60,000.00 (calculated on an annualized basis).[51]  After reviewing Dunhill's Statement 3 Report which listed permanent placement revenues for the months January through October 2003, Mr. Lamanna testified that 28 offices reported no revenues at all and only 36 permanent placement franchisees generated more than $60,000.00 (calculated on an annualized basis).[52] Dunhill's representations to the Counterclaimants that the franchise system was a network of 150 offices which was growing, strong and vibrant and there "to assist you" were false and misleading.

This means that in the context of the Exchange Program, which the Counterclaimants relied upon to generate additional revenues, there were not 150 offices participating in the Exchange Program as had been represented to them, but rather, at most, 35 active franchisees in 2000, 38 active franchisees in 2001, 30 active franchisees in 2002 and 36 active franchisees in 2003.  And in reality, the numbers were far less due to the fact that the franchisees perceived the Exchange Program to be worthless, based upon Dunhill's failed technology and the stale listings of job orders. Dunhill's representations to the Counterclaimants that Dunhill's network of 150 offices would be there to assist them in connection with the Exchange Program were false and misleading.

---

[49] See TR from 1/29/07, Page 1610-1611.
[50] Id at 1624.
[51] Id at 1626-1627.
[52] Id at 1627-1630.

According to the FAC/DSS minutes dated October 12-13, 2001, Robert Stidham stated words to the effect that Dunhill must remain above the 100 office level to have "critical mass."[53]    The minutes from the October 2002, FAC/DSS Mega Regional meeting in Baltimore, indicate that Robert Stidham said words to the effect that "when we have less than 100 offices on the books, we don't look very credible."[54]    Mr. Stidham testified that his use of the phrase did not mean that there was anything "magical" about the number "100," but rather that his concern was that "it makes sense to me in the context of if you lose 26 offices that at some point a prospective franchisee is going to go: Gee, you have gone from triple digits to double digits you lost essentially 25 percent of your base. What happened?"[55]    Even if we take Mr. Stidham at his word, it is clear that he, Dunhill's then Vice President of Franchise Development, was very concerned about the fact that Dunhill was losing many franchisees at this time and how this would impact on prospective franchisees and the ability to "close" sales to them).    While Dunhill was selling significant numbers of franchises, Dunhill experienced a net loss of 5 permanent placement offices from the 90 offices operating at the end of 2000 (as reflected in Dunhill's 2001 UFOC) to 85 offices operating at the end of 2001 (as reflected in Dunhill's 2002 UFOC).    Dunhill's representations to the Counterclaimants that the franchise system was growing were false and misleading.

4.    Training

Dunhill's franchise sales personnel representatives made misrepresentations to the Counterclaimants, both verbally and in writing, which related to the high quality of initial and ongoing training that they would purportedly receive as Dunhill franchisees.  Mike Lamanna testified that Robert Stidham told him that Dunhill's training "was a strength of the system," that it was "state-of-the-art," the best in the industry, and also that it was delivered "on a personal level."[56]    Joanne

---

[53] See Zinn's Binder Exhibit #14, Bates 009131.
[54] See Dunhill's Exhibit #106 (Page 5 of 8).
[55] See TR from 3/6/07, Page 179.
[56] See TR from 1/29/07, Page 1543.

27

Naccarato provided Mike Lamanna with a form letter dated January 24, 2001 (which is deemed to be "sales literature" distributed to a prospective franchisee, and is therefore, part of Dunhill's franchise offering), which among other things, states:

> "Our professional and experienced staff provides unparalleled, continuous training, effective business development strategies and targeted research and development that help our franchisees realize their goals and potential."[57]

Additionally, Dunhill's Brochure, recognizing that most of Dunhill's new franchisees were new to the industry (as all of the Counterclaimants were), contained a representation that new franchisees would receive an intensive "nuts and bolts" training and then ongoing "hands on support" in your office. The Counterclaimants relied upon Dunhill's verbal and written representations regarding the training they were told they would receive.

With respect to Dunhill's initial training, each of the Counterclaimants testified in detail about how the President's NFT (initial) training that they received was woefully deficient and thoroughly ineffective in preparing them to operate their Dunhill franchises. The training was outdated and did not focus on how to use new technology, including the use of job boards and the Internet, which had become so crucial to achieving success in the employment staffing industry. Elias Zinn, testifying about this NFT training experience stated, "And the problem that we have here is that the training was good 20 years ago and that's what Dunhill still didn't understand."[58] Bud Westover testified, "After being in the business a very short period of time, I very quickly learned that everything I was taught was either dated or outmoded and not really factual in today's market."[59]

---

[57] See Lamanna Binder, Exhibit #15; We note that while Elias Zinn and Harvey Auger did not produce identical form letters from Joanne Naccarato, we submit that they would have, and id in fact, did receive identical form letters which would have also induced them into purchasing their franchises as they were prospective franchisees when Ms. Naccarato was Dunhill's Director of New Business Development.
[58] See TR from 1/24/07, Page 942
[59] See TR from 1/22/07, Page 530.

Harvey Auger testified that his NFT training was a "big disappointment to me not only on behalf of my son but on behalf of me."[60] He added that there was little to no training whatsoever in how to run an office, how to set up the office financially; how to set it up legally and how to manage it effectively.[61] Harvey also testified that, "There was no technology brought into the picture, and this is 2000 we were in the start of the technology age. And there was none of that brought into it."[62] Harvey added that his NFT training experience was a "disappointment in many, many ways and my summary evaluation said that to Dunhill."[63]    (We note that Dunhill never produced Harvey's evaluation of his NFT training sessions even though it was requested.)

Mike Lamanna summarized his NFT training experience as "overall, it was ineffective."[64] He testified that all of Dunhill's training was "paper trail based" and that it did not provide him with an opportunity to be successful.  Since leaving Dunhill he has learned how to use data bases, data mining and other technology in order to make placements.  He added, "I was not trained on any of that at Dunhill and those are the key ingredients in being a successful recruiter today."[65]  Mike testified that he was disappointed that Dunhill's training utilized "an old fashioned overhead projector" rather than using modern computer technology.[66]

With respect to the purported "ongoing training" that the Counterclaimants were offered, the major complaint was that what Dunhill provided was mostly repetition of specific aspects of the NFT training they had already received.  Dunhill did not update its training methods or techniques and the technology Dunhill used was out of date.  Bud Westover testified, "Every class was the same, there was no updated material from the original President's or Operation's Manual I received in Hauppauge

---

[60] See TR from 1/25/07, Page 1236.
[61] Id..
[62] Id at 1237.
[63] Id.
[64] See TR from 1/29/07, Page 1527.
[65] Id at 1528.
[66] See TR from 1/29/07, Pages 1543-1544.

at their initial training."[67]  Overall, the ongoing training offered by Dunhill was ineffective and of no

benefit to Counterclaimants.

5.    R.A.T.I.F.Y. Program.

Dunhill used its R.A.T.I.F.Y. program (Recruiting and Training Individuals for You) as

another inducement for the Counterclaimants to purchase Dunhill franchises. Dunhill recommended

that they each hire consultants who would make additional permanent placements and therefore

generate higher revenues (and higher royalties for Dunhill).   Through its R.A.T.I.F.Y. program,

Dunhill obligated itself to take various specific actions in an effort "to assist franchisees (the

Counterclaimants) in the acquisition of quality consultants."[68]  As referenced previously, Page 7 of

the Brochure included the following representation: "Assistance in identifying hiring and training of

your initial staff through our R.A.T.I.F.Y program."

Further, Dunhill's President's Manual (Section R) (which was provided to Bud Westover and

Mike Lamanna before purchasing their franchises) sets forth the written procedure for Dunhill's On-

Site and Video R.A.T.I.F.Y. program.  This procedure indicates that Dunhill is responsible for writing

the advertisement, fielding telephone responses, booking and paying for conference/seminar,

conducting the seminar/video conference, screening the applicants, interviewing the applicants,

profiling "serious" candidates and providing training after 60 days.

The "assistance" provided by Dunhill was limited and the training provided to the consultants

was inadequate and ineffective for the same reasons that the NFT training was inadequate and

ineffective.  The training was outdated and did not offer instruction with respect to the use of

technology.  The Counterclaimants also testified that the training their consultants received through

the R.A.T.I.F.Y. program was, like the President's NFT training and the ongoing training, outdated,

and not focused on technology.   Dunhill's training of Counterclaimants' consultants was ineffective,

---

[67] See TR from 1/22/07, Page 548.

and Dunhill's screening process was haphazard and superficial. Accordingly, the consultants that were hired based upon Dunhill's recommendations generated very few placements. Bud Westover testified, "Every person they (Dunhill) recommended that I hire, produced almost no income for me. I had one person who made, I think, one placement out of all the people I hired through Dunhill's recommendation."[69]

Elias Zinn testified that in late 2000, his company hired 5 consultants which were screened by Dunhill, but that within 90 days all five were gone. When he made a second (and last) attempt to hire consultants screened by Dunhill in early 2001, he hired 3 people but they lasted only 60 days."[70] Elias told Dunhill that his consultants "weren't working out and we had to ask them for assistance."[71] Elias testified that Sandy Watkins, a Dunhill trainer told him that Dunhill was working on changes to the R.A.T.I.F.Y. system and that Elias should "hold off" doing any more hiring of consultants.[72] Elias testified that he, on behalf of the FAC, and Mike Wilcoxson as well, requested several times that Dunhill revise and improve the system.[73] Dunhill never did.

