AMERICAN ARBITRATION ASSOCIATION

. . . . . . . . . . . . . . . . . . . . . . X

DUNHILL STAFFING SYSTEMS, INC.,

Claimant

-against-

DUNHILL FRANCHISEE TRUST et al,

Respondents.

. . . . . . . . . . . . . . . . . . . . . . X

200 Park Avenue
New York, New York
June 22, 2006
11:10 a.m.

DEPOSITION of HARVEY J. AUGER, taken on behalf of the Parties, pursuant to Notice, held before a Notary Public of the State of New York.

H. AUGER

Q Other than this letter, Exhibit A-5, and what you communicated to Dunhill through the FAC, did you give Dunhill, and by you meaning, you and/or your wife or the Auger Group, LLC, give Dunhill any other written notices of their alleged breaches?
A Verbally only.
Q In this case, Mr. Auger, you are claiming damages from Dunhill?
A Yes.
Q And have you calculated an amount of damages that you are going to ask the arbitrator to award in your favor?
A Yes.
Q And what types of categories of damages are you seeking?
A Initial investment, capital investment, the move to Charlotte and loss of annual revenue or annual pay for myself, attorney's fees.
Q Okay. Anything else?
A I think that's it.
Q Did you undertake the calculation yourself or did you have someone do that on your

H. AUGER

behalf other than your attorney?
A I did it myself.
Q And how did you calculate your losses in each of these categories?
A Well, the initial investment was very easy to do.
Q That would be the $38,000.00 fee?
A Correct.
Q What was the amount of your capital investment?
A Conservatively 200,000.
Q What was included in your capital investment?
A All the investments for the office; salaries, operating expenses, covering the losses.
Q Are there any outstanding business liabilities that have not been satisfied?
A Yes, I have a line of credit and numerous credit card bills.
Q What is the balance of the line of credit?
A The balance now is only about 6,000.

H. AUGER

Q Are those or is that amount all business related?
A All business, that's all.
Q How about the credit card balances?
A Credit card balances are fifteen on one and about four on the other.
Q And how much in losses are you seeking in relation to your move to Charlotte?
A Roughly 20,000.
Q How about your loss of annual revenue or pay?
A Continual income, the, you know, when I talked to Joanne and I said I'm used to making 250,000, she said that is not an unreasonable expectation. I never made any, I didn't make any income the whole time that I held my office so, you know, I would assume that I should make at least 200,000 a year.
Q Do you recall being given a request for production of documents that were served by my office to your counsel?
A Yes.
Q Did you participate in assembling documents that were provided in response to that

H. AUGER

request?
A Yes.
Q Did you understand that the request asked you to provide every document in your possession that would be supportive of the various counterclaims that you are asserting?
A Well, I believe so.
Q Okay. Your attorney this morning produced that one additional document, the business opportunity document that had not been previously produced. Are there any other documents in your possession that have not been produced that in any way would support the different counterclaims that are being asserted to the best of your knowledge?
A I am still going through files and looking for everything I can to support it so I don't know in this point of time that I will find something else.
MR. WOLF: Those are all the questions that I have for you. Thank you.
MR. ROSEN: I have a few questions.

AMERICAN ARBITRATION ASSOCIATION

DUNHILL STAFFING SYSTEMS, INC.,

Claimant,

-against-

DUNHILL FRANCHISEE TRUST, et. al.,

Respondents.

--------------------------------------)

DEPOSITION OF MICHAEL LAMANNA

New York, New York

Wednesday, June 21,2006

Reported by:

William Byrne

JOB NO. 43777

Page 122

M. Lamanna

would you describe that?

A. The money that I invested into the business that the loss of -- let's see, the money that I invested into the business that I have not recovered as of this time and to put a dollar figure on it, it's maybe in the amount of 50 --

MR. ROSEN: He didn't ask you to put a dollar figure.

Q. That was going to be my next question. If you could put an estimated dollar figure on the amount that you invested in either start-up or operating costs during the time that you were in business as a Dunhill franchise owner, what would that estimated amount be?

