## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **DUNHILL STAFFING SYSTEMS, INC.,** ) | **Case No. 13 181 Y 01674 04** |
| ) | |
| **Claimant,** ) | **RESPONDENT FRANCHISEES** |
| ) | **TRUST'S PRE-HEARING BRIEF** |
| **v.** ) | |
| ) | |
| **DUNHILL FRANCHISEES TRUST, ET AL.,** ) | |
| ) | |
| **Respondents.** ) | |

## I.    Procedural Background of Arbitration Proceeding

On or about June 23, 2004, Claimant, Dunhill Staffing Systems, Inc. (hereinafter "Claimant" or "Dunhill"), initially commenced this arbitration proceeding against the Dunhill Franchisees Trust (the "Trust"), which consisted of 18 former Dunhill franchisees. On or about September 10, 2004, The Trust, on behalf of its 18 Trust members, submitted and interposed defenses and counterclaims to the claims brought by Dunhill.[1]   Of the 18 former Dunhill franchisees against whom Dunhill had asserted claims, all but four (4) former Dunhill franchisees (Basil Westover, Harvey Auger, Michael Lamanna and Elias Zinn & Michael Wilcoxson who were business partners) have resolved their disputes with Dunhill.  According to Dunhill's Demand for Arbitration, Dunhill's claims against each of the 4 remaining franchisee respondents (the "Franchisees") are as follows:

A.    Basil Westover – Breach of restrictive covenant; and Non-submission or possible underreporting of royalties;

B.    Harvey Auger - Non-submission or possible underreporting of royalties;

C.    Michael Lamanna - Non-submission or possible underreporting of royalties; and Unpaid notes receivable;

---

[1]  At the time that the Trust, interposed its defenses and counterclaims, the Trust also asserted against Dunhill, claims brought by another former Dunhill franchisee, Robert Sommella. Mr. Sommella has since settled his dispute with Dunhill.

D.    Elias Zinn & Michael Wilcoxson - Non-submission or possible underreporting of

royalties.

The Defenses and Counterclaims of the various Franchisees, as set forth in the Trust's

Answering Statement, include:

  (i)     payment;

  (ii)    breach of contract;

  (iii)   failure of consideration;

  (iv)    fraud in the inducement to enter into the franchise agreement(s) [i.e.,

          fraudulent misrepresentations];

  (v)     equitable right of set-off;

  (vi)    termination of the franchise agreement for cause; and

  (vii)   unenforceability of the restrictive covenant.

## II.    Factual Introduction – The Dunhill Franchise System

Dunhill's franchise system was founded in the mid-1960s by Bob and Edward Kushell,

two entrepreneurs (brothers) who were totally committed to establishing a network of personnel

placement services that would become a leader in its field by providing the highest level of

service to its customers and clients and which would provide franchisees with an opportunity to

achieve a better than average return on their investment. By the time the Company ("Dunhill")

was sold to the Canteen Corporation, a subsidiary of the Transworld Corporation, in 1977,

Dunhill had grown to a network of over 375 franchises. During that period, the "Dunhill" name

was a recognized leader in the placement industry, one which invoked a reputation for

excellence. During that period, there was never any incident of litigation or disharmony between

Dunhill and its franchisees.

When Dunhill merged into Canteen Corporation, Canteen allowed Dunhill's

senior management to continue operating the company on a day to day basis, while at the same

2

time, setting up a system of oversight. Canteen provided the necessary resources to achieve Dunhill's objectives. The President of Dunhill attended Canteen's Board of Directors meetings and the President of Canteen was always directly interested and involved in Dunhill's operation and performance.

In 1988, when the current owner, Watsco, Inc., ("Watsco") acquired the Dunhill franchise system, the system included approximately 253 permanent placement franchised offices (which is the type of franchises that each of the Franchisees had at Dunhill[2]) and approximately another 35 temporary staffing offices. As the evidence will show in this case, when one compares and contrasts the culture and operations of the Dunhill franchise system *before* and *after* Dunhill was acquired by Watsco, it is clear that Dunhill, and/or Watsco (after it had acquired the Dunhill franchise system) inflicted such severe mismanagement and neglect on what was a thriving and prosperous franchise system that, for all intents and purposes, the current Dunhill franchise system barely exists on an operational level.