Harvey Auger testified that he relied on Dunhill's representations regarding what it would provide him with under the R.A.T.I.F.Y. system, but that Dunhill never provided Harvey with this assistance.[74] Similarly, Mike Lamanna testified that he relied on Dunhill's representations regarding what it would provide him with under this program, but he received no assistance from Dunhill.[75]

Bud Westover testified that the training his consultants received from year to year was repetitive (i.e., "the old stuff over and over") and that "their training did not change."[76] He further testified that when he and his consultants attended Dunhill's consultant training in San Antonio,

---

[68] See Westover Binder, Exhibit #13, Pages from President's Manual (Bates 001865).
[69] See TR from 1/24/07, Page 903.
[70] Id at 949-950.
[71] Id at 948.
[72] Id at 950.
[73] Id at 951.
[74] See TR from 1/25/07, Page 1257.
[75] See TR from 1/29/07, Page 1534.
[76] See TR from 1/23/07, Pages 613-614.

Texas, he found the training to be so poor that he submitted an evaluation to Dunhill grading the aspects of the training either "D"s or "F"s[77] and he then sent himself and his 4 consultants to an outside training seminar (with Bill Raden, an instructor in the recruiting industry) at an extra cost of approximately $1,000.00 (exclusive of travel expenses). Bud also ordered videotapes from another instructor, Steve Finkelman, which he used to train his consultants.[78] In comparing the consultant training his office received from Dunhill with the Raden seminar, Bud characterized the difference as between "daylight" (the Raden seminar) and "dark" (Dunhill's consultant training) and graded the Raden seminar an "A to A plus" as compared with the grades of "D" and "F" that he gave Dunhill.[79]

Each of the Counterclaimants was induced to purchase their Dunhill franchises based upon the R.A.T.I.F.Y. consultant training program. Bud and Elias, the two of the four that received any assistance from Dunhill at all, followed Dunhill's procedures and suggestions to their financial detriment. Bud lost "well over $200,000.00" in connection with the hiring of poor consultants that were recommended by Dunhill.[80] Pursuant to Rick Kean's suggestions, Bud hired 8-10 consultants over a 2½ year period and was paying them each between $3,000.00 and $4,000.00 per month.

6.    Ongoing Support and Services

Dunhill also induced the Counterclaimants to purchase their Dunhill franchises by making verbal and written misrepresentations which related to the ongoing support, services, guidance and assistance that they would purportedly receive as a Dunhill franchisee.

Page 8 of the Brochure states,

"The primary source of revenue for the franchisor, Dunhill Staffing Systems, Inc, is royalty. *In consideration for the ongoing services that we provide, the Dunhill Professional Search (permanent placement) franchisee pays a royalty of 7% of revenue*, plus an additional 1% of revenue, which is dedicated exclusively to the support of our national advertising program." (Emphasis added)

---

[77] Id at 614.
[78] Id at 614-615.
[79] See TR 1/23/07, Page 615.
[80] See TR from 1/22/07, Pages 581-582.

Page 5 of the Brochure states,

> "Field Support: You'll have a personal Franchise Development Manager to mentor you and assist your staff. Our Franchise Development Managers bring successful 'real world' experience to the task of setting up and organizing your office. Your Franchise Development Manager will continue to work with you (and your office) on an ongoing basis"

Page 7 of the Brochure (among other things) provides that "you'll get:

> - ongoing field support for your Franchise Development Manager throughout the year; and
> - unlimited advice, guidance and counsel from Dunhill Corporate."

Page 7 of the Brochure states that new franchisees will be provided with "Ongoing assistance with placement, business and operating issues as your business develops."

Joanne Naccarato's form letter to Mike Lamanna (which was previously referenced in the "Training" section) also made the following representation, "Ongoing support is provided, from specific placement strategies to growing a franchise office."[81]

Based upon the above statements, it is clear that Dunhill not only represented that it would provide the Counterclaimants with meaningful ongoing support, service, guidance and assistance, but that it had an obligation to do so, as well. The fact that a Dunhill representative may have showed up at a Counterclaimant's office every 9 months or so and provided him with a redundant, outdated training session that he had seen and heard before does not constitute meaningful ongoing service, support, guidance and assistance. Dunhill failed to provide the Counterclaimants with meaningful support, guidance or assistance on a reasonably regular or consistent basis.

The Counterclaimants testified that Dunhill was continuously experiencing a high turnover of management and staff and that cut-backs were rampant. Ongoing support and services of any kind were hard to come by and on the rare occasions you could actually reach a representative, the assistance or guidance, if any, was usually unhelpful and ineffective.

---

[81] See Lamanna Binder Exhibit #15; Again, we submit that Elias Zinn and Harvey Auger would have and did in fact, receive an identical form letter from Joanne Naccarato which would have been another inducement to purchase their Dunhill franchises.

When discussing the ongoing support and services that he was promised, Elias Zinn testified, "It's a joke as we go through the years, but so obviously the answer is they weren't there and we were on our own, basically, and the temp side, it was worse because they didn't have anybody to support that area. I mean they were losing people left and right....Tom Esposito, the Vice President of the temp side...he was gone two weeks after we started."[82]

Bud Westover testified that in 2002, John Clementi and Jamie Owen were Dunhill's two field support representatives. (Sandy Watkins had left Dunhill and Rick Kean was not working on a full-time basis and was employed on a "consultant" basis.) However, John Clementi was fired by Dunhill shortly after Bud bought his franchise.[83] Bud testified that he was not provided with the services and support that he needed to succeed[84] and that in his opinion "there was no support, because the support was useless."[85]

Harvey Auger was very outspoken when he testified about his reliance on Dunhill's representations regarding support, guidance and training. He said, "it was very critical for me because of my son joining me, the training and the support ongoing was critical."[86] When asked whether he received ongoing services and support from Dunhill, he testified, "No, it went downhill from January 2001 and continued downhill."[87]

Mike Lamanna testified that Robert Stidham told him that he would receive "personalized service" from Dunhill which he would not get from MRI which was a much larger company.[88] While Dunhill representatives did make a few visits to Mike's office over approximately three years, he testified that "it was not enough for the ongoing support of my business."[89] Mike also testified that he

---

[82] See TR 1/24/07, Pages 940-941.
[83] See TR from 1/22/07, Page 536.
[84] Id at 528.
[85] See TR from 1/23/07, Page 813.
[86] See TR from 1/25/07, Page 1235.
[87] Id at 1280.
[88] See TR from 1/29/07, Page 1547.
[89] Id at 1526-1527.

relied on the representations in the Brochure regarding ongoing support and assistance and that he found the above referenced statements made in the Brochure on this issue to be untrue.[90] Mike also reiterated his testimony that Dunhill did not provide any of the ongoing services that were described in the Brochure and that he had expected to receive.[91]

The representations made to the Counterclaimants included having a "personal Franchise Development Manager to mentor you" or otherwise receiving "personalized" service and support. The fact of the matter is that not only did Dunhill fail to provide any meaningful ongoing support, services, guidance or assistance, but even worse, Dunhill's management (i.e., whoever was in charge that month) had to have known that they could not have made such representations in good faith. Yet Dunhill made them, as selling franchises was its goal, and dealing fairly and in good faith with prospective franchisees was obviously not a priority.

The Counterclaimants testified that the representations that were made to them regarding the ongoing support, services, guidance and assistance that they expected to receive as Dunhill franchisees were major factors in persuading them to purchase their Dunhill franchises.

7.    Proprietary Software

Page 5 of the Brochure states, "Technology: *You'll receive our "state-of-the-art" proprietary software package*, which you'll *use for external placement processes and the administration of your office*. You'll communicate with clients, candidates and other Dunhill offices through our Internet and Intranet presence." (Emphasis added)

Elias Zinn's Permanent Placement UFOC, Harvey Auger's UFOC and Mike Lamanna's UFOC each contain the following statements[92]:

---

[90] See TR from 1/29/07, Page 1532-1533.
[91] Id at 1535.
[92] See Zinn Binder, Exhibit #5, Page 22; Auger Binder, Exhibit #5, Page 24; Lamanna Binder, Exhibit #5, Page 25.

- "Dunhill has had *proprietary software* developed for it – the Dunstar Professional Search Software – which it requires for permanent placement franchisees"; (Emphasis added)

- "The primary function of the system is to help make your Office more productive in terms of placements per recruiter/account executive";

- "The system is designed to assist in the following tasks: organize, maintain and search applicant, job order and company files; provide recruiters with tools to help in daily planning, scheduling, interview tracking, etc.; maintain and print letters, resumes, reports, labels and envelopes; maintain interview information and provide valuable reports regarding applicants, clients and recruiters; provide management with financial reports regarding placements and analysis by recruiter; provide more quality phone time by reducing paperwork, filing and administrative overhead."

Page 23 of Bud Westover's UFOC[93] contains the following statements:

- "You must use *our proprietary* Professional Search Software"; (Emphasis added)

- "The primary function of the system is to help make your Office more productive in terms of placements per recruiter/account executive";

- "The system is designed to assist in the following tasks: organize, maintain and search applicant, job order and company files; provide recruiters with tools to help in daily planning, scheduling, interview tracking, etc.; maintain and print letters, resumes, reports, labels and envelopes; maintain interview information and provide valuable reports regarding applicants, clients and recruiters; provide management with financial reports regarding placements and analysis by recruiter; provide more quality phone time by reducing paperwork, filing and administrative overhead."