A. I think it was approximately $50,000 in investment, and that's to the best of my recollection, there may be additional.

Q. I will not hold you to that specific estimation, it's just to get an idea of what you were talking about.

The $50,000 investment costs,

Page 123

M. Lamanna

the franchise fee, both the initial fee and royalties and loss of income and wages, would kind of cover everything?

A. It seems to be, yes.

MR. WOLF: I believe those are all the questions that I have for you. Thank you very much.

MR. ROSEN: I have a couple of questions.

EXAMINATION BY

MR. ROSEN:

Q. Mr. Wolf asked you to if you can recall to recite some of the areas of damage that you suffered, and you were reciting some of the areas that you had spent money on. Did you spend money on advertising, did you make an advertising contribution to the franchisor?

A. Yes, I did.

Q. Would that be an area you would also seek to be compensated?

A. Yes.

Q. Did you have to relocate -- you already talked about the expense of

Page 124

M. Lamanna

starting up your business?

A. Yes.

Q. Would you expect to be entitled to interest on your losses in your investment?

A. Yes.

Q. Do you think that the franchisor because of its conduct, and let's say its purported contract inducing you to enter into the contract, should be responsible for punative damages?

A. Yes, I would think so.

Q. You spoke about the conversation that you had, that you were virtually certain was with Robert Stidham, and you discussed the various information that you were seeking from Mr. Stidham, and you talked about information regarding the costs of the franchise.

Was there any other information that you asked Mr. Stidham to give you?

A. Of course, in addition to costs, I was looking at what the income

Page 125

M. Lamanna

possibilities could be.

Q. Going back to the things you would be looking to recover in this case, would you also be looking to recover your attorneys' fees that you have incurred?

A. If possible, yes, of course.

Q. You were talking about the circumstances surrounding your signing of the franchise agreement, and you had testified this was done when you were at a training session --

A. Yes.

Q. -- presumably in Hauppauge.

A. Yes, it was.

Q. Did Dunhill or did any of Dunhill's representatives indicate to you that they wanted your agreement to be signed before you left the training?

A. They wanted my agreement to be signed and the initial check to be delivered while I was at the training. They wanted me to do it as soon as possible.

Q. But not after you left, they

AMERICAN ARBITRATION ASSOCIATION

DUNHILL STAFFING SYSTEMS, INC.

Claimant,

-against-

DUNHILL FRANCHISEES TRUST, et. al.,

Respondents.

-----------------------------------)

DEPOSITION OF ELIAS ZINN

New York, New York

Tuesday, December 12, 2006

Reported by:

WILLIAM BYRNE

JOB NO. 45470

E. Zinn

was never acknowledged as I understand it so at the advice of counsel starting after August, I did not report revenue but it's accurately reported through August of '04.

**Q. And through August of '04 all of the reported royalties have been paid?**

A. Yes.

**Q. So it's your position that no royalties would be due to Dunhill based on the revenues that were collected by your business?**

A. At what time?

**Q. Well, going back to when you first became a franchisee.**

MR. ROSEN: Can we say through August of '04, which is the last day that he reported them, if he answers the question through that date, will that be the answer you are looking for?

MR. WOLF: Well, yeah, without waiving Dunhill's right to the claim that its owed royalties past that day but yeah.

E. Zinn

A. Yes, everything was reported on the royalty reports.

MR. ROSEN: Was it paid?

THE WITNESS: Yes.

**Q. In this arbitration you're claiming to have sustained damages; is that correct?**

A. Yes.

**Q. What are the damages that you are seeking from Dunhill in this case?**

A. The categories of damages would be the franchise fee for the permanent and temp; the royalties for the permanent; the operating losses that we had to write checks for; the capital expenses that basically were written off at the time we terminated the Dunhill franchise; the interest of the monies -- I would have invested that money differently -- and, obviously, the attorneys fees, to get back that money.