## III.    **What this Case is About**

While each of the four (4) Franchisees' individual cases go way beyond the above referenced shameful and unnecessary decline and demise of the Dunhill franchise system, it is important to keep this situation in mind as it provides a meaningful "backdrop" for the events and evidence that will be described and offered in this case.

In this case, the Franchisees will certainly argue that Dunhill has failed, in a variety of ways, to comply with its contractual and other (including moral) obligations, and that Dunhill did not deal with its franchisees fairly or in good faith. [We note that Albert Nahmad, a Director of Dunhill and the Chairman and CEO of Watsco, testified at his deposition that there are in fact ethical codes promulgated by Watsco which govern the actions of all of Watsco's employees and

---

[2] At the same time that Elias Zinn & Michael Wilcoxson purchased their Dunhill permanent placement franchise, they also purchased a Dunhill temporary staffing franchise as well.

management as well as those of each of its subsidiaries (including Dunhill).] However, the Franchisees' case against Dunhill goes far beyond that. Indeed, beyond merely alleging that Dunhill has breached its obligations to the Franchisees and that Dunhill permitted its franchise system to decline. What this case is really about is how Dunhill, in the context of the above referenced decline and demise of its franchise system, made a wide variety of egregious and unconscionable misrepresentations (and/or omissions) to each of the Franchisees, which Dunhill knew or should have known were false, and which were not only improperly made, but which were often made in violation of the law. These misrepresentations, respectively, induced each of the Franchisees to join the Dunhill franchise system and the Franchisees reasonably relied upon them to their detriment.

These misrepresentations (including omissions) fall into two (2) main categories:

(i) misrepresentations (or omissions) which were common to or which related to the franchise system, generally, and which were made to each of the Franchisees (and of course, to many other Dunhill franchisees); and

(ii) separate and distinct misrepresentations (or omissions) which were made to specific Franchisees (and/or violations of the law) which induced each such Franchisee, respectively, to purchase a Dunhill franchise.

## IV.    Summary of "Common" Misrepresentations

None of the Franchisees had prior experience in the placement/staffing industry. Each of them relied on the information that Dunhill provided to them about its franchise system. In addition to members of Dunhill's corporate staff making verbal representations to the Franchisees, many of the misrepresentations stated to the Franchisees were also contained in a written marketing brochure entitled "Dunhill Staffing Systems, Inc. Business Opportunities" (the "Brochure") which was provided to each of the Franchisees prior to when they signed their franchise agreements. We will prove each of the following misrepresentations during the hearing:

4

1.    <u>Dunhill's Exchange Program</u>. As none of the Franchisees had prior experience in the placement or staffing industry, the Franchisees had a reasonable concern about being able to generate sufficient revenues to operate and sustain their businesses, especially in the short term when they had no experience, leads or connections.  As an important component of Dunhill's marketing approach and to allay the Franchisees' concerns, Dunhill's franchise sales staff communicated to the Franchisees that approximately 25% to 35% of the placement revenues that each of them would generate in their franchised business would come as a result of participating in the Dunhill Exchange Program.  These exchanges would occur when: (i) a Franchisee had a job order and was not aware of any suitable employment candidate who could satisfy the requirements of the job order and would post the job order on Dunhill's exchange database; and (ii) when another Franchisee (located anywhere in the United States) who was also participating in the Exchange Program and was aware of a suitable candidate to match the job order, communicated same to the Franchisee who had listed his job order.  When the candidate was successfully placed, any revenues or fees earned by either Franchisee would be split between them on some agreed upon basis.

Participation in Dunhill's Exchange Program by its franchisees was generally voluntary.[3] While the Franchisees did, in fact, participate in the Exchange Program, and although they tried to utilize the program to increase their revenues, none of the Franchisees made any exchanges as a result of the program.  The fact of the matter was that the Exchange Program, which many years before, had been a credible and functional system, had over time, become a dysfunctional, broken down program which provided little, if any benefit to the Franchisees.  The technology used was obsolete and the information was not properly purged and updated on a regular basis.  It was com-

---

[3]  Apparently sometime in 2002, Dunhill changed its policy and began requiring franchisees' participation in the Exchange Program. Basil Westover's franchise agreement (dated July 18, 2002) provides that his participation in the Exchange Program is required.

mon to find "stale" job orders posted on the system dating back more than a couple of years.