---

[93] See Westover Binder, Exhibit #5.

- "We pay the fees of Resummate, our designated supplier of our *proprietary* Professional Search software, for providing *initial training* in the software to you."

Elias Zinn's Temporary Staffing UFOC states that the franchisee is required to use the "employment service management software comprehensive resource management" for the Temporary Business as specified by Dunhill which is obtained from Allegro Software, Inc.    The section continues, "These programs, provided to you by Dunhill, include work (job) order; search and retrieval; prospecting; integrated payroll and billing; accounts receivable; and worker's compensation (risk management) programs."[94]

Before entering into their franchise agreements, the Counterclaimants were promised verbally and in writing, that they would receive "state of the art", proprietary software to help them operate their business.    Bud Westover testified that Robert Stidham told him that Dunhill used its own proprietary software called Resummate.[95]  Bud also testified that he understood the term "proprietary" in this context to mean that it was exclusive to the Dunhill franchisees and the Dunhill company stores; that it was not available to anyone except for Dunhill offices.[96]  He also testified that at his NFT training, Rick Kean, his instructor, was unable to use the Resummate software and was therefore unable to train Bud on the software.  In fact, Bud testified that during his training session, Mr. Kean called Resummate several times in order to try to get assistance from them.[97]  Bud further testified that the Resummate software he received was not installed as it had been promised by Dunhill and that it did not work properly.[98]  Bud eventually gave up trying to figure out how to use Resummate and never did use it in his business.[99]

---

[94] See Zinn Binder, Exhibit #6, Pages 11-12.
[95] See TR from 1/22/07, Page 508.
[96] See TR from 1/22/07, Pages 537-538.
[97] Id at 533.
[98] See TR from 1/23/07, Page 772.
[99] See RE from 1/22/07, Page 537.

Bud also testified that he never received a Resummate training manual and that in January 2003 (six months after he purchased his franchise), he spoke to Rick Kean at a President's meeting and asked him when he could expect to receive the Resummate training manual. Mr. Kean responded that he didn't know, but then sarcastically added that Bud could ask him again.[100] It is undisputed that Dunhill never provided the Counterclaimants with any kind of Resummate training or user's manual.

Elias Zinn testified that at his November 1999 meeting with Dan Abramson, he was told by Mr. Abramson, in connection with the permanent placement franchise, that Dunhill had state-of-the-art proprietary software and that he would be provided with one computer loaded with this software "ready to go." Elias testified that Mr. Abramson said that he would be able to turn on the computer and be in business, that this software package was proprietary to Dunhill and that it was one of the reasons why we should buy a Dunhill franchise.[101] Elias testified that in his experience, which included working for a public company that had manufactured computers, he understood "proprietary" in this context to mean that "you couldn't find it anywhere else and you had to get support through Dunhill and it was theirs only."[102]

Elias testified that he and his partner, Mike Wilcoxson (who oversaw the permanent placement side of the business), had major problems with the Resummate software in connection with their permanent placement business. For example, Elias testified that the software they received could not be installed on their computer and so he and Mike had constantly asked Dunhill for software support for the Resummate package.[103] Elias testified that for basically two years, the software sat in the box unused as he and Mike kept waiting for Dunhill to provide them with a user's manual which never came.

---

[100] See TR from 1/22/07, Page 600.
[101] See TR from 1/24/07, Pages 984-985.
[102] Id at 985 and 986.
[103] See TR from 1/24/07, Pages 945-946.

Elias testified that he, through the FAC,[104] had asked for assistance with respect to software support and that Mike made several requests to Dunhill representatives, including Rick Kean, Jeff Rose (who was in charge of technology) and Sandy Watkins, a Dunhill trainer. But Dunhill never provided them with any training or user's manual. Elias testified that Rick Kean's response was always that he was working on the manual (and Elias reminded everyone that Rick Kean left Dunhill for about a year as a full-time employee and only worked on a limited basis as a consultant).[105] Elias explained that Jeff Rose told him that Dunhill was considering getting rid of Resummate and using a different software "so nothing happened there," and that Sandy Watkins "kind of shook his head and said it's a problem." Elias testified that in approximately 2003, he and Mike called Resummate directly and that its technical support staff provided them with assistance, sent them some "new modules" and that the software finally became operational.[106] Elias and Mike then had to purchase a training package for approximately $400.00.[107] Elias testified that from 2000 through 2003, his staff had no "resume based" software to operate his business and instead was stuck using a much inferior Microsoft Word program which was "ridiculous."[108]

With respect to his temporary staffing business, Elias testified that he also had serious problems with the software he received. He explained that the software was called "Maestro"[109] and that it was different from Resummate. Elias explained that the software was on the temporary staffing side was even "more critical" because on the temporary side of the business, the software also had to perform tasks relating to the employees' payroll and additional reports. He testified that

---

[104] Id at 989.
[105] Id.
[106] Id at 990.
[107] Id
[108] Id at 991.
[109] Id at 992.

he requested software support from Dunhill for his temporary business "probably 50 times" but to no avail.[110]

Elias testified that he was told by Tom Esposito, Dunhill's Vice President of the Temporary Division that the Maestro software package was "state-of-the-art," that it would work great and integrate with any computer system that he had and that he would be up and running immediately.[111] Unfortunately, the reality was that Elias and his staff could not get Maestro online (operational) and as a result, they had to fax Dunhill the reports which would otherwise have been generated through the software program and accessible directly by Dunhill. In a time consuming and cumbersome procedure, Elias and his staff had to manually list every employee (there were several hundred of them) and fax Dunhill the time records and social security numbers for all of the employees.[112]

Elias was told by Dunhill that it was going to get rid of the Maestro software package and use another system and that they would send training personnel to train his office staff. But in 2002, Dunhill's accounting department told Elias to keep sending in the reports manually (as Dunhill had scrapped its plans to have its temporary staffing franchisees utilize a new software system). However, by that time, Elias and Mike's temporary staffing business was "losing a considerable amount of money" and they decided to "de-emphasize" the temporary staffing side of their business.[113]

In Mr. Wolf's cross-examination of Elias, Mr. Wolf suggested to Elias that he could have "made an independent investigation" into whether or not the software was "state-of-the-art" or "proprietary." On redirect, Elias testified that he did not believe that he was obligated or bound in any way to perform an independent investigation into the truth or accuracy of what he was told by

---

[110] Id at 947-948.
[111] Id at 992.
[112] Id.
[113] Id at 995.

Dunhill. Elias had met with Dunhill's President, Dan Abramson and Mr. Abramson had told him that Dunhill was a subsidiary of a public company which was traded on the NYSE. Elias testified that he had no reason to question or suspect that what he was being told was not correct and that he "presumed that what he was telling me was factual."[114] Similarly, Elias testified that he had no reason to suspect that the information he received from Tom Esposito was incorrect.[115] The fact of the matter is that before Elias and Mike purchased their Dunhill franchises, they had no reason to question or suspect that what Dunhill was representing to them (about anything, not just relating to technology and software issues) was not correct. Prospective franchisees have no legal obligation to perform such an "independent investigation." Dunhill, on the other hand, as a franchisor, *had a legal obligation* to not make any false or misleading representations which may induce prospective franchisees into purchasing franchises. As the evidence in this case has shown, Dunhill has repeatedly failed to comply with its legal obligations.

Mike Lamanna testified that he was told by Robert Stidham that he was going to receive a Dunstar proprietary software package and that this package had Internet and Intranet capabilities which would allow him to communicate with other Dunhill offices, and also be connected to the Internet and his database. Mike testified that Robert "played up" to his technology background (which is the industry Mike came from) and told him that Dunhill has the technology to help him to succeed.[116]

However, Mike testified that Dunhill's representations were untrue because he received Resummate as opposed to Dunstar and because he did not consider Resummate to be either state-of-the-art or proprietary in any way.[117] Mike testified that Resummate was a very difficult database

---

[114] Id at 1196-1197.
[115] Id at 1197.
[116] See TR from 1/29/07, Pages 1528-1529.
[117] See TR from 1/29/31, Pages 159-1530.

program to learn, especially without instruction or training, and that because he received no training or assistance from Dunhill, he was unable to use the Resummate software package.

Harvey Auger testified that he did not believe that Resummate was proprietary, as anyone could purchase it directly from Resummate's website.  Harvey added that he relied on Dunhill's representations that he would receive proprietary, "state-of-the-art" software but that he did not.[118]

Dunhill, both verbally and in writing (in its UFOCs and the Brochure), represented to the Counterclaimants that they would be provided with "state-of-the-art" proprietary software.  Dunhill failed to do so.  The franchisees were promised Dunstar but they received Resummate.  Resummate was a very difficult program to install (the Counterclaimants were told it would be installed for them) and operate, and Dunhill provided them with no training, no manual and no software support or assistance despite repeated requests.  Neither Bud nor Mike could get the software package operational at all and they never used it.  Elias, three years after purchasing his franchise, got Resummate operational through Resummate's (and not Dunhill's) assistance.  Furthermore, Resummate was not "state-of-the-art."  The program was not customized for their respective businesses and each franchisee had to customize the program to be efficient in his respective business. Elias and Mike Wilcoxson's Maestro software package on the temporary staffing side was another nightmare situation where the software program was not operational and his staff had to manually transmit information to Dunhill that it should have been granted access to through the software program.  Dunhill's failure to provide Elias and Mike with software support with respect to Maestro was a major reason why their temporary staffing business failed.