**Q. The first category is the initial franchise fee paid for both the permanent and temp franchise agreement?**

E. Zinn

A. Yes.

**Q. The next category is all of the royalties paid on the permanent agreement?**

A. Yes.

**Q. You are not seeking reimbursement of the royalties paid on the temp agreement?**

A. That's a complicated question because there are no royalties paid on the temp agreement, so I can't answer yes or no to that because I have to visit with that with counsel.

**Q. The next category is your operating losses, the losses for which you wrote checks?**

A. Yes.

**Q. How much is that?**

A. I don't have the exact number but within 175 and 225,000 through 2000 and 2003, but that is an approximate number.

**Q. What was the number?**

A. 175 to 225,000.

E. Zinn

**Q. And that is from what period to what period?**

A. From 2000 to 2003.

**Q. Then the next category was capital expenditures?**

A. Any additional capital expenditures that I had when we bought the franchise, and we capitalized some issues that related to the purchase of the Dunhill franchises. We subsequently didn't write that off until after 2003.

**Q. What is the writeoff figure?**

A. I haven't really analyzed that. I have to get together with our accountants to see what the exact number is.

**Q. Have you undertaken any analysis of the interest that you are claiming on the monies that you would have invested differently?**

A. I have not.

**Q. How much in attorneys' fees are you seeking?**

A. I forgot one area there, I'm

E. Zinn

sorry, that made me think. I had lost earnings obviously related to not being in my real estate business because I terminated my managing partnership in my real estate business to take on the Dunhill franchise.

**Q. How much were you earning as a managing partner of your real estate business?**

A. Approximately 80 some-odd thousand a year to be the managing partner.

**Q. Have you undertaken some calculation of what the value of your lost earnings claim is?**

A. Well, I would say that each year that I operated at Dunhill and had to write a check to operate it, I was losing the earnings I would have done if I remained the managing partner of the real estate company to 2000 through 2003. I would have earned at least what I earned in '99, which was in the mid-80,000 range.

**Q. So the calculation of your**

[Page 166]

**E. Zinn**

**lost earnings claim would be based on $80,000 a year times four years?**

A. Mid-80s, yes.

MR. WOLF: I have nothing further. Thank you very much.

MR. ROSEN: Are you finished with your answer on that?

THE WITNESS: Yes.

MR. ROSEN: I have a couple of questions.

EXAMINATION BY
MR. ROSEN:

**Q. Let's go back to November 1999 at your meeting, and I would like to clarify a couple of things you said.**

A. Yes.

**Q. You testified earlier about the exchange program, what exactly were you told with respect to the exchange program?**

A. In the meetings in November of '99?

**Q. Yes.**

A. I was told that we will do 25

[Page 167]

E. Zinn

to 35 percent of our revenue in the Dunhill exchange program.

**Q. Who told you that?**

A. Joanne, and Rick Keane.

**Q. Now, you also testified that you were shown information with respect to what certain franchisees were generating in revenue at that meeting. What were you shown?**

A. I was shown the monthly data statistics MDS, I think for either October or November of '99 -- September or October of '99.

**Q. And who showed you that?**

A. Joanne.

**Q. And how did it come up, how did she happen to show that to you?**

A. Basically, when we went to a private meeting with her I said I was really concerned that how could I or how could this be.

I think I said the question is why should I buy a Dunhill franchise over MRI, which they seem to be very successful

[Page 168]

E. Zinn

also, and what kind of money could I make on a Dunhill franchise.

**Q. What did she do at that point?**

A. She showed the MDS report from September October '99 and she proceeded to say that the Martineus and Winston-Salem are the leading franchisee, they are making over a million and the guys on Cherry Hill are approaching a million this year and you can do it too.

**Q. Did anybody else that was on the permanent side?**

A. That was on the permanent side?

**Q. Did anybody show you any information or discuss any earnings that franchisees were making on the temporary side?**

A. Tom Esposito in his meeting said that the guys like Phil Mercillen and Jacob Joseph in Irvine, Texas are making millions and you can do that too.

**Q. I want to go to your prior testimony regarding the notice issue, and**

[Page 169]