The Brochure, which was given to each of the Franchisees before they signed their particular franchise agreements, stated that: "Today, almost 25% of our placements are a direct result of the exchange network." The misrepresentations made by Dunhill regarding the Exchange Program (both verbal and written) were particularly egregious because the Franchisees were relying on Dunhill's statements that the revenues generated from the Exchange Program essentially functioned as a "safety net" and would generate revenues while the Franchisee was trying to acclimate himself to the new business he had opened. Further, Dunhill had no historical data to support the claim that between 25% and 35% (and up to 40%) of revenues generated would result from participation in the Exchange Program. Indeed, it was reported at a Franchise Advisory Counsel ("FAC" meeting on October 11, 2001, that there was an inter-office exchange rate of only 4% of overall revenues. The fact that Dunhill could so grossly mislead the Franchisees in this manner is a clear example of how Dunhill would say or do virtually anything in order to sell a franchise.

Notwithstanding all of Dunhill's representations, both verbally and in the Brochures, relating to the revenues that the Franchisees could expect to generate from participating in the Exchange Program, unbelievably, Robert Stidham, Jr., a former President of Dunhill, testified in his deposition that Dunhill could not possibly predict the percentage (or amount) of a franchisee's revenues which could be generated from the Exchange Program (or in fact, whether a Franchisee could generate any revenue at all from the Exchange Program). But Dunhill *did*, in fact, tell the Franchisees, both verbally and in the Brochures distributed to each of them before they signed their franchise agreements, that they could expect that 25% or as much as 40% of their revenues would come from the Exchange Program. None of the Franchisees in this case generated any revenues

6

from the Exchange Program.

2.   Number of Dunhill Active Permanent Placement Franchised Offices / Failure to Make Required Disclosures.

Some of the most serious and egregious misrepresentations (and omissions) which were made by Dunhill's franchise sales staff to each of the Franchisees related to the size and financial stability of the Dunhill franchise system. We begin with Dunhill's corporate staff communicating to each Franchisee (both verbally and in writing, before they signed their franchise agreements) that Dunhill has "a network of 150 offices nationwide to assist you." First, this representation was misleading to each of the Franchisees when taken in the context of the Exchange Program. When the Franchisees were told that there was a network of 150 offices "to assist" them, this reinforced and confirmed all of the misrepresentations Dunhill had made relating to how valuable the Exchange Program would be for them. As will be discussed below, Dunhill's "150 offices" figure is misleading, and even worse, essentially had no meaning for the Franchisees.

As an example, Franchisee Westover signed his franchise agreement in July of 2002 and was given Dunhill's 2001 permanent placement Uniform Franchise Offering Circular ("UFOC") which indicates, among other things, that as of year end 2000, Dunhill had 90 permanent placement franchised offices and 10 additional "company owned" permanent placement offices. To be able to determine the number of other Dunhill offices, a review of Dunhill's 2001 temporary staffing UFOC indicates that as of year end 2000, Dunhill had 23 temporary staffing franchisees and 1 additional company owned temporary office, for a grand total of 124 offices. Therefore, even on its face, Dunhill's repeated references to a network of 150 offices "to assist you" is inaccurate and is misleading, especially, in the context of the Exchange Program as described above. On the one hand the Franchisees (who purchased permanent placement franchises) were told that there was a network of 150 offices "to assist" them while the permanent placement UFOC indicated that there were only 90 permanent placement franchised offices listed in the Dunhill

franchise system. (It is important to note that the number of temporary staffing offices in the Dunhill system was irrelevant to the Exchange Program and the permanent placement Franchisees as these offices had no job orders to list for matching by permanent placement offices.) In any event, the Franchisees reasonably believed that they could count on a strong and effective Exchange Program with strong participation levels form a large network of franchisees which would generate between 25% and 35% (and up to 40%) of their revenues. As described below, even these figures are misleading and, as one takes a closer look at the revenues being produced by the permanent placement offices, it is easy to understand why the Exchange Program was of little or no benefit to the permanent placement Franchisees.