The one person who testified in this case that he used Resummate and was happy to do so was Dunhill's witness, Neil Whitman. Of course, Mr. Whitman not only testified that he had experience

---

[118] See TR from 1/25/07, Page 1241.

developing his own software but he had even "won an international award for it."[119] Furthermore, he acknowledged that the Resummate program was not customized for his business and that he had to take additional steps in order to make it customized for his office.[120]

With respect to Dunhill's technology, Robert Stidham made a statement at the October 2002 FAC/DSS meeting in Baltimore in effect, acknowledging that Dunhill's technology was out of date.[121] The minutes reflect that Robert Stidham made the following statement, "We have an MDS system [monthly data reporting system] that requires investment and resources to configure to our website *and a website that is using a software language that has been dead for five years.*"[122] (Emphasis added)

8.    National Advertising

Each of the Counterclaimants were required to pay Dunhill 1% of his gross receipts, as an "advertising fee" under his respective (permanent placement) franchise agreement.[123]

As previously referenced, Page 8 of the Brochure states,

"The primary source of revenue for the franchisor, Dunhill Staffing Systems, Inc, is royalty. In consideration for the ongoing services that we provide, the Dunhill Professional Search (permanent placement) franchisee pays a royalty of 7% of revenue, *plus an additional 1% of revenue, which is dedicated exclusively to the support of our national advertising program.*" (Emphasis added)

On Page 5, the Brochure also states, "Marketing Services: Our *national advertising,* marketing, communications and public relations programs are available to promote your office and position you in your market." (Emphasis added)

Elias Zinn's (permanent placement) UFOC, Harvey Auger's UFOC, and Mike Lamanna's UFOC each state in Item 11, "The Franchisor's Obligation's" under the section headed "Advertising

---

[119] See TR from 1/30/07, Page 1810.
[120] See TR from 1/30/07, Page 1756.
[121] See TR from 1/22/07, Page 539.
[122] See Dunhill Exhibit #106 (Page 3 of 8 – end of 6th Paragraph)
[123] See Zinn Binder, Exhibit #7, Page 11; Auger Binder, Exhibit #6, Page 11; Lamanna Binder, Exhibit #8, Page 12; Westover Binder, Exhibit #7, Page 36.

and Promotion" the following: "Dunhill *will* expend the proceeds of the Advertising Fund for *national advertising*, publicity and promotions and activities."[124] (Emphasis added)

Item 11 of Bud Westover's UFOC, which was slightly modified, states in the section describing how Dunhill will administer its Permanent Placement Advertising Fund (the "Fund"), states,

> "We may use the Fund to meet all costs of administering, directing, preparing, placing and paying for *national*, regional or local advertising. This includes the *cost of preparing and conducting television, radio, magazine and newspaper advertising campaigns* and other public relations activities and the cost of employing advertising agencies."[125] (Emphasis added)

Bud Westover's franchise agreement, which also includes the sum and substance of the above statement from his UFOC, further states that, "You acknowledge that the Fund is intended to further general public recognition and acceptance of the Proprietary Marks for the benefit of the Dunhill System." [126]

It is clear from the above written provisions that Dunhill represented to the Counterclaimants that the 1% of gross receipts paid to Dunhill was to be spent on national and other advertising, or other promotion of the Dunhill name. While Counterclaimants acknowledge that their franchise agreements reserve to Dunhill, the right to choose the particular form of media or where the advertising dollars were to be spent, Dunhill was clearly obligated to provide national and other advertising which would have benefited the system generally, and therefore, would benefit each of the Counterclaimants, as well.

Elias Zinn testified that when, prior to purchasing his Dunhill franchises, he met with Daniel Abramson, Dunhill's then President, in November of 1999, he was told by Mr. Abramson that Dunhill was going to be placing national advertisements in two of the most widely read newspapers,

---

[124] See Zinn Binder, Exhibit #5, Page 20; Auger Binder, Exhibit #5, Page 20; Lamanna Binder, Exhibit #5, Page 23;
[125] See Westover Binder, Exhibit #5, Page 20.
[126] See Westover Binder, Exhibit #7, Page 36 (Section 9.04 B)

USA Today and the Wall Street Journal.[127] Elias testified that this was an inducement to purchase the Dunhill franchise because Mr. Abramson told him that while the advertising might not benefit any particular office directly, all of the franchisees would benefit because the advertisements would discuss "Dunhill's strengths" in both the permanent placement and temporary staffing contexts.[128] Elias explained that Abramson said that calls would come into Dunhill's corporate headquarters and would then be sent to the specific Dunhill offices, which would obviously increase opportunities to generate additional revenues for those offices. Bud Westover and Harvey Auger also testified that they relied on Dunhill's representations that they were going to provide national advertising.[129]

Each of the Counterclaimants' testified that they never saw or were aware of any advertisements, national or otherwise, which were placed by Dunhill.[130] This testimony is undisputed. Dunhill has not offered any testimony or other evidence that it placed even one advertisement, or spent $1.00 on any form of advertising (or brand promotion), whether it be in the national, regional or local context.

The lack of advertising was a frequent issue raised by the FAC, especially because the franchisees were never provided with statements of the Advertising Fund's revenues and expenditures. Elias Zinn testified that he was on the advertising committee of the FAC and that he and the advertising committee requested at every FAC/DSS meeting, copies of such Advertising Fund statements. However, no statements or reports were ever provided.[131] Dunhill's failure to provide such statements is egregious because the UFOC which Dunhill provided to Bud Westover dated May 22, 2001, states:

---

[127] See TR from 1/24/07, Page 983.
[128] Id.
[129] Id at 842 (Westover); and See TR from 1/25/07, Page 1241 (Auger).
[130] See TR from 1/22, Page 542 (Westover); TR from 1/24/07, Pages 1033-1034 (Zinn); TR from 1/25/07, Pages 1241-1242 (Auger); and TR from 1/29, Pages 1531-1532 (Lamanna);
[131] See TR from 1/24/07, Page 1031 and TR from 1/25/07, Page 1206.

> "We *must* distribute a *statement detailing advertising Fund income and expenses*
> for the fiscal year to *all Dunhill permanent placement franchisees within 120 days
> after the end of the Fund's fiscal year."* (Emphasis added)

Therefore, Dunhill was <u>obligated</u> to provide <u>all permanent placement franchisees</u> with statements

detailing the revenues and expenses of the Advertising Fund <u>beginning with the year 2001</u>. The fact

that Dunhill refused to provide such statements, even when it was consistently being asked for them

by the FAC's advertising committee, is truly egregious.    It is undisputed that none of the

Counterclaimants were provided with any such Advertising Fund Statements by Dunhill.  As Dunhill

was providing no advertising, we can, in retrospect, perhaps understand its unwillingness to disclose

this information to its franchisees.

## IV.    **Dunhill's Franchise Advisory Council**

In this case, Dunhill seeks to avoid responsibility and liability for its egregious actions by

trying to hide behind a provision in its various franchise agreements which provides that its

franchisees are required to provide written notice to Dunhill, within one year, with respect to any

alleged misfeasance or nonfeasance by Dunhill.  However, in his opening statement in this case, Jeff

Wolf acknowledged that this provision would only be applicable for alleged violations of the

agreement or "post-agreement" misrepresentations.[132]   Therefore, Dunhill's counsel acknowledges

that this contractual provision is wholly inapplicable with respect to misrepresentations made by

Dunhill representatives that were communicated to the Counterclaimants *prior to the time* that they

entered into their respective franchise agreements.  Furthermore, with respect to Dunhill's argument

that this provision should bar the Counterclaimants from recovering with respect to their contentions

that Dunhill breached its obligations, this technical argument should not prevail because sending

Dunhill formal notices to cure was not reasonable or practical under the circumstances as set forth

below.

---

[132] See TR from 1/18/07, Page 19, Lines 23-25 and Page 20, Lines 1-4.

As the testimony of the Counterclaimants, as well as the testimony of Mike Green (the former chairman of the FAC), indicated, the FAC functioned as the venue by which the franchisee base interacted with and resolved the issues and complaints the franchisees had with Dunhill's management. The Counterclaimants testified that they (and many other franchisees) conveyed their concerns and complaints to the FAC. For example, Bud Westover testified that he conveyed various complaints and concerns he had about the franchise system to Mike Green, then Chairman of the FAC and Dennis Garton, another FAC franchisee member. These complaints were with respect to problems such as the turnover of Dunhill's Presidents, the Exchange Program and the fact that he had not received a Resummate training manual.[133] (No franchisee received the Resummate training manual because Dunhill never provided one.)

Elias Zinn testified that from mid-2000 on there were various committees set up by Dunhill to improve the system through the FAC. He also testified that "there were many what were called emergency meetings because of all the problems, every meeting – we kept minutes of the meeting, either the Dunhill representative was there or by phone or they were there in person. And they were made aware of all the problems that we had from the Dunhill Staffing Systems from mid-2000 on."[134] He further testified that as a member of the FAC, he personally asked Dunhill to provide better President's training, consultant training (through the R.A.T.I.F.Y. Program) and software support.[135] Mr. Zinn also testified that he was on the technology committee and was asking Dunhill when the technology would be operational in order for the Exchange Program to be viable[136] and that the FAC had expressed its concern that the exchange rate was "well below" where it should be.[137] Elias testified that through these meetings, Dunhill was continuously made aware of all of the concerns that the FAC (and the franchise base) had and that a dialogue was always open with Dunhill corporate.