As stated above, Dunhill's 2001 UFOC indicates that as of year end 2000, Dunhill had 90 permanent franchised offices. However, when one closely examines how many of the permanent placement franchised offices were generating very little business or were reporting no royalties or minimal royalties to Dunhill in 2000, one gets a much clearer picture of the actual size of the active Dunhill permanent placement franchise system. The figure of 90 permanent franchised offices which is contained in the 2001 UFOC is very misleading when it is revealed that a whopping 43 of the 90 listed offices reported *absolutely no revenues at all* to Dunhill in 2000. Further, only 35 of the 90 permanent franchised offices listed in the 2001 UFOC reported more than $60,000 of revenues in 2000. During 2001, while Dunhill listed 85 active permanent placement franchises in its 2002 permanent placement UFOC, only 38 permanent franchised offices reported revenues of more than $60,000.00. As Dunhill did not issue any UFOCs of any kind in 2003 and beyond, we are left to use the 85 active permanent placement franchises figure as the best estimate of the number of permanent placement franchises Dunhill had in 2002 and 2003; in 2002, using the 85 figure as an estimate of the number of permanent placement franchises, only 30 permanent franchised offices reported revenues of more than $60,000.00; in 2003, again using

8

the 85 figure as an estimate of the number of permanent placement franchises, only 36 permanent franchised offices reported revenues of more than $60,000.00.

The fact that so many of Dunhill's permanent placement franchised offices were reporting no royalties or minimal royalties or were generating minimal revenues, should have been disclosed to the Franchisees. Had the Franchisees been provided with this information, had they known how few Dunhill permanent placement franchisees were really "doing business," they would never have purchased and invested in the Dunhill franchise system.  In fact, had they been given this information, they would have "run for the hills" as it would have been financial suicide to knowingly and willingly, join a system where almost fifty (50%) percent of the franchisees with businesses similar to yours (e.g., permanent placement), were reporting *absolutely no revenues* and only approximately 39% of the type of franchise that you were contemplating purchasing were reporting *more than a bare minimum* of revenues.  In fact, it <u>did</u> turn out to be financial suicide for the Franchisees.

In any event, Dunhill's willful and material omissions and its failure to disclose these material facts to the Franchisees: (i) violated the Federal Trade Commission Act (the "FTC" Act), which is a federal statute governing requirements for the disclosure of information to potential franchises to whom offers are made; (ii) the New York State Franchise Sales Act (the "Franchise Sales Act") which provides that: "It is unlawful ... to make any untrue statement of a material fact *or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading*"; (iii) violated the covenant of good faith and fair dealing that is implied in contracts between the Franchisor and its Franchisees pursuant to the law of the State of New York; and (iv) constitute fraud and/or misrepresentations under common law principles.

Again, Dunhill was willing to say or do, *or fail to say or do,* whatever it felt was necessary in order to sell additional franchises from 2000 and 2002.  The fact of the matter is, that based

9

upon the badly deteriorated state of the Dunhill franchise system, it was improper for Dunhill to sell franchises to the Franchises when it did. The Franchisees' chances of success were so minimal that Dunhill's misrepresentations (and lack of disclosure) to the Franchisees constituted a fraud perpetrated upon each and every one of them. As a result, each of the Franchisees' franchise agreements should be subject to rescission and Dunhill should be responsible for the damages suffered by the Franchisees as a result of Dunhill's actions.

   3.    Financial Strength of Dunhill Franchise System.

Dunhill communicated to the Franchisees (both verbally and in writing) that in the last 5 years Dunhill had, on average, achieved a system wide revenue growth of 20% annually and had doubled the revenues of the Dunhill organization. We believe that these representations were exaggerated and were false.

   4.    National and Regional Advertising.

The Franchisees were required to pay Dunhill 1% of its monthly revenues to be deposited into its National Advertising Fund and spent on national and regional advertising. Before signing each of their franchise agreements, each of the Franchisees were told by Dunhill representatives that Dunhill had an advertising fund and that Dunhill was committed to spending the funds on national and regional advertising in order to continue promoting the Dunhill brand. However, there was little, if any, national or regional advertising done by Dunhill for the Franchisees' benefit or otherwise.

   5.    Training.

As a way of inducing the Franchisees to join the Dunhill franchise system, Dunhill's franchise sales personnel representatives made numerous misrepresentations, both verbally and in the Brochure, which related to the purported excellent quality of the initial and ongoing training that they would receive as a Dunhill franchisee. All of the Franchisees will testify that, for a variety of reasons including but not limited to the fact that the training techniques and materials

10

used outdated technology, failed to address important topics and that the "ongoing" training was a mere repetition of earlier training programs, both the initial and ongoing training they received was inadequate, out of date and generally, ineffective.