---

[133] See TR from 1/22/07, Pages 600-602
[134] See TR 1/25/07, Pages 1201-1202.
[135] See TR from 1/24/07, Pages 947-948.
[136] Id at 948.

When Elias was shown Item #8 on page Bates 009123 of Exhibit #14 of his binder (the Minutes of the October 2001 FAC/DSS meeting), he testified that John Mills, Dunhill's acting President, in response to the FAC's complaints that its input and concerns were not being heard by Dunhill, suggested at the October 2001 FAC/DSS meeting that the FAC committee chairpersons (for example, with respect to the following committees: Technology, Advertising, Training, and Office Growth) should have discussions with specific "go to persons" at Dunhill in order to better communicate regarding the various complaints raised by the FAC.[138] Elias testified that:

> "The context was we complained that we had constantly been making these recommendations to Dunhill. All these things were not new. This had been happening for several years, and that we needed to have – if we have input this is input from the franchisees – we need somebody at corporate to get the input and do something about it, because we were tired of continuing to have these meetings and getting nothing done."[139]

Elias also testified that Dunhill Memoranda such as Dunhill's Exhibit #84 "President's Only Teleconference Report March 19, 2003" evidences the fact that Dunhill was well aware of all of the problems in the system as raised by the FAC. Elias testified that this particular document reflected what was discussed at an emergency meeting led by Rick Kean and which included a discussion of 12 key action items which were the "key points" that the FAC felt needed to be addressed at that time.[140] Elias testified that during his involvement with the FAC from the beginning of 2002 through "late 2003", there were approximately 8 FAC/DSS meetings, including those that were scheduled quarterly and a "couple" of emergency meetings.[141]

Elias testified that the minutes of all FAC meetings were sent in the regular course to all FAC members as well as to Dunhill's leadership.[142]  Mike Green, who testified he was an FAC member since 1998 and Chairman from 2002 through 2004, testified that after each combined FAC/DSS

---

[137] See TR from 1/24/07, Page 971.
[138] See TR from 1/24/07, Pages 974-977.
[139] Id at 976-977.
[140] Id at 1018-1028.
[141] See TR from 1/24/07, Pages 979-980.

48

meeting, where at least one member of Dunhill management was always present, the minutes of the meetings, which were prepared by the Secretary of the FAC, and which were reviewed by him as FAC Chairman together with some of the other FAC members, were then submitted to Dunhill's management, to be reconciled and approved by Dunhill management before they could be "published."[143]

From the testimony in the case, from the Counterclaimants as well as from Mike Green, it is clear that Dunhill, through its continuing interactions with the FAC, was made fully aware on a continuing and ongoing basis, for several years, of the wide range of serious problems and complaints that the franchise base had. From a practical standpoint, providing Dunhill with formal written "notices to cure" would have provided them with no information or "notice" that they did not, in fact, already have. The Counterclaimants tried hard to communicate their issues and complaints to Dunhill, and to work together with Dunhill in good faith, in order to make necessary changes and improvements and essentially, help save the Dunhill franchise system.

During the first half of 2004, each of the Counterclaimants, through their former counsel, Mr. Purvin, gave Dunhill written notice that they deemed their franchise agreements with Dunhill to be terminated for cause.

## V.    The Individual Cases

In prior sections of this brief, we have addressed many of the various false and misleading representations which Dunhill made to the Counterclaimants (and these representations and the underlying facts also represent breaches of contract as well), including, but not limited to oral false statements and misrepresentations, misrepresentations set forth in the Brochure and the UFOCs (and omissions therefrom) including those relating to such things as the Exchange Program; Dunhill being comprised of a growing, vibrant network of 150 offices that were there "to assist" new franchisees;

---

[142] Id at 978-979; also 968.

the number of permanent placement franchisees that were actually generating revenues; training (initial, ongoing and consultant), ongoing support and services, guidance and assistance; "state-of-the-art" proprietary software and technology; and national advertising. We do not intend to reiterate these various points again, below. However, there are additional, specific misrepresentations, false statements and omissions, which apply to the individual Counterclaimants, some of which may have been referenced above (and some of which also constitute breaches of contract), which should also be discussed. We do so now.

1. Specific Misrepresentations Made to (and/or Dunhill's Failures to Meet the Obligations Contained in its Franchise Offering re:) Bud Westover
(Permanent Placement Franchise Agreement – July 2002)

A. Exchange Program.

Bud Westover testified that prior to signing his Dunhill franchise agreement, Dunhill, by virtue of statements made by Robert Stidham and by statements set forth in the Brochure and in his Manual, represented to him that he could generate 25% to 35% in additional revenues by participating in the Exchange Program.[144] A stated above, the Brochure stated that "Today, almost 25% of our placements are a direct result of the Exchange Network." Bud's Manual also stated that:

> "While most national recruiting networks have some kind of interoffice applicant and job order referral process in place, *Dunhill is an industry leader in exchange, with some 25% of its revenues being generated through interoffice referrals – placements that otherwise would not have been possible. Dunhill is currently perfecting the first electronic exchange network* to be implemented in a major franchise organization, *a computerized system which will revolutionize the time frames for responding to urgent job orders and highly marketable candidates,* both regionally and nationwide."[145] (Emphasis added)

---

[143] See TR from 1/26/07, Pages 1468-1469.
[144] See TR from 1/24/07, Page 841; See Brochure, Page 4; and See Westover Binder Exhibit #10 (Bates 001870).
[145] See Westover Binder Exhibit #10 (Bates 001864).

Bud testified in detail about the flaws and problems relating to the Exchange Program. He also specifically, testified that Dunhill failed to provide him with any such "electronic exchange network" which was supposed to "revolutionize" time frames for making placements.[146]

When speaking about the oral and written misrepresentations made to him regarding the Exchange Program, Bud emphasized that "That was one of the major selling points in fact to get my business started and work with other people and I could find the candidates or the clients and not have to do both. So I was counting on that revenue stream coming in to get my business established."[147] Mr. Stidham referred to the Exchange Program as a "safety net."[148]

Bud also testified that Robert Stidham "went over" the Brochure with him (not that Mr. Stidham read the Brochure to Bud as was later mischaracterized by Dunhill at the hearings) at their first meeting and at that meeting, Mr. Stidham confirmed that Dunhill had 150 franchisees to assist him.[149] Bud's testimony was that he understood the references in the Brochure and Mr. Stidham's statements as to Dunhill having "150 offices to assist him" to be in connection with the Exchange Program and that they meant that all of Dunhill's offices participated in the Exchange Program. Bud also noted that his franchise agreement indicated that participation in the Exchange Program was required and that his President's Manual, which was given to him during his training which occurred before he signed his franchise agreement and therefore was part of Dunhill's franchise offering, stated in connection with the Exchange Program:

> "*100% Participation – i.e., every Dunhill Permanent Placement Franchise and DPS Corporate have signed the Exchange Agreement.*" (Emphasis Added)

However, Bud testified that he later learned that neither Dunhill's temporary staffing offices nor its company owned offices participated in the Exchange Program.[150] Therefore, this left at most, the 90

---

[146] See TR from 1/22/07, Pages 573-574.
[147] Id at 534-535.
[148] Id at 525; See TR from 1/24/07, Pages 853-854.
[149] See TR from 1/24/07, Pages 524-525.
[150] See TR from 1/22/07, Pages 515-516.

permanent placement franchises who might have participated in the Exchange Program. However, as the testimony in the case clearly indicated, practically no permanent placement franchisees were actively participating in the Exchange Program because it was worthless. Bud testified that the job orders listed on the exchange network were over 2 years old and that he asked Rick Kean to "clean up" the network.[151] Rick Kean said he was "working on it," but he and Dunhill never fixed the problem. Bud testified that he did not generate any revenues at all from the Exchange Program.[152]

B.     Protected Territory.

Bud testified that Dunhill had suggested to him that he initially operate a Dunhill permanent placement office and then later, expand into the temporary staffing business.[153] Bud testified that he attempted to follow this policy or "profile" of Dunhill as he referred to it. Bud testified that when he met with Robert Stidham in February 2002, he initially wanted to purchase the Arlington, Texas territory, but that Mr. Stidham told him that this was not possible because Dunhill already had an office in Arlington and that Dunhill's policy was that only one franchisee could operate in a "protected Territory." When Bud then asked if he could purchase the territory in Mansfield, Texas which is just south of Arlington, Mr. Stidham again told him that Dunhill already had an office in Mansfield. Bud testified that he discussed with Mr. Stidham the fact that he wanted to also operate a temporary staffing business "in the near future" after his permanent placement business was up and running.[154] Bud asked Mr. Stidham if he could purchase the portion of Tarrant County which included the Alliance Airport area, which Bud believed represented a great opportunity for the temporary staffing side of the business based on the amount of light industrial and light manufacturing work that was concentrated in that area. Mr. Stidham told Bud that there was no one

---

[151] Id at 519-520.
[152] Id at 517-518.
[153] Id at Page 598.
[154] Id at 591.