6.    Ongoing Support.

Dunhill also induced the Franchisees to join the Dunhill franchise system, with misrepresentations, both verbally and in the Brochure, which related to the stellar ongoing support and guidance that they would receive as a Dunhill franchisee. However, each of the Franchisees will testify that for a variety of reasons, including but not limited to the fact that Dunhill was continuously experiencing a high turnover and cut-backs with respect to support and training personnel, the ongoing support they received was so very hard to obtain and when it was finally given, it was usually not helpful and ineffective.

7.    Proprietary Software.

Before entering into their franchise agreements, the Franchisees were promised that they would receive high level technology and "state of the art" proprietary software to help them operate their business. However, what they received was an ineffective and hard to use software program called ResuMate, which was an "off the shelf" product that could be purchased at retail chains such as Staples. Dunhill failed to provide the Franchisees with sufficient training to use the ResuMate software. At Westover's training session, Dunhill's trainer had extreme difficulties utilizing the ResuMate software system himself, let alone teaching it to Westover.

8.    R.A.T.I.F.Y. Program.

The R.A.T.I.F.Y. program (Recruiting and Training Individuals for You) was used by Dunhill as another inducement for the Franchisees to join the Dunhill franchise system. Dunhill recommended that the Franchisees hire consultants to make additional permanent placements and Dunhill, through the R.A.T.I.F.Y. program, obligated itself to take various specific actions in an effort to assist the Franchisees in connection with the hiring and training of "quality" consultants.

11

The "assistance" provided by Dunhill was limited and ineffective and the training provided by Dunhill was inadequate, failed to use current technology and was repetitive of the initial (inadequate) training provided to the Franchisees.

      9.      Dunhill as a Discontinued Operation.

Watsco reported in its SEC filings that Dunhill, its wholly owned subsidiary, had been listed as a "discontinued operation." The Franchisees, who were in the process of investing in a Dunhill franchise not long after this had occurred, had the right to know this. Even if the term "discontinued operation" is intended as a technical accounting term used when a public company (Watsco) tries to "sell off" a subsidiary (i.e., the entire Dunhill franchise system, as Mr. Nahmad testified), the purchasing Franchisees had a right to know this and form their own opinion as to the true meaning and perception of a "discontinued operation."

**VI.    Specific Misrepresentations Made to the Franchisees.**

      In addition to each of the "common" misrepresentations set forth above, Dunhill communicated additional, specific misrepresentations to each of the Franchisees which induced them to enter into their franchise agreements. (Additionally, some or all of these misrepresentations, etc., may also constitute breaches of the particular Franchisee's franchise agreement.) A description of each of these misrepresentations is set forth below, together with any additional noteworthy comments which pertain to said Franchisee.

      1.      Basil "Bud" Westover - Signed his Dunhill franchise agreement on July 18, 2002. Pursuant to Section 3.01 of his franchise agreement, Westover was granted an exclusive territory in Tarrant County, Texas, which is set forth more fully in Exhibit A to his franchise agreement. Without his knowledge, *Dunhill already had placed another franchisee in his exclusive territory who was operating both a permanent placement and temporary staffing franchise.* Clearly, the granting of an exclusive area is one of the most important, if not *the* most important aspect of purchasing a franchise. By selling Westover a franchise which purportedly contained an exclusive

territory, but which in reality, already contained a franchisee within said territory, Westover's franchise agreement is subject to rescission on that basis alone. Further, in an Addendum to his franchise agreement, Westover was given a right of first refusal with respect to opening a Dunhill temporary office within his exclusive territory. However, because Dunhill had already granted another franchisee the right to operate a temporary staffing franchised business within Westover's "exclusive" territory, Westover's "right of first refusal" was rendered worthless. It is unfathomable how Dunhill could not have known that, although it was selling Westover a franchise in an exclusive territory, it had previously sold two franchises (permanent and temporary) within the same territory. Westover was fraudulently induced to sign his franchise agreement. Further, Dunhill's actions constituted a serious breach of its obligations under Westover's franchise agreement.

Additionally, it is important to note that Westover, unlike the other Franchisees, was provided his Dunhill "President's Manual" prior to when he signed his franchise agreement. Therefore, any misrepresentations which are contained in Westover's President's Manual take on additional significance as they were not only confirmatory documents which evidence a failure by Dunhill to comply with its obligations, but also, represent inducements upon which Westover relied in making his decision to purchase his Dunhill franchise.