in that area and that he could have that territory.[155]   In approximately March of 2002, Bud paid Dunhill a $5,000.00 territory deposit in connection with said territory[156] and in July of 2002, he signed a Dunhill permanent placement franchise with respect to this "protected" territory (as described in his franchise agreement as Exhibit "A" and as set forth in the map that was introduced into evidence[157] (the Territory"), and at or about that time, signed an amendment to his franchise agreement setting forth Bud's "right of first refusal"[158] with respect to the operation of a Dunhill temporary staffing business within said Territory.[159]

Bud testified that in approximately the fall of 2002, he received several phone calls from prospective clients at his office and, after questioning them, soon realized that there was another Dunhill office operating within his Territory.   Bud determined that Andrew Barham, a Dunhill franchisee, was operating both a permanent placement and temporary staffing franchise from 669 Airport Freeway in Tarrant County, which was almost in the exact geographic center of Bud's Territory.[160]   At some point, but not later than 1999, Mr. Barham had moved his office from Downtown, Ft. Worth to the Airport Freeway address.[161]   Bud testified that within one week of his finding out that Mr. Barham was operating in his Territory, he contacted Jamie Owen, who is listed in Dunhill's October 2002 UFOC as the Director of Franchise Development,[162] about this problem.[163] Bud spoke to Ms. Owen several times about this problem and she promised that she would look into the matter and get back to him.  As far as Bud is aware, this matter was never addressed by Dunhill.[164] No testimony to the contrary was introduced in this case.

---

[155] Id at 591and 599.
[156] Id at 587.
[157] See Westover Binder, Exhibit #23.
[158] See Westover Binder Exhibit #8.
[159] See TR from 1/22/07, Pages 591-592
[160] Id at Page 593.
[161] See TR from 1/23/07, Page 611; and Westover Exhibit #25.
[162] See General Binder (Large), Exhibit #6, Page 3.
[163] See TR from 1/22/07, Page 594.
[164] See TR from 1/23/07, Pages 609-610.

Bud testified that the fact that Andrew Barham had been operating a Dunhill temporary staffing office in his Territory prevented him from going into the temporary staffing business.[165]  As was explained by witnesses on both sides of this case, the temporary staffing business, much more so than the permanent placement side, was based almost entirely upon having a local presence with local contacts.  The fact that Andrew Barham had been operating as a Dunhill temporary staffing business in Bud's Territory, essentially, made Bud's right of first refusal worthless and squashed his hopes (and rights) of having a Dunhill temporary staffing office within his own Territory.  Bud testified that his business plan all along, which Dunhill was well aware of, was that in addition to operating a permanent placement business, Bud wanted to also operate a Dunhill temporary staffing business from his Territory.[166]  That is why he gave so much though to the territory he ultimately selected and why he negotiated the right of first refusal in the first place.

Dunhill attempted to minimize its responsibility with respect to this issue by producing at the hearing (why it was not part of Dunhill's earlier production is a mystery) a letter agreement between Dunhill and Mr. Barham dated December 29, 2000 (the "Barham Agreement")[167]  However, Section 6(a) of this agreement clearly indicates that the term of Mr. Barham's Dunhill permanent placement franchise agreement was "deemed renewed for a term ending May 31, 2008."  While section 6(b) indicates that Mr. Barham was given "no territorial protection whatsoever" (meaning that Dunhill was permitted to grant the territory which included the location where Mr. Barham was operating from to another franchisee), this in no way made it permissible for Dunhill to sell Bud a franchise with an exclusive territory while having previously granted another franchisee to operate a permanent placement office in that same territory.  Section 3.02 of Bud's permanent placement franchise agreement[168] (entitled "Our Restrictions") states:

---

[165] See TR from 1/22/07, Page 598.
[166] Id at 598.
[167] See Dunhill Binder, Exhibit #61.
[168] See Westover Binder, Exhibit #7, Page 5.

> "*Within the Territory, we*, our corporate parent, and our and our parent's affiliates, subsidiaries and designees *will not* operate a Company Owned business of the type franchised under this agreement or *grant a franchise for the operation of a similar or competitive business*, so long as you are not in default under this Agreement and all other related agreements…" (Emphasis added)

Dunhill also tried to defend its position by arguing that Section 1 of the Barham Agreement indicated that Mr. Barham's <u>temporary</u> staffing franchise agreement was terminating two days after it was executed (i.e., on December 31, 2000). However, the Barham Agreement excepted the post-termination restrictions by which Barham would otherwise have been bound. Bud proved at the hearing, beyond any question that Mr. Barham was in fact, operating both a Dunhill permanent placement business ("Dunhill Professional Search") and a Dunhill temporary staffing business ("Dunhill Staffing Systems") within Bud's territory from at least 1999 and continuing through 2004. Bud produced and testified concerning the various Ft. Worth White Pages listings indicating Mr. Barham's Dunhill's temporary staffing business and permanent placement business were operating at the 669 Freeway Airport address which is within Bud's Territory. Dunhill is charged with knowing where its franchisees are located before selling a franchise based on a franchise agreement containing an exclusive territory and granting a (meaningless) right of first refusal.

In any event, these facts are clear: (i) Dunhill sold Bud a Permanent Placement Franchise and a Right of First Refusal for a Temporary Staffing Franchise together with an exclusive, protected territory applicable to each; (ii) at the time that Dunhill sold Bud these franchise rights, Mr. Barham had the right to operate a Dunhill Permanent Placement Franchise within Bud's protected Territory; (iii) similarly, at the time Dunhill sold Bud these franchise rights, Mr. Barham had the right to operate a temporary staffing business within Bud's protected Territory, since Dunhill had canceled his post-termination restrictions; (iv) at the time that Dunhill sold Bud these franchise rights, Mr. Barham was actually operating both a permanent placement business and a temporary staffing business under the Dunhill name, within Bud's exclusive protected Territory; (v) none of these facts or circumstances

were disclosed to Bud at the time that he purchased his Dunhill Franchise and Right of First Refusal; (vi) had he known of these facts or circumstances he would not have purchased his Dunhill Franchise; (vii) These failures to disclose the above information and circumstances violated Bud's rights, his franchise agreement, and obviated a meaningful part of the consideration that Bud had bargained for in purchasing his Dunhill Franchise and Right of First Refusal.[169]

C.    Failure to Re-Disclose.

Dunhill has produced a signed receipt for the UFOC dated May 22, 2001 that Bud received on February 28, 2002.[170] However, Bud did not sign his franchise agreement until July of 2002. The UFOC dated May of 2001 which was delivered to Bud was "stale" as it was issued more than 1 year before Bud signed his franchise agreement. When Bud visited Dunhill's corporate offices in Hauppauge, New York in March or April 2002, Dunhill recognized this and he was handed a "current" UFOC by Robert Stidham in a conference room. Bud testified that Robert gave him the new UFOC but then took it back when they started walking around the office so that Bud could be introduced to Dunhill corporate staff.[171] Bud then explained that while he had initially planned on going out to dinner with Robert Stidham and staying in New York that night, and then coming back to Dunhill's headquarters the next day, Bud had to fly back to Texas that night to take care of personal matters relating to his wife's mother's estate. Bud testified that he told Robert Stidham of these changes in plans and that Robert Stidham told Bud that he would mail him the current UFOC. However, he never did so.[172]

Mr. Westover testified that in July 2002, he attended Dunhill's initial training at its headquarters in Hauppauge, New York where he received his Dunhill President's Manual (Dunhill's Operation's Manual). Mr. Westover also testified that he underwent Dunhill's initial training and

---

[169] Even after Bud advised Dunhill that Mr. Barham was operating under the Dunhill name within Bud's exclusive, protected Territory, Dunhill did nothing to prevent him from doing so or to otherwise "solve" the problem.
[170] See Westover Binder, Exhibit #6.
[171] See TR from 3/7/07, Page 55.

therefore, received the President's Manual, <u>before</u> he signed his franchise agreement.[173]  Therefore, any misrepresentations which are contained in Westover's President's Manual take on additional significance as they were not only confirmatory documents which evidence failures by Dunhill to comply with its obligations, but also represent additional inducements upon which Bud relied in making his decision to purchase his Dunhill franchise.