Also, the UFOC Dunhill provided to Westover on February 28, 2002 was "stale" as it was issued in May 2001. When Westover visited Dunhill's corporate office in March or April of 2002, he was handed a purportedly "current" UFOC by Robert Stidham in a conference room. However, when Westover was asked to follow Mr. Stidham out of the room to continue touring the corporate facilities, etc., the UFOC was taken back from him and was not returned to him. Stidham told Westover that he would mail Westover the UFOC, but Westover never received it. In that Westover's franchise agreement was entered into less than 3 years before this proceeding was filed, and because Dunhill offered and sold Westover his franchise in New York, Dunhill's

misrepresentations to Westover as well as Dunhill's failure to provide Westover with a current UFOC, not only constitute violations of the FTC Act and common law principles, but also constitute violations of The New York State Franchise Sales Act.

2.    Harvey Auger - Signed his Dunhill franchise agreement on October 12, 2000. Before investigating an opportunity to purchase a Dunhill franchise, Auger had been living in Connecticut. When Auger asked Dunhill if he could open a permanent placement and temporary staffing office in Connecticut, Dunhill told him that he could not do so because there was already another franchisee in his proximity, and they steered him to consider opening an office in the southern United States. Dunhill told Auger that the temporary staffing market was growing very rapidly and that if Auger purchased a permanent placement franchise (in the South), he would also soon be permitted to operate a temporary staffing business, through a new Dunhill program called "Dunhill 2000" which was to be introduced shortly. This would be in addition to having his permanent placement franchise which he would currently purchase. (It is important to note that the UFOC provided to Auger discusses the Dunhill 2000 program which confirmed what Dunhill was telling him.)

Based on Dunhill's directive that he consider opening an office in the South and Dunhill's representations that he would be permitted to also make temporary staffing placements, Auger chose Charlotte, North Carolina which was a growing market, and moved his entire family there, including his son and daughter-in-law. As it turned out, the permanent franchisees revolted at the prospect of having to also do temporary staffing placements, the Dunhill 2000 program never materialized, and Dunhill never permitted Auger to make temporary staffing placements. Auger was stuck doing only permanent placements, which he could have done from any geographic location, including his hometown in Connecticut. Auger had agreed to uproot himself and his family and move to Charlotte, North Carolina based upon Dunhill's representation that he would

14

be permitted to also make temporary staffing placements. The fruits of this promise never materialized.

    3.   <u>Michael Lamanna</u> - Signed his Dunhill franchise agreement on June 14, 2001. Franchise statutes have been promulgated to prevent frauds from being perpetrated on prospective franchisees. It is basic that the Franchisor is not permitted to provide a prospective franchisee with any income or expense estimates or financial projections relating to what kinds of revenues or profits he can expect to generate, that are not fully disclosed in the Franchisor's UFOC. Notwithstanding the fact that the UFOC Dunhill provided to Lamanna contained no disclosure of any such information (referred to as "Earnings Claims"), Lamanna did in fact receive a *written* Earnings Claim on February 26, 2001, more than three and one-half months before he signed his franchise agreement on June 14, 2001.

    On February 9, 2001, Lamanna met with Robert Stidham, Jr., Dunhill's then Vice-President of Franchise Development. At this meeting, Stidham gave Lamanna a copy of Dunhill's 2000 UFOC. Subsequent to this meeting, Lamanna had one or more discussions with Stidham regarding the amounts of revenues and/or expenses that Lamanna could expect to experience in his first year of operation as a Dunhill permanent placement franchisee. On February 26, 2001, Lamanna received a two (2) page fax from Dunhill which provided information relating to two (2) different scenarios. In the "conservative case" scenario, Dunhill represented to Lamanna that in the first twelve (12) months of operation, he could expect to generate revenues of $246,000 and have a profit of approximately $74,000.00. In the "expected case" scenario, Dunhill represented to Lamanna that in the first twelve months of operation, he could expect to generate revenues of approximately $345,000 and have a profit of approximately $131,000.00. In reality, over this initial twelve month period, Lamanna's revenues were approximately $69,000.00 and his loss was approximately $600.00. It is irrelevant on what basis Dunhill might have believed that Lamanna could generate approximately $345,000.00 in revenues in his first twelve months. Even if Dunhill

15

had been accurate in their predictions, which they were not, and regardless of what Lamanna's actual revenue and profit numbers were, it was illegal for Dunhill to provide Lamanna with such an undisclosed Earnings Claim.