Paragraph H on Page 18 of the section of the President's Manual (under the heading "Consultant Prospect Selling Points") which was provided to Mr. Westover[174] indicates that:

> "While most national recruiting networks have some kind of interoffice applicant and job order referral process in place, *Dunhill is an industry leader in exchange, with some 25% of its revenues being generated through interoffice referrals - placements that otherwise would not have been possible. Dunhill is currently perfecting the first electronic exchange network to be implemented in a major franchise organization, a computerized system which will revolutionize the time frames for responding to urgent job orders and highly marketable candidates, both regionally and nationwide.*"[175]  (Emphasis added)

Based upon the above representation in Bud's President's Manual, not only did Dunhill claim to be an "industry leader" with respect to the Exchange Program, but it was also claiming to have been "perfecting an electronic exchange network" that will "revolutionize the time frames for responding to urgent job orders and marketable candidates." Bud testified that he was never provided with any such electronic exchange network and that he relied on this representation together with Dunhill's other representations regarding the Exchange Program (i.e., relating to expecting to generate 25% to 35% of additional revenues).[176]

Section 6.1 of Bud's franchise agreement (entitled "Start-Up Training or Assistance") states that within the first 6 months after you open your business Dunhill "will provide a representative to assist and consult with you on matters relating to the operation of the business at your first Office for

---

[172] Id at 56.
[173] Id at 571.
[174] See Westover Binder Exhibit #10.
[175] See TR from 1/22/07, Pages 573-574; See Respondent Westover Exhibit #10 (Bates 001864).
[176] See TR from 1/22/07, Pages 573-574.

a period of not less than 5 business days which may not be consecutive, at our option." Bud testified that he only received "at most 1½ days" of training within the first 6 months after opening his business and that he complained to Dunhill.[177] Dunhill then sent Jamie Owen to complete the training which Bud testified was ineffective.[178]

Dunhill communicated to Bud, both verbally and in the Brochure, that in the last 5 years Dunhill had, on average, achieved a system wide revenue growth of 20% annually and had doubled the revenues of the Dunhill organization. As stated previously, Robert Freeman testified that Dunhill's revenues declined from almost $67,000,000.00 in the year 2000 to approximately $44,000,000.00 in the year 2001 to approximately $33,500,000.00 in the year 2002.[179] The decline from 2000 to 2001 represents a decline of approximately 35% and the decline from 2001 to 2002 represents a further decline of almost 25%. Cumulatively, the decline in Dunhill's total revenues from 2000-2002 was 50%. The above representation by Dunhill was false and misleading and Bud testified that he relied on this statement in making his decision to purchase his Dunhill franchise.[180]

On March 5, 2004, Bud, through his former attorney, Robert Purvin, provided written notice to Dunhill that he deemed his franchise agreement with Dunhill to be terminated for cause.[181] Bud testified that he de-identified his business and ceased using the Dunhill name in April of 2004.[182]

Bud's losses from his Dunhill franchise were devastating. He testified that he and his deceased wife, Terrye, lost virtually all of their life's savings in this franchise and that, for all of the time, effort, blood sweat and tears that they put into their Dunhill franchise, they got almost nothing back. Bud's despair was evident in his testimony when he was asked why he "continued this

---

[177] See TR 1/23/07, Pages 612-613.
[178] Id at 613.
[179] See TR 1/18/07, Page 201.
[180] See TR from 1/22/07, Page 513.
[181] See TR from 1/23/07, Pages 644-645; Westover Binder Exhibit #14.
[182] See TR from 1/22/07, Page 604.

business, why didn't you close it down?" He answered, "I can't afford to quit. I lost so much money. I need to try to recoup that any way I can."[183]

Summary of Damages (Bud Westover)

Based upon all of the foregoing, and pursuant to law, Bud Westover is entitled to damages consisting of his franchisee fee paid, additional capital investment, royalties paid, advertising fund fees paid and lost income (based upon the income he had been making before he purchased his Dunhill franchise). These damages total $1,194,476.58 (including interest) and are set forth in a summary schedule of damages annexed hereto as Exhibit #2 of the Submission Binder. In addition, pursuant to his claim under the Act, and otherwise, Bud is also seeking reimbursement for attorneys' fees and arbitration costs and expenses.

2.    Specific Misrepresentations Made to (and/or Dunhill's Failures to Meet the Obligations Contained in its Franchise Offering re:) Mike Lamanna
       (Permanent Placement Franchise Agreement – June 2001)

After Mike Lamanna first expressed interest in learning more about the Dunhill franchise opportunity, Joanne Naccarato sent him a form letter dated January 24, 2001 as part of its "comprehensive information kit."[184] This form letter which constitutes "sales literature" and which forms part of Dunhill's franchise offering, states the following:

-    "We enjoy a *reputation as one of the most thorough and professional permanent and temporary employment services in the industry*, qualities that lend themselves well to *strong client relationships and repeat business*"; and

-    "Our *professional and experienced staff* provides *unparalleled, continuous training, effective business development strategies and targeted research and development that help our franchisees realize their goals and potential. Ongoing support is provided, from specific placement strategies to growing a franchise office.*" (Emphasis added)

---

[183] See TR from 1/23/07, Page 642.

With respect to being granted a license to use the Dunhill trademark, Mike testified that he was told that the name had recognition. Mike further, testified that "the fact that they had a national advertising program and 150 offices and they were 50 years old was very intriguing to me."[185] Mike subsequently learned that these representations were false.

Like Mr. Westover, Mr. Lamanna testified that he received his President's Manual before he purchased his Dunhill franchise.[186] Mike testified that he reviewed the Manual when he received it on June 11, 2001.[187] Mike testified that prior to signing his Dunhill franchise agreement, Robert Stidham, represented to him that he could generate 25% to 40% in additional revenues by participating in the Exchange Program.[188] Mike further testified that these representations were, in general, confirmed by the Dunhill Brochure and his President's Manual.[189] Mike testified that at his first meeting with Robert Stidham on February 9, 2001, Mr. Stidham discussed "a lot of things that were in this Brochure, among them the Exchange Program."[190] Mike testified that "what Robert and I discussed was the ability to start making placements immediately because candidates and job orders were placed on the Exchange or part of the Exchange Program. So I wouldn't have to start generating job orders from day one, I could use somebody else's job order to find a candidate and make a placement of what I thought would be immediately."[191]

Mike testified that with respect to the Exchange Program, "all along I heard 150 offices to assist me and growing."[192] When asked what he understood the "150 offices to assist you" meant, Mike answered, "...the primary reason was the Exchange Program which was represented to me as

---

[184] See TR from 1/29/07, Page 1517; See Lamanna Binder Exhibit #15
[185] See TR from 1/29/07, Page 1531.
[186] Id at 1559.
[187] Id.
[188] See TR from 1/29/07, Pages 1542 and 1716;
[189] Id at 1522-1523, 1559-1560; Also see Page 4 of Brochure; and See Lamanna Binder Exhibit #12, Bates 003674.
[190] See TR from 1/29/07, Page 1524.
[191] Id at 1524-1525.
[192] Id at 1541.

one of the things that Dunhill had built up and was kind of exclusive to them."[193]  Mike also testified

that "My thought is that 150 offices would be very similar to my office, and that we would have

similar businesses. I did not know that there was a difference between a temporary office and a

permanent office or a company owned office as far as assisting me."[194]  Mike's President's Manual,

under the heading "The Dunhill Exchange," states:

> "100% Participation – i.e., every Dunhill Permanent Placement Franchise and
> DPS Corporate have signed the Exchange Agreement."[195]  (Emphasis added)

Mike testified that he later learned that neither the temporary staffing nor the company owned offices

participated in the Dunhill Exchange Program.[196]  He further testified that he did not generate any

revenues at all from the Exchange Program.[197]

Mike began his hearing testimony stating that his yearly compensation at Mita was

$130,000.00 (which was prior to his employment at Hitachi).  Subsequent to Mike's first meeting

with Robert Stidham (Dunhill's then Vice-President of Franchise Development) on February 9, 2001,

Mike testified that he had indicated to Mr. Stidham that "I was really not ready to make the [career]

change unless I could get a handle on what the costs and potential earnings could be from a venture

like this. So I felt that I needed additional information to that perspective."[198]  Mike added, "Robert

was aware of that, he knew what I had been earning. And I told him I would be comfortable if I could

get an approach that in a start-up approach; that sort of income in a start-up approach and he was

trying to get me into a March training class at the time and I was not ready to move."[199]  Mike also

---

[193] Id at 1520.
[194] Id at 1546.
[195] See Lamanna Binder Exhibit #12 (Bates 003674).
[196] Id at 1545-1546.
[197] Id at 1523.
[198] Id at 1549.
[199] Id.

testified, "In addition to the representations he made, we had discussions about specific profits and specifically setting up the business. And at that time he also connected me to Sandy Watkins."[200]

On February 26, 2001, several months before he purchased his Dunhill franchise, Mike received a two (2) page fax from Dunhill which provided a projection and analysis of revenues, expenses and profits for his (future) Dunhill franchise. Specifically, the document was a formal written proforma indicating expected revenues, expenses and profits (the "Proforma") under two (2) different scenarios (a "Conservative Case" and an "Expected Case") in connection with the first 12 months of operation of a Dunhill permanent placement franchise to be owned by Mike.[201]  In the Proforma's "Conservative Case" scenario, Dunhill represented to Mike that in the first twelve (12) months of operation, he could expect to generate revenues of $246,000 and have a profit of approximately $74,000.00.  In the "Expected Case" scenario, Dunhill represented to Mike that in the first twelve (12) months of operation, he could expect to generate revenues of approximately $345,000 and have a profit of approximately $131,000.00.[202]  Contrary to the "Expected Case" projections, Mike testified that over the initial twelve (12) month period of his business's operation, he had a loss of $634.00.  On what basis did Dunhill believe that Mike could generate a profit of approximately $131,000.00 in his first twelve (12) months?  We suggest that the number is not a coincidence and that it was because Mike told Robert Stidham that he had previously made $130,000.00 at Mita and that he was not comfortable moving forward unless he was confident that he would make a similar amount of money in his first year.  Dunhill gave him the projection that Mike needed to see in order to go forward.  Dunhill gave him the bait and Mike took it.