In Stidham's deposition, he testified that if a franchisee asked him or other Dunhill employees for information relating to how much money the franchisee could expect to make, he would "absolutely not" provide that information because it would be a "violation of company policy" and a "violation of the FTC Rule." Stidham further added that if he became aware that any Dunhill employee had provided this kind of information to a prospective franchisee, "it would come to an end immediately and probably result in a termination" of the employment of such person. Upon further questioning as to what would happen if a Dunhill employee did not "play strictly by the rules," Stidham confirmed that the employee would in fact, be fired if the individual had engaged in such conduct. It is clear that Dunhill violated the law by providing Lamanna with an illegal Earnings Claim prior to his signing his franchise agreement.

4.    Elias Zinn and Mike Wilcoxson - Signed the Dunhill permanent placement and temporary staffing franchise agreements on January 21, 2000.

Zinn and Wilcoxson are friends and business partners. When Zinn spoke to and met with Dunhill's representatives, Zinn told Dunhill that he was interested in exploring the purchase of a Dunhill permanent placement franchise. (Zinn indicated that he was considering purchasing a temporary staffing franchise from a competitor.) However, Dunhill was "really pushing" the temporary staffing franchise – (remember, at this time Dunhill was gearing up for its Dunhill 2000 program whereby the permanent placement franchisees would also have to make temporary staffing placements).

In November 1999, Zinn visited Dunhill's corporate headquarters in Hauppauge, Long Island. During that visit, Joanne Naccarato showed Zinn a recent Dunhill Monthly Data Report which listed the permanent placement franchisees (broken down by office) and the amounts of

revenue that each office had reported for that month. Naccarato showed Zinn the report and told him that several permanent placement franchises were generating either over a million dollars or almost a million dollars and that he could expect to generate similar "numbers." With respect to the temporary staffing side, Zinn testified in his deposition that Tom Esposito, Dunhill's then Vice-President with respect to temporary staffing franchises, told him that various temporary staffing franchisees "are making millions and you can do that too." Dunhill made illegal Earnings Claims to Zinn with respect to both the permanent placement and temporary staffing franchises and Zinn and Wilcoxson were improperly induced to enter into both of their Dunhill franchise agreements.

## VII.    Decline of the Dunhill Franchise System.

The Dunhill franchise system has declined to such an extent, both in numbers and effectiveness, that it has become an irrelevant non-factor as far as the placement industry is concerned. In 1977, Dunhill had over 375 offices. In 1988, when Watsco acquired the Dunhill franchise system, Dunhill had 253 permanent placement franchised offices. In its 2001 UFOC, Dunhill represented that in the year 2000, it had 90 active permanent placement franchised offices. However, we know that this was not true and that since 2000, the number of Dunhill permanent placement franchised offices which were actively making placements has declined dramatically. In fact, as of year end 2006, the Franchisees have determined (by making phone calls to offices listed on Dunhill's website) that the number of Dunhill permanent placement franchised offices "open for business" was only approximately 22. (However, since Dunhill no longer sells franchises or publishes a UFOC, we have no data indicating how many of these offices are actually reporting any revenues to Dunhill or are generating revenues of more than $60,000.00.)

The Franchisees are hard-working people who followed the Dunhill system and who tried everything they could to "make it work." But over time, Dunhill became weaker and weaker as more and more of the larger revenue generating offices left the system. By 2000, the Exchange

17

Program had become practically worthless, Dunhill did less national and regional advertising and Dunhill's decline began spiraling downward. After Dan Abramson resigned as Dunhill President in approximately September 2001, a "revolving door" of new Dunhill Presidents and management staff existed in 2002 and 2003 and Dunhill began providing fewer support services. Further cutbacks and turnover resulted, and training or support could rarely be found so that by the beginning of 2004, Dunhill was unable or unwilling to provide the Franchisees with practically any ongoing training, support or advertising. In fact, the Franchisees (together with many other franchisees) felt strongly that they were part of a franchise system in name only (a name which had lost the market cachet that it had in the 1970s and 1980s) and that they were receiving practically no value from Dunhill.

Dunhill's witnesses will likely testify that the placement/staffing industry was hard hit by recession as a result of the events of September 11, 2001 and that neither Dunhill (nor Watsco) can be blamed for the decline of the Dunhill franchise system. However, as will be shown at the hearing, while it is true that some of Dunhill's competitors struggled somewhat in the wake of September 11, 2001, other companies rebounded extremely well and have grown in size as compared with Dunhill which never regained its footing and has essentially imploded.