The Proforma's title is indicated as "Dunhill Professional Search of Irvine, California – Year 1, Michael Lamanna, President."  At the top of the Proforma, the fax number "949-858-7392" is

---

[200] Id at 1550.
[201] Id at 1550-1556; See Lamanna Binder Exhibit #6.
[202] See TR from 1/29/07, Pages 1552-1556.

indicated.  Mike testified that he received the Proforma via fax at Hitachi at that fax number.[203] During the case, Robert Stidham pointed out that the Proforma did not have a Dunhill "tag" or any cover sheet.  While this is true, there can be no doubt that the Proforma was faxed to Mr. Lamanna by someone at Dunhill.  Mr. Stidham testified quite clearly, that he was aware that providing Mr. Lamanna with the information contained in the Proforma would have constituted a violation of FTC Rules and Regulations with respect to making earnings claims.[204]  Therefore, it is not surprising that whoever faxed Proforma to Mike made sure that the fax transmission contained no Dunhill "tag" or cover sheet which would have clearly tied this illegal earnings claim to the Franchisor.  In any event, the way that we know that the Proforma came from Dunhill, beyond any reasonable doubt,  is that, as was pointed out in the case by Mr. Rosen, the formatting of the facsimile's imprint on the top of the Proforma's pages which indicates "FEB-26-2001 MON 10:41 AM    FAX NO.    P. 01 (and P. 02)" matches and lines up identically with the formatting of the Barham Agreement[205] which indicates "DEC-29-2000 FRI 03:08 PM    FAX NO.    P. 03 (through P. 07)" which Dunhill has produced and admitted into evidence as a document that was faxed from Dunhill to its counsel's office, Kaufmann, Feiner et al.  There can be no doubt at all that the Proforma was in fact, sent to Mike Lamanna on February 26, 2001, by someone at Dunhill, from Dunhill's fax machine.

On June 8, 2004, Mike, through his former attorney, Robert Purvin, provided written notice to Dunhill that he deemed his franchise agreement with Dunhill to be terminated for cause.[206]  Mike testified that he de-identified his business and ceased using the Dunhill name in approximately the middle of 2004.[207]

---

[203] Id at 1551.
[204] See TR from 3/6/07, Pages 118-119.
[205] See Dunhill's Exhibit #61.
[206] See TR from 1/29/07, Page 1562.

Summary of Damages (Mike Lamanna)

Based upon all of the foregoing, and pursuant to law, Mike Lamanna is entitled to damages consisting of his franchisee fee paid, additional capital investment, royalties paid, ad fund fees paid and lost income (based upon the income he had been making before he purchased his Dunhill franchise). These damages total $671,610.52 (including interest) and are set forth in a summary schedule of damages annexed hereto as Exhibit #2 of the Submission Binder. In addition, Mike is also seeking reimbursement for attorneys' fees and arbitration costs and expenses.

3.     Specific Misrepresentations Made to (and/or Dunhill's Failures to Meet the Obligations Contained in its Franchise Offering re:) Elias Zinn & Mike Wilcoxson
(Permanent Placement Franchise Agreement & Temporary Staffing Franchise Agreement – January 2000)

Elias testified that when he first contacted Dunhill, he communicated to Dunhill that he was interested in obtaining information about a Dunhill permanent placement franchise as he and Mike Wilcoxon was already considering purchasing a temporary staffing franchise from a company called TRC.[208]

Elias testified that when he met with Daniel Abramson in November 1999, Mr. Abramson's "sales pitch" was that Dunhill was a 50 year old company which would be growing to a $100 million company in sales by the end of 2001. Mr. Abramson told Elias that within the three years (i.e., by the end of 2002), Dunhill was going to open 40 new permanent franchises, 20 new temporary franchises and between 5 company owned offices.[209] In April of 2000, Mr. Abramson essentially confirmed these numbers in writing when he distributed a memorandum setting forth Dunhill's "growth strategies" to the FAC Office Growth Committee Members.[210] However, from the evidence in the case, we know that the number of Dunhill permanent placement franchises that were operating at the end of 1999 was 84, at the end of 2000 was 90 and at the end of 2001 was 85. We also know that of

---

[207] Id at 1580-1581.
[208] See TR from 1/24/07, Page 914.
[209] Id at 923, 956, 957.

those offices, barely one-third of them were actually generating revenues in excess of $60,000.00 per year. Further, in terms of revenues, Dunhill's revenues declined by 50% between 2000 (almost $67,000,000) and 2002 (approximately $33,500,000.00). What basis did Daniel Abramson have to make such unrealistic claims of projected growth, in terms of number of units as well as revenues, to prospective franchisees? None.

Elias testified that prior to signing his Dunhill franchise agreement, Dunhill, through Joanne Naccarato and the Brochure, represented to him and Mike Wilcoxson that they could generate between 25% to 35% in additional revenues by participating in the Exchange Program.[211] Elias also testified that Rick Kean told him that the Exchange Program was unique or proprietary to Dunhill and that MRI did not have such a system of exchanges.[212] Further, Elias testified that "it was clear" from his discussions with Ms. Naccarato and from the Brochure that he and Mike would be working with Dunhill's network of 150 offices in connection with the Exchange Program.[213] However, Elias later learned that none of Dunhill's temporary staffing or company owned offices participated in the Exchange Program.[214] Also, Elias testified that he was unaware until the hearings that participation in the Exchange Program was voluntary.[215] Elias testified that he and Mike generated no revenues from the Exchange Network during the years 2000, 2001, 2002 and the first half of 2002. In the second half of 2003 and in 2004 they made a few exchange placements through one contact that they had established with a Dunhill franchisee.[216]

---

[210] See Zinn Binder Exhibit #13
[211] See TR from 1/24/07, Pages 931and 937.
[212] Id at 936 and 938.
[213] See TR from 1/24/07, Pages 918-919.
[214] See TR from 1/25/07, Pages 1207-1208.
[215] See TR from 1/25/07, Page 1104.
[216] See TR from 1/24/07, Pages 961-962.

As previously stated, Elias testified about the inadequacy of Dunhill's technology and website in connection with the Exchange Program.[217]  When testifying about what he was told about the Exchange Program, Elias became animated and said,

> "So I mean I get upset about this because this was one of the main reasons why we bought a Dunhill franchise over other franchises; this sounded – and you got to take the date late '99, everything, the computer boom is going on; all the job boards are becoming and the world is changing. Dunhill didn't, but the world is changing and this sounded like this company had it together; it was going to be on the breaking end of the permanent placement business with this Exchange Program."[218]

Elias and Mike's temporary staffing franchise agreement obligates Dunhill to provide them with five (5) business days of "start-up assistance" at their office within the first 120 days of operation.[219]  However, Elias testified that he and Mike received no such start-up assistance from Dunhill.[220]

In the above section relating to "Proprietary Software," we set forth a fairly comprehensive summary of Elias' and Mike's horrific problems with both Dunhill's permanent placement software package (Resummate) and Dunhill's temporary software package (Maestro).  For the sake of brevity, we will not reiterate the points that were previously made.  Suffice to say, Dunhill's egregious failures to provide Elias and Mike with state-of-the-art proprietary software which could be installed and which actually functioned, coupled with the utter lack of any software support for years, had very serious negative ramifications for Elias and Mike's businesses.

As previously set forth above in the section relating to "National Advertising," Elias testified that Daniel Abramson's statements that Dunhill was going to run advertisements for Dunhill in such national newspapers such as the USA Today and the Wall Street Journal served as an inducement for Elias and Mike to purchase their Dunhill franchises.  This representation, when taken together with Mr. Abramson's projections about Dunhill's future growth in terms of numbers of offices and

---

[217] Id at 934.
[218] Id at 931.
[219] See Zinn Binder Exhibit #8, Section 8B.01 Page 16.

revenues, not to mention the promised training, proprietary software, and ongoing support and services, paints a false and misleading picture that differed greatly from what Dunhill's reality was.

In November 1999, Elias and Mike visited Dunhill's corporate headquarters in Hauppauge, Long Island. At one point, Joanne Naccarato, Dunhill's Director of New Business Development, took them into her office and told them that with the kind of business background they had, they would be extremely successful.[221] Then Ms. Naccarato said words to the effect, "let me show you some guys that don't have your business background and what they are doing."[222] She then pulled out a monthly data sales ("MDS") report (from either September or October 1999), which is a summary of the monthly revenues generated and reported to Dunhill by permanent placement franchises, and showed it to them and said that the permanent placement franchisees in North Carolina, the Martineaus, were "making millions" with Dunhill.[223] Then, still showing them the MDS report, Ms. Naccarato told Elias and Mike that the Emerson franchisees in Cherry Hill, New Jersey were "making millions" with Dunhill. And he told Elias and Mike that "you are going to make millions."[224]

With respect to the temporary staffing side, Elias testified that Tom Esposito, Dunhill's then National Director of the Staffing Division took him and Mike into his office to speak to them about the temporary staffing side of the business.[225] Elias testified that Mr. Esposito told them about why Dunhill was the premier agency in the temporary staffing business. Then Mr. Esposito pulled out a monthly data report with respect to the temporary staffing offices and told them that a temporary staffing franchisee in Long Island, New York, Phil Misserlian, was "making millions" in the temporary business, that Jerry Joseph, another temporary staffing franchisee (located in Texas), was also "making millions," and that various temporary staffing franchisees "are making millions and you

---

[220] See TR from 1/24/07, Page 943.
[221] See TR from 1/24/07, Pages 996-997.
[222] Id at 997.
[223] Id.; An example of an MDS report (from February 2000) is in Zinn's Binder, Exhibit #9.
[224] See TR from 1/24/97, Page 997.
[225] Id at 998.