## VIII.   Dunhill's Franchise Advisory Council.

Dunhill will likely argue that the Franchisees did not give Dunhill written notice of any alleged specific "breaches" of their franchise agreements. This technical argument should carry no weight as taking such action was unreasonable and impractical under the circumstances.

As the Franchisees know and as every Dunhill witness knows, the Dunhill franchise system had a Franchise Advisory Council ("FAC") whose purpose was to resolve whatever issues and concerns the Dunhill franchisees had with Dunhill's management. The FAC, through its executive committee, not only had "FAC only" teleconference meetings where a wide variety of Dunhill related issues were addressed internally, amongst the franchisees, but also had regular "FAC/DSS"

meetings (often by teleconference) where the FAC's executive committee met with representatives form Dunhill's management. For many years, the FAC's executive committee, at these meetings, would communicate in direct fashion, the concerns and complaints of the franchise base. Through these meetings, Dunhill was continuously made aware of these concerns and a dialogue was always open. (We note that the minutes of these meetings were produced after each meeting by the FAC committee and that these minutes were always approved by Dunhill for distribution to the entire FAC.) Typically, Dunhill would have some kind of response, or new initiative, which would purportedly address the situation. But in reality, by 2003, Dunhill was just making excuses for why it had not done the various things and made the necessary improvements that it said it would make. It became increasingly clear that Dunhill's management was "tuning out" the FAC and the relationship between Dunhill and the franchisees deteriorated dramatically. At this point, it was clear to the Franchisees, that staying in the Dunhill franchise system gave them no value and indeed, was leaving them in a position where they were not able to make a living.

When various franchisees, through an attorney, Robert Purvin, approached Dunhill in an effort to negotiate an "exit strategy" from the Dunhill franchise system, Dunhill indicated that it would not permit any franchisees to leave the system unless they paid Dunhill a substantial amount of money. In 2004, the Franchisees, through Mr. Purvin, gave Dunhill written notice that the Franchisees deemed their franchise agreements with Dunhill to be terminated for cause as of December 31, 2003.

## IX.    Remedies.

Based upon all of the foregoing, the Franchisees seek a determination from the Arbitrator that:

(i)    Each of the Franchisees were improperly induced, either through fraud or misrepresentations, to enter into their respective Dunhill franchise agreements such that each of them is entitled to rescind his respective franchise agreement(s); that

19

each of them is entitled to damages (see below); and that any restrictive covenant contained in any of the Franchisees' respective franchise agreements should be held unenforceable and of no force or effect;

(ii)    Dunhill has breached each of the Franchisees' respective franchise agreements and has failed to meet other obligations to them to such an extent that each of the Franchisees was justified in terminating his respective Dunhill franchise agreement(s); that each of them is entitled to damages (see below); and that any restrictive covenant contained in any of the Franchisees' respective franchise agreements should be held unenforceable and of no force or effect;

(iii)   Each of the Franchisees were justified in terminating their respective Dunhill franchise agreements and that none of them owe Dunhill any amount of money;

(iv)    Based upon the egregious conduct of Dunhill which "shocks the conscience" in connection with this matter, the Franchisees seek to recover punitive damages, attorneys' fees and costs and expenses which have been incurred by the Franchisees (or the Trust);.

## Damages Sought by Franchisees:

In order to simplify the presentation of the Franchisees' claimed damages, we are attaching a schedule of the Franchisees' damages (the "Schedule"). This Schedule has been produced to Jeff Wolf and is included in each of the Franchisees' exhibit binders [as Bates No. 000578 (Revised)].[4]

Based upon all of the facts and evidence that will be presented in this case, each of the Franchisees believe that they should be entitled to the amount of damages set forth in the attached Schedule.

---

[4] *Note: The reason that Basil Westover's additional capital investment is much larger than the other Franchisees is because he listened to Dunhill's suggestions that he hire consultants as employees to assist his office in the making of placements. Dunhill recommended the hiring of unproductive consultants and failed to adequately train them.

Dated: January 16, 2007

Respectfully submitted,

DUNHILL FRANCHISEES TRUST
On Behalf of:
Basil M. Westover
Harvey Auger
Michael Lamanna
Elias Zinn

By its attorneys,


  /S/
Richard L. Rosen
Leonard S. Salis
THE RICHARD L. ROSEN LAW FIRM, PLLC
110 East 59th Street, 23rd Floor
New York, NY 10022
(212) 644-6644

21